**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RAFAEL FOX, PAUL D'AURIA, and JILL
SHWINER,

                      Plaintiffs,

        vs.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

                    Defendant.

Case No.: 19-CV-4650

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Rafael Fox ("Mr. Fox"), Paul D'Auria ("Mr. D'Auria") and Jill Shwiner ("Ms. Shwiner") (collectively, "Plaintiffs"), by and through their undersigned counsel, Filosa Graff LLP, as and for their Complaint in this action against Defendant Starbucks Corporation d/b/a Starbucks Coffee Company ("Defendant," "Starbucks" or the "Company"), hereby allege as follows:

### PRELIMINARY STATEMENT

Starbucks is an internationally iconic brand, famous for generating billions of dollars through the sale of expensive cups of coffee to countless millions of Americans and tens of thousands of New Yorkers each day. Its ability to do so depends, in part, on a brand perception steeped in a high-stakes mythology. The Company's legions of loyal consumers don't merely spend $4.50 for a latte—they pay for a meticulously orchestrated consumer "experience" that depends on Starbucks's fictionalized self-portrayal as a "model" corporate citizen and employer.

This lawsuit pulls back the curtain on that fiction. Far from being a model employer, Starbucks has for years permitted the deployment of toxic chemicals in its stores, which infused not only the food products and fixtures, but also the very air circulated throughout its retail

locations in Manhattan. This Complaint sets forth direct, first-hand allegations and documentary proof of these practices by three former workers who, when they became aware that they were working in close proximity to this hazardous threat, refused to remain silent about Starbucks's reckless indifference to the health, safety, and well-being of its patrons and employees.

This systematic misconduct also cannot be construed as a mere oversight. Instead, Starbucks management personnel responsible for overseeing Manhattan-area stores have been provided with no fewer than a dozen different explicit written warnings from external experts in the past three years. These repeated written reports were also accompanied by an almost countless series of direct personal pleas and warnings relayed to responsible Starbucks officials, who were capable of stopping this callus betrayal of public trust, but nevertheless failed to take any meaningful corrective action.[1] As set forth below, it is also apparent that Starbucks management personnel located in (at the very least) three different corporate "Regions" — which collectively encompass hundreds of stores in the NYC-Area alone — systematically and unlawfully hid these toxic products in their stores for the past several years.

Given the lengths Starbucks has undertaken to create and perpetuate its image, it is perhaps unsurprising that Plaintiff Rafael Fox was terminated not only after issuing complaints about Starbucks's use of toxic chemicals throughout its stores, but also after he investigated, documented, and attempted to remedy systematic wage theft (often in multi-hour blocks) from the hourly wages of many of its most vulnerable employees.

Plaintiffs now seek to hold Starbucks accountable for its misconduct against its patrons, employees and workers, as further described below.

---

[1] In a particularly ironic development in light of this background, the "benevolent" overseer of Starbucks — who reaped billions of dollars in personal wealth while these practices thrived under his stewardship — has now publicly and repeatedly urged that his "success qualifies him to serve as President of the United States.

## NATURE OF THE CLAIMS

1.      Plaintiffs seek declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's negligence and gross negligence in exposing Plaintiffs to hazardous chemical poisons that Defendant wrongfully concealed in their worksites at Starbucks retail locations throughout the Borough of Manhattan, New York. Plaintiff Rafael Fox also seeks to recover for Defendant's unlawful, retaliatory employment practices against him in violation of New York Labor Law ("NYLL") Section 215, and Fair Labor Standards Act ("FLSA") Section 15(a)(3).

## JURISDICTION AND VENUE

2.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiffs — residents of the State of New York (Mr. Fox), the Commonwealth of Pennsylvania (Mr. D'Auria) and the State of Nebraska (Ms. Shwiner) — and Defendant, a corporation with its headquarters in the State of Washington, and this action involves a matter in controversy that exceeds the sum of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Starbucks Corporation is a corporation doing business in the State of New York and is subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

4.      Plaintiff Rafael Fox, a former employee of Starbucks, resides in New York County, New York. At all relevant times, Mr. Fox worked in New York City and met the

definition of an "employee" under all applicable statutes throughout his employment with Defendant.

5.      Plaintiff Paul D'Auria served as an outside pest control technician assigned to service Starbucks Manhattan store locations, including from in or around calendar years 1999 through 2003, as well as from 2005 through November 2009 and, most recently, from March 2013 through June 2018. Plaintiff D'Auria currently resides in Pike County, Pennsylvania.

6.      Plaintiff Jill Shwiner served as an Operations Director for the outside pest control entity that Starbucks retained to provide expert pest control services for Manhattan store locations during the same timeframes. Plaintiff Shwiner currently resides in Douglas County, Nebraska.

7.      Defendant Starbucks Corporation d/b/a Starbucks Coffee Company is a foreign business corporation organized and existing under the laws of the State of Washington with a principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks owns and operates a global chain of coffee shops comprising over 20,000 stores in over 70 countries. At all times relevant herein, Starbucks was Mr. Fox's "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.      **Plaintiffs' Professional Relationships with Starbucks in Manhattan**

A.      **Plaintiff Rafael Fox**

8.      Mr. Fox served with distinction as a Starbucks employee and Store Manager at multiple locations in Manhattan for sixteen years — until Starbucks abruptly terminated his employment in February 2018, as further set forth below.

9.     Mr. Fox earned a reputation for professional excellence over the course of his lengthy tenure with Starbucks, which included serving as a Store Manager at three different locations during the ten years prior to his sudden termination.

10.     His dedication to Starbucks, his co-workers and customers alike resulted in Mr. Fox's receipt of multiple awards for his performance as a Store Manager, including in the final years of his tenure.

11.     For example, while serving as Manager of the Starbucks located at 405 Broadway in Manhattan in 2016, Mr. Fox was lauded as *Starbucks Manager of the Quarter* for his Region, comprised of approximately 102 New York City-area stores.

12.     In October 2017, Mr. Fox was presented with an award for achieving the highest customer survey ratings for Store Operations and Customer Connection of any of the stores in his District, comprised of approximately 11 stores.

13.     That same month, Mr. Fox was also recognized with an award for achieving the highest score of any store in his District on a stringent, unannounced health inspection by "Ecosure," an outside vendor contracted to conduct food safety and cleanliness audits.

14.     On October 10, 2017, Mr. Fox was re-assigned to become Store Manager of the Starbucks location at 180 West Broadway, where he replaced a Store Manager who had been fired the day before.

15.     As further set forth below, Starbucks abruptly terminated Mr. Fox's employment approximately four months later in response to his complaints concerning the misuse of a toxic airborne insecticide in a neighboring Starbucks store, as well as for reporting and attempting to correct the Company's knowing underpayment of wages owed to dozens of current and former

Starbucks employees — including many of whom who had worked at the West Broadway store prior to his re-assignment as Store Manager of that location.

**B.**     **Plaintiff Paul D'Auria**

16.     Mr. D'Auria worked as a licensed, certified Pest Control Technician in New York City for more than 21 years until his retirement from the industry in June 2018, as further set forth below.

17.     Throughout his career, Mr. D'Auria excelled at his work and earned a reputation for his dedication, integrity and diligence.

18.     Having contracted lymphoma associated with exposure to airborne toxins in the aftermath of the September 11 World Trade Center attack, Mr. D'Auria is also keenly aware of the risks of exposure to toxic, carcinogenic chemicals, reinforcing his already scrupulous care when handling pesticides or applying them in client facilities.

19.     From October 2000 through November 2009, Mr. D'Auria was employed as a pest management technician with AVP Termite & Pest Control of New York, Inc. ("AVP"), a pest management control services provider based in New York City.

20.     During much of that period, Starbucks contracted with AVP to provide pest management services to certain stores located in Manhattan. AVP, in turn, assigned Mr. D'Auria as the Pest Control Technician primarily responsible for servicing the Starbucks account.

21.     After leaving AVP in 2009 to work for another entity, Mr. D'Auria resumed his employment with AVP in March 2013.

22.     At that time, Starbucks contracted with AVP to provide pest management services, but the scope of AVP's work had expanded to the majority of Starbucks store locations in Manhattan.

23.     Upon his return in March 2013, AVP again designated Mr. D'Auria as the Pest Control Technician primarily responsible for servicing the Starbucks account. In light of the increased number of stores, AVP assigned Mr. D'Auria to service more than 100 different Starbucks locations in Manhattan as his exclusive, full-time account.

24.     Mr. D'Auria provided routine, regularly scheduled services at each of the Starbucks stores located in Manhattan, and responded, on an urgent basis, to particular stores in the event of any emergent pest control challenges.

25.     To enable him to perform his work overnight, Starbucks provided Mr. D'Auria with keys and security codes to access each store in Manhattan.

**C.     Plaintiff Jill Shwiner**

26.     Ms. Shwiner served as a Director of Operations for AVP from in or around 1990 through late 2018.

27.     In that capacity, Ms. Shwiner was responsible for an array of administrative duties, including, among other things, scheduling and staffing assignments for AVP's technicians, including Mr. D'Auria.

28.     Ms. Shwiner also provided periodic training to Starbucks management personnel in Manhattan regarding Integrated Pest Management ("IPM") best practices.

29.     She also accompanied District Managers on walk-throughs of many Starbucks stores in Manhattan, during which she would identify maintenance and other IPM deficiencies and recommend appropriate corrective action.

30.     Ms. Shwiner also personally responded to address emergent pest control matters in particular Starbucks stores if Mr. D'Auria was unavailable to respond directly.

**II.     Starbucks Willfully and Secretly Exposes Plaintiffs (and All Employees, Patrons and Visitors) to Hazardous Pesticides Hidden Throughout its Manhattan Stores**

    **A.     Background**

31.     A primary factor contributing to pest infestations in food establishments such as Starbucks is the failure to maintain adequate sanitary conditions.

32.     With respect to Starbucks locations in Manhattan in particular, these failures include, by way of examples only, the failure to thoroughly clean food residue, stagnant water, and other filth that can spread throughout such facilities in the ordinary course of their operations — as well as the general rot and disrepair afflicting areas within each store that customers cannot see directly, including, for example, under and within the main coffee bar counters.

33.     As such, professional pest management technicians and public agencies urge proprietors to ensure thorough cleanliness and proper construction and maintenance of their facilities as the first and most critical steps in preventing and eliminating pest infestations.

34.     As set forth below, however, Starbucks stores located throughout Manhattan — from Battery Park to upper Manhattan — continuously failed to take necessary or adequate measures to ensure their cleanliness and instead recklessly hid hazardous pesticides throughout their stores, including in close proximity to food and food preparation areas.

35.     Moreover, this dangerous misconduct occurred systematically and with the apparent knowledge and approval of Starbucks Corporate Leadership — despite repeated warnings that such conduct was dangerous and unlawful.

**B.     Starbucks's Pervasive Misuse of Hot Shot Brand "No-Pest" DDVP Strips
        Despite the Resulting Health Hazard to Employees and Customers**

36.     Spectrum Brands Holdings ("Spectrum") produces a line of powerful insecticide

units encased in small, perforated plastic boxes and marketed as "Hot Shot No-Pest 2" strips

("No-Pest Strips"), which are commercially available in many home and garden stores or online.

37.     As described on its retail labeling:

> Hot Shot No-Pest Strip utilizes controlled release technology to
> slowly diffuse a deep-penetrating vapor in enclosed spaces for up
> to 4 months. The clean, odorless vapor is evenly distributed
> throughout the enclosed treatment area, killing visible and hidden
> insects on contact and preventing new insect infestations while
> you're away.

38.     In particular, each No-Pest Strip diffuses a continuous "deep penetrating vapor"

emanating from a 65-gram strip of a toxin called Dichlorvos (2,2-dichlorovinyl dimethyl

phosphate or "DDVP"), which kills insects within an approximately 1,200 cubic foot radius for

four months.

39.     Significantly, however, DDVP is hazardous to humans, and the No-Pest Strip

labeling is clear that the strips must ***not*** be used in occupied areas or in the vicinity of food or

food preparation areas.

40.     Among other warnings, the Hot Shot No-Pest Strip labeling provides as follows:

- **"[I]t is a violation of Federal law to use this product in a manner
  inconsistent with its labeling"**

- **"Do not use in the food/feed areas or food/feed processing or food/feed
  manufacturing or food/feed establishments"**

- **"FOR USE IN UNOCCUPIED AREAS"**

41.     The warnings also specifically state:

- **"Do not use in kitchens, restaurants or areas where food is prepared or served. Do not use in homes except for garages, attics, crawl spaces, and sheds occupied by people for less than 4 hours per day."**[2]

42.     The Center for Disease Control ("CDC") and the National Institute for Occupational Safety and Health ("NIOSH") jointly maintain a website, which warns consumers that the known health hazards of DDVP also include, *inter alia*:[3]

- **"Pupillary constriction, muscle cramp, excessive salivation. Sweating. Nausea. Dizziness. Labored breathing. Convulsions. Unconsciousness"**

- **Upon skin contact "MAY BE ABSORBED! Redness. Pain."**

- **"STRICT HYGIENE! AVOID EXPOSURE OF (PREGNANT) WOMEN! AVOID EXPOSURE OF ADOLESCENTS AND CHILDREN!"**

- **"IN ALL CASES CONSULT A DOCTOR!"**

- **"The effects may be delayed. Medical observation is indicated."**

43.     Lest there be any doubt about the potential seriousness and genuine risk that accompanies exposure to DDVP, one such warning states that even short-term exposure,

> **"may cause effects on the central nervous system. Cholinesterase inhibitor. Exposure above the OEL (Occupational Exposure Limit) <u>may result in death</u>."**

(emphasis added).

---

[2]     *See* No-Pest Strip 2, Precautionary Statements, *available at* http://www.hotshot.com/products/general-insect-control/no-pest-strip.aspx

[3]     https://www.atsdr.cdc.gov/ToxProfiles/tp88-c1-b.pdf (last visited May 20, 2019); *see also* http://pmep.cce.cornell.edu/profiles/extoxnet/carbaryl-dicrotophos/dichlorvos-ext.html

44.    Starbucks has also, itself, explicitly acknowledged that DDVP is classified as "Highly Hazardous" by the World Health Organization, and Starbucks purports to have a "Zero Tolerance" policy to prevent the misuse of DDVP by its vendors and ingredient suppliers so as "to ensure that Starbucks sources sustainably grown and processed coffee."[4]

45.    As described below, despite the harmful toxicity of the DDVP contained in No-Pest Strips, Starbucks personnel continued to knowingly permit these No-Pest Strips to permeate Starbucks stores throughout Manhattan, even after being put on written notice on numerous occasions that this was a dangerous practice. As such, due to Starbucks's conduct, Mr. Fox, Mr. D'Auria and Ms. Shwiner were repeatedly – for years – exposed to DDVP.

46.    Indeed, while serving as the professional pest management control technician assigned to Starbucks Stores in Manhattan, New York — Mr. D'Auria discovered that Starbucks management personnel routinely placed numerous sets of DDVP No-Pest Strips within virtually each of the more than 100 stores that he serviced from at least early in 2015 through June 2018, and in multiple locations in each such store.

47.    Mr. D'Auria routinely photographed many of the No-Pest Strips that he discovered for purposes of documenting and reporting the dangerous misuse of this product which posed an obvious threat to his own health and safety (as he worked in close and unsafe proximity to these DDVP strips) and the health and safety of Starbucks patrons and employees alike (who are also all commonly in close and unsafe proximity to these DDVP strips).

---

[4]    *See C.A.F.E. Practices Verifier and Inspector Operations Manual v5.3*, Starbucks Coffee Company, Oct. 2017, at 68.

48.     By way of examples only, true and correct copies of several such photographs —

labeled by location and date — are annexed hereto as Appendix A.[5]

49.     Among other things, the photographs reproduced in Appendix A document the

presence of numerous DDVP strips methodically placed out of sight in and around the main

customer areas of numerous stores, including, by way of examples only: (i) piled on or around

air vents; (ii) affixed behind the coffee bar; (iii) piled in heaps along high shelves and ledges; (iv)

under and along countertops; (v) in and next to pastry cabinets; (vi) in employee break areas; and

(vii) in out-of-sight areas of near-permanent filth and disrepair. In each such location, the DDVP

strips are hidden mere feet from unsuspecting customers and/or employees.

50.     Mr. D'Auria regularly emailed such documentation to Starbucks management

and/or relayed the same to Ms. Shwiner (in her capacity as an AVP Director of Operations) for

her to address with senior Starbucks management directly.

51.     Ms. Shwiner repeatedly warned Starbucks management personnel responsible for

overseeing Manhattan-area stores that the No-Pest Strips must not be used in Starbucks stores

because they pose a severe health hazard. She delivered such warnings both in writing and in-

person, including numerous instances when she discovered No-Pest Strips while personally on-

site at various Starbucks stores in Manhattan.

52.     The repeated warnings that Ms. Shwiner and Mr. D'Auria relayed to Starbucks

management personnel also regularly emphasized that the root cause of the presence of fruit flies

and other pests were dirty, unsanitary conditions in affected stores, which were frequently left to

fester.

---

[5]     The photographs — and descriptive captions — as set forth in Appendix A are expressly
incorporated herein as substantive allegations of this Complaint.

53.     One of AVP's many warnings to Starbucks District Managers was sent by email on July 5, 2017. District Management thereafter forwarded AVP's email to Mr. Fox and other Manhattan area managers on July 5, 2017, with the forwarding subject line "No-Pest Strips."

54.     The email included a link to a news article headlined "CDC WARNING ON MISUSE OF PEST STRIPS,"[6] which describes the extreme hazard of using DDVP in the vicinity of humans. Among other things, the article emphasized that:

> "**[M]isuse can result in ending up on your back twitching like a dying roach**."

(emphasis added).

55.     It also attached a copy of the packaging label that warned of these dangers.

56.     However, Starbucks management personnel nevertheless continued to acquire and place new No-Pest Strips in stores throughout Manhattan. As such, AVP issued additional email warnings of the dangerous hazard that the misuse of DDVP invisibly inflicted upon the health of Starbucks customers and employees.

57.     Ms. Shwiner and/or Mr. D'Auria delivered such written warnings to Starbucks Regional and/or District Managers, *inter alia*, on or around: May 29, 2016; July 18, 2016; August 1, 2016; August 10, 2016; October 25, 2016; March 1, 2017; June 28, 2017; July 5, 2017; September 11, 2017; September 26, 2017; October 15, 2017; October 17, 2017; January 16, 2018; March 17, 2018; and April 18, 2018. These warnings included, but were not limited to the following:

- "**[N]o pest strips were bought by Starbucks and placed on top of cabinets and should be removed**."

---

[6]     https://www.wired.com/2014/01/cdc-warning-misuse-pest-strips/

- "We keep finding new Dichlorvos strips…. My tech or myself are down under cabinets working and work over and find <u>we've been working next to the strips breathing in the chemical not to mention the fact that they aren't allowed in food establishments</u>."

- "Recently there has been an <u>increasing amount of stores we find them in. The product label clearly states it's a violation to use this product in food establishment[s]</u>."

- Warning that DDVP strips are "<u>not lab[e]led for use in food establishments</u>" but have been repeatedly "<u>found in FOH under counters hanging from pipes or on floor, on top of high cabinets near vents, one was recently found inside a pastry[]case</u>."

- "<u>[S]tores continue to use multiple no pest strips, CB80, bombs etc.</u>"

- "<u>These are against the law to have in food establishments. The active pesticide in strip, Dichlorvos, is toxic</u>. I am attaching a copy of the label of product."

- "[U]nder the pastry case at motor was a brand new pe[st] strip with DDVP which should never be used in food establishments. <u>The motor fan was probably circulating vapors throughout the store</u>."

- Referencing, among other things: "<u>the improper use of this product and the liability that it creates</u>" as a result of the hazard to employees and others subject to exposure in Starbucks stores.

- Emphasizing, among other things, that additional No-Pest Strips were discovered on consecutive days in multiple stores and urging Starbucks's Regional Quality Assurance Manager to reiterate to Store Managers that "<u>these are illegal to use[,] let alone toxic</u>."

- Warning of the ongoing presence of hazardous DDVP strips hidden, by way of example, "<u>in a flylight</u>" and "<u>under counter cabinets</u>."

- "<u>This is a serious hazard for those touching it and as well as those in the area. The use of these strips has increased. This is [a] serious environmental issue. Dichlorvos is an organophospate which affects the cholinesterase levels</u>

14

**in the brain and it interferes with proper working of the nervous system in insects as well as humans."**

- **"[P]est strip was hidden under the bagels."**

- **"DDVP strip was found in the pastry case."**
- **Urgently warning of hazardous pesticides "literally dripping down off ceiling and onto the uncovered bar/equipment below."**

(emphasis added).

58. Despite this litany of repeated warnings over a period of *__years__*, Starbucks's Regional Quality Assurance Manager admitted to Ms. Shwiner in October 2017 that Starbucks personnel had failed to internalize "***the importance of breaking this habit***" and instead continued to misuse DDVP in Manhattan-area stores with impunity.

59. Upon information and belief, Starbucks has *never* undertaken any meaningful corrective or disciplinary action in connection with the known, systemic misuse of DDVP by its management personnel responsible for overseeing Manhattan-area stores.

60. During this period — in the course of assisting in the closure of a Starbucks located at 471 Broadway — Mr. Fox, himself, discovered several Hot Shot-brand DDVP No-Pest Strips that had been hidden throughout the store.

61. Mr. Fox immediately reported this finding to his then-District Manager, who responded by assuring Mr. Fox that he would purportedly investigate to confirm that the No-Pest Strips had not been placed in recent years.

62. In fact, although unknown to Mr. Fox, Starbucks was at that time actively continuing to hide such toxic strips in stores throughout Manhattan, despite the increasingly urgent and categorical warnings of the severe risks to health and safety being relayed in-person and in writing by Ms. Shwiner and Mr. D'Auria.

63.    In January 2018 — approximately three months after being re-assigned to serve as Store Manager of the Starbucks located at 180 West Broadway — Mr. Fox saw a former co-worker of his who continued to work at Mr. Fox's prior Starbucks location at 405 Broadway.

64.    The co-worker informed Mr. Fox that his successor as Store Manager at that location had placed No-Pest Strips throughout the store — including near and within the pastry display (emitting toxic poisons into baked goods) and alongside the espresso machine (emitting toxic poisons into customers' beverages) as well.

65.    Fearful of the known hazard to which Starbucks employees and patrons were being unwittingly exposed, Mr. Fox reported this information to the Company's Senior Human Resource Compliance Specialist, Tina McDonald, on January 31, 2018.

66.    To Mr. Fox's profound dismay, however, McDonald responded dismissively, asserting that No-Pest Strips are "very common" and that there was no need to "overreact," nor, evidently, to take any action whatsoever to remove toxic poison contaminating food and beverages and permeating the air of Starbucks stores full of employees and customers.

67.    On February 7, 2018, Mr. Fox asked another former co-worker if the No-Pest Strips had been removed from the 405 Broadway Starbucks location. The co-worker informed him that they were still in place, hidden around all the food preparation areas of the store.

68.    Mr. Fox asked the former co-worker to take photographs so that he could escalate an urgent complaint to higher management in the interest of protecting the health and safety of Starbucks employees and customers.

69.    But before Mr. Fox could even obtain that photographic documentation, Starbucks intervened on the following day, February 8, 2018, by abruptly terminating Mr. Fox's 16-year employment as an award-winning and exemplary store manager.

70.     Given the temporal proximity of Mr. Fox's complaints to Starbucks's compliance representative about the misuse of No-Pest Strips at his former store — and his evidently unsatisfied response at the Compliance official's indifference to the resulting danger to health and safety of employees — it is apparent that Starbucks chose the expedient, albeit shortsighted, route of resolving Mr. Fox's complaints by firing him.

71.     This conclusion is underscored by the fact that Starbucks New York Metro Senior Management demonstrated an unwillingness to stop exposing customers and employees to that same health hazard in stores throughout Manhattan — despite receiving repeated, explicit written warnings about No-Pest Strips and other hazardously misused pesticides from Mr. D'Auria and Ms. Shwiner on numerous occasions throughout calendar years 2015, 2016, 2017, and 2018.[7]

72.     Thus, rather than addressing the root cause of fruit fly and other insect infestations in its stores — namely, the existence of festering and uncleaned filth — Starbucks instead sought to achieve the same result by systematically exposing its unsuspecting customers and employees to the known health hazards of DDVP exposure.

73.     Presumably, Starbucks personnel made the calculated decision that it was more cost-effective to use DDVP strips (and therefore expose everyone in its stores to lethal chemicals) rather than cure the underlying problem with appropriate policies and practices.

---

[7]     Starbucks's systematic disregard for the health and safety of Plaintiffs and its own employees and customers is rendered all the more willfully reckless and inexplicable in light of the Company's acknowledgment in its November 2018 10-k financial report to the United States Securities and Exchange Commission, which states, in part:

> Any report linking us to the use of unclean water, food or beverage-borne illnesses, tampering, adulteration, contamination, mislabeling or other food or beverage-safety issues could damage our brand value and severely hurt sales of our food and beverage products and possibly lead to product liability claims, litigation (including class actions) or damages.

74.     Similarly, when confronted by Mr. Fox's evident unwillingness to remain silent in the face of such callous disregard for the health of Starbucks patrons and employees, Starbucks terminated his employment so as to continue its systematic exposure of customers and employees throughout Manhattan to DDVP poison with impunity.

**C.     Starbucks Recklessly Exposes Plaintiffs to Additional Hazardous Pesticides Concealed Within Manhattan Stores**

75.     Although No-Pest Strips were by far the most prevalent of the hazardous pesticides that Mr. D'Auria and Ms. Shwiner discovered they were being exposed to while servicing Starbucks locations in Manhattan, they each occasionally discovered a variety of other toxic pesticides hazardously hidden about their scheduled work locations.

76.     By way of example only, on the night of September 14, 2016, upon entering a Starbucks location on West 23rd Street in lower Manhattan, Mr. D'Auria was unexpectedly engulfed by toxic pesticides spewing forth from two "bug bombs" that store personnel had placed in the front of the store lobby — without any warning or notice to Mr. D'Auria — only moments before he arrived to perform scheduled work at that location.

77.     By way of further example only, on September 11, 2017, Mr. D'Auria was similarly shocked to be confronted by three Hot Shot brand pesticide fogger bombs actively spraying toxic insecticide into his face upon entering the Starbucks located at the intersection of 36th Street and 6th Avenue in Manhattan.

78.     By way of further example only, Ms. Shwiner, while investigating a pest concern at the Starbucks located at 250 W 57th Street, discovered that she had been crawling through a highly toxic rodenticide powder that had been careless scattered underneath the main counter areas of the store.

79.     By way of further example only, on the night of April 18, 2018 — while performing scheduled services at the Starbucks located at the intersection of Broadway and 60th Street in Manhattan — Mr. D'Auria was shocked and alarmed upon feeling an unknown liquid dripping down on him from the ceiling above the bar area of the store.

80.     Upon further inspection, Mr. D'Auria discovered that Starbucks personnel had placed a dangerous quantity of toxic D Force brand insecticide — which is not designed for use in occupied areas or in the vicinity of food or food preparation areas — that was streaming forth from the ceiling down into the bar area of the store and onto his skin and the exposed food preparation areas of the store.

81.     Published guidelines for the safe use of this type of insecticide make clear that inhalation or skin contact pose immediate, known risks that require immediate response to mitigate, even if only in part.

82.     Upon information and belief, the Starbucks personnel who placed DDVP and other pesticides in Manhattan stores as described above were *not* duly licensed or certified to do so in accordance with New York State law, and their conduct was thus grossly reckless, negligent, and contrary to law.

83.     As a lymphoma survivor, Mr. D'Auria suffered from ever-escalating fear, stress and anxiety as a result of being repeatedly and involuntarily exposed to toxic, carcinogenic pesticides that Starbucks personnel hid about his scheduled work locations without notice or warning.

84.     In the face of years of explicit, repeated warnings about the known and substantial risk to the health and safety of unsuspecting patrons, Mr. D'Auria also despaired of his ability to

restrain Starbucks's systematic misuse of such toxic chemicals at Starbucks locations throughout Manhattan.

85.     Mr. D'Auria's concerns were ultimately confirmed when Starbucks proceeded to terminate its contract with AVP — thereby silencing his repeated reports and complaints about the foregoing risks to health and safety — in June 2018.

86.     The timing of Starbucks's decision to terminate AVP's services came as a particular surprise, as Starbucks had recognized AVP as its "Vendor of the Year" only a few months prior, in February 2018.

III.    **Starbucks Prohibits Mr. Fox From Correcting the Underpayment of Earned Wages to Numerous Store Employees**

87.     During the first weeks following his October 2017 re-assignment to serve as Store Manager at the Starbucks located at 180 West Broadway — and in a reflection of the diligence that was a hallmark of his sixteen years of service — Mr. Fox sought to learn more about the schedules and attendance records of the employees who were newly under his management at the West Broadway location.

88.     He did so by conducting an independent audit of the Global Labor System ("GLS") time keeping records for his new store.

89.     Mr. Fox almost immediately discovered that several employees had performed hours of work without pay in the weeks prior to his assignment to that location.

90.     Mr. Fox approached one such employee to ask if he had been aware that he was working hours without being paid.

91.     Mr. Fox was dismayed when the employee responded that he had been afraid that the prior manager would fire him if he had challenged the apparent non-payment of portions of his wages.

92.     He assured the employee that he had nothing to fear and, with the employee standing beside him, Mr. Fox entered retroactive pay into the system to account for the hours of work for which the employee had never been paid.

93.     During a meeting with his District Manager the following week, Mr. Fox informed him of the issues he had discovered concerning the non-payment of wages for hours worked by numerous employees.

94.     Mr. Fox's District Manager thereafter directed him to gather further information – presumably for purposes of identifying all underpayments of wages at issue preliminary to correcting the same.

95.     As requested, Mr. Fox gathered additional information, and, on November 3, 2017, he sent an email to his District Manager with the subject line "*Time clock manipulation at West Broadway and Leonard.*"

96.     Mr. Fox's email included images of manipulated time cards, and an explanation of the mechanics of the scheme to deprive employees of their earned wages.

97.     The District Manager responded by email, thanking Mr. Fox for the information, and commending him that "*it's even more clear to me now that you are the right guy for this job.*"

98.     Encouraged by the positive feedback, and eager to do what he could to attempt to ensure that every employee working at his new location had been paid for all hours of work at that location, Mr. Fox undertook a more systematic audit of the GLS records.

99.     Mr. Fox reviewed time card and pay records for every employee who worked at that location for any length of time over the course of the prior three years.

100.     After reviewing these records for a limited sample of approximately 130 such current and former Starbucks employees, Mr. Fox identified at least 29 who had worked hours on the clock during the preceding three-year period without being paid. Those employees were spread across the West Broadway location, as well as eight other stores in the area.

101.     When Mr. Fox presented this information to the newly appointed District Manager for his district, however, the District Manager's demeanor shifted and he expressed skepticism at the apparent proof, dismissively suggested that it was a computer glitch, promised to investigate further — and prohibited Mr. Fox from inputting retro pay for any of the 29 employees pending further instructions from his Regional Director.

102.     Shortly thereafter, on February 8, 2018, Starbucks abruptly terminated Mr. Fox's employment — without ever providing payment to the 29 employees who performed hours of work without pay at the nine locations for which Mr. Fox conducted an audit.

103.     Given the temporal proximity to his complaints about unpaid wages owed to dozens of employees — together with Starbucks's demonstrated unwillingness to remedy the unlawful withholding of such wages — it is apparent that Starbucks chose the expedient, albeit shortsighted and unlawful, route of resolving Mr. Fox's complaints by firing him.

### FIRST CAUSE OF ACTION
**(Negligent Infliction of Emotional Harm)**
***On Behalf of all Plaintiffs***

104.     Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

105.     The conduct of Defendant, as described above, was negligent and grossly negligent. Defendant's negligence consisted of, among other things:

a.   recklessly, carelessly and negligently failing to provide a safe and suitable place for Plaintiffs to perform their work and duties and failing to take suitable and proper precautions to ensure the safety of Plaintiffs in their work;

b.   recklessly, carelessly and negligently failing to properly advise Plaintiffs as to the hazardous and dangerous character of the undertaking in which they were engaged — due to the danger posed by hidden improperly placed and applied pesticides — of which danger and hazard the Plaintiffs then and there were wholly ignorant and unaware;

c.   recklessly, carelessly and negligently and with knowledge of the hazards, directing Plaintiffs to expose themselves to such hazards without taking adequate or, in fact, any, precautions to safeguard Plaintiffs or remove or allay dangers and hazards to be encountered; and

d.   recklessly, carelessly and negligently failing to provide, promulgate and/or make known to their supervisors, foremen, agents, employees and servants suitable and proper rules and regulations for their government, control and instruction in working, operating and managing the use of hazardous pesticides in their workplaces.

106.   As a direct and proximate result of Defendant's foregoing negligence and gross negligence, Plaintiffs have been caused to suffer physical harm as well as extreme personal and emotional hardship, worry, fright and fear for which they are entitled to an award of monetary damages and other relief.

107.   Defendant's conduct entitles Plaintiffs to an award of punitive damages under any and all applicable legal standards in the greatest amount possible as:

a. Defendant's conduct demonstrates a conscious disregard – or at the very least a grossly negligent, wanton and/or reckless disregard – of Plaintiffs' rights;

b. Defendant's conduct implies a criminal-like indifference to its civil obligations and constitutes a quasi-criminal level of wrongdoing;

c. Defendant has engaged in egregious, morally culpable conduct directed not only at Plaintiffs but at the general public;

d. Defendant must be specifically deterred from engaging in the alleged unlawful conduct and/or similar conduct in the future; and

e. Other persons and businesses must be generally deterred from engaging in the alleged unlawful conduct and/or similar conduct in the future.

<u>**SECOND CAUSE OF ACTION**</u>
**(Retaliation in Violation of NYLL § 215: Conduct Prohibited by NYLL § 200)**
***On Behalf of Plaintiff Fox***

108.   Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

109.   Defendant has violated the NYLL by subjecting Plaintiff Fox to unlawful retaliation and termination of employment for his protected complaints of and opposition to Defendant's violations of the NYLL § 200.

110.   Specifically, NYLL § 200 imposes a "general duty to protect health and safety of employees" and to provide "reasonable and adequate protection to the lives, health and safety of all persons employed in [Starbucks Manhattan store locations], or lawfully frequenting such places."

111.   Mr. Fox engaged in protected activity under the NYLL when he repeatedly raised concerns about Starbucks's deployment of hidden pesticides in such locations despite the known

risk to health and safety to which employees and others were thereby systematically and continuously exposed.

112.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

113.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

114.    Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff Fox's rights under the NYLL for which he is entitled to an award of punitive damages.

115.    Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the NYLL for which Plaintiff Fox is entitled to an award of liquidated damages in the maximum amount permitted by law.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of NYLL § 215: Unlawful Wage Practices)**
***On Behalf of Plaintiff Fox***

116.    Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

117.    Defendant has violated the NYLL by subjecting Plaintiff Fox to unlawful retaliation for his protected complaints of and opposition to Defendant's above-outlined improper payroll practices, including the non-payment of earned wages to numerous employees.

118.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

119.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

120.    Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the NYLL, for which Plaintiff Fox is entitled to an award of liquidated damages in the maximum amount permitted by law.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of FLSA § 15(a)(3))
### *On Behalf of Plaintiff Fox*

121.    Plaintiffs repeat and re-allege each and every allegation of the preceding paragraphs as if fully set forth herein.

122.    Defendant has violated the FLSA by subjecting Plaintiff Fox to unlawful retaliation for his protected complaints of and opposition to Defendant's above-outlined improper payroll practices, including the non-payment of earned wages to numerous employees.

123.   As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FLSA, Plaintiff Fox has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

124.   As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FLSA, Plaintiff Fox has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

125.   Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff Fox's rights under the FLSA for which he is entitled to an award of punitive damages.

126.   Defendant's unlawful retaliatory conduct was not in good faith and was undertaken without reasonable grounds for believing that such conduct was not in violation of the FLSA for which Plaintiff Fox is entitled to an award of liquidated damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B.   An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      An order directing Defendant to place Plaintiff Fox in the position he would have occupied but for Defendant's retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect his employment and personal life;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic harm;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory harm, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of liquidated damages to Mr. Fox under the NYLL;

J.      An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

K.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
       May 21, 2019                           Respectfully submitted,

                                              **FILOSA GRAFF LLP**

                                              By: _____
                                                  Ariel Y. Graff
                                                  Gregory N. Filosa

                                              111 John Street, Suite 2510
                                              New York, NY 10038
                                              Tel: (212) 203-3473
                                              Fax: (212) 256-1781
                                              agraff@filosagraff.com
                                              gfilosa@filosagraff.com

                                              *ATTORNEYS FOR PLAINTIFFS*