KA59FOXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RAFAEL FOX, ET AL.,

                    Plaintiffs,

          v.                          19 CV 4650 (AJN) (SN)
                                      Remote Telephone Conference

STARBUCKS CORPORATION,

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      October 5, 2020
                                      2:02 p.m.

Before:

                    HON. SARAH NETBURN,

                                          District Judge

                         APPEARANCES

FILOSA GRAFF
     Attorney for Plaintiffs
BY:  ARIEL YIGAL GRAFF

LITTLER MENDELSON
     Attorneys for Defendant
BY:  A. MICHAEL WEBER
     GARY MOY

KA59FOXC

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good afternoon, everybody.  This is Judge

3   Netburn.  Looks like we have everybody on the line including,

4   most importantly, the court reporter.

5          (Court reporter responds affirmatively)

6          THE COURT:  Good afternoon, madam court reporter.

7          OK, let's begin the case.  This is Fox et al. v.

8   Starbucks Corporation.  The docket numbering is 19 Civil 4650.

9          Can I ask counsel for the plaintiffs to state their

10  appearance, please.

11         MR. GRAFF:  Good afternoon, your Honor.  This is Ariel

12  Graff of Filosa Graff LLP appearing for the three plaintiffs.

13         THE COURT:  Thank you.  Good afternoon.

14         And on behalf of the defendant.

15         MR. WEBER:  Michael Weber and Gary Moy at Littler

16  Mendelson for the defendant.

17         MR. MOY:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon, everybody.  I hope

19  everybody on this call is healthy and safe.

20         In light of the COVID-19 pandemic we're conducting

21  this proceeding remotely by telephone.

22         A court reporter, as I indicated, is on the line.

23  Please keep that in mind.  And so I'll ask that everybody state

24  your name before you speak so that the court reporter can

25  properly attribute your statements.

KA59FOXC

1          And also please be mindful of when somebody else is

2   speaking to avoid speaking over anyone.

3          In addition, it's always best to keep your phone muted

4   if you're not going to be speaking.

5          I'll also note that this is an open and public call-in

6   number and so members of the public and the press can call in.

7   I can see who is on the call and it doesn't look like anybody

8   other than the people who stated their appearance as well as my

9   law clerk is on the call but it is a public line and you might

10  have somebody join on at any time.

11         So, we have a raft of letters to go through.  I'll

12  just note them for the record briefly.

13         There was a letter filed that began this on

14  September 23rd, ECF 62 by the plaintiff.  And that was

15  responded to by the defendants on October 1 at ECF 71.

16         In addition, I have a letter from the plaintiff filed

17  on September 23 at ECF 63.  And that was responded to by the

18  defendants on October 1 at ECF 72.

19         And then on Friday of this past week the plaintiffs

20  filed a third application and that's at ECF 74.

21         So there are a number of matters for our dispute

22  today.

23         I will remind everybody that discovery in this case,

24  fact discovery has closed and expert discovery is scheduled to

25  close on October 18 and that will certainly affect some of the

KA59FOXC

1    rulings for today's conference.

2          All right.  Why don't we begin with -- with where this

3    all began with the letter that plaintiffs filed with respect to

4    the subpoena served on Laura Mazur.  As I understand, it was

5    served on September 22, calling for her deposition on

6    September 29, the close of -- actually the day after the close

7    of fact discovery.

8          Let me just first begin by asking the defendants why

9    they waited until the eleventh hour to serve this subpoena.

10         MR. WEBER:  Your Honor, Michael Weber speaking.

11         We learned just recently after plaintiffs -- excuse

12   me, plaintiff Shwiner's deposition, that her mother owns the

13   AVP.  And our initial responses from AVP suggested that Jill

14   Shwiner had much of the information that we were seeking.  So

15   we expected at her deposition to gain knowledge of the very

16   information that we now seek from her mother, Ms. Mazur,

17   relevant to the case.  So that's the reason for the delay, your

18   Honor.

19         THE COURT:  All right.  You just learned that there

20   was an owner of the company.  I'm confused.

21         MR. WEBER:  We just learned that Ms. Laura Mazur is

22   the mother of Jill Shwiner.

23         THE COURT:  Well, what does her motherhood have to do

24   with the subpoena?

25         I thought you were subpoenaing her because she's the

1    owner of AVP.

2            MR. WEBER:  She is.  But in her discovery responses

3    demanded last year, she specifically stated that Jill Shwiner

4    would have knowledge of certain things that during her

5    deposition, i.e., Jill Shwiner said she did not have knowledge

6    of, she is not familiar with AVP policies and procedures which

7    are relevant to this case.

8            THE COURT:  I see.  So the plaintiff in their initial

9    disclosures indicated that plaintiff Jill Shwiner would have

10   information about the AVP policies and procedures but it wasn't

11   until Ms. Shwiner's deposition that that proved to be

12   incorrect?  Is that what you're saying?

13           MR. WEBER:  Exactly.

14           THE COURT:  And when was that deposition?

15           MR. WEBER:  That was taken the last month or so.  I

16   don't have the exact date in front of me.  Relatively recently.

17           MR. GRAFF:  September 11.

18           I'm sorry.  Ariel Graff for plaintiff's counsel.  I

19   didn't mean to interject.  I was just providing the date which

20   was September 11.

21           THE COURT:  OK.  So on September 11 you learned that

22   Jill Shwiner would not be able to provide the relevant

23   information so then eleven days later you served a subpoena on

24   the former owner.

25           MR. WEBER:  Correct.

1    THE COURT:  OK.  Let me ask Mr. Graff to respond to

2 some of the arguments that were raised in the defendant's

3 response.

4    MR. GRAFF:  Thank you, your Honor.

5    An initial concern with the subpoena was simply an

6 urgent manner that it was served without adequate notice and on

7 a date when we already had a deposition scheduled.

8    Defendant's opposition, apart from not really

9 explaining why they waited eleven days, I'm not even going to

10 get into whether they have known all along that Ms. Shwiner's

11 mother was a former part owner of the company.  But even

12 assuming that that was new to them, in their letter explaining

13 why they need this subpoena there's a conclusionary sentence,

14 at best, on the third page that just refers to policies or

15 procedures used by AVP Pest Control.

16    I've read the transcript very carefully.  I have no

17 idea what they could be referring to.  And they haven't

18 articulated it clearly in their letter or otherwise.  So from

19 our perspective this is untimely but also there doesn't seem to

20 be any grist or substance to it other than that -- I don't even

21 want to speculate.  I don't understand even at this point why

22 they would be seeking Ms. Shwiner's mother's deposition.

23    THE COURT:  I think everybody is best served by

24 ignoring the fact that Ms. Mazur is Ms. Shwiner's mother.

25 Excuse me.

1    I don't understand the defendants to be seeking Laura

2    Mazur's deposition because she is a, for instance, fact witness

3    of her daughter's emotional distress.  I understand that they

4    are seeking her deposition solely because the question of AVP's

5    policies and procedures regarding pest control and pest issues

6    is relevant to Ms. Shwiner's claim.

7        And I hear Mr. Weber saying that he was led to believe

8    from disclosures that Ms. Shwiner would be able to testify to

9    those policies and practices of AVP.  And when she was unable

10   to do so, they decided that they wanted to then go to the

11   former owner, and presumably was the owner during the relevant

12   time, to ask that person, who I would say coincidentally is the

13   mother rather than that being relevant to ask questions about

14   their practices.  That's my understanding of defendant's

15   position.

16       MR. MOY:  Your Honor, this is Gary Moy.  May I speak?

17       THE COURT:  Sure.

18       MR. MOY:  We had not drafted the deposition outline

19   for Ms. Mazur, but I wouldn't say that her knowledge isn't

20   something that we would have probed in terms of the deposition

21   should it occur.

22       I do believe that Jill's mother is relevant I think

23   for reasons I think I will try to explain with some context.

24   But, first, I just wanted to clarify some issues.  That would

25   be the subpoena was served I believe eleven days afterwards.

1   We provided notice to Mr. Graff on September 18 within a week

2   of Ms. Mazur's -- I mean of Ms. Shwiner's deposition that we

3   intended to depose Ms. Mazur.

4           And respectfully, your Honor, I would also note for

5   the Court's consideration that Ms. -- part of the reason we

6   needed an extension of discovery from September 15 until

7   September 30 is because Mr. Graff noted Mr. Fable's deposition

8   with only six days' notice.

9           So respectfully, your Honor, I believe that we have

10  exceeded the amount of notice and we could ask plaintiff to

11  extend that same courtesy with respect to allowing the

12  deposition to be extended so that we can depose Ms. Mazur.

13          Now, with respect to why we need Ms. Mazur and why the

14  relationship could be relevant.  For context, your Honor, we

15  originally subpoenaed AVP in October of 2019 for AVP's records

16  on services they provided to Starbucks and specifically how

17  many times the plaintiffs might have cited they encountered the

18  Hot Shots as well as their normal usage and encountered the Hot

19  Shots as test technicians as well as the company's policies and

20  procedures on how to handle Hot Shots.

21          Now, several weeks later on, in November 2019 AVP's

22  response, specifically from Ms. Mazur, indicated that AVP

23  mostly destroyed its records after the company was sold in

24  March 2019.  And I would note Ms. Mazur destroyed the records

25  in March 2019 even though by November of 2018 Ms. Shwiner had

1    already joined this lawsuit and by February of 2019 Ms. Mazur's

2    counsel had served a demand letter on Starbucks.

3         So, certainly, from our perspective, this relationship

4    could be probative in terms of what obligations Ms. Shwiner had

5    to preserve documents that we believe are relevant to the

6    issues in this case.  And it may be relevant because it was

7    just disclosed to us just this past month that Ms. Mazur is

8    Ms. Shwiner's mother.  And it's relevant from our perspective:

9    What, if any, input that Ms. Shwiner had with respect to

10   formulating Ms. Mazur's response to the subpoena.

11        Now, as part of Ms. Mazur's response to the subpoena,

12   she indicated that not only did most -- did she destroy much of

13   the records after learning that her daughter had joined a

14   lawsuit against Starbucks, implicating the documents that she

15   had in possession.  The subpoena response indicated that Jill

16   Shwiner would have knowledge about the documents related to

17   compliance and New York state and city standards and procedures

18   to handle pesticides and that Ms. Shwiner was responsible for

19   training and evaluation of test technicians.

20        So at the time we believed, based on AVP's response,

21   and not to mention Ms. Shwiner's title and that we have with

22   Ms. Shwiner, that she would have such information.  But,

23   instead, Ms. Shwiner at the deposition claimed that she was not

24   familiar with AVP policies and procedures, which we expect her

25   to testify, again, based on Ms. Mazur's own representation and

1    Ms. Shwiner's position as operations director.

2          Now, if Ms. Shwiner doesn't know these issues, which

3    we were caused to believe that she would have such knowledge,

4    then Ms. Mazur, as the owner of AVP, should know.  And we

5    believe that we should be allowed to take this limited

6    deposition.

7          Now, there was a discrepancy with Mr. D'Auria's

8    deposition testimony where during -- Paul D'Auria.  You know,

9    according to plaintiff, the pest control plaintiffs, they told

10   Starbucks that they were finding Hot Shots and they were

11   throwing them out.  But at their deposition testimony I think

12   Mr. D'Auria said that AVP instructed him not to touch or throw

13   out any Hot Shots.  So he did not.

14         So, again, we would like to get these documents.  And

15   we don't have these documents.  And I believe we should be able

16   to get the testimony from the owner of the company who has such

17   information.

18         Again, the discovery disclosure of Laura Mazur, as

19   Ms. Shwiner's mother, I believe it's relevant.

20         One, plaintiffs never identified Ms. Mazur as, in

21   their Rule 26 disclosure, even though evidently she would be

22   the only one with information about AVP's policies and

23   procedures and the products that they encountered.  But as I

24   mentioned, deposition testimony of Ms. Mazur is relevant with

25   respect to the original responses.  It's probative with respect

1    to the circumstances under which the documents we sought

2    from AVP were evidently destroyed should have been preserved

3    much earlier.

4         Now, either Ms. Shwiner should have preserved or

5    Ms. Mazur should have known to preserve such documents that

6    contained information relating to the issues central to this

7    case, for example, documents related to what products, pest

8    control products that the pest control plaintiffs encountered

9    which they claim now cause them emotional distress.

10        Now documents destroyed by a stranger is very

11   different than documents destroyed by someone who has a close

12   relationship with the plaintiff.  And I believe Ms. Mazur's

13   testimony may provide a basis for Starbucks to seek relief such

14   as an adverse inference for spoliation of evidence, depending,

15   again, on what information Ms. Mazur reveals at a deposition

16   should the court allow it to occur.

17        THE COURT:  All right.  Thank you.  Anything further

18   on this issue, Mr. Graff?

19        MR. GRAFF:  There was a lot -- in fact, it was a

20   little bit hard to follow.  Part of that might be the fact that

21   Mr. Moy and Mr. Weber who are on this call have not been a part

22   of any prior meet-and-confer discussions in the history of this

23   case.  I know Mr. Weber took the plaintiffs' depositions.

24   Mr. Moy defended certain depositions but that they have not

25   otherwise been part of any of the document discovery.  And

1    Mr. Moy's relatively new in the history of the case.

2              I would say, first of all, as to the subpoena to AVP,

3    October 2019, I don't think anybody alleged that records were

4    destroyed.  Instead, what I understand was related to counsel

5    for defendant at the time is that the company was out of

6    business and that its archives had been moved to a certain

7    cellar in Staten Island and that defendants, they were given

8    free access.  There are records there in the basement.

9    Defendant took a sample, decided that they were dirty or

10   unsalvageable, and didn't pursue that further for more than a

11   year.  So there was certainly no indication that anybody

12   destroyed records or made anything inaccessible.

13             I also don't agree with the characterization of

14   Ms. Shwiner as being unable to testify to anything.  But those

15   are also arguments that weren't really fleshed out in their

16   letter and I don't want to waste time on the call just being

17   speculative except to say it's very hard for me as the only

18   one, only participant on this call who was at the relevant

19   depositions, I don't see what they could possibly be talking

20   about and they didn't put it in their letter.

21             THE COURT:  OK.

22             MR. MOY:  Mr. Graff is certainly correct that in part

23   some of the documents that Ms. Mazur kept were somehow

24   destroyed by mold, I believe.  But she also stated in her

25   subpoena response, "I disposed of the majority of the AVP file,

1    documents, computers, equipment," and that she did so after the

2    company was sold and effectively shutdown in March 2019, after

3    she had knowledge that her daughter had joined a lawsuit

4    against Starbucks.

5         And with respect to participation in discovery.  One,

6    Mr. Weber, of course, has been actively involved.  And

7    notwithstanding my recent filing of a notice of appearance, I

8    defended all but one deposition.  And I have been in part

9    not -- along with Ms. Goldstein, involved in paper discovery.

10   So I don't believe that I'm speaking from a vacuum here.  I

11   certainly am in a position to talk about what information that

12   we had and what information that we need.  And, of course,

13   Ms. Goldstein, after her meet and conferred with Mr. Graff,

14   because obviously we do not want to bill our client for five

15   people on a call on a meet-and-confer, relayed information to

16   us from such conferences.

17        THE COURT:  OK.  Thank you.

18        I'm going to authorize the deposition of Ms. Mazur, a

19   date at her convenience.  The only topic that is available for

20   the deposition is the AVP policies and practices with respect

21   to training its employees and exterminators and the products

22   that are used by AVP pest control specialists to treat pest

23   issues in the Manhattan Starbucks location.  Those are the

24   topics that may be covered for the deposition and that is all.

25   So you can work with Ms. Mazur and schedule her deposition at a

KA59FOXC

1 date that's convenient. Obviously that deposition will happen

2 outside of the close of fact discovery.

3     MR. MOY: Your Honor, this is Mr. Moy again. May I

4 ask clarification on that order?

5     THE COURT: Sure.

6     MR. MOY: Does that include that we could ask

7 Ms. Mazur the instances in which the pest control plaintiffs

8 reported to her that Hot Shots and other pesticides were

9 encountered at Starbucks locations?

10     THE COURT: No. You've indicated that the reason why

11 you need this deposition and the reason why you scheduled it so

12 late is because Ms. Shwiner was unable to answer questions

13 about policies and practices. So from your application to me

14 this deposition is to fill that hole. So you can ask her those

15 questions.

16     MR. MOY: Respectfully, your Honor, but some of the

17 documents that we wanted to seek reflected in part, you know,

18 the instances of the instances where the -- a pest control

19 plaintiff encountered Hot Shots. Our letter was, of course,

20 subject to page limitations, but that certainly is at issue in

21 this case, whether or not plaintiffs encountered Hot Shots and

22 the frequency. It goes to their emotional distress damages.

23     THE COURT: Understood. But that's information that

24 was plainly relevant and something you could have been seeking

25 for the last six months, nine months, however long discovery

1    has been ongoing.  So when you serve a subpoena at the eleventh

2    hour and seek permission to take a deposition outside of the

3    close of fact discovery when fact discovery has been extended

4    so many times, then there are consequences.

5         So this deposition is intended to fill the gap that as

6    you have described in your letter, which does not seem to

7    suffer from a limitation on page space, that Ms. Shwiner was

8    unable to answer questions related to policies and practices

9    which you indicate she had indicated in her initial disclosures

10   an area of knowledge that she had.  And since she evidently,

11   based on your representation to me, was unable to answer those

12   questions, I'm allowing you to ask Ms. Mazur those questions.

13        OK.  The next application is filed by the plaintiffs.

14   It's ECF 63.  And it concerns three areas of discovery.  The

15   first is the foundation for Starbucks' public statement

16   regarding its own consultation with experts that has satisfied

17   the company, that is Starbucks, that its employees and

18   customers were not exposed to health risks.  Plaintiffs seek

19   the underlying records to support that public statement.

20        The second question has to do with retention policy in

21   light of plaintiffs' view that there was a limited number of

22   documents produced related to these P-cards purchases for pest

23   control that only were produced, according to the plaintiff,

24   for a period of time that has only a slight overlap with the

25   plaintiffs' employment and very little, really, during their

1　term of their employment.  And so as I understand it, the

2　plaintiffs are seeking at a minimum a copy of the official

3　document retention schedule.

4　　　　And the third issue concerns the production of text

5　messages that may have been sent or received on company-issued

6　smartphones between employees.

7　　　　The defendants have responded to this letter on

8　October 2, filed at ECF 72.

9　　　　So why don't I begin with plaintiffs, since it's your

10　application, if you want to respond to any of the arguments

11　raised in the defendant's letter.

12　　　　MR. GRAFF:  Thank you, your Honor.

13　　　　As to the first item, we're here at the end of

14　discovery.  And at the time of filing, Starbucks had their

15　spokesperson attribute a statement to the spokesperson of the

16　company about how they had, supposedly, experts who have looked

17　into this and all is resolved.

18　　　　At depositions, none of the witnesses had any

19　information about this, had never anything consistent with it

20　except for the corporate witness who was directed not to share

21　the basis for her understanding on grounds of privilege.

22　　　　I understand defendants have cited case law that in

23　different circumstances holds that you're not allowed to get

24　into what defense counsel may have consulted with experts about

25　to understand the case and to prepare their defense.  But, here

1    it was a public statement, not attributed to counsel in any

2    way.  And it's an unqualified fact.  It's a factual statement

3    that there was certain activity done and certain conclusions

4    reached.

5        I'm not asking for all communications and

6    correspondence by defendant on how they got to their

7    characterization of the facts.  But I think it would be fair to

8    know if they were making this up or had gravely, grossly

9    distorted some kernel of truth as their public response to the

10   lawsuit.  That's on the first issue.

11       I don't know if that gets at any particular questions

12   your Honor might have had.  I can go through all in a row or

13   pause there if you have any questions.

14       THE COURT:  Why don't you address all three issues

15   that are in your application.

16       MR. GRAFF:  Thank you, your Honor.

17       On the second issue, as you know, and this was relayed

18   in your summary, we had moved for these P-card records.

19   Somehow we got records only for the period roughly January 2019

20   through summer 2020, basically after this lawsuit was already

21   filed primarily.  And we still see, even in the records for

22   that limited, late period, we still are finding examples left

23   and right that allow, we were exactly right, this is what we

24   said the records would show.  They are buying on these P-cards

25   prohibited poisons and logging it and giving the receipts and

apparently nothing has happened.  It's supposed to be audited by district managers and up.

And we're unclear, after the five letters that defendants sent in the course of looking for these documents and in their response letter on this application to compel where they had very long footnotes laying out retention schedules, we haven't seen anything or heard anything that would explain why these records do not exist for the period in question.  And defendant, it seems, has artfully and very carefully kind of skirted around concrete issues, like:  What is the retention schedule; what do you tell people about when to destroy these things.

I'm not even clear if they even looked, based on what they've said, if they've even looked for records in the proper period, or if they've only made objections that it's not accessible and not -- I don't know what.  And what we were looking for in this application as to this issue was simply for them to give a declaration by somebody who actually knows, not the lawyer who is characterizing it, but somebody who knows the record retention schedule, to explain:  This was the schedule, this is why these are the only records that were available and why the records are not available for the period of plaintiffs' employment.

In the normal course of things, this is not a hard item to get to the bottom of in discovery and it's been

peculiar that here it has seemed very, very difficult.  And it

doesn't make sense, even genuinely truthfully to me now from

everything they've said, everything they've sent, I don't know

that they've even looked at the right records.  And there

certainly is not an evidentiary basis for them to say, except

in lawyer words, that they don't exist.  That's item two.

Item three, text messages.  At the depositions that

plaintiffs have taken, in the course of each deposition at some

point I've asked and gotten confirmation that the witness was

issued a company cellphone, did use it for text messaging

coworkers about work-related issues.

And in all cases up to and including the last

deposition a week ago today, after these letters, the witness

has said they were never asked to look, nobody took their phone

to check for them, and they don't know if they have responsive

messages or not.

I know that defendant says:  Oh, none exist.  That may

be true.  But I know that as of last Monday the witness had not

even been asked.

So I'm not sure.  But if none exist, none exist on

that third point.  But I would, again, appreciate -- request

something definitive in writing that they definitely asked and

that's why they don't have them.

THE COURT:  Thank you.

Who from the defendants wants to respond?

KA59FOXC

1          MR. WEBER:  Michael Weber.  Let me just deal with the

2     first one on the information on communications.

3          I think I would just remember that Mr. Fox claims he

4     was terminated in retaliation for certain complaints and the

5     other two plaintiffs claim the emotional distress from

6     encountering products.  I don't see how the communications

7     with -- communications of PR individuals would be relevant.

8     Clearly, there's attorney-client issues here that both outside

9     counsel and in-house provided back-and-forth guidance and

10    information on how to respond.

11         In addition --

12         THE COURT:  Can I interrupt you for a second on the

13    relevance point.  I know you raised that in your letter as

14    well.

15         I mean as I read the letter, the purpose -- sorry, the

16    statement, the public statement that Starbucks issued, the

17    purpose of the statement was, at least in part, to notify

18    employees and customers that it was safe to come to Starbucks.

19    And so if part of the plaintiffs' emotional harm has to do with

20    their fear that they have been exposed, and Starbucks is saying

21    don't have that fear, you haven't been exposed, why is that not

22    directly relevant to this case?

23         MR. WEBER:  Again, I don't think it's relevant to when

24    the claims arose.

25         But, more importantly, I think the attorney-client

KA59FOXC

1    privilege here is a bar to the discovery.

2            And I am just going to say defendants have turned

3    over, over five hundred pages of information related to certain

4    media and public relations communications, not that we haven't

5    done that.

6            What we're objecting to are those communications that

7    are by and between in-house and outside counsel to

8    communications experts.  That's where we draw the line.  Not

9    that we're not saying you can't have some information.  That

10   we've turned over.  So that's where our objection is.

11           THE COURT:  Can you describe for me with any

12   particularity how the communication that Starbucks had with

13   these experts were conversations that were for the purpose of

14   providing legal advice.

15           MR. WEBER:  Maybe Mr. Moy can.  I am not familiar with

16   the exact communications other than to know that they were

17   formulated with in-house and outside counsel.

18           And as your Honor may know, there is another lawsuit

19   that's been initiated on this issue.  So there was a number of

20   attorneys from other law firms involved in this communication

21   process as well.

22           THE COURT:  And I guess the other thing that I would

23   say is that I don't hear the plaintiffs asking for the

24   communications in which litigation counsel is developing its

25   defense to these claims.

1    But the statement says that we, Starbucks -- not we

2    Starbucks lawyers -- but we, Starbucks, have engaged experts to

3    look into this issue and based on what our experts have found,

4    we, Starbucks, can tell the public that everything is fine.

5    This doesn't really seem like a close call to me.  I

6    don't see how there's an attorney-client privilege in the

7    underlying records that Starbucks Corporation had with its

8    experts and that you then broadcast to the world.

9    MR. WEBER:  Well, as I say, your Honor, we have turned

10   over five hundred or more pages on those types of

11   communications, excluding those that were either generated by

12   or communicated to and from in-house outside counsel, etc.,

13   dealing with the defense of these claims.  That's the only

14   thing we're objecting to.  Not general communications which

15   we've already provided and which the plaintiffs' attorney said

16   they've had for quite a long time.

17   We're a little surprised we got this request at the

18   eleventh hour since we've given them substantial documents

19   related to this issue some many months ago.

20   MR. MOY:  Your Honor, this is Mr. Moy.

21   I wanted to also note for the court that we retained

22   this expert specifically in response to plaintiffs' demand

23   letter.  And Starbucks in-house counsel retained legal counsel

24   and the expert so that it could contest the legal claims and

25   formulate a response, if any, that was appropriate to it.

1    So for that reason, it was -- timeline indicates that

2 they retained the experts clearly in anticipation for

3 litigation.

4    And I also distinguish this case from other situations

5 like, for example, where there's at issue waiver in like, for

6 example, the securities case a defendant might argue:  Oh, this

7 company --

8    THE COURT:  Sorry.  Which case?

9    MR. MOY:  Like a security case where there's a fraud

10 case where a corporation might assert a good faith defense

11 based on the advice of counsel, for example, saying we made

12 these statements or we took this course of action because our

13 counsel advised us that it is OK.  And so there, some courts

14 have said:  OK, you can't use that as a sword and a shield.

15    But we aren't using this as a sword and a shield.  In

16 this case, we don't argue that, you know, plaintiffs -- the AVP

17 plaintiffs can't assert the emotional distress or that we took

18 sufficient precautions based on actions that we did in

19 consultation with this alleged expert.

20    THE COURT:  I think there's a pretty strong argument

21 that to the extent Starbucks contracted with experts and is

22 then publicly stating to the world:  Don't worry, we've talked

23 to experts and experts are telling us that everything is safe,

24 that any privilege, should one exist, would be waived.  But

25 there's nothing that I've heard you say to suggest that there

1    even would be a privilege here.  I mean it's one thing when a

2    lawyer is retaining a PR expert for purposes of the litigation,

3    for purposes of the underlying case.  And I know you cited to

4    the *Pearlstein* case, which I don't think supports your

5    proposition because I think it was where the PR expert was

6    hired by the lawyer in the context of avoiding a grand jury

7    subpoena and issues really directly related to the litigation.

8         Here, the fact that Starbucks is responding to the

9    complaint on a multifront, you know, both hiring lawyers to

10   defend the claim but also telling the public:  Don't worry, we

11   have experts here.  I don't see how, if, in fact, you did,

12   hiring experts was done for the purposes of obtaining legal

13   advice.  It appears self-evident that the purpose of hiring the

14   expert was to calm the market.  And there was nothing that I

15   have seen that suggests that these experts, again if they

16   exist, were hired for the purpose of obtaining legal advice or

17   for helping lawyers provide legal advice.

18        MR. WEBER:  I think that's exactly what in-house

19   counsel did, your Honor.  I think that's the exact reason that

20   she did it.

21        There are multiple fronts that we're fighting.  That's

22   correct.  But one of them, and the primary one, is advice

23   regarding the substance of the case.  And since the plaintiffs

24   publicized this lawsuit quite heavily, it was imperative that

25   the company respond both in the legal proceeding but also for

1    the public at large.  I don't see there's a distinction.  And I

2    think this *Pearlstein* case is on point.  That's exactly what

3    she did.  And for the exact reason that we're fighting with the

4    plaintiffs here.

5           THE COURT:  Can you articulate for me why the expert,

6    who presumably conducted some investigation in order to give

7    Starbucks the confidence to make this strong statement about

8    the safety of its stores, how that investigation and that

9    report that resulted in the public statement would be

10    information that would be for the purposes of litigation?

11           And I'm not asking for the lawyer's evaluation of

12    those statements or discussions about the risks of the lawsuit

13    but, rather, the underlying statement to the public saying:

14    We've investigated this and everything is fine.

15           How is that underlying scientific report for the

16    purposes of obtaining legal advice?

17           MR. WEBER:  If counsel says, look, we've been sued and

18    two of the plaintiffs say they were exposed to these hazardous

19    chemicals, we want an opinion that that exposure was not

20    harmful.  And, again, they're only seeking emotional damages

21    here.  That's integral to our defense in the lawsuit.

22           MR. MOY:  Your Honor, this is Mr. Moy.  We didn't

23    retain the expert so that we could -- for the sole purposes of

24    responding to public inquiries.  We retained the expert in

25    response to plaintiffs' counsel's demand letter before this

KA59FOXC

1    even went to -- out to the public.  And legal counsel, in

2    working with a public relations experts, you know, helped

3    formulate a response based on the information received.  But

4    the experts, that is the -- let's call them the Hot Shot

5    expert, wasn't retained to provide the statement that was

6    released on or about May 21, 2019.

7              THE COURT:  Mr. Graff, do you want to respond?

8              MR. GRAFF:  Your Honor, here they're not saying

9    counsel consulted with experts.  We believe that this lawsuit

10   is -- one, we will contest it vigorously and the facts will

11   prove us right.  Here, they're putting it in the mouth of an

12   external spokesperson.  They actually contracted with crisis

13   communication.  So they got somebody outside to say "on behalf

14   of Starbucks."

15             As your Honor pointed out, this is an assurance to the

16   public.  It's bold.  It's underlined.  And it's factual:

17   Employees and customers were not exposed to health risks.

18             That is not part of their assessment for their

19   defense.  It's an outward-facing, categorical statement of

20   fact.  And I'm not sure how they can shield that as if it's

21   part of their confidential client communications to defend the

22   lawsuit when it's something that they told somebody else to

23   announce to the press for them and to quote and to feel free to

24   attribute even here in this e-mail to a Starbucks spokesperson,

25   not a lawyer, not a legal argument.

1    I think for them to try to put this back in the box

2  now and claim that that quote was anything other than what your

3  Honor characterized it as is not tenable.

4    I would also note:  I didn't quote in the letter from

5  the first paragraph of the spokesperson's e-mail to the press,

6  which made all kinds of aspersions on the character and

7  motivations of plaintiffs' counsel and plaintiffs.  Those are

8  all opinion.  I don't agree with them.  I think they shouldn't

9  have been sent.  But those are clearly their defense and their

10  lawyers' opinions and spin on the allegations, very different

11  from what we are moving on here, which is just what are the

12  facts that you presented to the public as facts that make this

13  statement not a lie.  I don't care how you discussed it behind

14  the scenes; just:  What facts did you have that make this not a

15  lie?  And I believe they have no facts and they're lying.

16    MR. MOY:  This is Mr. Moy again.

17    One, our client was not lying.

18    The second issue is by Mr. Graff's reasoning, any time

19  a defendant is facing a public inquiry, and this statement was

20  only released in response to a newspaper inquiry in response to

21  plaintiffs' lawsuit, is defendants deny it and did homework to

22  deny this allegation, that defendants would therefore be

23  waiving its attorney-client privilege.  We did do our homework

24  and we deny the allegations in the complaint.

25    I don't believe that that provides the

all-encompassing waiver of attorney-client privilege, again,

for a person, an expert who was retained by legal counsel and

communicated only with legal counsel about the allegations

raised in plaintiffs' complaint.

THE COURT: OK. Either I don't see an attorney-client

privilege that is valid in this instance; or to the extent

there might be one, it has been waived by the statements from

Starbucks.

I'm not going to direct that Starbucks produce any

communications between lawyers and these experts. But I am

going to require them to produce -- to identify these experts

and to produce whatever underlying factual reports or

representations those experts provided to Starbucks that were

the basis of the statement in the outside spokesperson e-mail

that was sent.

All right. Let's move on to the retention policy.

Excuse me. Let's move on to the -- yes, retention policy.

Mr. Moy, do you want to respond?

MR. MOY: I believe, as we stated to the court, we

provided a copy of the retention policy to Mr. Graff and --

THE COURT: Can you tell me what you provided. Can

you tell me what you provided. Because Mr. Graff's

representation of the retention policy was that it was,

"ambiguous," meaning that it wasn't clear exactly what it was

and that what he was seeking was just the official policy, to

1  the extent Starbucks has one, which I can't imagine that it

2  does not.

3      MR. MOY:  I apologize, your Honor.

4      With respect to the specific documents, my colleague,

5  Ms. Goldstein, who is on -- who is an attorney of record but is

6  not available for today's conference, she specifically produced

7  that document to Mr. Graff.

8      But my understanding is that retention policy sets

9  forth that receipts, which are at issue in the motion to

10  compel, are retained for six months.  And as set forth in our

11  letter, these receipts are stored in daily record books that

12  are shipped off to Iron Mountain.  And Iron Mountain destroys

13  these receipts within, I believe, six months.  And this was

14  before this lawsuit was filed or the motion to compel was

15  filed.

16      THE COURT:  So I guess what I'm curious to know:  The

17  letter reflects that only one page from Starbucks' retention

18  policies was produced, which that resulted in the plaintiff

19  describing it as ambiguous.  I don't know whether it is or is

20  not.

21      I guess I don't understand why the full retention

22  policies haven't been produced.

23      I understand that Starbucks says it would produce the

24  entire retention policy on an attorneys' eyes only basis.

25  Maybe that's reasonable.  Maybe that's not.  I'm not sure.

1     MR. GRAFF:  Your Honor, I'm sorry.  I didn't mean to

2  interrupt.

3     They gave me the one partial page from the document on

4  attorneys' eyes only basis.

5     THE COURT:  I see.  OK.  So they won't produce the

6  whole thing even if it's attorneys' eyes only?

7     MR. GRAFF:  Not the cover page, not the table of

8  contents, not the page that starts the chapter that it appears

9  in.

10     THE COURT:  OK.  Thank you.

11     Mr. Moy, why can't you produce this retention policy?

12     MR. MOY:  I don't understand -- respectfully, your

13  Honor, I don't see what the retention policies that they'll

14  apply to the issues in this case have anything to do with

15  plaintiffs' inquiry.

16     I don't think defendants should produce something just

17  for the sake of producing something.

18     And, respectfully, we've produced 32,000 pages related

19  to receipts of an issue that is relevant to whether or not we

20  terminated Fox in retaliation for talking about what's -- about

21  the use of Hot Shots or whether or not the pest control

22  plaintiffs suffered emotional distress from -- Hot Shots.  This

23  is discovery on discovery and burdensome in any trial on

24  discovery on discovery.

25     So I think our proposal is fair.  It's in proportion

KA59FOXC

to what is needed.  And I believe that we've already indulged
too much in agreeing to produce documents that have nothing to
do with the issues that are going to be before summary judgment
or trial if it goes that far.

THE COURT:  Mr. Moy, there are a lot of tropes there.

I don't understand the difficulty here.  So the
plaintiffs are saying you haven't produced that document.  And
we had an endless amount of litigation at the height of the
pandemic about whether or not you were going to be able to get
into Iron Mountain and produce your receipts.  And you did, at
great difficulty.  And you produced what you produced.  And
your view is that it is adequate.

The plaintiff says:  Well, it's not really adequate
because my clients' claims are that they were exposed to these
impermissible pesticides during the time of their employment.
And the receipts that you provided are only for the tail end of
their employment and after their employment.

And so to the extent Starbucks is going to say:  Just
because we bought them after you left doesn't mean we bought
them before you left.  They need to be armed with some
explanation.

So, as I understand Mr. Graff, he is saying:  I'd like
to see the retention policy and understand, so I understand:
Maybe it's true that all of the documents that are during the
heart of the plaintiffs' employment have been appropriately

1    destroyed under Starbucks' corporate retention policy, or maybe

2    there's something else going on.

3            And so you turned over a single page of what I assume

4    is a standard document that probably all of the lawyers that

5    work for Starbucks have access to.  And I haven't looked at the

6    document, but Mr. Graff says it's ambiguous.

7            What's the problem with producing the whole thing?

8    That's what I don't understand.

9            MR. MOY:  These are company documents.  And, again,

10   respectfully, your Honor, I don't believe that Starbucks should

11   just produce documents just because plaintiffs' counsel wants

12   them.

13           Now if there is -- if there is ambiguity, we're happy

14   to meet and confer with him about -- if there are any other

15   portions properly tailored that we should be producing but.

16   For example, I'm not sure why it matters to Mr. Graff if we

17   have a backup policy on backup tapes or how we treat cellphones

18   or, you know, anything other than what we direct Iron Mountain

19   to destroy or to keep.

20           THE COURT:  OK.  I'm not going to ask for a meet and

21   confer because that should have happened before today's

22   conference and my experience with the parties in this case is

23   that the meet-and-confer process does not really work.

24           So I'm going to direct that Starbucks produce the

25   table of contents, the full table of contents for its retention

1    policy, the cover page so we can see what date it was activated

2    or became in effect, cover page, table of contents, and all

3    pages related to document retention.  And it can be produced on

4    attorneys' eyes only.

5              The last issue on this set of letters is regarding

6    text messages.

7              Can I ask someone from defendants to -- where did your

8    letter go.

9              You indicated in your letter on page 5, I'm looking at

10   your October 5 letter, that you inquired if there were any

11   responsive documents to this request.  We did so and discovered

12   that there were no responsive text messages.

13             Can you describe for me what you did to write that

14   statement.

15             MR. WEBER:  Please address that, Gary.

16             MR. MOY:  I apologize, your Honor.  But Ms. Goldstein

17   was the one communicating with the witnesses on the -- with

18   their cellphones.

19             THE COURT:  Well, today was the day --

20             MR. MOY:  I'm not -- sitting here today, I'm not able

21   to provide that information to your Honor because I would have

22   to rely on the information provided by Ms. Goldstein for that.

23             THE COURT:  So should we schedule another conference

24   so Ms. Goldstein can answer my questions?  Today's conference

25   was intended to address all of the issues, and there are many

KA59FOXC

1    of them, that the parties have presented to the court.

2                MR. WEBER:  Yes, your Honor.  I apologize on that

3    issue.  I would like to -- there's also an issue of the text

4    messages by and among the plaintiffs that we're seeking.

5                THE COURT:  OK.  Well, that's not before me right now.

6    I don't have any letters on that.

7                So I'm focusing right now on the letter that the

8    plaintiffs filed on September 23rd regarding text messages.

9    And what the plaintiffs' counsel tells me is that even after

10   September 23rd, at depositions of your witnesses, they have

11   testified that they have never been asked to look through their

12   text messages or done anything in order to identify those.

13               So at least based on that record, which is all I have

14   because your other lawyer is not here, that would suggest that

15   you did nothing to inquire.

16               MR. MOY:  Well, your Honor, Ms. Goldstein wrote that

17   letter, I think with Mr. Weber, and she indicated that she

18   actually did inquire directly with the witnesses.

19               THE COURT:  I know.  Well, the letter is signed by

20   Mr. Weber.

21               MR. MOY:  Correct.

22               THE COURT:  Mr. Weber signed it.

23               So the letter says:  We agreed to inquire as to

24   whether there any -- whether there, presumably are, any

25   responsive documents to this request.  We did so and discovered

1   there were no responsive text messages.

2           So Mr. Weber signed this letter on October 1 -- excuse

3   me, October 2.  And I'd like to know the basis for that

4   statement.

5           MR. WEBER:  Your Honor, I can represent that my

6   associate inquired from our client in response to the letter

7   from plaintiff.  That's the information we received.  That's

8   what I represented.

9           THE COURT:  OK.  So why don't I ask your associate to

10  file a letter tomorrow setting forth in detail what she did to

11  inquire as to the availability of text messages.

12          MR. WEBER:  Understood.

13          THE COURT:  And to the extent that she spoke to them

14  person by person, she should indicate that.  To the extent she

15  spoke with somebody at IT, she should indicate that.  Whatever

16  she did in order to make such a definitive statement that there

17  has been an inquiry and that no responsive text messages were

18  discovered.  She can file that by the end of the day tomorrow.

19          MR. WEBER:  Understood.

20          THE COURT:  OK.  I think that addresses all of the

21  letters in that batch of documents.

22          The last letter was filed on Friday afternoon by the

23  plaintiff.  And the defendants have not had an opportunity to

24  respond to it.  I don't know whether or not anyone on the phone

25  here has read that letter or cares to respond to it on the

KA59FOXC

1    phone or whether or not you prefer that we -- that you submit

2    something in writing.

3                MR. WEBER:  Your Honor, from the defendant's point of

4    view we'd like to respond in writing and possibly schedule

5    something to address that issue and the one we were talking

6    about earlier.

7                THE COURT:  OK.  When will you get your letter

8    submission in?

9                (Pause)

10               MR. WEBER:  I'd say Wednesday.

11               THE COURT:  OK.  Are people available on Thursday

12   morning?

13               MR. WEBER:  That would be great.

14               MR. GRAFF:  This is Ariel Graff for the plaintiff.

15   Yes.  Thursday morning would be great.  Thank you.

16               THE COURT:  So I'll receive a letter on Tuesday from

17   the person you just referred to as the associate.

18   Unfortunately --

19               MR. MOY:  Ms. Goldstein.

20               THE COURT:  Ms. Goldstein, who will explain what she

21   did to draft the letter that Mr. Weber signed representing that

22   inquiry was undertaken.

23               And then on Wednesday the 7th I'll get a letter from

24   the defendants responding to the October 2 letter.  And we'll

25   have a conference and I'll issue an order for Thursday the

1    8th.

2                  OK.  Anything further from the plaintiff?

3                  MR. GRAFF:  Nothing at this time.  Thank you, your

4    Honor.

5                  THE COURT:  Anything further from the defendant?

6                  MR. WEBER:  Not at this time.

7                  Would 9 a.m. work on Thursday, your Honor, for you?

8                  THE COURT:  I don't know right now.  I have to speak

9    with my deputy.  It will probably be a little later.

10                  MR. WEBER:  We have a deposition at 10.  That's the

11   reason I'm asking.  On Thursday.

12                  MR. GRAFF:  Not in this case.

13                  THE COURT:  Well, let me look and see if my schedule

14   permits.  Do you anticipate that deposition being a full-day

15   deposition?

16                  MR. WEBER:  We have depositions starting at 10,

17   probably go 10 to 2 on Thursday.

18                  THE COURT:  What I may do is move it later in the day.

19   I need to look at my schedule and speak with my deputy.

20                  MR. WEBER:  And I have something at 4.  So 2 to 4 and

21   before 10 will be great for us, your Honor, if that works for

22   you.

23                  THE COURT:  I'll do my very best to accommodate you.

24                  MR. WEBER:  Thank you, your Honor.

25                  THE COURT:  All right.  Thank you everybody.  We're

KA59FOXC

1    adjourned.

2            MR. WEBER:  Good talking to you, your Honor.

3            MR. GRAFF:  Thank you, your Honor.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25