# EXHIBIT A

1

2            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK
3            Case No. 19-CV-4650

4    --------------------------------------------------
     RAFAEL FOX, PAUL D'AURIA and JILL SHWINER,
5
                    Plaintiff,
6
                v.
7
     STARBUCKS CORPORATION d/b/a
8    STARBUCKS COFFEE COMPANY,

9                   Defendants.
     --------------------------------------------------
10

11       PORTION OF TRANSCRIPT DESIGNATED CONFIDENTIAL

12           TRANSCRIPT OF ZOOM VIDEOCONFERENCE OF

13

14                      CARLA RUFFIN

15

16

17

18

19              TRANSCRIPT of the stenographic notes

20   of the proceedings in the above-entitled matter, as

21   taken by and before TAB PREWETT, a Registered

22   Professional Reporter, a Certified LiveNote

23   Reporter, and Certified Shorthand Reporter with all

24   parties present remotely via Zoom videoconference on

25   Friday, August 21, 2020, commencing at 10:05 a.m.

1                    Carla Ruffin

2        A        Four years.

3        Q        Could you describe in general what the

4    role of a regional director was at that time?

5        A        Overseeing the work of seven district

6    managers, responsibility for fiscal performance

7    based on set targets and goals, and ensuring

8    policies and procedures are followed through.

9        Q        Did you enjoy that role in Florida?

10       A        I did.

11       Q        Why did you at some point change

12   positions?

13       A        I was requested to take on an

14   opportunity in New York.

15       Q        What opportunity specifically?

16       A        Regional director.

17       Q        When you say you were requested, who

18   made that request, and what was the process of

19   securing that position?

20                MR. MOY:  Objection.

21       A        The request was made by Sara Trilling,

22   also Angela Alfano.  I was asked to come to New York

23   and interview for the job.  The market was in a

24   turnaround process, and it was believed that I could

25   help successfully lead that in one of the market

1                    Carla Ruffin

2                    It is also across the street from a

3    law school, so it has those customers.  And so that

4    store has a more intimate environment, where

5    Broadway and Canal had a bigger footprint

6    logistically and not -- was not as personal or cozy

7    as the West Broadway and Leonard store.

8         Q         Was it your perception that one of the

9    two locations was more or less prestigious or

10   desirable a posting for store managers than the

11   other?

12                   MR. MOY:  Objection.

13        A         No.  I -- stores exist in different

14   market areas.  All of them are of value.  And it can

15   be helpful as a leader to learn different market

16   areas, but I didn't perceive either store to be more

17   prestigious.  I don't think of our business in that

18   perspective.

19        Q         In connection with your interaction

20   with Mr. Hutchinson or the district manager about

21   transferring Mr. Fox, did you review any performance

22   history or documentation concerning Mr. Fox?

23        A         Not that I can recall.

24        Q         Did you at any point become aware that

25   Mr. Fox had raised concerns about unpaid wages to

1                    Carla Ruffin

2       certain employees at the Broadway and Leonard

3       location?

4              A       I did not.

5              Q       As you sit here today, are you aware

6       from other than my proposing it that Mr. Fox ever

7       raised such concerns at the company?

8              A       I am not aware that he ever raised any

9       concerns.  There were never any brought to my

10      attention during -- no, I'm not aware.

11             Q       Did anyone else bring to your

12      attention any possible problems with wages not being

13      paid in full to any employees at the Broadway and

14      Leonard location during the time that Mr. Fox was

15      there?

16             A       I actually became aware of there

17      possibly not being wages paid at that location

18      during a visit with the district manager,

19      Tim Hutchinson, in the West Broadway and Leonard

20      store while Mr. Fox was the store manager.

21             Q       Do you recall --

22             A       Your question didn't come through.

23             Q       Do you recall what month or year?

24             A       I do not know -- recall the specific

25      month or year.  I recall specifically what

1                          Carla Ruffin

2      transpired during our visit.

3           Q      Would you describe everything that

4      transpired in sum and substance as best you recall

5      it in connection with that visit?

6           A      I was touring the market area with

7      Tim Hutchinson.  The West Broadway and Leonard store

8      was part of our tour agenda.  While we were in the

9      store, I reviewed with the district manager and with

10     Mr. Fox what is called our daily records book.

11                 Within that daily records book is

12     something that's called the "time edit log."  And

13     the title of that sheet might be a little different.

14                 But what happens on that particular

15     document is that, whenever a store manager has to

16     edit the time punch of an employee, they are to

17     enter it into the log, and the employee has to sign

18     and date that they agree with the edit.

19                 During that visit when I reviewed the

20     log, all of the handwriting on the sheet was the

21     same, and it did not appear that the store employees

22     had actually signed and dated.  And when I asked

23     Mr. Fox about it, he shared with me that he made all

24     of the entries.

25                 I became concerned because that --

1                        Carla Ruffin

2    when you edit a punch for an employee, you are, in

3    essence, possibly taking pay away from them, and

4    they have to sign off on it.  So I became concerned

5    that that had not happened in that location, or we

6    wouldn't show that it had because he did all the

7    entries.

8            Q       Was there anything else that you

9    recall that you can describe from that visit?

10           A       During that visit, as we had the

11   discussion regarding the log sheet, Mr. Fox, I

12   believe, brought up that he had gotten a letter from

13   the New York Labor Commission.  He showed it to us.

14                   I said to Mr. Hutchinson, the district

15   manager:

16                   "Please send an E-Mail notifying our

17   labor compliance manager," who was Tina McDonald,

18   "that we have this letter so that she can become

19   aware that there is a problem."

20                   The letter was not super specific, but

21   my concern was that employees had complained; and

22   part of it could be tied into the fact that edits

23   were being made without the employee's signature and

24   date approval.

25           Q       Was there anything else from that

1                    Carla Ruffin

2        Q        Let me try again.

3                 You had mentioned before that you had

4   a concern when you reviewed the daily records book

5   that there were not employee signatures affirming

6   that they consented to time edits.

7                 Did you do anything further at that

8   point or after to find out whether those edits had

9   been improper or not with employee consent?

10       A        Mr. Fox, when questioned, told me he

11  made all of the entries into the log sheet because

12  the employees might be messy in doing so.  And so in

13  him sharing that information, I understood that the

14  employees had not approved the edits via their

15  signature and date.

16       Q        Did you understand that the employees

17  did not agree to the edits affirmatively, or you

18  were just inferring that from the absence of their

19  signatures?

20       A        From the absence of their signatures,

21  they have not approved, from my view, because I can

22  only see the signatures and the date.

23       Q        Did you speak with any employees to

24  determine whether they had been subjected to

25  improper clock edits?

1                    Carla Ruffin

2         A       I did not during that visit.

3         Q       Did you at any point, yourself or

4   somebody else -- direct somebody to determine

5   whether the employees, in fact, consented to those

6   edits that you saw in the daily book?

7         A       I did not.

8         Q       As you sit here today, do you know one

9   way or another whether the employees actually

10  consented to the edits that you saw in the daily

11  record book?

12        A       If the employee's signature and date

13  is not there, they have not consented.  You have to

14  show the consent.  It can't just be verbal.

15        Q       Given your belief that consent had not

16  been obtained, did you feel that you had any

17  responsibility at all to the employees to make sure

18  that they had been fully paid?

19        A       I did, and that is why I requested

20  that a more thorough edit of the time punches and

21  labor in that location be completed by our

22  compliance manager.

23        Q       Who is that compliance manager?

24        A       Tina McDonald at that time.

25        Q       Was Ms. McDonald investigating time

1                        Carla Ruffin

2    entries in the daily record book or something else?

3         A        She went into the actual system, and

4    she also went into the logbook that managers kept

5    for predictability pay to determine if partners were

6    paid in their time punch edits and also if it had

7    incurred predictability pay.

8         Q        Focusing -- focusing specifically on

9    the time clock edits aspect of it, were you ever

10   informed that the complete audit had shown that

11   employees were, in fact, paid improperly in

12   connection with clock edit times?

13        A        So, again, your whole question didn't

14   come through.

15             MR. GRAFF:  Going forward, if you guys

16        can't hear me, if you just do a hand up, I'll

17        pause and re-ask; and hopefully it will go

18        through, so we don't make you listen to the

19        garble.

20             MR. MOY:  Well, I just want to make

21        sure of the witness that she does more than

22        just raise her hand.  She should say so on the

23        record just so that we're very clear about

24        what's going on.  I will raise my hand, of

25        course, but the witness should also say so for

1                    Carla Ruffin

2    receive any awards or recognition during his

3    employment at Starbucks while you were covering the

4    New York area?

5         A    I do not recall Mr. Fox receiving

6    awards or recognition.  Sometimes recognition is at

7    the district level during store manager meetings

8    where I would not be present.  But I do not recall

9    any awards being provided to Mr. Fox.

10                   Based on the visit that I did in his

11   store with the time-edit punches and his responses

12   to me as I questioned him filling out the time log

13   sheet, I left that visit very concerned about his

14   commitment to following standards, policies, and

15   procedures, and his ability to do the job that was

16   needed because he didn't acknowledge that -- what

17   the policies were.

18                   He justified why he filled out the

19   whole thing rather than let his employees

20   acknowledge that they'd approved the time edits if,

21   in fact, they had.

22        Q    Did you yourself or by direction to

23   anyone else impose any sort of corrective action or

24   discipline on Mr. Fox in connection with the

25   nonsigned edit clock records that you were referring

1                    Carla Ruffin

2        to?

3             A        I did not at the time of that visit.

4             Q        Was there a reason you did not at the

5        time?

6             A        At the time, based on the letter that

7        was shared from the labor commission, based on the

8        seriousness of what I found in the time edit log, I

9        felt that there was further investigation needed to

10       determine the scope of the problem in the store

11       under Mr. Fox's leadership.

12            Q        Was that the first time that you had

13       visited a store -- or visited a store that Mr. Fox

14       was the manager of during your tenure in New York?

15                     MR. MOY:  Objection.

16            A        I want to clarify.  You're asking:

17                     Is that the first time I visited when

18       the incident with the time log sheet happened?

19            Q        Yes.  Yes.  Was that the first time

20       you had visited his store?

21            A        No.  I visited his Broadway and Canal

22       store as well as the West Broadway and Leonard

23       store.

24            Q        Did you form any impression of his

25       performance at the Broadway and Canal store?

1                    Carla Ruffin

2          A        That he was stagnant and -- I used the

3    term previously -- "status quo."  The partners did

4    not appear to be up on the latest processes or

5    standards as they needed to be.

6                    Because of his longevity as a store

7    manager, I thought being able to put him in a new

8    location might help him to revitalize in his

9    leadership capability.

10         Q        Did you ever document or memorialize

11   in any writing any of your impressions of Mr. Fox's

12   performance as a store manager at Broadway and

13   Canal?

14         A        It is not normally that the regional

15   director is memorializing the visits, that the

16   district managers do that.  So I wouldn't be able to

17   specifically respond at this point.

18         Q        Were there any specific facts or

19   incidents that contributed to your overall

20   impression of Mr. Fox's performance at the Broadway

21   and Canal store?

22         A        That he -- I had an impression, based

23   on adherence to standards and policies, procedures,

24   that he was not being detailed in ensuring that

25   those were consistently at standard in his location

1                        Carla Ruffin

2      as it pertains to.

3             Q       And you're referring to?

4             A       As it pertains to the knowledge and

5      ability of the partners in the store, the

6      cleanliness of the store, the customer service, the

7      organization of the back of house.

8             Q       And just to be clear, that was the

9      impression that you formed of Mr. Fox specifically

10     at the Broadway and Canal store?

11            A       Yes.  And it was the reason I

12     supported Mr. Hutchinson and thought the possibility

13     of him going to a different location might help

14     revitalize his leadership capability and focus to

15     attention, detail.

16            Q       And now that we've been talking about

17     it for a little bit, just to confirm, are the only

18     two stores that you're aware of that Mr. Fox was the

19     store manager for during your tenure in New York the

20     one we've been calling Broadway and Canal and the

21     second one being Broadway and Leonard?

22            A       West Broadway and Leonard.  Yes.

23            Q       Are you aware that Mr. Fox was

24     selected as manager of the quarter in fall 2016 in

25     your region?

1                          Carla Ruffin

2          A       It's very possible.  I don't recall

3    it.

4          Q       Would that be inconsistent with your

5    personal impressions of his performance as you had

6    just been describing?

7                  MR. MOY:  Objection.

8          A       I would not say that it's

9    inconsistent.  The "manager of the quarter" awards

10   are not given by the regional director.  The

11   district managers present to one another and then

12   vote.  And so it is very possible that the district

13   manager presented it, and the peers supported it.

14         Q       And who was Mr. Fox's district manager

15   in 2016?

16         A       I'm not positive.  During my tenure we

17   had, I believe, four district managers:

18   Tracy Bryant, Arlene De La Cruz, Les Fable, and

19   Tim Hutchinson.

20         Q       Apart from in connection with your own

21   personal visits to stores, do you recall any of the

22   district managers over Mr. Fox ever speaking to you

23   about Mr. Fox in any other context?

24         A       I recall -- I recall specifically that

25   when Arlene De La Cruz first took over the

                        Carla Ruffin

1

2    district -- and I'm not sure what year it was -- she

3    was very concerned with attention to detail, the

4    store condition, and partners skill set.  She

5    endeavored to work with him and help him improve on

6    those concerns.

7         Q     Any other communications you can

8    recall with any of the district managers who

9    supervised Mr. Fox that you haven't already referred

10   to?

11        A     No.  Only with Tim Hutchinson, and

12   that being based on the labor issues that arose at

13   West Broadway and Leonard.

14        Q     I'm going to post a document that I've

15   labeled Exhibit Ruffin 11.  It's a one-page document

16   bearing Bates No. RF0943.

17                  (Exhibit No. Ruffin 11, Starbucks

18           Recognition for FY17 for Rafael Fox, Bates No.

19           0943, Document is marked by the reporter for

20           identification.)

21        Q     Ms. Ruffin, are you able to see that

22   file posted?

23        A     I don't see it.

24        Q     In your screen at the bottom in the

25   center, if you hover your mouse at the bottom,

1                        Carla Ruffin

2     manipulation in West Broadway and Leonard, and that

3     Mr. Fable is thanking him for it.

4          Q       Did anybody ever escalate or mention

5     to you at all that there was a report of time clock

6     manipulation as described in this E-Mail?

7          A       So I -- to my recollection, I knew

8     that that store manager, William, had been

9     terminated for timecard manipulation.  I actually

10    thought it was under Arlene De La Cruz, and that

11    she, as the district manager, had detected it.

12              I do not recall ever being

13    communicated that this came from Mr. Fox or that --

14    and I didn't recall that Les was the district

15    manager who addressed the issue with the store

16    manager William.

17         Q       Okay.  Earlier, I believe I asked

18    about William and why he left the company, and you

19    weren't sure.  Does this document now refresh your

20    memory so that you independently recall that, in

21    fact, you know that he left for time clock

22    manipulation?

23         A       Exactly.  I wasn't sure when it

24    transpired.  I wasn't sure if he was the store

25    manager prior to Mr. Fox going to that location.

1                     Carla Ruffin

2          Q       And could you describe the nature of

3   time manipulation for which Mr. William was fired?

4          A       Well, when I'm looking at this

5   particular document, he's editing time punches.  And

6   I would -- not seeing any further documentation, I

7   don't know.  It appears that he was doing that

8   outside of the policy and procedure.

9          Q       Who was involved in investigating, if

10  anyone, the conduct that resulted in William's

11  termination?

12         A       Som again, to my memory, I believed

13  that this happened under the leadership of

14  Arlene De La Cruz.  I don't recall addressing this

15  or dealing with it with Mr. Fable.  And I have no

16  idea why I don't have any recollection.

17         Q       Did you ever have any communication

18  with Ms. Arlene De La Cruz about Mr. Fox?

19         A       Only when she was the district

20  manager, and no specific conversations.  But I do

21  note that, when she first took over the district,

22  she had concern about the operation of the Broadway

23  and Canal store.

24         Q       Did those concerns relate to some

25  aspect of Mr. Fox's performance or something else?

1                       Carla Ruffin

2          Q        As far as you know -- withdrawn.

3                   Do you have any information at all

4     concerning whether Mr. Fox did or didn't ever

5     complain to anybody at Starbucks about Hot Shots or

6     DDVP?

7          A        I don't have any information

8     pertaining to that.

9          Q        I would like to go back to where we

10    were discussing Mr. Fox and you indicated that you

11    formed an opinion that there was a problem at a

12    store visit when he provided a letter from a

13    government agency about an employee complaint.

14                  Do you recall we had been talking

15    about that?

16         A        Yes, I do.

17         Q        After that site visit, what happened

18    next concerning Mr. Fox and his role at Starbucks as

19    it related to you?

20         A        The next thing that I recall is it had

21    been escalated to our compliance manager,

22    Tina McDonald; and the partner resources manager at

23    the time, Brad Jennison, went to the location to do

24    a more thorough audit of not just the time edit

25    punches, but also to -- everything as it relates to

1                        Carla Ruffin

2    the New York labor laws and predictability pay.

3                        They completed that audit.  I believe

4    that Tim Hutchinson might have also been present.

5                        A length of time went by, and at some

6    point -- when I say "length of time," I don't mean a

7    long time, but at some point I was communicated what

8    the findings were during that audit.  And there were

9    additional items that were of concern:

10                       The posting of schedules three-weeks

11   out, predictability pay that was owed and had not

12   been paid, and that documents that partners sign off

13   on acknowledging a change in their schedule or

14   whatever the reason for predictability pay might be

15   had not been fully completed for all employees.

16        Q        You had mentioned the name

17   Brad Jennison.  Could you let me know:

18                       Were there any other individuals

19   involved in the investigation or audit that you were

20   just describing who you could identify by name?

21        A        The actual physical audit to my

22   recollection was Brad Jennison, Tina McDonald, and

23   Tim Hutchinson -- was present.  And after that, I

24   note that also our regional director Rachel Kelly

25   was brought in and consulted.

1                     Carla Ruffin

2          Q        Were you part of any consultations

3    with Rachel Kelly concerning Mr. Fox?

4          A        As -- so I don't remember specific

5    meetings.  But as a result of the circumstance,

6    there were meetings with Rachel present where we

7    discussed the findings and what -- the follow-up

8    Tina received from it.

9                   So, additionally, predictability pay

10   was asked to be completed that Tina found lacking.

11   And in, I believe an E-Mail exchange, when she

12   followed up, it still had not been completed.

13         Q        On that last item that you mentioned,

14   who communicated that information to you about Tina

15   following up and it still not being completed?

16         A        I believe that was during a meeting

17   between Tina and I.  And it wasn't a meeting.  We

18   meet weekly to review the area overall; and at one

19   of those meetings she communicated to me that she

20   had not had the adequate follow-up she needed.

21         Q        But was it your understanding that she

22   was saying she hadn't had follow-up she needed from

23   Mr. Fox?

24         A        That actions had not been completed.

25   There were partners that were owed predictability

1                    Carla Ruffin

2    pay.  And when she followed up, it still had not

3    been completed.

4         Q       In what context were you informed of

5    the findings of the audit?  Was that an in-person

6    meeting?

7         A       I don't have specific recollection of

8    every meeting, but we did speak in person during the

9    course of our regular meetings.

10        Q       Did you ever see any writing or

11   written document describing how the audit was

12   conducted?

13        A       Not how the audit was conducted, but

14   she did show me where she followed up to see if the

15   predictability pay had been completed, her -- her

16   audit, and it had not.

17        Q       When you say she showed you, in what

18   manner did she show you?

19        A       E-Mail communication with Mr. Fox.

20        Q       Are you referring to E-Mail

21   communication between Tina McDonald and Mr. Fox --

22        A       Yes.

23        Q       -- or something else?

24        A       Communication between Tina McDonald

25   and Mr. Fox.

1                    Carla Ruffin

2    happened pretty quickly.  But Tina and I actually

3    reviewing it I think was approximately two weeks.

4        Q      So two weeks is when you finished

5    reviewing it with Tina or when the audit was

6    completed?

7        A      When I was able to review it with

8    Tina.

9        Q      Did Mr. Fox continue serving as store

10   manager as per normal while this investigation and

11   audit and review was ongoing?

12       A      I don't recall.

13       Q      From the date that you visited

14   Mr. Fox's store with Mr. Hutchinson until you ended

15   your employment with Starbucks, did you have any

16   communications with Mr. Fox?

17       A      I did not.

18       Q      What was the next thing to happen

19   after Ms. McDonald showed you documentation and a

20   summary of her findings?

21       A      I don't recall the specific date or

22   everyone who might have been a part of it, but it

23   was reviewed with the partner resource manager and

24   the partner resource director.  We looked at all of

25   the findings, and a decision was made to terminate

1                    Carla Ruffin

2    Mr. Fox's employment based on employees not being

3    paid for time worked for -- for the infractions in

4    the daily records book, and also the misses in the

5    predictability pay.

6                    And for my part as the regional

7    director, I felt there had been lack of transparency

8    on the part of Mr. Fox throughout from the time I

9    visited his store and asked questions about the time

10   punch edits, as well as Tina had discovered that

11   schedules were not posted three weeks in advance as

12   was Starbucks policy prior to the Labor Law

13   Commission also requesting that.

14                   And -- and the way she determined that

15   was the schedule showed the date when they were

16   printed, and they were not printed in that

17   three-week time frame.

18                   So there was a lack of transparency

19   which for me as the regional director indicated an

20   integrity issue.

21        Q    When you visited Mr. Fox's store and

22   you perceived that there was -- what you saw as

23   problems or incorrect documentation in the daily

24   book, is it your testimony that Mr. Fox was not

25   transparent in response to any questions you asked

1                    Carla Ruffin

2       him at that time?

3              A       Yes.

4              Q       Didn't Mr. Fox tell you that he had an

5       explanation for why all of the clock edits were in

6       his own handwriting?

7              A       He gave an explanation; but he also,

8       at the same time, understood what the policy was,

9       and he wouldn't acknowledge what the policy was.  He

10      would only say why he did what he did, which was not

11      to standard, our policy.  He should have been

12      carrying it out as a store manager.

13             Q       Did you tell Mr. Fox that he was doing

14      it incorrectly at that time?

15             A       Yes, I did.

16             Q       And is your testimony that there was

17      something in the way that he responded to that

18      information that led you to perceive that he was

19      transparent?

20             A       He continued to defend the way he

21      recorded the time edit punches, therefore not

22      respecting that he needed his partners' approval,

23      and he needed to show that in the time log and edit

24      sheet.  And so my take-away was that he was doing it

25      how he wanted to do it, not how the company wanted

1                    Carla Ruffin

2    him to do it.

3         Q     I'm just trying to get clarity on your

4    use of the term "transparent."

5              Did Mr. Fox provide any information to

6    you that you thought was false or not transparently

7    the information that he knew?

8         A     He -- when we reviewed the

9    three-weeks-out scheduling, he did not share that

10   there had been changes to the schedule and it had

11   been reprinted.  I didn't see the dates, and that

12   was discovered when Tina went into the store.

13             So, in fact, schedules were not being

14   posted three weeks out.  And while I was in the

15   store, as we reviewed that, he didn't share that

16   information.

17        Q     Did you ask him about that?

18        A     I don't recall specifically asking

19   him.  But when I say "transparency," I mean, as

20   we're reviewing things, my expectation is you --

21   because I do -- I do believe I asked him about the

22   schedules being three weeks out; and he acted in a

23   way that said they were, and then later we found

24   that they were not.

25        Q     I think we've covered this.  But just

1                        Carla Ruffin

2    fit with your memory, in what way is your memory

3    different than the proposition that it may have been

4    November 27, 2017, when predictability pay

5    regulations went into effect.

6          A      It's a detail that at this point, when

7    I've been away from the company for a year, I

8    couldn't confirm with you that that's the specific

9    date that it happened.

10         Q      Do you have any reason to believe that

11   it might have been an earlier date, or you just

12   don't recall?

13         A      I don't recall, and I don't have

14   access to look at my work records to confirm.

15         Q      As far as you know, did Tina McDonald

16   or anybody in her department conduct an audit of any

17   other stores in your area concerning their

18   compliance with predictability pay requirements at

19   or around the time that Mr. Fox was audited?

20         A      I actually requested that Tina support

21   Tim Hutchinson and do additional audits in his

22   district so that we could be sure that his store

23   managers were following the processes and that they

24   understood what was required.

25         Q      And after making that request to

1                    Carla Ruffin

2    Ms. McDonald and Mr. Hutchinson, did they report

3    back to you that they had conducted such a further

4    audit?

5         A        They did the audits ongoing.  They

6    weren't -- the whole district wasn't done within one

7    week or two weeks.  It was as she was able to go to

8    stores with him or go on her own.  But I wanted his

9    district to be a priority.

10        Q        As of the point in time when, as you

11   said, a decision was made to terminate Mr. Fox, how

12   many other stores in your area of your region had

13   been audited as to their compliance with

14   predictability pay?

15        A        I have no idea.

16        Q        Do you have any information about the

17   results of the audits as to any other particular

18   stores or generally?

19        A        Not now.  As someone who is not -- no

20   longer with the company, I don't.

21        Q        Was anybody other than Mr. Fox, who

22   was employed in your area of your region, subject to

23   any sort of discipline in connection with compliance

24   with the fair workweek law within the period of

25   months surrounding Mr. Fox's termination?

1                    Carla Ruffin

2        A       I could not give you specific detail,

3   but I do understand that individual district

4   managers conducted different types of corrective

5   action with store managers that they found not being

6   in compliance.  I would not be able to give you

7   specific stores or store managers, but that was

8   ongoing in the area at the time.

9        Q       Do you recall the range of actions

10  that were taken in response to identifying

11  noncompliance at any other stores in your area of

12  your region?

13               MR. MOY:  Objection.

14       A       I do not.

15       Q       You had earlier said that it was

16  decided that Mr. Fox would be terminated.  Who made

17  that decision?

18       A       The decision is made with the

19  consultation of the partner -- the decision is not

20  made without approval of the partner resource

21  director.  But as the operator, I made the decision.

22       Q       Did anybody involved in the process

23  recommend to you that Mr. Fox be terminated?

24       A       It's not done as a recommendation, but

25  more as a consultation, and I was the

1                    Carla Ruffin

2    decision-maker.

3        Q      Did you request permission to

4    terminate Mr. Fox?

5        A      It's not requesting permission.  It's

6    that, as a consultation with the partner resource

7    team, do we find the circumstance can merit

8    termination.  And then I made that decision as the

9    operator that the infractions were such that

10   termination should happen.

11       Q      How was Mr. Fox informed of his

12   termination?

13       A      To my recollection, I believe his

14   district manager accompanied by a peer -- and I

15   don't recall who the peer was -- and I'm stating

16   this based on what normally can transpire --

17   delivered the termination notice.

18       Q      Are you referring to a written notice?

19       A      They go -- it's in person, and the

20   district manager has all of the points that led to

21   the termination in writing to refer to.

22       Q      Is that then provided to Mr. Fox or

23   the employee who is being terminated?

24       A      I'm not positive.  But I believe that

25   it's not.

1                    Carla Ruffin

2    evidence relating to the plaintiffs' allegations

3    against Starbucks in this case?

4           A       I did not.

5           Q       Directing you to Mr. Gaff's other line

6    of questions regarding Tina McDonald's audits, do

7    you remember testifying that Tina McDonald

8    communicated to you that she did not have adequate

9    follow-up that she needed?

10          A       Yes.

11                  MR. GRAFF:  Objection.  Misstates the

12             testimony.  Vague and ambiguous.

13          Q       What is this follow-up that you

14   reference?

15          A       That there were partners that needed

16   to be -- their predictability pay reconciled because

17   it had not been completed initially, and that she

18   left instructions for that to happen; and when she

19   followed up, Mr. Fox still had not reconciled

20   predictability pay for those specific partners.

21          Q       What do you mean by "reconcile

22   predictability pay"?

23          A       Like you have to pay them.  They had

24   not been paid.

25          Q       And is it your testimony that

1                    Carla Ruffin

2   Mr. Fox -- Mr. Fox was supposed to pay them?

3        A       Yes.  So where I'm not positive, it

4   could have been during her audit she found partners

5   that had not been paid that needed to be paid or

6   that -- and when I say "during her audit," it could

7   be that these partners had their schedules changed

8   or their schedule wasn't posted on time -- we need

9   to pay them, or that he thought they needed to be

10  paid and they didn't get paid.

11                I don't know which circumstance or if

12  it was both, but she left instructions for it to be

13  followed up.

14       Q       Did you have a belief whether Mr. Fox

15  could be trusted to correct this conduct so that

16  store partners were properly paid predictability

17  pay?

18       A       Based on the many different areas from

19  the time of my visit to what transpired during the

20  audit, I had no trust that he would comply

21  forthcoming.

22       Q       And when you mentioned trust, your

23  trust or your lack of trust with respect to Mr. Fox

24  went beyond this predictability pay issue, correct?

25       A       Yes.  We had -- you know, every

1                    Carla Ruffin

2    company has its mission and values, and then you

3    have just what is the law.  And it should be time

4    work, time paid.

5                    And when there was not an urgency or

6    attention to detail regarding ensuring that the

7    partners in that location were being paid for the

8    time they worked and were also being paid for any

9    predictability pay owed, there was a lapse in

10   follow-up, in thoroughness.

11        Q       When you testified that there was a

12   lack of urgency, a lack of attention to detail,

13   whose lack of urgency and lack of attention to

14   detail are you referencing?

15        A       Mr. Fox.

16                MR. MOY:  Thank you.  No further

17        questions.

18                MR. GRAFF:  I have just a couple of

19        follow-ups.

20   REDIRECT EXAMINATION

21   BY MR. GRAFF:

22        Q       When you were describing your

23   understanding that Mr. Fox did not proceed to paying

24   employees in disregard of Tina McDonald's

25   instructions, what is the source of your information

1                    Carla Ruffin

2         A        I did not.

3         Q        Were you able to determine from the

4    way it was sent to you who else had received that

5    communication?

6         A        I don't recall.

7         Q        What was the nature of the matter that

8    was described in the letter that you were referring

9    to?  How did it describe the scope of the matter

10   that it was relating to?

11        A        I don't remember specifically.

12        Q        Did you take any particular action to

13   ensure that you wouldn't accidentally delete or

14   destroy any documents that might be within the scope

15   of this action?

16                 MR. MOY:  Objection.

17        A        I did not.  I do not typically have

18   files for store managers, and I -- and no E-Mails

19   were deleted.  So there was -- I didn't see any

20   action required.

21        Q        Did you exchange any text messages

22   with Tina McDonald concerning her investigation

23   involving Mr. Fox?

24        A        No.

25        Q        Did you exchange any text messages