# EXHIBIT B

1         CONFIDENTIAL

2    two months.  The next job was -- I

3    worked as a paralegal at a law firm.

4         Q.    Which law firm?

5         A.    I can't remember.

6         Q.    How long?

7         A.    Maybe three months.

8         Q.    Were you terminated?

9         A.    No.  The assignment

10   ended.

11        Q.    When was that?

12        A.    Either late 2000 or early

13   2001.

14        Q.    Next job?

15        A.    Oh, I worked at the

16   Deutsche Bank executive dining room.

17        Q.    How long?

18        A.    A month, maybe two.

19        Q.    What did you do?

20        A.    Something meaningful, but

21   I don't remember.

22        Q.    Were you terminated?

23        A.    No.

24        Q.    Next job?

25        A.    Starbucks.

1          CONFIDENTIAL

2      Q.      When was that?

3      A.      I was hired in early

4   November of 2001.

5      Q.      What year?

6      A.      2001.

7      Q.      And who hired you?

8      A.      Ismael, I-S-M-A-E-L,

9   T-O-R-R-E-S, I think.

10     Q.      And how did you learn

11  about the Starbucks job?

12     A.      I was -- I was spending a

13  lot of time in a Starbucks, not the

14  one where he hired me, and I guess I

15  got to know some of the people who

16  worked there, and they -- they

17  said -- they recommended that I

18  apply.

19     Q.      And who did you

20  interview, other than -- other than

21  with Ismael?

22     A.      Like who interviewed me

23  at Starbucks?

24     Q.      Who else, other than

25  Ismael?

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - - - - - -x

4    RAFAEL FOX, PAUL D'AURIA, AND JILL
     SHWINER,
5

6                              Plaintiffs,

7
                                    Case No.:
8                                   19-CV-4650

9

10                   -against-

11

     STARBUCKS CORPORATION d/b/a STARBUCKS
12   COFFEE COMPANY,

13                              Defendant.

14   - - - - - - - - - - - - - - - - - - - - -x

15        DEPOSITION OF RAFAEL FOX

16        LOCATION:  Littler Mendelson

17        900 Third Avenue,
          New York, New York 10022
18

19        DATE:  August 12th, 2020.

20   - - - - - - - - - - - - - -- - - - - - -x

21

22

23            AMBRIA IANAZZI, RPR

24              JOB#:  182742

25
              CONFIDENTIAL

1                CONFIDENTIAL

2       A.      I believe that there was

3   a second person interviewing me

4   named Mary Ann; I don't know her

5   last name.

6       Q.      What was your first job

7   there?

8       A.      Barista.

9       Q.      And how many hours were

10  you working?

11      A.      Anywhere from 20 to 40

12  hours a week.

13      Q.      What was your first

14  location at Starbucks that you

15  worked at?

16      A.      Nineteenth Street and

17  Eighth Avenue.

18      Q.      How long did you work

19  there?

20      A.      About two years.

21      Q.      Were you a barista there?

22      A.      Yes, but then I was

23  promoted to shift supervisor.

24      Q.      And when were you

25  promoted?

1                    CONFIDENTIAL

2        A.        Maybe a year in; I don't

3    know.

4        Q.        And your next position?

5        A.        Shift supervisor.

6        Q.        Where?

7        A.        Oh, I was transferred to

8    the location at 23rd Street and

9    Eighth Avenue.

10        Q.        How long were you there?

11        A.        I would say, like,

12    approximately, ten months, could

13    have been more.

14        Q.        Next position?

15        A.        I was transferred to the

16    14th and Sixth location.

17        Q.        How long were you there?

18        A.        Same thing, probably --

19    not more than a year.

20        Q.        Next position?

21        A.        Sixth Street and Waverly,

22    and that's when I was promoted to

23    assistant manager.

24        Q.        And when was that?

25        A.        Approximately, 2006.

1              CONFIDENTIAL

2      Q.     And how long were you the

3  assistant manager there?

4      A.     At that location, I was

5  probably the assistant manager for

6  the same thing, about a year.

7      Q.     Next position?

8      A.     I was transferred to 17th

9  and Broadway.

10     Q.     How long were you there?

11     A.     Same thing; a little less

12  than a year, I think, and, also,

13  assistant manager.

14     Q.     Did you receive any

15  promotions there?

16     A.     Sort of at the end, I was

17  promoted to manager, and they

18  transferred me to another location.

19     Q.     Which one?

20     A.     Three New York Plaza.

21     Q.     And how long were you

22  there?

23     A.     Maybe a year and a half.

24     Q.     And the next position?

25     A.     I was a manager at 405

1        CONFIDENTIAL

2  Broadway.

3       Q.     And, approximately, when

4  was that?

5       A.     Approximately, 2009.

6       Q.     I'm sorry?

7       A.     2009.

8       Q.     2009?

9       A.     Yeah.

10      Q.     And how long would you

11  hold that position?

12      A.     I was there until

13  October 2017.

14      Q.     And then what happened?

15      A.     Oh, what happened is,

16  they told me the manager had been

17  fired at -- at 180 West Broadway.

18  They told me that the -- the

19  partners there had been through a

20  lot, that the store was not where it

21  needs to be, and they said I would

22  be perfect for the role.

23      Q.     And --

24      A.     Those are quotes.  That's

25  not verbatim.

1          CONFIDENTIAL

2     Q.     Do you know why the

3   manager was fired from the position?

4     A.     No.

5     Q.     Did you ask?

6     A.     I did.

7     Q.     And --

8     A.     I believe he said, "we

9   don't talk about that."  That's all

10  I've ever gotten at Starbucks, if

11  you ask a pointed question like

12  that.

13    Q.     So, what was your last

14  location, before leaving Starbucks?

15    A.     180 West Broadway.

16    Q.     And how would you compare

17  the volume to the location at 405

18  Broadway?

19    A.     The business flow is

20  different, but overall, the business

21  sales were comparable, like maybe

22  there would be some months where the

23  180 West Broadway store made more

24  revenue, and other months, the other

25  store would make more revenue.

1             CONFIDENTIAL

2    understanding of that policy?

3        A.     That the Law had five

4    components.  I was familiar with the

5    five components.  I was familiar, as

6    I was taught by Starbucks.  I'm

7    sorry.  I want to make sure I answer

8    a specific question.  Could you --

9             MR. WEBER:  Could you

10        read that back, so we get it

11        clear?

12             THE COURT REPORTER:  Sure

13        .

14             (Whereupon, the

15             following portion was

16             read back by the

17             reporter:

18             Q.  "What was your

19             understanding of that

20             policy?")

21             MR. GRAFF:  Objection,

22        vague.

23    BY MR. WEBER

24        Q.     Do you want me to repeat

25    the question?

1                    CONFIDENTIAL

2        A.      Can you rephrase it?

3        Q.      Yeah.  Does Starbucks

4    have policies, relating to providing

5    partners with predictability pay for

6    scheduling changes?

7        A.      Yes.

8        Q.      And you were aware of

9    those policies, correct?

10        A.      Yes; I was aware of those

11    policies.

12        Q.      And do you recall when

13    you were alerted that New York City

14    had passed the Fair Workweek Law

15    regarding predictability pay?

16        A.      I believe -- I might be

17    off by a day or two, but I'm going

18    to say 16th.

19        Q.      October 16th?

20        A.      Yeah.  I mean, it could

21    have been October 12th.  I don't

22    know.  Mid October.

23        Q.      Okay.  And what year?

24        A.      2017.

25        Q.      And do you know,

1                    CONFIDENTIAL

2        Q.      (Handing.)

3                THE WITNESS:

4                (Handing.)

5        A.      (Perusing).  Sorry, but

6    this is the exact same document as

7    the one before, and all the answers

8    are the same as I gave before

9    (indicating).

10       Q.      I didn't hear you.

11       A.      All my answers are the

12   same.  This might be a different

13   version of the document, but it's

14   the exact same document you gave me

15   (indicating).

16       Q.      Okay.  But, you're saying

17   it's a duplicative document?

18       A.      Sure.

19       Q.      One second.  Have you

20   received, while employed by

21   Starbucks, any complaints related to

22   your store's compliance with the New

23   York City Fair Workweek Law, or the

24   New York City Predictability

25   Workweek Law?

1                CONFIDENTIAL

2       A.      Yes.

3       Q.      When?

4       A.      I received the Complaint

5    in the mail on January the 10th,

6    2018.

7       Q.      And what was the

8    Complaint --

9              Where was the Complaint

10   from?

11      A.      Oh, sorry.  The New York

12   Department of Consumer Affairs.

13      Q.      And what was it about?

14      A.      It was an allegation that

15   our store was not in full compliance

16   with the Fair Workweek Legislation.

17      Q.      And what did you do with

18   the Complaint?

19      A.      I contacted Tim

20   Hutchinson right away, and I sent it

21   to him in some format.  I think I

22   took pictures and emailed it or

23   something.

24      Q.      And what happened after

25   that?

1              CONFIDENTIAL

2        A.      He told me that -- oh,

3    I'm sorry.  He -- as far as I know,

4    he forwarded it to Tina McDonald and

5    Bradley Jennison, and I remember Tim

6    sending me a text message on -- on

7    the morning of the 11th, that Tina

8    and Brad Jennison were going to come

9    to my store, I think he said at

10   1:30.

11       Q.      That day?

12       A.      That day, to talk to me.

13       Q.      Showing you Exhibit 17.

14              MR. WEBER:  It's

15   ESI005070.

16              (Whereupon, Bates

17              ESI005070 was marked

18              Plaintiff's Exhibit 17

19              for identification as of

20              August 12th, 2020.)

21       Q.      (Handing.)

22              THE WITNESS:

23              (Handing.)

24       Q.      I ask you to review that

25   document.

1                    CONFIDENTIAL

2        A.      (Witness complies).

3    Okay.  You could go ahead.

4        Q.      Did you receive this

5    document?

6        A.      Yes.

7        Q.      That's the Complaint you

8    were referring to a minute ago?

9        A.      Yes.

10        Q.      And do you recall when

11    you received it?

12        A.      Yes; January 10th, 2018.

13        Q.      And that's the date you

14    sent it to Tim?

15        A.      I don't have a specific

16    memory, but I think so.

17        Q.      Showing you Exhibit 18.

18                MR. WEBER:  This one is

19        ESI005072.

20                (Whereupon, Bates

21                ESI005072 was marked

22                Plaintiff's Exhibit 18

23                for identification as of

24                August 12th, 2020.)

25        Q.      (Handing.)

1          CONFIDENTIAL

2   mentioned before, right?

3       A.     It is.

4       Q.     And that's the same

5   document you sent -- forwarded to

6   Tim, correct?

7       A.     It is, yeah.

8       Q.     Did there come a time

9   when Tina audited your store?

10      A.     I don't know whether I

11  would use the word, "audit."

12      Q.     What would you use?

13      A.     Well, I've seen her

14  audits from the document -- from

15  some of the documents, and what she

16  did was a little different, but it

17  was -- I guess it was a version of

18  an audit; sure.

19      Q.     Did Anna work for

20  Starbucks at the time you sent it to

21  her?

22      A.     No.

23      Q.     So, when you -- I'm

24  sorry.  I interrupted you.  You

25  wouldn't call it an audit?  What

1         CONFIDENTIAL

2    would you call it?

3        A.      No; then I agreed with

4    you, it is an -- a version of an

5    audit.

6        Q.      Okay.  And what did she

7    find?

8        A.      I'm sorry?

9        Q.      What did -- what did Tina

10   find when she audited your store?

11   What was her determination?

12       A.      Oh, um, well, there's two

13   things that strike out at me.  She

14   believed that schedules were posted

15   late.

16       Q.      I'm sorry.  I didn't hear

17   you.

18       A.      That schedules were

19   posted late.

20       Q.      Posted late?  Got it.

21       A.      Not within the

22   time-period that they're supposed

23   to.  And she also believed that logs

24   were missing in the -- or entries

25   were either incomplete, or -- or --

1  CONFIDENTIAL

2  I don't remember if she said,

3  "missing."  I think she said,

4  "incomplete."  I think it was called

5  the schedule change log, but I'm not

6  sure.

7      Q.    What else did she find?

8      A.    At the time of --

9            On January 11th, that's

10 all I could remember at the moment.

11     Q.    Do you remember asking

12 about having Tina determine that

13 partners were not signing off on all

14 their hours?

15     A.    Yes, I do.

16     Q.    And she found that you

17 weren't posting the schedules on

18 time, correct?

19     A.    She found that I wasn't

20 posting some of the schedules on

21 time.  I -- I think some of her

22 findings were erroneous, but that's

23 what she found; sure.

24     Q.    Which findings were

25 erroneous?

1              CONFIDENTIAL

2      A.     I'd need to see -- one of

3   the documents I looked at when I

4   prepared was -- was her -- what she

5   called her, "notes," from that day.

6   So, in order to -- to answer your

7   question, I need to see the document

8   in front of me.

9      Q.     If you felt -- strike

10   that.

11             Did you respond to Tina's

12   audit with any corrections that you

13   believe should have been made?

14             MR. GRAFF:  Objection,

15      vague.

16      A.     Can you rephrase that?

17             MR. WEBER:  Could you

18      read that back, please?

19             THE COURT REPORTER:  Yes.

20             (Whereupon, the

21             following portion was

22             read back by the

23             reporter:

24             "Q.  Did you respond to

25             Tina's audit with any

1          CONFIDENTIAL

2          corrections that you

3          believe should have been

4          made?")

5   BY MR. WEBER

6      A.    Yes.

7      Q.    And what did you do?

8      A.    I changed the -- I

9   started posting schedules earlier,

10  and with the time entry logs, I --

11  I -- perhaps I had a talk with every

12  partner, or most of -- the partners

13  that weren't doing their part in

14  filling it out, and -- and then a

15  few times a week, or maybe once

16  week, I don't remember, I would

17  highlight if there was any

18  opportunities in those logs.

19     Q.    Is that in writing?

20     A.    I don't know what you

21  mean.

22     Q.    In other words, did you

23  respond to Tina's --

24     A.    Yes.

25     Q.    You did?

1          CONFIDENTIAL

2    posting with Tina?

3         A.     When?

4         Q.     I'm going to ask you --

5    that's my next question.

6         A.     Oh.

7         Q.     When did you?

8         A.     I know that I wrote to

9    her on, I think, January 12, and I

10   think that's where I said that

11   sometimes schedules were taken off

12   the wall.  And then I think that

13   when I met her in person on

14   January 11th, that's when I told her

15   I misunderstood that one line in the

16   training.

17        Q.     And what did she say?

18        A.     I know she corrected me,

19   but I -- I don't remember her exact

20   words.

21        Q.     She made sure you

22   understood what the -- what was

23   required, right?

24        A.     Yes.

25        Q.     Did there come a time

1          CONFIDENTIAL

2    when Tina did a second audit of your

3    store?

4         A.    I would put it as she got

5    more documents related to the store,

6    but not that she came and did a

7    second full audit; no.

8         Q.    Explain what you mean by

9    that.

10        A.    The -- the -- the Notice

11   of Investigation from the DCA

12   required data from the GLS

13   timekeeping system, and I was

14   running the report, printing the

15   reports, and giving her the reports.

16              And one thing that I also

17   gave her was -- I was actually able

18   to get all those schedules, because

19   when she came, some of the schedules

20   weren't even there; I didn't have

21   them attention.

22              So, my supervisor, Dira,

23   who had taken pictures of the

24   schedules, gave me the pictures, and

25   then I was able to give it to -- to

1              CONFIDENTIAL

2    Tina.

3        Q.      She came back, and there

4    was still violations of the Law,

5    correct?

6        A.      Are you asking me if

7    there were additional violations, or

8    if the violations still existed from

9    her original audit?

10       Q.      Which one?

11       A.      I'm asking you.  You're

12   asking me --

13       Q.      One, two, or both?

14       A.      Okay.  Are you asking me

15   if --

16       Q.      Let me make it easy.

17       A.      Sure.

18       Q.      Were the prior violations

19   still in effect, one?

20               Two, were there new

21   violations?

22       A.      Well, the prior

23   violations, she told me, "take no

24   action."  So, yes, they were, in

25   fact.

1          CONFIDENTIAL

2      Q.    Yes, the prior violations

3  were still in effect?

4      A.    Yeah, because she told me

5  take no action, so I followed her

6  guidance.

7      Q.    Okay.  Go ahead.

8      A.    Sorry.  You want me to --

9      Q.    Were there new

10  violations, in addition to not

11  correcting the current violations?

12      A.    Not that I know of; no.

13      Q.    You say the partners were

14  taking the schedules down.  Where

15  were they posted?

16      A.    On the refrigerator.

17      Q.    And then how often were

18  they allegedly taken down by

19  partners?

20      A.    Well, first of all, I

21  would say that I was very vague, but

22  if a schedule is missing, and I

23  don't see it on the refrigerator,

24  then I guess I can't really conclude

25  that a partner took it, even if

1                    CONFIDENTIAL

2       Q.      But she told you that you

3    had other issues besides the

4    posting, correct?

5               MR. GRAFF:  Do --

6       A.      Yes.  She mentioned the

7    time entry logs.

8       Q.      And what else did she

9    mention to you?

10      A.      That's all I could

11   remember at this time.

12      Q.      In your Complaint, in

13   Paragraph 87, you say that you were

14   reassigned to serve as an SM at

15   Starbucks location 180 West

16   Broadway, and you sought to learn

17   more about schedules and attendance

18   records for the employees now under

19   your management; do you remember

20   that?

21      A.      Yes.

22      Q.      So, you said you

23   conducted an independent audit of

24   the global labor system timekeeping

25   records; do you remember?

1      CONFIDENTIAL

2      A.      I do.

3      Q.      What do you mean by you,

4    "conducted an independent audit"?

5      A.      Well, one thing that I

6    haven't experienced before is taking

7    over a store for a manager that

8    was -- that was fired.  So,

9    normally, like if a manager hands

10   over a store to another manager,

11   they give you some information about

12   the store, partners, that kind of

13   thing, and Les, the district

14   manager, didn't do that either.  So,

15   I pored through whatever online

16   information I could gather, and GLS

17   was one of the tools I used.

18     Q.      What did you pore through

19   online?  What did you see?  What

20   steps did you take?  What did you

21   find?

22     A.      Sure.  Well,

23   specifically, I was curious about,

24   like I guess, like who was coming

25   late to work, who was reliable; that

1          CONFIDENTIAL

2    kind of a thing, which is something

3    the old manager would normally tell

4    the new manager, but what I was

5    finding was missing -- missing time

6    punches.  It looked like what I

7    thought was manipulation.

8        Q.    Did you report that

9    missing time-punch manipulation?

10       A.    Yes.

11       Q.    Who did you report it do?

12       A.    If you mean -- two people

13   at the minimum -- the first -- first

14   person was my shift supervisor,

15   Wesley Manley, and then the second

16   person was -- sorry, there's three.

17   Wrong.  The second person is Les

18   Fable, and then the third person is

19   Tim Hutchinson.

20       Q.    And did they respond to

21   you?

22       A.    For Wesley, we paid

23   him -- I paid him right away because

24   I thought it was the right thing to

25   do.  We went through all his time

1              CONFIDENTIAL

2   punches.

3              For Les, he wrote an

4   email back to me with the title -- I

5   titled it, "time-clock manipulation,

6   West Broadway."

7              And he wrote me back, and

8   I remember he said, "it's even more

9   clear for me that you're the right

10  guy for the job."

11      Q.    You take that as a

12  compliment, correct?

13      A.    Yeah.

14      Q.    Thought you were doing a

15  good job trying to make sure there

16  was compliance with the laws and the

17  policies?

18      A.    Yes.

19      Q.    Other than the -- I think

20  it was an email you had sent, any

21  other record that you have with that

22  independent audit?

23      A.    Yes.

24      Q.    What is that?

25      A.    In November, I think

1          CONFIDENTIAL

2    19th, I wanted to see whether -- you

3    see, I don't have a record of it,

4    but I gave Tim about five pages of

5    like -- I made my own spreadsheets

6    because I don't -- I didn't know how

7    to do Excel.  I didn't have a record

8    of that, but about two weeks after

9    that, I wanted to check if he paid

10   the people.  So, I looked at someone

11   named Kioshi Atkinson (phonetic),

12   and I saw that Tim hadn't paid

13   Kioshi, and I took a -- I either

14   took a screenshot, or a photo, so

15   that way I could capture the time on

16   it, the timestamp.

17        Q.    And you've produced that?

18        A.     I have, but it doesn't

19   have the -- the -- like the way it's

20   produced with all the pictures, it's

21   not like all the pictures have a

22   timestamp on it, but I have my iPod

23   Touch still, which you could see the

24   time and date on that picture --

25        Q.    I'm having a hard time

```
 1             CONFIDENTIAL
 2   hearing you.
 3       A.     It's produced, but the
 4   timestamp isn't on each picture.  I
 5   could show you guys on my iPod Touch
 6   when I --
 7       Q.     Okay.
 8       A.     -- took this picture, but
 9   I don't have it on me.
10       Q.     All right.  So, maybe you
11   could produce that, and I'll copy
12   that.
13       A.     How would you like the
14   timestamp?  How do you do that?
15             MR. WEBER:  We'll take a
16       look at it --
17             MR. GRAFF:  I think it's
18       better for Counsel to follow up
19       on it.
20             You can follow up in
21       writing.  We'll take it under
22       advisement, and get you anything
23       you're entitled to --
24             MR. WEBER:  Okay.
25       Q.     You said in your
```

```
 1              CONFIDENTIAL
 2   Complaint, Paragraph 89, you
 3   discovered that several employees
 4   performed hours of work without pay
 5   in the weeks prior to your
 6   assignment at that location; do you
 7   remember that?
 8        A.    Is that an exact quote?
 9        Q.    I'm summarizing it,
10   but --
11        A.    Okay.
12        Q.    -- I'll give you the
13   exact words.
14        A.    Oh, yes.  Yes.  Sorry.
15   You're absolutely right.
16        Q.    Okay.
17        A.    Sorry.
18        Q.    Which employees are you
19   referring to?
20        A.    Well, originally, I -- I
21   did report this twice to the first
22   DM.
23        Q.    The question is, which
24   named employees?  That's the
25   question.
```

1          CONFIDENTIAL

2     A.     Well, there's 31 and I

3  can't remember.

4     Q.     Okay.

5     A.     I can't remember --

6     Q.     So, you reported 31?

7     A.     Could be 32.  I don't

8  know.  Around that.

9     Q.     Okay.  And you reported

10  to whom?

11     A.     First, I reported the,

12  approximately, ten people or so that

13  weren't paid correctly to district

14  manager Les Fable, and then within a

15  couple of days of Tim taking over as

16  the district manager, I reported to

17  him the 31 total.

18     Q.     And why were you looking

19  into this?

20     A.     Well, the original one I

21  told you, unless you want me to tell

22  you again.  But, as far as why I was

23  looking at other stores through the

24  computer is because I was thanked by

25  Les for the first time.  Like you

1              CONFIDENTIAL

2    said, I enjoyed the compliment.  And

3    for some reason, I got the hunch

4    that if this was happening at one

5    store, it'd be happening at more

6    stores, and I thought I could help.

7         Q.     Nobody told you to do

8    this?

9         A.     No.

10        Q.     You did it on your own?

11        A.     Yes.

12        Q.     And did you believe that

13   this was a violation of the

14   Starbucks policies?

15             MR. GRAFF:  Objection,

16        vague.

17        A.     No, not at all.

18        Q.     What did you --

19             You thought it was fine

20   what you found about not paying 31

21   employees?

22             MR. GRAFF:  Objection,

23        misstates the testimony.

24        Q.     You can answer.

25        A.     Did I -- can you repeat

1                  CONFIDENTIAL

2    the question?

3        Q.      Yeah.   I'll rephrase it.

4        A.      Thank you.

5        Q.      On your own, you did an

6    investigation?  You found that 31

7    employees were not being paid

8    properly, correct?

9        A.      Yes.

10       Q.      Was that failure to pay

11   them properly a violation of

12   Starbucks policy?

13       A.      Yes.

14       Q.      That wasn't so hard; was

15   it?

16               What was the policy being

17   violated?

18       A.      Time worked equals time

19   paid.

20       Q.      Did anybody comment on

21   your analysis of whether or not

22   these people were paid properly?

23       A.      Yes.

24       Q.      Who?

25       A.      Tim.

1          CONFIDENTIAL

2      Q.     What did he say?

3      A.     He said a few things.  He

4  said -- one thing I remember is he

5  said how could I be right.  Wouldn't

6  these partners have complained,

7  if -- if anything -- if what you say

8  is true?  That was one thing.

9      Q.     Okay.  Tell me your

10  response, if any.

11      A.     I don't remember my

12  response.

13      Q.     The next thing you said?

14      A.     One second.  Let me just

15  think if I did say a response.

16      Q.     Okay.

17      A.     Oh, I told him that --

18  that Wesley Manley, the -- the other

19  person, the shift supervisor, said

20  that he suspected that the manager

21  before me Will was stealing, and he

22  said he was too afraid because he

23  thought that Will would have fired

24  him.

25      Q.     Anything else?

1          CONFIDENTIAL

2       A.      Yes.  Well, when you say,

3    "anything else," I guess I'll tell

4    you more what Tim said.

5       Q.      That's my question.

6       A.      Yeah.  He said that -- he

7    said that the DMs do regular audits,

8    and how could I find something

9    that -- that the DMs don't find on

10   these audits?  I could give you an

11   answer, if you want what I told him.

12      Q.      What did you tell them?

13      A.      I told him that when the

14   DM does an audit, they only check

15   the Daily Record Books.  They don't

16   go into the GOS, and -- like I did.

17   So, I consider it -- I think I told

18   him I consider it an empty -- a

19   meaningless audit, if you're just

20   checking the book, and you're not

21   also checking the computer.

22      Q.      Who did you say that to?

23      A.      Tim.

24      Q.      Was he upset with that

25   comment?

1                    CONFIDENTIAL

2        A.      I don't know if he was

3    upset.

4        Q.      Well, do you think he was

5    happy that you brought this to his

6    attention?

7        A.      My impression was that --

8    that -- I wouldn't be able to tell

9    you, without guessing.

10       Q.      You don't have a --

11       A.      A --

12       Q.      -- a thought about his

13   reaction?

14       A.      His reaction, if I had to

15   use one word, I would say

16   skepticism, but I left the

17   conversation happy because he

18   mentioned that he was going to

19   investigate with another DM called

20   Carol Wong, W-O-N-G; I think that's

21   her name.  Carol, W-O-N-G; I'm not

22   sure that's her name.  And he said

23   she was an expert in GLS, and he

24   said she was kind of new to it, and

25   then he also said he would bring it

1        CONFIDENTIAL

2    to the attention of Carla, who --

3        Q.    Who?

4        A.    Carla, who is the

5    regional director and that made me

6    happy.

7        Q.    Anything else that you --

8        A.    Yeah.

9        Q.    -- that he said?

10       A.    Nothing else he said, but

11   I could remember a few things that I

12   said.

13       Q.    Go ahead.

14       A.    I told him that -- I told

15   him that I was worried about being a

16   whistleblower.  I told him that I

17   had to -- I reported something once

18   in the past to a -- to a place I

19   worked for, and then -- it -- it was

20   one of the temp jobs that we talked

21   about.  I wasn't fired, but with a

22   temp job, it would say the

23   assignment's ending.

24            It was at the law firm,

25   and the other paralegal temps were

1                  CONFIDENTIAL

2   and substance of his comments?

3        A.     No.

4        Q.     Did you put your concerns

5   about being a whistleblower in

6   writing?

7        A.     Hm -- wait, not that I

8   can recall at this time.

9        Q.     Did you call any

10  800-number the company had to report

11  your concerns?

12       A.     No, but I do have a

13  memory related to that, if you're

14  interested.

15       Q.     And what is that memory?

16       A.     Someone from HR called me

17  in a -- in October 2018, and they

18  asked me a whole bunch of questions;

19  if the previous district manager had

20  ever asked me to -- all that's

21  coming to my head is, "do something

22  bad with time" -- with -- I don't

23  remember, but they -- but they said

24  afterwards, "if you remember

25  anything" -- they wouldn't tell me

1          CONFIDENTIAL

2     A.     Well, in relation to --

3  in relation to Starbucks, I said to

4  him, "what happened?"  You know,

5  just in two words, and he replied

6  back the name of the person who made

7  the complaint against me.

8     Q.     Say that again.

9     A.     He replied back the name

10  of the person who made the complaint

11  against me to the DCA.

12     Q.     Who is that?

13     A.     Stella Morgan.

14     Q.     And what was the

15  complaint?

16     A.     There's notes of her

17  intake.  I can't remember off the

18  top of my head.

19     Q.     Generally?

20     A.     Generally, she said

21  that -- there's something called a

22  Good-Faith Estimate Form, and when

23  I -- when we filled it out in late

24  November, in good faith, I thought

25  she was, you know, going to have

1          CONFIDENTIAL

2    maybe 20 to 30 hours or something,

3    and then our sales multiplied in

4    December, and it was a new store.  I

5    didn't know that.

6              So, when I made the

7    schedules, I had to go with, like --

8    the computer says, "this is how many

9    hours you have."  And her --

10   everyone's hours dipped below their

11   good-faith estimate, which I put in.

12   So, they didn't understand that.

13             They didn't know the

14   mechanics of -- and that was one of

15   her complaints.  I think, like you

16   said, I think -- I mean, you said

17   it, so I believe you that -- that

18   she said schedules were missing, I

19   think.  And I think she said that

20   schedules weren't posted, the 14

21   days notice, and then I think there

22   was also something she mentioned

23   about, like tips or something, about

24   me not -- I don't remember at this

25   time.

1    CONFIDENTIAL

2    additional monies, correct?

3        A.      Approximately.

4        Q.      And you only changed

5    Mr. Manly's, right?

6        A.      Yes.

7        Q.      And why didn't you change

8    the other 30?

9        A.      First of all, because Tim

10   said to hold off, and he was

11   skeptical that I was even correct on

12   that they were actually not paid,

13   because --

14       Q.      What did he say to you?

15       A.      He said -- I'll remind

16   you, because I said it, but he said,

17   "If DMs are auditing the stores

18   constantly, how come you figured it

19   out and not them?"  Something along

20   those lines.

21       Q.      Right.

22       A.      And he also said, "if you

23   are right, then why weren't these

24   employees complaining?"

25       Q.      Other than Tim, did you

```
 1                   CONFIDENTIAL
 2   share with anybody else your
 3   concerns?
 4        A.     Well, other than Tim,
 5   Wesley Manley, and Les- -- Les,
 6   the -- I call him, "DM Les," Les
 7   Fable.
 8                   MR. GRAFF:  Fable.
 9        A.     I --
10        Q.     Those were the three
11   people that knew about the retro pay
12   issue?
13        A.     As far as I remember at
14   this time.
15        Q.     Okay.  Do you know if
16   Starbucks had a policy regarding
17   wage-an-hour retro pay?
18        A.     The only policy I know of
19   is time worked equals time paid, but
20   I don't know if some other policy
21   would have --
22        Q.     Other than the complaints
23   you've made orally, is there any
24   written complaints that you've made
25   about this?
```

1          CONFIDENTIAL

2    probably thought I would point the

3    finger at Carla Ruffin, and maybe

4    Tim Hutchinson because --

5         Q.    Maybe?

6         A.    Yeah.  Well, I think that

7    she thought that because, in my

8    opinion, all of these things

9    happened under their watch.  You

10   know, at this point, I -- I don't

11   know for a fact whether or not Carla

12   and Tim purchased a bunch of

13   pesticides and planted them around

14   the workplace, but I could see them

15   thinking it was a threat that --

16   that I had covered something that

17   happened while they' were in charge.

18   Yeah, I'll leave it at that.

19        Q.    Good.  Didn't Tina tell

20   you to speak with your DM about

21   these issues?

22        A.    She did.

23        Q.    And you did, right?

24        A.    I did not speak to --

25        Q.    You did not, but she did

1                    CONFIDENTIAL

2    tell you that, right?

3         A.       She did.

4         Q.       During your employment at

5    Starbucks, did you ever meet anyone

6    who worked for the company that Jill

7    and Paul worked for?

8         A.       Once I met -- I met Jill.

9         Q.       When?

10        A.       Pure guess, 2015.

11        Q.       2015?

12        A.       Yeah.

13        Q.       And where'd you meet her?

14        A.       At my location.

15        Q.       Where you were working at

16   the time?

17        A.       Yeah.

18        Q.       And how did you come

19   about meeting her?

20        A.       She was doing some kind

21   of pest control issue, but I can't

22   remember what.

23        Q.       You talked to her?

24        A.       Yes.

25        Q.       What did you say?

1          CONFIDENTIAL

2    and maybe Tina McDonald to give them

3    information regarding any possible

4    violations.

5          Q.    Do you know how they

6    originally --

7                Do you know if this is

8    the only complaint that was filed,

9    and if so, do you know who filed it?

10         A.    I do.  And I do, yes.  I

11   believe in probably the third week

12   of December, if memory serves,

13   December 21st, Stella Morgan filed a

14   complaint with the DCA.

15         Q.    And who is Stella Morgan?

16         A.    Stella Morgan was a

17   barista at 180 West Broadway.

18         Q.    And did you know her

19   prior to December 21st?

20         A.    Yes.

21         Q.    How did you know her?

22         A.    When I became the manager

23   of that location, I think I met her

24   on the first day; I think

25   October 11th, 2017.

1          CONFIDENTIAL

2     Q.     Did she discuss that she

3  was going to file a complaint with

4  the DCA with you?

5     A.     No.

6     Q.     Did you know she was

7  going to file a complaint before she

8  filed it?

9     A.     No.

10    Q.     Did you speak to her

11 after she filed the complaint?

12    A.     Not about that.

13    Q.     What did you talk to her

14 about?

15    A.     She requested a transfer

16 for more hours and I helped her

17 obtain a transfer.

18    Q.     And where did you

19 transfer her?

20    A.     I think that the transfer

21 took place after I left, but I think

22 it was Broadway and Barclay, but I'm

23 not sure.

24    Q.     By the way, do you know

25 the outcome of the DCA Complaint

1          CONFIDENTIAL

2    filed and any findings?

3        A.      I've read it.  Sure.

4        Q.      What did it say?

5        A.      Oh boy, top of my head --

6    I think that they found that the

7    schedules were posted late, that

8    some of the partners were owed

9    money, and I -- I believe that they

10   found -- that some partners, from

11   the time logs, were also owed money,

12   and that -- I believe that's it, but

13   I'm not sure.

14       Q.      Have you talked to Stella

15   Morgan, since you left the company?

16       A.      No.

17       Q.      Do you know if your

18   girlfriend has discussed your claims

19   with the person she works for?

20       A.      Not that I'm aware of.

21       Q.      Okay.  Did she ever share

22   with you that she was going to

23   discuss your claims with Helen?

24       A.      No.

25       Q.      Are you sure about that?

# Notice of Separation
## U.S. Retail

Fox_v_Starbucks_Exhibit 25
Plaintiff
Rafael Fox - 182742
08/12/2020(RG)

| Partner Name: | **Rafael Fox** | Date Delivered: | 2/6/2018 |
|---|---|---|---|
| Partner Number: | **1060932** | Store Number: | **15751** |
| Manager's Name: | **Timothy Hutchinson** | | |

## Statement of Situation

**Manager's Statement:** Describe the circumstances that led to the decision to separate the partner from employment.

This document serves a Notice of Separation for Rafael Fox for failure to execute in the Store Manager role as it pertains to adhering to Company Policy, New York City Legislation and Living our Mission and Values.

SM Fox failed to comply with the terms of the NYC Fair Work Week Law, including but not limited to posting schedules two weeks out, maintaining an updated Schedule Change Log and responding to internal partners who expressed interest in available shifts. In addition, SM Fox, failed to pay partner Predictability Pay after seeking guidance and being told that payment should be processed.

When initially questioned about his compliance with components of the law, SM Fox was not transparent and truthful about existing violations.

As a Store Manager, you are expected to act in a manner consistent with Starbucks Mission & Values; SM Fox failed to connect with transparency, exhibit integrity in his actions and comply with both Company policy and NYC legislation.

SM Rafael Fox is separated from Starbucks Coffee Company effective immediately.

## Signatures

| | Date delivered | Name (please print) | Partner # |
|---|---|---|---|
| *[signature]* Manager Signature | 2/5/18 | Rafael Fox | 1060932 |
| *[signature]* Witness Signature (if applicable) | 2/8/18 | AMANDA PERSTAC | 1364128 |

*Partner:* The above has been discussed with me by my manager. I understand my signature does not necessarily imply agreement, but acknowledges receipt of this form.

| | Date delivered | Name (please print) | Partner # |
|---|---|---|---|
| *[signature]* Partner Signature | 2-8-18 | Tim Hutchinson | *[partner #]* |

*Partner:* For information regarding the impact of your separation on your benefits and other aspects of your employment, please refer to the Partner Separation FAQ – US Retail (available from your manager).

---

*Manager:* Print two copies of this form. Provide one signed copy to the partner and retain one signed copy in the store partner file.

©2017 Starbucks Corporation. All Rights Reserved. Internal Use Only     Source: PRSC, rev. July 2017