# EXHIBIT J

1                    - RACHEL KELLY -

2       UNITED STATES DISTRICT COURT

3       SOUTHERN DISTRICT OF NEW YORK

4       --------------------------------X

5       RAFAEL FOX, ET AL.,

6                    V.              CIVIL CASE NO.

7                          1:19-CV-04650-AJN-SN

8       STARBUCKS CORPORATION,

9                    Defendant.

10      --------------------------------X

11      DATE:  SEPTEMBER 2, 2020

12      TIME:  11:15 A.M.

13

14               VIDEOCONFERENCE DEPOSITION OF RACHEL

15      KELLY, pursuant to Notice, before Hope Menaker, a

16      Shorthand Reporter and Notary Public of the State

17      of New York.

18

19

20

21

22

23

24

25

1                    - RACHEL KELLY

2    where it was split into the division.

3         Q.    What -- sorry, I thought you were

4    done.  I didn't mean to cut you off.  Please

5    continue.

6         A.    I don't -- I was going to say I don't

7    recall the exact date.

8         Q.    When you were Director of Partner

9    Resources, what positions, if any, reported to you

10   as their direct supervisor?

11        A.    So Partner Resources Managers and the

12   HR Compliance Specialist Senior.

13        Q.    What sort of training, if any, did

14   you undergo in connection with becoming Director

15   of Partner Operations the first time in September

16   2016?

17             MR. MOY:  Objection.

18        A.    So based on my recollection, I was

19   assigned Partner Resources Director mentor.  I was

20   given a training plan where I would, you know,

21   meet with other HR representatives in the company

22   to learn about their roles and how we would work

23   together.

24             There was, you know, ongoing

25   trainings that we had as a selective group for

1                    - RACHEL KELLY

2    worked under you when you were Director of Partner

3    Resources in New York?

4         A.     In the entire time or at one time

5    directly reporting to me?

6         Q.     At a given time, how many positions

7    were there?

8         A.     At a given time, two to three.

9         Q.     Were they split up amongst the

10   geographic zones?

11        A.     Correct.

12        Q.     Other than human resources managers,

13   who else, if anybody, reported to you as their

14   immediate supervisor when you were Director

15   Partner Resources in New York?

16        A.     The senior HR compliance specialist.

17        Q.     Was there more than one such

18   individual during your tenure there?

19        A.     Yes.

20        Q.     Was there more than one at a time?

21        A.     No.

22        Q.     Who were the individuals who held

23   that position?

24        A.     Tina McDonald and Monica Maddock.

25        Q.     During what period of time did Monica

1                    - RACHEL KELLY

2    Maddock hold the job?

3         A.    February 2019 to present.

4         Q.    During what period of time did Tina

5    McDonald hold the job?

6         A.    November 20, 2017.  And we did have a

7    bit of a transition period from -- Tina was

8    promoted to a Partner Resources Manager, so there

9    was a time lapse in between Tina's promotion to

10   the time that Monica went into position.  So I

11   can't remember the exact dates of Tina's

12   promotion, but she held the position up until

13   Monica took it.

14        Q.    Did somebody hold that position

15   immediately prior to Tina McDonald?

16        A.    In New York Metro?

17        Q.    Yes.

18        A.    No.

19        Q.    Do you have an understanding of why

20   it was that a decision was made to hire somebody

21   for that position in New York Metro?

22              MR. MOY:  Objection.

23        A.    Yes.

24        Q.    Can you explain.

25        A.    Yes.  So the person was put into --

1                  - RACHEL KELLY

2       the decision was made as to support the

3       implementation and execution of the Fair Workweek

4       legislation that was due to come about in November

5       2017.

6            Q.    Apart from Ms. McDonald's role in

7       connection with that legislation, did she have any

8       other duties or responsibilities in connection

9       with her role as Partner Resources -- excuse me,

10      as a Senior HR Compliance Specialist?

11           A.    That would be the primary function of

12      her role.  Some of the other things that she did

13      would be to work on -- or consulting on, you know,

14      tools, processes to support that, or other systems

15      that would be in support of that legislation and

16      then, you know, document, collection and retention

17      in support of that, and then training in support

18      of the legislation.

19           Q.    Does Ms. Monica Maddock have the same

20      role and responsibilities as Tina McDonald did

21      when she held the position?

22           A.    Yes.

23           Q.    Has anything else been incorporated

24      into the duties of the Senior HR Compliance

25      Specialist apart from Fair Workweek?

1                  - RACHEL KELLY

2      are other, you know, specific things as in like

3      partner care, partner safety, wage and hour, you

4      know, Fair Workweek in certain situations.

5          Q.    As far as you know during his

6      employment, did Rafael Fox make any complaints

7      that bared on health and safety issues?

8          A.    I was informed of that at, you

9      know -- obviously it's a part of this case, so I

10     am aware of it.  He raised a concern.

11         Q.    As of the points in time when Mr. Fox

12     separated from his employment, were you aware if

13     he had at any point during his tenure raised

14     complaints about matters of health or safety?

15         A.    No.

16         Q.    As of the time he separated from

17     employment, were you aware of whether Mr. Fox had

18     raised complaints or concerns about wages being

19     unpaid for certain employees?

20         A.    At the time of his separation?

21         Q.    Yes.

22         A.    Was that -- no, I was informed after

23     the separation.

24         Q.    What store did Rafael Fox manage at

25     the time of his separation?

1                    - RACHEL KELLY

2          A.     If I recall correctly, West Broadway

3     and Leonard.

4          Q.     Who preceded him as manager of that

5     store?

6          A.     I'm sorry, I don't recall the

7     partner's first name, or full name.  I believe the

8     partner's first name was William.

9          Q.     Do you have any information about the

10    circumstances of William's leaving his role as

11    manager of that store?

12         A.     (No audible response.)

13         Q.     Could you describe what you know

14    about that subject?

15         A.     Yeah.  It's my understanding that

16    William was separated for violations of wage and

17    hour.  And that as Rafael came in, he was asked to

18    make adjustments, I believe, to correct those

19    inaccuracies of wage and hour.  That's my

20    understanding of the situation.

21         Q.     Who was the District Manager at the

22    time that Will was separated?

23         A.     It's my understanding that it was Les

24    Sable, but I also believe that there was a

25    transition between Les and Tim like right around

1                    - RACHEL KELLY

2    former manager Will?

3                    MR. MOY:  Objection.

4         A.    So -- so the District Manager is

5    involved in the investigation itself.  I'm not

6    sure who Les worked with from Partner Resources in

7    that particular investigation.  Again, it would

8    have either been Partner Resources Manager or

9    someone within the PRSC.

10        Q.    Were the partners who were owed money

11   due to whatever misconduct by Will compensated for

12   any losses that he caused them?

13        A.    It is my understanding that yes, they

14   were all compensated.

15        Q.    Were they compensated prior to Rafael

16   Fox becoming Store Manager of that location?

17        A.    Again, it's my understanding that

18   Rafael was asked by Les to make those corrections

19   to ensure that they were paid accurate.  Again,

20   that's my understanding.

21        Q.    What is the source of information for

22   that understanding, your source of information?

23        A.    Yeah.  Conversations with Les and

24   conversations with Tim.

25        Q.    What, if anything, did you discuss

1                  - RACHEL KELLY

2       see there's two entries 9-18, and they have the

3       description "supplies pest"?

4            A.    Uh-huh.

5            Q.    Just for the record, could you say a

6       word?

7            A.    Yes.

8            Q.    Do you see in the first it says,

9       supply pest lines, the amount is 24.30-something?

10           A.    Yes.

11           Q.    We can put aside that document.  Was

12      it your decision to hire Tina McDonald for a new

13      position in the district as senior compliance

14      manager?

15           A.    Yes.  In the region.  Not in the

16      district, but in the region, yeah.

17           Q.    Was it your decision to create that

18      position in the district in the region?

19           A.    No.

20           Q.    Who decided to create that position?

21           A.    My predecessor had requested that the

22      position is funded, and got the approval to do so.

23           Q.    And did you then make the first hire

24      into the position?

25           A.    I did.

1                  - RACHEL KELLY

2          Q.     What was the process for identifying

3      and then selecting among candidates?

4          A.     Sure.  So this position was certainly

5      going to be one of importance, and so the first

6      step that I did was shared the job overview,

7      expectations of the role, and just some guidelines

8      of what we were looking to have this person do in

9      support of the Fair Workweek legislation that was

10     upcoming.  I shared that with the Regional

11     Directors in the region and the Partner Resource

12     Managers, and certainly Robyn and Tracy, the RBT,

13     and our recruiting team to just talk about who

14     might be a really good candidate for the position.

15             We identified this was going to be an

16     internal partner that would move into the role

17     because of the nature of the job and the

18     importance of understanding our Starbucks

19     processes and protocols as it would relate to the

20     expectations of the job.

21             So I shared that with the regional

22     leaders, asked them to think about individuals on

23     their respective teams, talk to their District

24     Managers and identify who might be interested in

25     the role and who they would assess based on

1               - RACHEL KELLY

2    performance, interest, knowledge of operational

3    protocol, et cetera, who might be a good candidate

4    to interview for the position.

5               From there, two Regional Directors

6    put forward two candidates.  One was an Anaiad

7    Espinosa, and the other was Tina McDonald.  I

8    asked Robyn to conduct the interviews with me,

9    given that this person would interface heavily

10   with the two of us and certainly my respective

11   teams.  We interviewed both candidates together,

12   and I made the final decision to offer the job to

13   Tina.

14       Q.    When you referred a moment ago to

15   Robyn, are you referring, just for the record, to

16   the woman you identified as Starbucks in-house

17   counsel Robyn Ruderman?

18       A.    That is correct.

19       Q.    And you and she jointly interviewed

20   and selected Tina?

21       A.    We interviewed Tina together.  I made

22   the selection of Tina.

23       Q.    Which Regional Director put forward

24   Tina McDonald as a candidate?

25       A.    Ron Shuler.

1                    - RACHEL KELLY

2          Q.     Did you read anything?

3          A.     No.

4          Q.     Who devised the training program for

5     employees at Starbucks in New York in connection

6     with the Fair Workweek Law?

7                 MR. MOY:  Objection.

8          A.     Can you clarify just a little bit in

9     more detail what you're looking for as it relates

10    to training program.

11         Q.     Sure.  Was training provided to Store

12    Managers at Starbucks in New York concerning the

13    Fair Workweek Law?

14         A.     Yes.

15         Q.     Can you describe what that training

16    involved?

17         A.     Sure.  We had a series of both formal

18    and informal training sessions.  You know, I'll

19    talk about what we did leading up to the

20    implementation of the law, and then that's

21    certainly sustaining training efforts as well.  So

22    as I shared, I joined the New York Metro team the

23    first week of October in 2017, and the previous --

24    my predecessor had outlined some expectations for

25    training.

1              - RACHEL KELLY

2                    So we followed through with those and

3     then we added some supplemental things.  So the

4     first training session that was provided was at

5     the Store Manager summit in the areas that would

6     be applicable for the predictability, or for the

7     Fair Workweek legislation.  So we had three areas

8     that had stores within the five boroughs of New

9     York.  So area 76, which was Ron Shuler's area;

10    Area 146, which was Carla Ruffin's, area 82 which

11    was Kate McShane's, and then, and then a portion

12    of area 75 which was Alexis Vertucci.  There were

13    three districts.

14                    The first training session that I was

15    involved in, like I said, was at the -- for

16    managers' summit.  We brought in someone from

17    Seattle to lead this training for the Store

18    Managers.  These summits were held over the course

19    of two weeks between October the 10th and the

20    17th.  All Store Managers and District Managers

21    were in attendance as well as some of the regional

22    leadership team, support partners, business

23    partners, et cetera.

24                    The training session that was given

25    to Store Managers at that summit was approximately

1              - RACHEL KELLY

2    a 90-minute session.  It was led by Sandy Ellison,

3    as I shared, the person that came in from Seattle;

4    and she walked the Store Managers through our Fair

5    Workweek training guide.  In addition to that, we

6    shared barista needs to know, a Store Manager

7    needs to know, and a District Manager needs to

8    know, and introduced what would be the schedule

9    change log that would come to fruition once the

10   law went into place.

11            So that was the first occasion for

12   training.  For formal training, I should say.

13   Sorry, go ahead.

14       Q.    That first occasion, were the

15   training materials distributed or provided to the

16   Store Managers to keep?

17       A.    They were.

18       Q.    Were they handed out on paper at the

19   training or something else?

20       A.    I don't know if it was handed out.  I

21   think they were placed on like the tables of the

22   participants, but it was on paper.

23       Q.    Date-wise I believe you already

24   specified the range of time that this first

25   training occurred.  What is the next phase of

1                - RACHEL KELLY

2       training that happened?

3            A.    Yes.  So from there, in an ongoing

4       basis as we learned more about how we were going

5       to implement the processes at Starbucks or how --

6       you know, as we were learning details on what we

7       were anticipating from a legislation standpoint,

8       we would provide updates to the regional

9       leadership team at the weekly huddles.  So this

10      was the Regional Directors, our Partner Resources

11      Manager, the RBT, and we just provide updates on

12      an ongoing basis to keep everybody in tune to what

13      was coming and what the plans were.

14               We were anticipating the detailed

15      regulations of the -- excuse me, that there would

16      be legislation to come out a little so sooner than

17      they did.  So we had put forth a plan to train the

18      managers throughout the month of November, but we

19      weren't ready to do that because we didn't have

20      the detailed regulations, and many of our

21      processes were going to be dependent on that.

22               So we continued to work on the

23      documents in preparation, and the next training

24      sessions that we held were November 14th through

25      November 17th.  This, again, was an opportunity

1                    - RACHEL KELLY

2        for us to train all of the Store Managers, all of

3        the District Managers, and all of the Regional

4        Directors in greater detail with the training

5        guide.  And that had more of the additional

6        processes in place and new documents to share with

7        them at that training.

8                    So that was a two-hour session, and

9        we generally broke it up to about two districts at

10       a time, and they were facilitated in partnership

11       between the Partner Resources Managers, myself, I

12       believe Robyn shared and did some co-facilitation

13       at times and answered questions, and we conducted

14       those through the course of that week.

15                   On November the 17th, which was the

16       conclusion of that week, we compiled all of the

17       outstanding questions that arose during those

18       training sessions.  Things that we may not have

19       been able to answer in the moment or still wanted

20       to provide, like get clarity and calibrate on.  So

21       we compiled those as a Partner Resources team and

22       had a chance to work through those.  On November

23       17th, I followed up with an e-mail to the

24       regional -- I'm sorry, the District Managers and

25       the Regional Directors just outlining some of the

1                    - RACHEL KELLY

2      key things that we covered in the training in

3      anticipation of the law going live on November the

4      24th, and reinforcing some of the standards that

5      were shared in those training sessions.  So more

6      of an inform reinforcement of the time training

7      that we provided.

8                    That following Monday, on November

9      the 20, we again just reviewed some of the

10     training materials with the regional leadership

11     team, talked through some those Q and A, and just

12     really talked about, you know, if there are any

13     needs or anything else that we wanted to put in

14     place leading up to the go live date.

15                   Then from there, the Fair Workweek

16     legislation went live on November the 24th.  So

17     the day that it went live, I sent a message to the

18     applicable stores, the District Managers, the

19     regional leadership team, again outlining key

20     components of the legislation, some of the key

21     points around our expectations, the processes, and

22     certainly opening the door that if they had

23     questions, to reach out to their leader, their

24     Partner Resources Manager.

25                   And then from there, the following

1                    - RACHEL KELLY

2        week -- or I'm sorry, that was the go live date.

3        The following week we opened it up to office

4        hours, so each R&D lead had set up a working

5        partnership with their PRM to, you know,

6        communicate out and just hold some time on their

7        calendar the following week to be available if

8        questions were to come up.  And then, you know, I

9        would say there are many updates, written

10       communication, reminders that were sent out via

11       e-mail either through myself or Tina.

12                We also held a following -- we held a

13       make-up session to that training the first week of

14       December for anybody that might have missed that

15       Store Manager training that I had shared.  And

16       then from there, we would continue to, on a weekly

17       basis, provide the team with hypothetical -- when

18       I say team, I'm sorry, more specifically provide

19       Store Managers, District Managers, Regional

20       Directors either reinforcement to some of the

21       standards, updates if they were applicable,

22       scenarios, really teaching and guiding them on how

23       to handle situations as they arose.

24                And then from there we did periodic

25       trainings, updates.  Specifically, you know, Tina

1                  - RACHEL KELLY

2    would join huddles the RDs would have with their

3    District Managers.  Tina would join huddles that

4    DMs had with their Store Managers.  We would be

5    out in the Field in stores actually going through

6    and kind of checking the information and providing

7    on-the-spot coaching and helping the teaching

8    coach in more of a one-or-one or two-on-one basis.

9    And certainly available all the time in regards to

10   questions.  And then we had kind of a sustainment

11   training plan from there.

12              So hopefully that gives you a little

13   bit of an introduction of what we did to prepare

14   the team, but I can certainly provide

15   clarification if needed.

16        Q.    Did you ever go in person to Rafael

17   Fox's store for any purpose?

18        A.    I did not.

19        Q.    Who would -- created the written

20   training materials that you mentioned?

21        A.    So the Fair Workweek training guide

22   was created prior to me stepping into position.

23   So I don't know who collaborated to put that

24   together specifically.  Sandy Ellison, the person

25   that flew in from Seattle to lead the training,

1                - RACHEL KELLY

2    questions, but not in a formal way that I think

3    you're asking about.

4         Q.    You mentioned the date when the Fair

5    Workweek Law I think you said went live on

6    November 24, 2017; is that the correct date?

7         A.    That is correct.

8         Q.    Leading up to that time, did

9    Starbucks have a plan in place to conduct audits

10   to assess compliance with the Fair Workweek Law by

11   stores upon the law taking effect?

12              MR. MOY:  Objection.

13        A.    Can you just clarify what you mean by

14   "audit."

15        Q.    Was this any mechanism planned

16   whereby you were planning to somehow ascertain

17   whether stores were complying fully with the new

18   regulations?

19        A.    Sure.  So there's a couple of ways

20   that we verify.  One is to physically go into the

21   stores and talk to the partners, talk to the

22   leaders, and physically check whether or not the

23   standards were in place; and that would be a part

24   of the DM's role and responsibility.  We talked

25   about the importance of leading this at a high

1                    - RACHEL KELLY

2        level and really all of us taking ownership

3        because of the importance in creating a great work

4        environment for our partners and taking that

5        collective ownership around this.

6                    So we also talked about, you know,

7        RDs making sure they understood Partner Resources

8        Managers so that Tina certainly as a compliance

9        specialist so that they could go in and they could

10       check in with partners, follow up to the things

11       that we were putting in place.  So that was one.

12                   Secondarily, we did put together an

13       audit in that Tina as part of her role would have

14       a consistent mechanism for evaluating the

15       standard, the processes and the protocols around

16       the Fair Workweek legislation and other components

17       tied to that; and so that was a formal audit that

18       she had in place.

19                   From there, eventually we started to

20       recognize that that could be valuable for District

21       Managers as well.  So the DMs were given the audit

22       also to leverage, and the expectation for the

23       audit from a DM standpoint was that they would do

24       that periodically throughout the year based on

25       their cadence with their stores.

1                  - RACHEL KELLY

2                  And I think those are probably the

3       three main ways that we talked about kind of

4       auditing issues better or validating that things

5       were happening in our stores.

6                  And then we hadn't gotten to this

7       yet, but we do a quarterly document collection in

8       the region for the documents that are associated

9       with the Fair Workweek legislation.  So once those

10      documents come in, we actually audit the documents

11      from there, and then provide feedback back to the

12      leaders so that they can go back into the stores,

13      circle back to the partners, the leaders, and

14      follow up in greater detail.  Those are some of

15      the mechanisms we had in place for validation and

16      follow-up.

17          Q.    When did the audits by Tina McDonald,

18      which were in the list that you just explained,

19      when did those audits begin?

20          A.    Yeah.  So we had more of an informal

21      audit, you know, that Tina did, right, where she

22      would go in and she would check the standards; and

23      then, as I said, eventually we had put the formal

24      audit in place.  So Tina started in her role on

25      November the 20th.  The law went live on the 24th,

1              - RACHEL KELLY

2          A.    So specifically the more formal

3     audit.  So are you asking if she conducted a

4     formal -- yeah, can you provide me a little more

5     detail on what you're looking for there.

6          Q.    Sure.  You said that there was a

7     point in time when she began conducting more

8     systematic audit mechanisms.  My question now is

9     whether that point in time came prior to Mr. Fox's

10     separation or if it started after he was

11     separated?

12          A.    I -- I don't recall exactly.  I would

13     say it was around that time.  I don't recall

14     specifically if was right before, right after.

15          Q.    Is it fair to say that you're aware

16     of a complaint that was made about Mr. Fox related

17     to Fair Workweek compliance to the Department of

18     Consumer Affairs?

19          A.    Yes.

20          Q.    When did you first become aware of

21     the fact that that complaint had been lodged?

22          A.    I believe it was on January the 10th

23     of 2018.

24          Q.    Had Ms. McDonald begun conducting her

25     more formalized audits as of that date?

1                    - RACHEL KELLY

2                    MR. MOY:  Objection.

3          A.    No.

4          Q.    What, if any, involvement did you

5     have in handling the complaint after you became

6     aware of it?

7          A.    Well, so once I was -- once I was

8     made aware of it, I directed Tina and Brad to go

9     to the store, to Rafael's store specifically to

10    look into the Fair Workweek standards and the

11    concerns.  I can't remember if we had the exact

12    concerns.  I don't recall what the partner shared

13    as their specific concern, but I know it went to

14    the Department of Consumer Affairs.  We were

15    informed, and I directed them to go in really to

16    evaluate the compliance around the Fair Workweek

17    standards.

18         Q.    Were you aware at that time of the

19    identity of the person who lodged the complaint?

20         A.    I don't believe so.  I don't -- I

21    don't recall knowing the name of the partner that

22    made the complaint.

23         Q.    Did you at some point in time come to

24    learn the name of the partner who made the

25    complaint?

1                  - RACHEL KELLY

2       notes created the created by the Department of

3       Consumer Affairs in connection with the interviews

4       of Starbucks partners?

5            A.    Not that I recall.

6            Q.    You had mentioned I think that you

7       became aware of the complaint on January 10th, and

8       that you directed Tina McDonald and Brad Jennison

9       to go to the store.  Do you know what date they

10      did that?

11           A.    I believe that was on -- I believe

12      they did that the following day, on January the

13      11th.

14           Q.    Did they report back to you after

15      they visited his store?

16           A.    They did.

17           Q.    Did they provide you with any written

18      summary of their visit?

19           A.    I -- yes.  And Robyn Ruderman was

20      also copied, and I do believe it was titled as

21      attorney-client privileged.

22                 MR. GRAFF:  Now, for the record, to

23           the extent there is any nonprivileged

24           document of that sort, we'd request

25           production of all in writing as with other

1              - RACHEL KELLY

2        requests during the deposition.

3              MR. MOY:  Off the record.

4              (Whereupon, a brief discussion was

5        held off record.)

6        Q.    Ms. Kelly, did Tina McDonald send you

7    any communication detailing the facts that she

8    gathered and observed while visiting Mr. Fox's

9    store on January 11th?

10             MR. MOY:  Objecting.

11       A.    Yes.

12       Q.    Was the e-mail that she sent you with

13   those facts also copied to legal counsel?

14       A.    Yes.

15       Q.    As best you recall, what were the

16   facts that Tina communicated to you based on her

17   visit on January 11th?

18       A.    So based on my recollection of her

19   visit to Rafael's store on January 11th, she had

20   identified that there were four schedules that

21   were posted under the -- posted late, so with less

22   than 14 days' notice.  She had also identified

23   that Rafael had hired a person into Starbucks

24   externally, and the internal partners that had

25   reached out who were interested in those hours,

1              - RACHEL KELLY

2      that Rafael did not get back to them, did not

3      respond to them.

4              She also shared that predictability

5      pay was not paid where it was to be incurred as

6      aligned with those late schedules that I had

7      previously mentioned.  And she also gave an

8      example where Rafael had reached out to her and

9      asked a specific question regarding a partner on

10     whether or not they were owed predictability pay;

11     and that she directed him to pay the partner.  But

12     upon visiting the store, had identified that he

13     never did pay that partner.  Sorry, go ahead.

14          Q.    Are all of these findings --

15          A.    So --

16          Q.    I'm sorry.  If you're not done

17     answering, please finish your answer.  I'm not

18     trying to speak over you.

19          A.    Yeah, no worries.  Yeah, there were

20     some additional requests -- additional components

21     as well.

22              She also stated that Rafael didn't

23     appear to be forthcoming around his violations of

24     the predictability pay.  When she was reviewing

25     the logs, the schedule change logs specifically,

1               - RACHEL KELLY

2    Rafael had been completing those logs as the Store

3    Manager.  And she also noted that there was -- a

4    partner consent was missing on a number of

5    occasions as she reviewed those logs.

6               I know they also had some

7    conversation and she talked with Rafael, but I --

8    I wasn't there, so I can't speak to the specifics

9    of those dialogues, but that was really the

10   overview of what she reported back.

11        Q.    And this is all information she

12   reported back based on her first visit on January

13   11th?

14        A.    The -- I'm not exactly sure when the

15   conversations happened with Rafael.  The

16   components that I shared around the late

17   schedules, the log and him not getting back to the

18   partners, and the question that he had asked, yes.

19   She did respond, yes she did share that.

20        Q.    Did Ms. McDonald make more than one

21   site inspection to Mr. Fox's store?

22        A.    I believe so.

23        Q.    When was the second such visit?

24        A.    I believe she went back the following

25   week, if I recall correctly.

1                    - RACHEL KELLY

2          Q.    If I suggest that it might have been

3    the 16th, does that ring a bell or you're not

4    sure?

5              MR. MOY:  Objection.

6          A.    I believe it was the following week.

7    I don't recall the exact day.

8          Q.    In substance, what did Tina

9    communicate to you about whatever new information

10   she discovered on that second visit?

11         A.    Yeah.  So I think in the second visit

12   it was more details around her findings, and I

13   believe that was -- I would be guessing.  I

14   believe that's when she shared more about her

15   conversations with Rafael.

16         Q.    Who was the associate who

17   Ms. McDonald had directed him to pay but hadn't

18   been paid?

19         A.    I don't recall that person's name,

20   I'm sorry.

21         Q.    Do you believe their name would be

22   documented in any of your written communications

23   with Ms. McDonald or others about this

24   investigation?

25              MR. MOY:  Objection.

1                    - RACHEL KELLY

2          A.     Yes.

3          Q.     One of the items you had mentioned

4     was in connection with Mr. Fox allegedly not

5     getting back to certain internal partners who

6     wanted certain available positions.  Was it your

7     understanding that there were any timely

8     communications from partners who would have been

9     eligible to take this position -- that position?

10         A.     It is my understanding that yes,

11    there were partners that had reached out and

12    expressed interest to Rafael.

13         Q.     Is there a period of time after

14    posting within which managers are required to

15    express interest if they're interested?

16         A.     If managers are or partners?  We're

17    talking about hourly partners.

18         Q.     Partners.

19         A.     So we're required to post the

20    opening, the recurring shift for three days in all

21    the stores in the respective borough.  There's not

22    a legal requirement on how long you have to wait

23    thereafter before you can make a hire.  However,

24    it is noted that preferential preference should be

25    given to internal partners who express interest

1              - RACHEL KELLY

2    over hiring externally.  So it would be dependent

3    on individual situations and the timing of that

4    situation.

5         Q.    Is it your understanding that there

6    were partners who within the three-day posting

7    period expressed interest and Mr. Fox did not

8    respond?

9         A.    So that wasn't my intention to

10   express that, if that was how you interpreted it.

11        Q.    I'm not --

12        A.    The posting -- okay.  The posting is

13   required to be up for three days so that partners

14   within the respective borough have an opportunity

15   to see it.  It's not expected that they are

16   required to reach out within that three-day time

17   frame, within a reasonable time frame.

18        Q.    Did you have any interaction with

19   Mr. Fox in connection with his hiring of an

20   outside person?

21        A.    I did via e-mail.

22        Q.    Can you describe the interaction.

23        A.    Yes.  So based on based on my

24   recollection, there were a couple of instances

25   that Rafael had e-mailed either asking questions

1               - RACHEL KELLY

2       subsequent visit, as far as you know, was she

3       accompanied by anyone?

4               A.     I don't recall either way.  Sorry, I

5       don't recall.

6               Q.     You had referred earlier to

7       Ms. McDonald telling you about how there had been

8       a prior e-mail and she had directed Mr. Fox to pay

9       a partner, and she later determined the partner

10      hadn't been paid.

11              A.     Uh-huh.  That's correct.

12              Q.     Apart from that prior direction that

13      had been given prior to Tina's visits, did

14      Ms. McDonald tell you that she had directed

15      Mr. Fox to take any actions during either of her

16      visits?

17              A.     Can you clarify what you're looking

18      for in taking any actions?

19              Q.     Did Ms. McDonald direct Mr. Fox to

20      take any action to correct whatever problems she

21      identified?

22              A.     I wasn't there, so I don't know what

23      kind of information she shared with him at the

24      time.

25              Q.     Is it your understanding that Mr. Fox

1                   - RACHEL KELLY

2    with Tina.

3         Q.    Did he share any information that was

4    new or different than what Tina had already shared

5    with you?

6         A.    No.

7         Q.    After Tina McDonald's second visit to

8    Mr. Fox's store, which you said took place the

9    week after January 11th, what is the next step or

10   thing that happened in the investigation process?

11        A.    Yeah.  I know the sequencing of the

12   details might just -- you know, I just want to put

13   that out there.  We also validated that Rafael

14   attended training, because this was a new law that

15   went into place.  We wanted to make sure that he

16   had, in fact, attended the training and had the

17   knowledge of the standards and of the expectations

18   that were set forth to Store Managers.  Brad did

19   validate that Rafael attended training on November

20   the 14th.

21             We also had Tina visit some other

22   locations in the district just to get an

23   understanding of, you know, how the standards and

24   expectations were being implemented across that

25   portfolio of stores, did a spot check in a couple

1                   - RACHEL KELLY

2     of other locations within Tim's district.  And

3     then, you know, I know there were certainly

4     detailed follow-up conversations to, you know,

5     validate.  I know Tina did a number of document

6     collections so that we could report back to the

7     Department of Consumer Affairs.

8                 And so we really worked to put the

9     information together in regards to responding to

10    that complaint.  And at some point it's my

11    understanding that Tina and/or Tim talked with

12    Rafael about these things that they had found in

13    the store really to get his perspective and to

14    understand hike what happened with some of these

15    instances.

16         Q.    I'd like to focus on the last thing

17    you just referred to, that at some point -- did

18    you say Tina McDonald or Tim Hutchinson met with

19    Rafael or did they meet together?

20         A.    I said Tim and -- Tina and/or Tim.  I

21    believe that Tina had conversations with Rafael.

22    I believe that Tim had conversations and there may

23    have been times where they did that together.

24    That's my understanding.

25         Q.    And what is the source or basis for

1               - RACHEL KELLY

2      your belief and understanding that those

3      conversations with Tina and Brad for Rafael's

4      response to these things took place?

5          A.      Could you repeat the question.

6          Q.      Why is it --

7          A.      Why is it that --

8          Q.      -- those conversations happened as a

9      matter of fact in the manner that you described

10     them?

11         A.      When we had further dialogue, they

12     noted specific -- sorry, Tina noted specific

13     things that Rafael had shared with her around

14     his -- some of these things that we had talked

15     about, right, the predictability pay or paying

16     partners and things like that.  The log.  So that

17     led me to the conclusion that Tina had a

18     conversation with him; and I believe that Tim also

19     did during the course of this time as well.

20         Q.      Did you ever review any documentation

21     describing those conversations?

22         A.      No.

23         Q.      During any of those discussions that

24     you believe happened involving Ms. McDonald, is it

25     your understanding that she directed Mr. Fox to

1                    - RACHEL KELLY

2    take any particular action with respect to the

3    items that she had found?

4              MR. MOY:  Objection.

5         A.    I am not aware of any direction that

6    Tina gave to Rafael in reference to the particular

7    item.

8         Q.    You had mentioned that Ms. McDonald

9    also visited some other stores in the area.  How

10   many other stores did she visit?

11        A.    If I recall correctly, I believe it

12   was four.  Three or four.

13        Q.    And did she conduct those visits of

14   all three or four stores prior to Mr. Fox's

15   separation?

16        A.    Yes.

17        Q.    Do you remember specifically which

18   any of the four stores were?  Which stores they

19   were?

20        A.    I'm sorry, I don't.

21        Q.    Did Ms. McDonald provide any --

22   withdrawn.

23              When Ms. McDonald visited those

24   stores, did she conduct a similar compliance audit

25   to what she had done on her visit to Mr. Fox's

1                    - RACHEL KELLY

2      store?

3                    MR. MOY:  Objection.

4           A.    I wasn't present, so I don't know

5      specifically her approach.  She did report back on

6      similar items as it relates to compliance.

7           Q.    Could you describe in a little bit

8      more detail what it is that she reported to you

9      based on her visits to the other stores?

10          A.    Sure.  I don't recall the exact

11     details of each location.  She reported back

12     around store schedules, scheduling change logs,

13     postings of the shifts, the available shifts.

14     Schedules, as I said, predictability payments, and

15     I think general knowledge, the standards and

16     expectations.  This is what I recall.

17          Q.    Did Ms. McDonald communicate to you

18     that each of the stores that she had visited had

19     some of those problems?

20                MR. MOY:  Objection.

21          A.    I don't recall if each store had some

22     of those problems and how it was allocated amongst

23     the different stores.  There were definitely

24     opportunities around the execution of the

25     standards in some of the other locations that she

1                  - RACHEL KELLY

2      think it reiterated the importance of us to

3      continue to visit stores on an ongoing basis; and

4      provide that coaching and the shoulder-to-shoulder

5      leadership to ensure that we got compliance and

6      that we're addressing it as appropriate and

7      understanding trends and themes that are

8      happening.

9                  MR. GRAFF:  I would just note briefly

10           for the record, I had some communication with

11           your colleague Rebecca Goldstein, Gary,

12           yesterday.  She had indicated there were

13           documents concerning the findings of

14           Ms. McDonald's audits of other stores that

15           had not been produced yet and would shortly

16           be produced.  I'm only noting that I haven't

17           received those, and this might be the point

18           in the deposition when I would have to

19           question the witness with the benefit of

20           those documents.

21      Q.     Back to questions, Ms. Kelly.

22                  MR. MOY:  One thing for the record.

23           Insofar as there are any other audits, you

24           can certainly ask the witness about those.

25      Q.     Ms. Kelly, was it your understanding

1                  - RACHEL KELLY

2      that any of the compliance issues that

3      Ms. McDonald identified at Mr. Fox's stores

4      resulted in any partners being owed money?

5          A.     You said in Mr. Fox's stores.  In his

6      store?

7          Q.     In his store, yes.

8          A.     That is correct.  It is my

9      understanding that we did owe partners money.

10         Q.     Did Ms. McDonald pay them that money

11     upon identifying the problems?

12                MR. MOY:  Objection.

13         A.     I don't know exactly who inputted the

14     pay adjustments to ensure that the partners were

15     paid.

16         Q.     At what point in time were the

17     partners paid?

18                MR. MOY:  Objection.

19         A.     I don't have the exact date.  I would

20     say shortly thereafter, we concluded our

21     investigation.

22         Q.     Were the partners paid prior to

23     Mr. Fox's separation?

24                MR. MOY:  Objection.

25         A.     I don't have that information, and

1                  - RACHEL KELLY

2    had found in the stores, and our standards, and

3    how to ensure they could consistently comply with

4    the Fair Workweek legislation.

5         Q.    And apart from that verbal coaching,

6    are you aware of any other disciplinary

7    consequence imposed on any of those managers?

8              MR. MOY:  Objection.

9         A.    Again, Tim would be the person that

10   would deliver disciplinary action, so you would

11   need to either speak with him about that or

12   someone else.  I wasn't involved in that.

13        Q.    Were you involved in identifying,

14   compiling information to provide to the Department

15   of Consumer Affairs in connection with its

16   investigation?

17             MR. MOY:  Objection.  What

18        investigation, please?

19             MR. GRAFF:  Of the Fair Workweek

20        complaint that we've been talking about.

21        A.    So just so I understand the question,

22   you're asking if I was involved in compiling

23   documents for the Department of Consumer Affairs

24   complaint that came out of Rafael's store against

25   him?

1                   - RACHEL KELLY

2        Q.      Yes.

3        A.      That's the question?  Okay.

4                I would say I had limited

5    involvement.  Tina was really the primary person

6    that was gathering the documents that were needed

7    for it and, you know, I certainly saw some of them

8    as we prepared to make our submission.  I was more

9    involved in the general approach and how we would

10   respond, the timeline, making sure we had the

11   information available.  Tina really was the

12   primary person who produced the documents and put

13   them together in partnership with legal counsel.

14       Q.      As far as you know, was information

15   concerning Ms. McDonald's inspection of stores

16   other than Mr. Fox's provided to the DCA?

17       A.      Could you repeat the question.

18       Q.      As far as you know, were the

19   materials provided to the DCA limited solely to

20   Mr. Fox's store or did they include information

21   about the Fair Workweek noncompliance at other

22   stores as well?

23               MR. MOY:  Objection.

24       A.      So it's my understanding that the

25   complaint revolved around the person, and so it

1                    - RACHEL KELLY

2    would be dependent on whether or not the person

3    worked in other locations.

4         Q.    As far as you know, did the

5    Department of Consumer Affairs give any sort of

6    direction as to what disciplinary consequence, if

7    any, should be imposed on Mr. Fox?

8         A.    Could you repeat the question.

9         Q.    Did the Department of Consumer

10   Affairs make any recommendation or suggestion

11   concerning what form of discipline would be

12   appropriate for Mr. Fox?

13        A.    Not to my knowledge.

14        Q.    At some point in time, did

15   Ms. McDonald complete her investigation?

16        A.    Yes.

17        Q.    Do you remember what date Mr. Fox was

18   terminated?

19        A.    I believe it was February the 8th of

20   2018.

21        Q.    How long prior to the date of

22   termination did Ms. McDonald complete her

23   investigation?

24              MR. MOY:  Objection.

25        A.    I don't know the exact date she

1                  - RACHEL KELLY

2       completed her investigation.

3            Q.    What was the next step in the process

4       after Ms. McDonald had completed her fact finding

5       investigation?

6                  MR. MOY:  Objection.

7            A.    So for charity, her investigation for

8       the Department of Consumer Affairs complaint or

9       Rafael's?

10           Q.    Thank you, that's an important

11      clarification.  I understood that Ms. McDonald

12      investigated Rafael's store and found certain

13      noncompliance issues, and that she reported those

14      issues to you, and that at some point she

15      completed the process of fact finding as to

16      Mr. Fox's store.  What is the next step in the

17      process that culminated in his termination?

18                 MR. MOY:  Objection.

19           A.    So as it -- so as it relates

20      specifically to Rafael, when we had culminated the

21      facts and information that we believe we needed to

22      the discuss the next step of corrective action

23      based on the findings, we did have a meeting to

24      discuss what was found as it relates to Rafael

25      specifically, as it relates to Fair Workweek

1              - RACHEL KELLY

2    compliance and his leadership in that regard.

3         Q.     When you say that "we had a meeting,"

4    who participated in that meeting?

5         A.     Thank you for asking.  I apologize

6    for not being clear.  It was myself, it was Brad

7    Jennison, it was Tina McDonald, it was Carla

8    Ruffin, and Robyn Ruderman was present as legal

9    counsel.

10        Q.     When did that meeting take place?

11        A.     I don't recall the exact date.  I

12   apologize.  I didn't have it noted in my

13   notations, so I apologize.

14        Q.     Where did the meeting take place?

15   Were any of the participants physically gathered?

16        A.     In the New York regional office.

17        Q.     Were all of the individuals who you

18   identified as participants physically present for

19   the meeting?

20        A.     I believe -- I'd be guessing.  I

21   believe Brad may have joined by phone.

22        Q.     Who made the final decision to

23   terminate Mr. Fox?

24        A.     Carla Ruffin.

25        Q.     During that final meeting, did

1                  - RACHEL KELLY

2      Ms. McDonald provide any documents or records from

3      her investigation for anybody to review as part of

4      the meeting?

5          A.    I recall her having them available.

6      I don't recall specifically the documents, if they

7      were reviewed or not.

8          Q.    Was --

9          A.    At that meeting.  At that meeting.

10     Sorry.

11         Q.    Was there a draft or already written

12     termination letter for Mr. Fox at that meeting?

13         A.    No.

14         Q.    Was somebody directed to draft such a

15     letter?

16         A.    So once the decision was made that

17     Rafael was going to be separated, the direction

18     was that Brad, the partner -- Brad Jennison, the

19     Partner Resources Manager, would work in

20     partnership with Carla to draft the separation

21     notice.  That was the direction at that time.

22         Q.    What were the reasons for terminating

23     Mr. Fox?

24         A.    Yeah.  So the reasons for

25     termination, for separation, he was separated as

1                  - RACHEL KELLY

2        an involuntary separation for policy violation,

3        other; and the details of that separation and led

4        to the decision for separation would be as

5        follows:  First, Rafael failed to post four

6        schedules with the appropriate time expectations

7        of three weeks' notice.  As a result of that

8        investigation, we had identified that.  And

9        subsequently, based on those schedules, there were

10       partners who were owed predictability pay that

11       Rafael had not paid.

12                  Secondly, Rafael was -- was

13       completing the schedule change log on behalf of

14       other partners; and so it's our standard that

15       partners sign off and consent to the schedule

16       changes and that we have that documented.  There's

17       business initiated changes and there's partner

18       initiated changes, and so the partner's consent in

19       those logs, excuse me, is a critical component in

20       identifying that.

21                  Thirdly, Rafael was hooking to hire,

22       and he had partners express interest in wanting

23       the hours that he had available.  Rafael made the

24       decision to hire externally without meeting with

25       the interim partners or getting back to them as

1                  - RACHEL KELLY

2        they expressed interest in the hours that he had

3        available in his store.  And in addition to that,

4        during points of the investigation, others have

5        had interactions with Rafael where they didn't

6        feel he was being transparent, and that he wasn't

7        being forthcoming with information.  And

8        specifically by signing logs on behalf of his

9        partners, not paying predictability pay when he is

10       given direction to by Tina, the compliance

11       specialist, that was a big concern for us, and

12       that really spoke to his integrity and it breached

13       the leadership trust in that he would actually

14       read these standards and the law in his store in a

15       way that we could trust.

16                  And so the combination of all of the

17       violations in the Fair Workweek, his lack of

18       transparency in parts of the investigation, and

19       ultimately that integrity piece where he wasn't,

20       you know, completing activities in a way that we

21       would expect of a Store Manager, the combination

22       of all of those violations is what led to the

23       decision for separation for Rafael.

24            Q.    In the absence of that final what you

25       call transparency and integrity piece, would he

1              - RACHEL KELLY

2      have been terminated for the other violations that

3      you described?

4              MR. MOY:  Objection.

5          A.     It would be difficult for me to

6      speculate the outcome.  In a lot of these

7      situations and circumstances, we're evaluating the

8      standard, we're evaluating the legal implications,

9      the impact on the work environment and to other

10     partners, the brand.  So it would be difficult for

11     me to speculate.  While I noted earlier there were

12     other opportunities in other stores, the managers

13     were more forthcoming in taking actions to make

14     corrections and open to coaching.

15             Rafael, it was a big differentiator

16     with him in that he wasn't following the guidance

17     that he was being given, and that puts our partner

18     experience at risk in our stores, and quite

19     frankly the brand.

20         Q.     Other than Ms. McDonald, were there

21     any other individuals who provided you information

22     supporting the conclusions about transparency and

23     integrity?

24         A.     Yes.

25         Q.     Who else?

1                    - RACHEL KELLY

2          A.     Carla shared an example of when she

3    had visited the store and she had asked about

4    posted schedules, because to my understanding,

5    again, I wasn't present, but based on what she

6    shared, there wasn't a date printed on the

7    schedule.  And when she had some conversation with

8    him about it, it's my understanding that she

9    didn't feel as though he was being transparent.

10              Our schedules automatically print a

11   date on them, so I'm not sure how it came about in

12   that particular instance and the details around

13   it, but Carla felt as though Rafael was not

14   transparent and that there was an integrity

15   concern there.

16         Q.     Beside that concern that Ms. Ruffin

17   had encountered personally, she personally

18   discovered the date from the schedules and

19   interacted with Mr. Fox and reached her

20   conclusions from his responses?

21              MR. MOY:  Objection.

22         A.     Again, this was her personal

23   experience that she had shared with me.  So I

24   don't have any other information other than that.

25         Q.     I just wanted to confirm that it was

1                  - RACHEL KELLY

2    her firsthand experience and not anecdotal.

3         A.    Yes, that's correct.

4         Q.    Other than Ms. McDonald and

5    Ms. Ruffin as you just described, did any other

6    individuals provide any other information going to

7    the conclusions of lack of transparency and

8    integrity?

9         A.    No, only Tina and Carla.

10        Q.    Did Ms. McDonald inform you or

11   communicate in any way that she had a

12   communication with Mr. Fox concerning Hot Shots?

13        A.    During that meeting?

14        Q.    Ever.

15        A.    After Rafael's separation and after

16   this case was brought forward, she did share that

17   with me.

18        Q.    During that meeting.  Does that mean

19   she didn't share it at that time?

20        A.    She did not.

21        Q.    During that meeting, did anybody make

22   reference to Mr. Fox's involvement in any respect

23   in correcting wage issues at the West Broadway and

24   Leonard store in connection with time log

25   manipulation?

1                    - RACHEL KELLY

2          A.      No.

3          Q.      Did you have any input into the

4     language of the notice of separation?

5          A.      I -- so I just want to kind of back

6     up.  So earlier I said that the direction was

7     given that Brad would work in partnership with

8     Carla to craft the separation notice.  Brad was

9     taking time off the following week.  Lisa Welch,

10    who was his peer PRM in the region reached out to

11    me to help get some insight on the information

12    that would support the separation document.

13             That is an attorney-client privileged

14    communication, so I just want to note that in that

15    I did provide the facts as I saw them, and it was

16    still waiting on legal advisement from Robyn

17    Ruderman, who was also included in that.  So I did

18    outline -- I'm sorry, were you going to ask a

19    question?

20         Q.      No.

21         A.      I did outline the violations as we

22    had discussed from the meeting.  The first spoke

23    to the Starbucks standard of not having schedules

24    posted within three weeks.  Then I went into the

25    legal violations, starting with the schedules that

1                  - RACHEL KELLY

2       would also presume that Amanda Perstack was

3       present.

4            Q.    Did Tim Hutchinson participate in the

5       meeting at which it was decided to terminate

6       Mr. Fox's employment?

7            A.    He did not.

8            Q.    Did anyone provide Mr. Hutchinson

9       with any information apart from what's stated in

10      the termination letter concerning the basis for

11      Mr. Fox's termination?

12                 MR. MOY:  Objection.

13           A.    I did not, and I do not know for

14      certainty if anyone else did or what was shared

15      specifically with Tim Hutchinson.

16           Q.    Do you have any information about the

17      substance of what occurred during the termination

18      meeting?

19           A.    No.

20           Q.    Generally when a Store Manager is

21      involuntarily separated, is there a standard exit

22      interview or some kind of outgoing process that's

23      followed?

24                 MR. MOY:  Objection.

25           A.    No.

1          - RACHEL KELLY

2     issued written warnings.  I don't know with

3     certainty all of those people that have been

4     issued written warnings.  A written warning is a

5     level of disciplinary action that wouldn't

6     necessarily come to my level or that I would have

7     consistent visibility to.  So I wouldn't be able

8     to provide a complete list of people who have

9     received a written warning as it relates to the

10    Fair Workweek legislation.

11         Q.    Were any Store Managers in New York

12    other than Mr. Fox terminated in connection with

13    noncompliance with Fair Workweek requirements?

14         A.    Yes.

15         Q.    How many other managers were

16    terminated?

17         A.    Including Rafael, in the first year

18    there were nine managers including Rafael.

19         Q.    You may have already indicated, but

20    approximately how many stores in New York were

21    subject to the Fair Workweek Law?

22              MR. MOY:  Objection.

23         A.    I believe on or about that time,

24    there were approximately 315 stores.

25         Q.    Were you involved in the decision to

1              - RACHEL KELLY

2              So I don't know that I could provide

3    a specific answer around the details and if there

4    were any other factors that came into the

5    decision.

6         Q.    When is the first time that a Store

7    Manager was terminated in connection with Fair

8    Workweek compliance after Mr. Fox?

9              MR. MOY:  Objection.

10        A.    On March the 1st of 2018.

11        Q.    And when is the most recent time?

12        A.    I wouldn't be able to speak to that

13   because I'm no longer overseeing that region.

14        Q.    Do you recall the locations of any of

15   the eight stores where the managers were

16   terminated?

17        A.    I don't recall the exact stores, but

18   I recall that in -- since they were nine including

19   Rafael's, six of those nine were in area 76, which

20   was Ron Shuler's area.  Two of those were in Kate

21   McShane's area, which is area 82; and Rafael was

22   the one in area 146.

23        Q.    To the best of your memory, have you

24   ever met Jill Shwiner?

25        A.    No.  Well, we haven't met personally,

1                    - RACHEL KELLY

2          Q.     Was his new employment with a

3     different employer?

4          A.     Yes.

5          Q.     Is Brad Jennison eligible for rehire

6     if he were to apply for Starbucks?

7          A.     Did you say eligible or ineligible?

8          Q.     Eligible.

9          A.     Brad is eligible for rehire based on

10    my recollection, yes.

11         Q.     You had mentioned earlier that at

12    some point after the termination meeting,

13    Ms. McDonald communicated something to you about a

14    communication she'd had with Mr. Fox concerning

15    Hot Shots.  Do you recall what I'm referring to?

16         A.     Yes.  And I just want to provide

17    clarity.  It was after the separation of Rafael.

18    It wasn't after the investigation.  After the

19    separation of Rafael.

20         Q.     Okay.  What did Ms. McDonald

21    communicate to you at that time?

22         A.     It was my understanding that Rafael

23    shared with Tina that he had a concern about

24    managers or other stores having Hot Shots in their

25    stores, and that they were not an approved item

                    - RACHEL KELLY

1    break so that I can prepare.  Before we do

2    take a break, however, I do want to formally

3    request the opportunity for the witness to

4    review the transcript according to Rule 30E

5    of the Federal Rules of Civil Procedure.

6                MR. GRAFF:  Noted.

7                MR. MOY:  So can we reconvene around

8    6:53?

9                MR. GRAFF:  Sure.

10               MR. MOY:  Thank you all.

11               (Whereupon, there was a brief recess

12    in the proceedings.)

13        Q.    Ms. Kelly, did you communicate with

14    anyone other than counsel during the break?

15        A.    No.

16        Q.    Did you read anything?

17        A.    No.

18        Q.    Before the break, we've been talking

19    about a communication you had with Ms. McDonald in

20    which she relayed to you a communication she'd had

21    with Mr. Fox concerning his concern about Hot

22    Shots.  At what in time was that communication

23    between you and Ms. McDonald?

24        A.    Once I was informed of that in the

1                    - RACHEL KELLY

2       case, when it was raised in the case, I asked Tina

3       about it.  So the communication happened after I

4       was informed of this legal case.

5            Q.    And the lawsuit, as we saw in the

6       last exhibit, was filed May 21, 2019.  Was it

7       after that date that you had the communication

8       with Ms. McDonald?

9            A.    Yes, I believe so.

10           Q.    Without getting into any of the

11      substance, there had been a meeting between the

12      parties before the lawsuit was filed that included

13      you as a participant.  Do you recall the event I'm

14      referring to?

15           A.    I do.  So --

16           Q.    Did the communication with

17      Ms. McDonald happen before or after that meeting?

18           A.    Yes.  So I would like to correct what

19      I shared.  Once I was aware of the concerns that

20      were brought in the legal case, so I don't know

21      the exact terminology, and I apologize, as I said

22      before, I didn't have the exact date, I believe --

23      I believe I was aware, yes, before we -- I would

24      be guessing at this point.  I don't recall for

25      sure.  Once I was informed through one of the

1                    - RACHEL KELLY

2      legal conversations about this case or legal

3      documents about this case, I asked Tina about it.

4           Q.    Just in terms of points of time.  At

5      a certain point in time prior to the lawsuit, I

6      sent a letter to counsel for the company.  Was

7      your communication with Tina before or after that

8      letter, if you know?

9                    MR. MOY:  Objection.

10          A.    Again, I don't recall the exact

11     timing, and I don't know the date of that letter.

12     Yeah.

13          Q.    I first wrote to the company around

14     October 2017.  You know if the communication with

15     Tina was before or after that date?

16                    MR. MOY:  Objection.  Ari, just

17          clarify the year.

18          Q.    October 2018.

19          A.    Yeah.  So I don't recall

20     specifically.  It would have been in relation to

21     this case, you know, the first instance that it

22     was put in writing to us that Rafael had made that

23     concern as part of this legal case.

24          Q.    Thank you.  I have nothing else at

25     this time, but I may have some more questions

```
 1                  - RACHEL KELLY

 2     separation is noted in our system as involuntary

 3     deficient performance.  I believe as terms of his

 4     agreement, it is voluntary in lieu of separation.

 5          Q.     And again, this is -- I just want to

 6     clarify.  Is it your testimony that

 7     Mr. Hutchinson's separation pursuant to the

 8     separation agreement is considered a voluntary

 9     separation?

10               MR. GRAFF:  Objection.

11          A.     That is correct.

12          Q.     Moving on with respect to

13     Mr. Hutchinson, do you recall that during the

14     course of this deposition, Mr. Graph asked

15     questions about your conversation with Les Sable

16     and Mr. Hutchinson concerning Mr. Fox's alleged

17     reports of underpayment of wages?

18          A.     Yes, I do.

19          Q.     When did this conversation occur with

20     Mr. -- with Mr. Sable and Mr. Hutchinson?

21          A.     It was after the separation of Rafael

22     Fox when we were informed that this concern was

23     raised by Rafael, again, through these legal --

24     through this legal case.

25          Q.     Sitting here today, do you recall
```

1                    - RACHEL KELLY

2    whether this conversation with Mr. Sable and/or

3    Mr. Hutchinson occurred before or after the

4    commencement of litigation by Mr. Fox?

5              MR. GRAFF:  Objection.

6         A.    So specifically when you mean

7    commencement, can you share what you mean by that.

8         Q.    Well, as you testified earlier today,

9    Mr. Fox filed a complaint for legal action

10   concerning his termination of employment, correct?

11        A.    That is correct.

12        Q.    And you also testified a few moments

13   ago that you had conversations with Mr. Sable

14   and/or Mr. Hutchinson concerning Mr. Fox's reports

15   of alleged underpayment of wages; is that correct?

16        A.    That's correct.

17        Q.    I understand that based on your

18   testimony, the conversations with Mr. Sable and/or

19   Mr. Hutchinson occurred after Mr. Fox's separation

20   from Starbucks; however, my question now is did

21   your conversation or conversations with Mr. Sable

22   and/or Mr. Hutchinson occur before or after this

23   litigation relating to the complaint filed by

24   Mr. Fox?

25              MR. GRAFF:  Objection.

1                    - RACHEL KELLY

2          A.     After.

3                 (Whereupon, there was a brief recess

4          in the proceedings.)

5          Q.     Did you have knowledge at the time of

6    Mr. Fox's termination whether he had concerns

7    about alleged underpayment of wages to store

8    employees?

9                 MR. GRAFF:  I said objection.

10         A.     No.

11         Q.     Ms. Kelly, sitting here today, do you

12   recall whether your conversations with Mr. Sable

13   and/or Mr. Hutchinson about Mr. Fox's reports

14   concerning alleged underpayment of wages occurred

15   before or after Mr. Graff sent a prelitigation

16   letter to Starbucks, if you are aware of any such

17   letter to Starbucks?

18                MR. GRAFF:  Objection.

19         A.     Based on my knowledge, after.

20         Q.     Similarly, sitting here today, do you

21   recall whether this conversation that you had with

22   Mr. Hutchinson and/or Mr. Sable concerning

23   Mr. Fox's report of alleged underpayment of wages

24   occurred before or after Mr. Fox filed a legal

25   action at issue in this case?

1                    - RACHEL KELLY

2              MR. GRAFF:  Objection.

3         A.    So I just want to be clear that I

4    understand the question.  So in between the first

5    time that the demand letter was sent and a formal

6    filing of the legal case; am I understanding that

7    correctly?

8         Q.    Correct.

9         A.    Again, based on my recollection, I do

10   believe it was within that time frame.

11        Q.    It was somewhere in between?

12        A.    So after the -- if it was outlined in

13   the demand letter, whenever the first time it was

14   outlined in writing and I was made aware of it, I

15   would have subsequently had the conversation

16   thereafter.

17        Q.    Do you recall having knowledge of

18   such a demand letter sent by Mr. Graph on behalf

19   of the plaintiffs in this case?

20              MR. GRAFF:  Objection, vague as to

21         time.

22        A.    It would have been in conversation

23   with legal counsel.  So based on my recollection,

24   I do believe, unless there another document or

25   something that was shared before I was informed.

1                - RACHEL KELLY

2      that there was a wage and hour issue reported by

3      Mr. Fox?

4                MR. GRAFF:  Objection.

5           A.    I don't have that information.  I

6      don't know when Carla was made aware.

7           Q.    What is the basis for your

8      understanding that Ms. Ruffin was aware that there

9      was a wage and hour issue reported by Mr. Fox?

10          A.    I don't -- I don't recall for certain

11     information around when Carla was made aware of

12     that.

13          Q.    Well, sitting here today, do you

14     recall Ms. Ruffin ever reporting to you around the

15     time of Mr. Fox's termination that Mr. Fox

16     reported an alleged underpayment of wages to other

17     Starbucks employees?

18          A.    No, Carla never reported it to me.

19          Q.    I'm going to refer you to a line of

20     questioning by Mr. Graff regarding the discipline

21     of Starbucks employees.  There is verbal and

22     written discipline, correct?

23          A.    Correct.

24          Q.    You are not aware of -- you as

25     partner -- sorry.  You as the Director of Partner

1                    - RACHEL KELLY

2        Resources for the New York Metro region was not

3        aware of every single instance of a verbal

4        discipline, correct?

5            A.    That is correct.

6            Q.    As the Director of Partner Resources,

7        were you aware of every single instance of a

8        written warning?

9            A.    No.

10           Q.    Were you expected to be aware of

11       every single instance of a verbal or written

12       warning involving a Starbucks employee?

13           A.    No.  No.

14           Q.    Were you ever made aware of any

15       specific Starbucks employee who was found to have

16       authorized the use of Hot Shots?

17           A.    No.

18           Q.    Prior to this litigation, were you

19       ever made aware of any specific Starbucks

20       employees who was found to have used Hot Shots?

21           A.    No.

22           Q.    And to clarify, sitting here today, I

23       mean, just to clarify.  At the time of Fox's

24       termination, were you aware of any reports of

25       underpayment of wages or the use of Hot Shots by

1                    - RACHEL KELLY

2        Mr. Fox?

3             A.    No.

4             Q.    Were there any other Store Managers

5        who were under investigation by the New York City

6        Department of Consumer Affairs around the time of

7        Mr. Fox's termination?

8                    MR. GRAFF:  Objection.

9             A.    Not that I recall.

10            Q.    No further questions.

11                    MR. GRAFF:  I have just a couple of

12            follow-ups.

13        EXAMINATION BY MR. GRAFF:

14            Q.    Ms. Kelly, is there any sort of

15        document at Starbucks like a corrective action

16        matrix or some sort of chart that describes

17        different categories of infractions and correlates

18        them to particular types of appropriate

19        discipline?

20            A.    We do -- we do have what's called a

21        virtual coach, and this is a tool that you can go

22        on and work through different scenarios, and it

23        could provide a recommendation or examples; and it

24        also would outline instances where they would

25        recommend you reach out to either a local Partner