# EXHIBIT K

1                    - TINA McDONALD -

2          Q.    Did you ever have occasion to

3     terminate any employees when you were a store

4     manager?

5          A.    Yes, I did terminate.

6          Q.    How many approximately?

7          A.    I can't -- I can't really recall a

8     specific number, to be fully honest over that many

9     course of years, honestly.

10         Q.    Other than termination what, if any,

11    other forms of corrective or disciplinary action

12    did you have the authority to take as the store

13    manager?

14         A.    As a store manager you're responsible

15    for coaching, which could be a conversation with a

16    partner.  Coaching could also come in the form it

17    could be documented, so it could be on an actual

18    corrective action form of you documenting a

19    partner's policy violation.

20         Q.    Any other forms of discipline?

21         A.    Aside from corrective action as far

22    as in the documentation form, as well as --

23         Q.    Yes, under --

24         A.    Go ahead, I'm sorry.

25         Q.    I didn't want to speak over you.

1                 - TINA McDONALD -

2      Please continue.

3          A.    I just want to clarify.  So you're

4      saying outside of documenting policy violations or

5      having coaching conversations and as far as

6      separations, besides that?

7          Q.    Yes, let me clarify.  Other than

8      termination, verbal coaching, written

9      documentation of coaching, are there any other

10     disciplinary measures or types of things that you

11     could do to correct performance problems in your

12     store?

13         A.    No.  Those would be the standard

14     processes as far as coaching, forms of corrective

15     action, or/and it could be, depending on what it

16     is, including separation.

17         Q.    Did you receive training into how to

18     determine what degree of discipline should be

19     meted out for any particular offense?

20             MR. MOY:  Objection.

21         A.    Can you clarify more about that,

22     please?

23         Q.    How was it that you came to know

24     whether a particular conduct should be met with

25     termination versus a verbal coaching versus a

1                  - TINA McDONALD -

2     documented written coaching; how did you know

3     which to pick?

4                  MR. MOY:  Objection.

5          A.     So at Starbucks they provide you

6     with -- we have a partner resources, partner

7     contact system that we're able to call in to

8     receive guidance in regard to disciplinary actions

9     with partners to ensure that we're fair and

10    consistent and what's the precedent, because they

11    have information to how similar violations are

12    being handled across the U.S. business.

13         Q.     Do you believe that consistency in

14    that respect is important?

15                 MR. MOY:  Objection.

16         A.     I think I'm going to need you to

17    expound a little bit more on that specific

18    question.

19         Q.     Why do you believe that

20    Starbucks -- withdrawn.

21                 For what purpose do you believe that

22    Starbucks maintains processes designed to try to

23    keep consistency in the form of discipline meted

24    out for similar conduct in different incidents?

25                 MR. MOY:  Objection.

1                    - TINA McDONALD -

2          A.     That -- well, to be honest, I cannot

3     speak to why let's say the -- I can't speak to all

4     the decisions that are made.  I just -- cause

5     that's not necessarily my area of expertise in

6     regard to every decision that is made that comes

7     down, so I can't definitively give you an answer

8     on that.  You know, I just know that, you know, as

9     far as our company values it's important for us to

10    be fair and consistent.

11         Q.     In connection with hiring employees

12    for either of your stores, if an employee had been

13    terminated from their immediate prior employer for

14    the same or similar reasons to your being

15    terminated at Best Buy, would that have

16    categorically disqualified such an employee from

17    being hired by you?

18              MR. MOY:  Objection.

19         A.     What exactly -- can you be more clear

20    on what exactly you're asking me?

21         Q.     Sure.  If you're considering a

22    candidate to be say a barista and you found out

23    that they had been terminated from their past job

24    of many years, would you still consider them

25    eligible as a candidate?

1                    - TINA McDONALD -

2          I'm going to instruct the witness not to

3          answer.  This is getting to the point of

4          being harassing, outside the scope of this

5          deposition.  Move on.

6               MR. GRAFF:  I disagree.  If I can get

7          an answer to this question, I would be able

8          to move on.  There's a question pending.

9               MR. MOY:  There is -- she's

10         already -- you've already asked her about

11         this issue.  Unless you can actually tie it

12         to an issue in this case, this is going far

13         outside the scope of the deposition.  I'm

14         going to allow the witness to answer, but

15         going forward I'm going to be shutting down

16         this rabbit hole because this is getting

17         ridiculous.

18              MR. GRAFF:  Reject to your

19         characterizations, but you can guide yourself

20         as you wish.  If the witness could answer

21         this question, please.

22         A.    Okay, could you repeat the question.

23              MR. GRAFF:  Could the court reporter

24         read back my last question, please.

25              (The question requested was read back

```
 1                  - TINA McDONALD -

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    -------------------------------X

 5    FOX, ET AL.,

 6              V.            CIVIL CASE NO.

 7                       1:19-CV-04650-AJN-SN

 8

 9    STARBUCKS CORPORATION,

10              Defendant.

11    -------------------------------X

12    DATE:  August 27, 2020

13    TIME:  10:00 A.M.

14

15          VIDEOCONFERENCE DEPOSITION OF TINA

16    McDONALD, pursuant to Notice, before Hope Menaker,

17    a Shorthand Reporter and Notary Public of the

18    State of New York.

19

20

21

22

23

24

25
```

1                    - TINA McDONALD -

2          Q.     Did your compensation change at all

3     in connection with your transferring from 75th to

4     69th and First?

5          A.     Yes, it did.

6          Q.     In what way did it change?

7          A.     I received an increase.

8          Q.     What was your salary after you

9     transferred?

10         A.     That I don't recall, specifically

11    what my salary became after transferring there.

12         Q.     Do you know what your total

13    annualized compensation was subsequent to your

14    transferring?

15                MR. MOY:  Objection.

16         A.     That -- I honestly don't recall that

17    far back, what it was.

18         Q.     How did you come about obtaining the

19    first human resources or partner resources

20    position that you attained?

21                MR. MOY:  Objection.

22         Q.     I'll ask a different question.  What

23    job did you take after you stopped being a manager

24    at 69th and First?

25         A.     I took the role of the senior HR

1                - TINA McDONALD -

2    compliance specialist.

3         Q.    Was that in November, 2017?

4         A.    That was in November, 2017.  Yes,

5    that's correct.

6         Q.    Did you apply for that position?

7         A.    I did apply for that position.

8         Q.    What prompted you to apply?

9         A.    I was made aware of the opportunity.

10        Q.    How did you go about applying?

11        A.    I communicated my interest to my

12   district manager.

13        Q.    How did you become aware that there

14   was an available position?

15        A.    If I recall correctly, my district

16   manager made me aware.

17        Q.    What did you have to do to apply?

18        A.    I had to go through an interview

19   process.  I had to submit a resume.

20        Q.    Anything else?

21        A.    At this time, I can't recall

22   anything.  I just remember the interview process

23   and the resume.

24        Q.    Who interviewed you, what was the

25   interview process?

1                          - TINA McDONALD -

2              the communication was intended to seek legal

3              advice or, in fact, resulted in legal advice?

4                          MR. MOY:  I think it all depends on

5              the context.

6                          MR. GRAFF:  Okay.

7              Q.      Ms. McDonald, did anyone explain to

8      you in the context of your interview why legal

9      counsel was participating?

10             A.      Yes, I believe it was explained.

11     Possibly, yeah.

12             Q.      What was the explanation, if you can

13     recall it?

14             A.      As I recall it was because

15     this -- the role of the HR senior compliance

16     specialist was in relation to a new legislation

17     that was going to be coming into effect.  The Fair

18     Workweek legislation was centered around

19     scheduling compliance and had different legal

20     components to it.

21             Q.      How were you informed that they were

22     offering you the position?

23             A.      I was contacted by Rachel Kelly.

24             Q.      At any point, did you receive a

25     written job description for your new position?

1              - TINA McDONALD -

2         A.    Yes, I did.

3         Q.    Was that before you started in the

4    position or something else?

5         A.    That was -- I can't recall.

6         Q.    Upon becoming senior compliance

7    specialist, who was your immediate supervisor?

8         A.    I reported into Rachel Kelly.

9         Q.    Did you report to anyone else

10   directly or indirectly?

11        A.    No.

12        Q.    As senior compliance specialist, did

13   anyone report to you as their supervisor?

14        A.    No.

15        Q.    As far as you know, were you the only

16   senior compliance specialist in New York at the

17   time that you held that position or is it

18   something that there were multiple individuals in

19   that capacity?

20        A.    To my knowledge, I was the first

21   senior compliance specialist.

22        Q.    During what period of months or years

23   did you hold that position?

24        A.    From November, 2017 to November,

25   2018.

1                    - TINA McDONALD -

2         Q.      Did you receive a raise when you

3    became the senior compliance specialist relative

4    to being a store manager?

5         A.      No, I did not receive a raise1.

6         Q.      Do you have an understanding of why

7    it was that -- withdrawn.

8                 Could you describe your duties and

9    responsibilities as a senior compliance

10   specialist?

11        A.      As a senior compliance specialist I

12   was responsible for supporting compliance with the

13   Fair Workweek legislation and what that entailed

14   was assuring that schedules are posted with 14

15   days' notice to partners; partners had access -- a

16   greater access to hours through available shift

17   posting; partners were paid schedule change

18   premiums in line with their schedule changes that

19   they maybe had received; partners were required to

20   receive an 11-hour rest between shifts.

21                And so that was something

22   additionally that I had to be responsible for, as

23   well as ensuring that partners completed a good

24   faith estimate form when they had availability

25   changes or were, upon hire, to support

1                    - TINA McDONALD -

2    transparency around the amount of hours they

3    should expect; all with the intent of providing

4    predictable work schedule to partners.

5         Q.    What was the geographic area of your

6    responsibility as senior compliance specialist?

7         A.    It encompassed the five boroughs

8    which was Manhattan, Staten Island, Brooklyn, the

9    Bronx, and Queens.

10        Q.    Did you undergo any formal training

11   in connection with becoming the senior compliance

12   specialist?

13        A.    I went through training at the

14   regional office around the law itself and what it

15   entailed.

16        Q.    Over what period of days or weeks did

17   you have that training?

18        A.    That was a one-day training.

19        Q.    Did you receive any other training in

20   connection with becoming a senior compliance

21   specialist?

22        A.    No, it was more -- no, not a formal

23   training.

24        Q.    Who conducted the training at the

25   regional office that day?

1                      - TINA McDONALD -

2          A.     That was conducted -- to the best of

3    my recollection, I remember the partner resource

4    managers at the time.

5          Q.     As the store -- withdrawn.

6                 As the senior compliance specialist,

7    did you conduct training for any other employees?

8          A.     As a senior compliance specialist,

9    yes, I did.

10         Q.     What other employees did you train?

11         A.     I trained store managers on the Fair

12   Workweek legislation.

13         Q.     In what context did that training

14   happen; did you go from store to store?

15         A.     It was -- okay, it all depended.

16   Well, there would be times where we would conduct

17   trainings in the regional office in a large group

18   setting as well as me visiting stores one on one

19   for training.

20         Q.     What training were store managers

21   supposed to receive in total, what amount of

22   training in connection with the Fair Workweek Law?

23                MR. MOY:  Objection.

24         A.     I'm not aware of a specific amount.

25   I don't recall saying that there was a specific

1                    - TINA McDONALD -

2      specifically at particular stores?

3          A.     Anything I was doing was within the

4      scope of the Fair Workweek legislation.  So, for

5      example, schedules needed to be posted for

6      partners with 14 days' notice, so it's going into

7      a store and validating is that happening.

8                 Schedule change logs was a part of

9      the Fair Workweek legislation as well, so going

10     into a store and seeing is the schedule change

11     logs in place.

12                Partners also have to complete a good

13     faith estimate form, and so going into a store and

14     going through a partners' files to see, do all

15     partners have a good faith estimate form on file;

16     or in the case of the available shift posting, is

17     it visibly posted in the location as well as the

18     posters required to be visibly in the back of

19     house letting partners know they're entitled to a

20     predictable work schedule.

21         Q.     When did Fair Workweek regulations go

22     into effect?

23         A.     I believe it was November -- I'm

24     thinking November -- it started out, I believe, on

25     a Friday initially, maybe November 24th, but I

1               - TINA McDONALD -

2       believe we really put it into effect on the 25th

3       or 27th.

4              Q.     Of what year?

5              A.     2017.

6              Q.     When you would do store visits, did

7       you typically take notes?

8              A.     Yes, I would typically take notes.

9              Q.     Would you be filling in a particular

10      form or something else?

11             A.     No, I wasn't -- it wasn't a

12      particular form.

13             Q.     Did you have a regular practice for

14      what you would do with your notes after creating

15      them?

16             MR. MOY:  Objection.

17             A.     I guess this was -- is this with the

18      assumption that I had a particular practice in

19      place?

20             Q.     Yes, I'm asking if you did have a

21      practice.

22             A.     Okay.  Yes, I did have a practice in

23      place.

24             Q.     Where would you typically put your

25      notes after you wrote them?

1              - TINA McDONALD -

2        you may proceed, and thank you for the time.

3        Q.    Ms. McDonald, other than counsel did

4    you communicate with anyone during this last

5    period of break?

6        A.    No, I did not.

7        Q.    Did you read anything during the last

8    break?

9        A.    No, I did not.

10        Q.    Are you familiar with the product

11    called Hot Shot No-Pest Strip?

12        A.    I am familiar with it now.

13        Q.    Are you aware that its main active

14    ingredient is something called DDVP?

15        A.    No.

16        Q.    When did you first become aware of

17    what Hot Shots are?

18        A.    I would say learning about it in the

19    news.

20        Q.    What position did you hold at

21    Starbucks when you first became aware of what Hot

22    Shots are?

23        A.    Partner resources manager.

24        Q.    And what was it in the news that you

25    read that made you aware of Hot Shots?

1                   - TINA McDONALD -

2          A.      I'm trying recall.  I think there was

3     an article in regards to this matter and that's

4     what -- cause I had never known what a Hot Shot

5     was before or seen it.

6          Q.      Had you ever -- strike that.

7                  Do you have any information about the

8     use of Hot Shots in Starbucks stores in New York?

9          A.      No.  I don't have information aside

10    from knowing that we're not allowed to use

11    anything of -- I know we can't -- they can't be

12    used.  They're not supposed to be utilized in

13    stores.

14         Q.      Have you heard from anybody, whether

15    it's rumor or proven, about any Starbucks store

16    using Hot Shots?

17         A.      No.  I'm not aware of any stores

18    using Hot Shots.

19         Q.      When you were a store manager did you

20    ever receive any correspondence, e-mail

21    correspondence, from district managers about Hot

22    Shots and not using them?

23         A.      I can't recall specifically in

24    regards to that.

25         Q.      Did you ever hear any Starbucks

1                - TINA McDONALD -

2      employee refer to DDVP ever?

3           A.    No, I've never heard of that.

4           Q.    As far as you know, has Starbucks

5      ever conducted an investigation into the potential

6      use of Hot Shots or DDVP in Starbucks stores?

7           A.    Not to my knowledge or recollection.

8           Q.    To the best of your understanding,

9      why is it that Hot Shots are not allowed for use

10     in Starbucks stores?

11               MR. MOY:  Objection.

12          A.    Well, I don't -- you're saying to the

13     best of my recollection or --

14          Q.    If it's unclear, I'll ask the

15     question differently.

16               Did anybody ever explain to you why

17     it is that Hot Shots should not be used in

18     Starbucks stores?

19          A.    I -- I guess I don't recall having a

20     conversation specifically around Hot Shots.

21          Q.    Do you recall having a conversation

22     around the use of any other particular pesticide

23     in Starbucks stores?

24          A.    I recall just being aware naturally

25     as a store manager that that's not allowed, to use

1                  - TINA McDONALD -

2     any outside source to address pests.

3          Q.     Is it your understanding that there's

4     any health or safety concern related to the use of

5     Hot Shots in Starbucks stores if they were used?

6          A.     I'm not -- because I'm not super

7     familiar with it, I don't know the -- the

8     implications of utilizing it as far as what

9     is the impact on a person from having it in their

10    vicinity.  I'm not well-versed to speak on that.

11         Q.     What was it that you read about this

12    case that made you aware of Hot Shots; do you

13    remember what specifically you had read about

14    them?

15         A.     No, I honestly can't remember

16    specifics to it.  It was like a really long time

17    ago.

18         Q.     When you read about Hot Shots in an

19    article about this case, did you ask anybody else

20    any questions about it?

21         A.     Actually, no.

22         Q.     Did you ever discuss anything that

23    you read about this case in any publication other

24    than with counsel?

25         A.     No.

1                  - TINA McDONALD -

2          Q.      Did Mr. Fox ever complain to you

3    about the use of Hot Shots or DDVP at Starbucks?

4          A.      Complain to me, what do you mean by

5    that?

6          Q.      Did he ever express concern to you

7    that he perceived there to be a problem concerning

8    the use of Hot Shots in Starbucks in New York?

9          A.      I can't remember verbatim what he

10   shared specifically, but -- yeah, I can't remember

11   verbatim what he said specifically.  I just -- I

12   know we had a conversation and it was not in

13   relation to compliance and I directed him to his

14   district manager.

15         Q.      Was it an in-person conversation that

16   you're referring to?

17         A.      Yes.

18         Q.      Where did the conversation take

19   place?

20         A.      From my recollection, it was in the

21   back of house of his store.

22         Q.      What store?

23         A.      West Broadway and Leonard.

24         Q.      Did Mr. Fox tell you that he was

25   concerned about Hot Shots or DDVP at any

1                    - TINA McDONALD -

2    particular store location?

3         A.    I don't recall him mentioning any

4    particular store location or any details as you

5    just asked.

6         Q.    Did you ask him any questions to

7    clarify or get further information about what he

8    was talking about?

9         A.    I did not dig deeper into what he was

10   referring to because I was there to address

11   compliance and in regard to the Fair Workweek

12   legislation, and anything outside of that would

13   have been without -- beyond my scope of work.

14        Q.    Did you ever communicate to anyone

15   else that Mr. Fox had said something to you about

16   the use of Hot Shots or DDVP?

17        A.    No, I did not.

18        Q.    Do you believe that as of an employee

19   at Starbucks you were required to repeat his

20   complaint to anyone in particular?

21        A.    No, I don't believe that -- based on

22   the recollection of the conversation, I believe

23   that I addressed it appropriately in directing him

24   to his district manager given that as a store

25   manager if you have a concern that you need to

1                 - TINA McDONALD -

2    escalate, the next resource is the district

3    manager.

4         Q.    Did you refer him to his district

5    manager by name or did you just say district

6    manager?

7         A.    I can't recall specifically if I said

8    speak to your DM or Tim.  I can't recall

9    specifically.

10        Q.    Was Tim Hutchinson Mr. Fox's DM at

11   that time?

12        A.    Yes, he was.

13        Q.    Do you have any information as to

14   whether Mr. Fox had raised concerns about DDVP or

15   Hot Shots to any other managers at Starbucks at

16   any times, other than the one conversation you

17   referred to?

18        A.    No, actually I -- I don't have any

19   awareness of that.

20        Q.    What, if anything, did Starbucks do

21   in response to any complaints by Mr. Fox

22   concerning the alleged use of DDVP at Starbucks?

23             MR. MOY:  Objection.

24        A.    Are you asking if Starbucks did do

25   something?

1                    - TINA McDONALD -

2          Q.     As far as you know, did Starbucks do

3    anything?

4          A.     I am not familiar with that.  That

5    would not have been within my scope.  I'm not even

6    aware of -- I'm not aware of any complaints is

7    what I'm saying, so I don't have any knowledge of

8    that.  I only had knowledge of the conversation

9    that him and I had.  I don't have any knowledge of

10   anything outside of that involving -- you said

11   DDC, I'm not sure, and Hot Shots, I don't have any

12   knowledge of that.

13         Q.     After that conversation with Mr. Fox,

14   did anyone ever communicate anything to you about

15   Hot Shots at Starbucks at any time?

16         A.     No, we never spoke about Hot Shots at

17   Starbucks.

18         Q.     After your conversation with Mr. Fox

19   did Starbucks, to your knowledge or information,

20   change its enforcement practices with respect to

21   the use of Hot Shots in stores?

22         A.     To my knowledge, no, as the company

23   always had guidelines that required we're not able

24   to utilize anything outside from contacting a pest

25   vendor in the event of us having a concern for

1                      - TINA McDONALD -

2        that activity.  So I don't -- I guess I don't

3        imagine that -- to my knowledge I don't know, to

4        be honest, you know, if something else was put in

5        place because the rules were already in place that

6        supported that not being utilized in stores.

7              Q.    As far as you know, did Starbucks

8        ever do anything to verify whether its policies

9        were being followed with respect to the use of Hot

10       Shots in stores?

11             A.    I'm -- I'm not aware of what

12       Starbucks or -- I'm not aware of the actions they

13       would take in regard to that because that is not

14       within my scope of works.

15             Q.    I think I touched on this already,

16       but just so the record is very clear:  As far as

17       you know, did Rafael Fox ever, in words or

18       writing, express concern about the use of Hot

19       Shots or DDVP at Starbucks to anyone else apart

20       from the one conversation with you?

21             A.    Based on my recollection, no, I'm not

22       aware of any -- I'm not aware of anyone else that

23       he may have spoken to.  I'm not aware of.

24             Q.    Did you write down or memorialize in

25       any way that Rafael Fox had said something to you

1                  - TINA McDONALD -

2       may have had with Starbucks employees?

3              A.    No.

4              Q.    Did you ever read a summary or a log

5       documenting the substance of any interviews that a

6       New York City Department of Consumer Affairs

7       representative may have conducted with employees

8       concerning the complaint you referenced?

9              A.    No.  Are you assuming that I'm aware

10      of them contacting any employees?  Cause I'm not.

11             Q.    Okay.  Do you have any information

12      about the outcome of the NYDCA complaint?

13             A.    Yes.

14             Q.    To your understanding, what was the

15      outcome?

16             A.    Based on -- based on the nature of

17      the complaint, it was substantiated that we were

18      in violation of different portions of the Fair

19      Workweek legislation.

20             Q.    Did you ever read any written summary

21      or determination by the NYDCA?

22             A.    I can't recall.

23             Q.    What is the source of your

24      information about the outcome of the NYDCA

25      complaint?

1            - TINA McDONALD -

2        A.      As the compliance specialist, when

3    the complaint came forward I had a responsibility

4    to go into the store at this point to look into

5    the complaint and identify if any of those -- if

6    the information was in violation of the law

7    itself, so that's really where my extent lies.

8        Q.      We had talked before about e-mail

9    communications with Mr. Fox.  Let's now go into

10   site visits.  How many times did you visit Mr.

11   Fox's store while he was an employee there?

12       A.      It's two that I can recall --

13   possibly a -- possibly a third -- maybe three.

14       Q.      When was the first occasion?

15       A.      The first occasion was after

16   receiving the New York City Department of Consumer

17   Affairs complaint.

18       Q.      Do you recall approximately the date?

19       A.      I don't recall the specific date.  I

20   just know it was -- it was like in January.

21       Q.      When you went to visit the store on

22   that occasion, were you already familiar with the

23   details of the NYDCA complaint?

24       A.      I had seen the complaint, the actual

25   form, yes.

1                    - TINA McDONALD -

2          Q.     Did you note the identity of the

3     employee who had made the complaint?

4          A.     You mean note them like as far as

5     like I would be able to identify them, no.

6          Q.     Do you know what position the

7     employee held?

8          A.     I know -- she may have been a

9     barista.

10         Q.     Did you ever have any communications,

11    written or oral, with the employee who made the

12    DCA complaint?

13         A.     I can't recall specifically.

14    Possibly, yeah, but I can't recall.  I'm trying

15    to -- I can't recall specifically.

16         Q.     Do you have any information, either

17    way, as to whether Mr. Fox had previously

18    consulted with any partner resources

19    representative concerning difficulties with that

20    particular employee prior to her complaint?

21         A.     I am not aware of any actions or any

22    conversations or consultations that he may have

23    had specific to the partner.  All I was aware of

24    is that there was a complaint filed by a partner

25    and we had a responsibility to look into it.

1                 - TINA McDONALD -

2       anyone else did because, to my knowledge, I was

3       the first compliance specialist.

4            Q.    Did you consider starting to visit

5       stores to assess compliance prior to this specific

6       first visit?

7            A.    Yes.

8            Q.    Why didn't you start visiting stores

9       for that purpose prior to this first visit?

10                 MR. MOY:  Objection.

11           A.    I'm sorry, can you elaborate on that.

12           Q.    Why was it that the first time you

13      conducted a site visit to assess compliance with

14      predictability pay was Mr. Fox's store, rather

15      than any other stores at any prior point in time?

16                 MR. MOY:  Objection.

17           A.    No, are you saying that the first

18      time I went into visit a store was with Mr. Fox?

19           Q.    What is the first store that you went

20      to visit to assess compliance with predictability

21      pay?

22           A.    So I don't remember the first store

23      that I had went to, but this was the first store

24      where we had a complaint from the Department of

25      Consumer Affairs.

1              - TINA McDONALD -

2      that purpose prior to your visit to Mr. Fox's

3      store?

4          A.    I -- I honestly don't recall a

5      specific amount.

6          Q.    Did you document the site visits in

7      any way?

8          A.    I would imagine that I did, but

9      because I really can't recall the timeline of

10     everything I can't -- you know, I can't say

11     specifically.

12         Q.    Did you identify any incidents

13     of noncompliance with any aspect of the

14     predictability pay law at the stores you visited

15     prior to Mr. Fox's store?

16         A.    The time I spent prior to -- okay,

17     what led to going to the store was a New York City

18     Department of Consumer Affairs complaint in

19     regards s to compliance.  My intent in visiting

20     stores was to get an understanding of how it was

21     being executed, given that it was a new law and

22     everybody was in the process of learning and there

23     was some things that we would naturally really

24     expect to have already been in place.  So, for

25     example, three weeks of schedules being posted,

1                  - TINA McDONALD -

2       that was already a Starbucks standard, but Fair

3       Workweek made it the law, right.  So my

4       understanding with visiting stores was to just get

5       and identify, you know, how we were showing up in

6       that regard, to provide any type of support.

7                  However, going to Mr. Fox's store was

8       specific to a New York City Department of Consumer

9       complaint filed by a partner that required us to

10      immediately look into.

11          Q.     In any site visits that you made to

12      any stores prior to Mr. Fox's store on this

13      specific occasion, did you identify any incidents

14      where you saw something not in compliance with the

15      predictability pay or Fair Workweek Law?

16          A.     I would say yes.  I never encountered

17      anywhere that is a hundred percent or there's no

18      areas to improve.

19          Q.     When you would notice such areas for

20      improvement on those early site visits what, if

21      anything, did you do?

22          A.     I would provide coaching to the store

23      manager and the district manager on how we could

24      improve in that regard.

25          Q.     Did you ever document that you had

1                    - TINA McDONALD -

2          Q.    I'm asking.

3          A.    No, no.

4                MR. GRAFF:  Why don't we take a break

5          for eight minutes, until 4:55 if that's okay.

6                MR. MOY:  Yes.

7                MR. GRAFF:  Lets' go off the record.

8                (Whereupon, a brief discussion was

9          held off record.)

10         Q.    Ms. McDonald, please tell me as much

11  as you remember about what occurred during the

12  first site visit to Mr. Fox's store with Mr.

13  Jennison and Mr. Hutchinson.

14         A.    Okay.  I -- I recall just going to

15  the store due to, as I said, the New York City

16  Department of Consumer Affairs complaint and

17  trying to just get an understanding of like what

18  led to the complaint and identifying if we -- if

19  there were gaps in compliance in relation to this

20  complaint, and so I think most of the time was

21  spent talking to Rafael.

22                I believe I recall at some point

23  going through a few timecards, looking at some

24  schedules.  I asked about are schedules posted on

25  time in the store, I remember that.  He shared

1              - TINA McDONALD -

2      with me that schedules are always posted on time

3      and it was kind of like --

4           Q.     Wait, I'm sorry.  Wait one second.

5                  MR. GRAFF:  I think Ms. Ruderman

6           needs to mute her phone.  There's some

7           background noise.

8                  (Whereupon, a brief discussion was

9           held off record.)

10          Q.     Ms.  McDonald, do you remember where

11     you were in your last answer?

12          A.     I just remember -- yeah, I just

13     remember going in there, doing like an overview of

14     what did compliance look like in the stores, you

15     know, cause he initially shared that schedules

16     were always posted on time, but that

17     couldn't -- that couldn't really be proven.  That

18     wasn't proven I would say, based on the review.

19     Checking to see if there was schedule change logs

20     in place, available shift postings, just trying to

21     get an understanding of what led to this complaint

22     and where we were in regard to the Fair Workweek

23     legislation.

24          Q.     Did you document your findings?

25          A.     Yes.  Yes, I did.

1                     - TINA McDONALD -

2          Q.     In what form?

3          A.     I can't -- I'm not sure if it was

4      like an e-mail or I utilized OneNote possibly, but

5      I did document the findings.

6          Q.     Did both Mr. Hutchinson and Mr.

7      Jennison participate together with you for the

8      entirety of that visit?

9          A.     No, I don't recall them

10     always -- they may have been in the lobby.

11         Q.     How long was that visit?

12         A.     Couple of hours.

13         Q.     Was Mr. Fox on duty at the store

14     during the visit?

15         A.     He was in the store.  Yes, he was

16     there.

17         Q.     What specifically did you determine

18     to be noncompliant with the predictability pay

19     rules on that first visit?

20         A.     On the first visit I did, we were

21     not -- we were definitely not providing 14 days'

22     notice to partners of their posted schedules.

23     Partners -- the schedule change log was there, but

24     it was the entries were questionable in regards to

25     if these schedule changes were consent or not

1                    - TINA McDONALD -

2       cause a lot of times -- if I recall correctly, he

3       may have been filling out a portion of it himself.

4       I don't necessarily recall that it was all entries

5       by the partners and missing consent in regards to

6       that.

7                    I can't remember if it was this visit

8       or the second visit when I learned about the shift

9       postings and the opportunity around that as well,

10      like that was a -- we were not in compliance in

11      regards to shift posting and how they were being

12      handled; because what started the complaint was a

13      partner was saying that their hours had been

14      reduced because we hired externally.

15                   The intent on the part of the law is

16      to provide partners with a greater access to

17      hours, making them a priority before we go and

18      hire outside.  We want to give the opportunity to

19      our partners within the company first.

20           Q.    Is that last issue a provision of the

21      predictability pay law or just a Starbucks policy?

22           A.    That's part of the Fair Workweek

23      legislation, so predictability pay is a part of

24      the Fair Workweek legislation.  So everything I'm

25      talking about is in relation to the Fair Workweek

1                    - TINA McDONALD -

2    legislation.

3              So if schedule is not being posted

4    with 14 days' of notice, partners experiencing

5    schedule changes and not being compensated

6    appropriately with the proper schedule change

7    premiums, posting available shift postings, hiring

8    externally before giving our partners the

9    opportunity to get those hours, all of that falls

10   under the umbrella of the Fair Workweek

11   legislation.

12        Q.    Did you conclude, based on any of

13   your observations on that first visit, that any

14   employees were owed any monies by Starbucks in

15   connection with any of the noncompliant items that

16   you noticed?

17        A.    I can't remember if it was

18   specifically the first visit or the second visit,

19   but I do know that the timecards did not match the

20   schedule change log.

21              So, for example, on the schedule

22   change logs there's different reason codes that

23   indicate whether a partner is supposed to receive

24   a schedule change premium or not; and so there

25   were instances where the -- it was either written

1                  - TINA McDONALD -

2       in by Rafael himself and there was no consent or

3       where things were captured that supported a

4       partner was supposed to be paid, but it

5       wasn't -- you couldn't tell in the timecard.

6       There was no actual payment, and that actually

7       helped lead to me, as I continued to look into the

8       concern at the location, going back to the e-mail

9       communication in which I provided him guidance to

10      pay a partner that was not paid as well.

11          Q.      At what point in time was that

12      guidance to pay a partner that you noticed after

13      the first visit hadn't been paid?

14          A.      Recognizing -- from what I recall

15      was,  was -- we -- the communication in regards to

16      the predictability pay, any questions in regard to

17      that had nothing to do with the -- the DCA

18      complaint, like that came after.

19              So at that point we're looking at --

20      it could have been a few weeks since he received

21      the guidance to pay the partner and it wasn't

22      paid.

23          Q.      Do you recall what specific issue had

24      occasioned the need to make a special payment to

25      the particular partner?

1                     - TINA McDONALD -

2          A.     The -- the situation, it was around,

3   I believe, partners staying after their scheduled

4   times because if a partner stays more than beyond

5   fifteen minutes of their scheduled shift, they're

6   entitled to a schedule change premium and I

7   believe that's what it was in regard to.

8          Q.     Did Mr. Fox reach out to you with a

9   question about how to handle payment for that

10  partner, which resulted in your directing him to

11  make the payment that you just described?

12         A.     Yes.  Mr. Fox reached out asking in

13  this particular instant, are we required to pay

14  predictability pay.

15              It was a question of this is what

16  happened, this is the situation, is predictability

17  pay owed to the partner.  It was in that form.

18         Q.     Do you remember the particulars of

19  the situation?

20         A.     Not specific.  I don't remember all

21  the intricate details, but I know it had to do

22  with a partner staying later than their scheduled

23  time.  So I can't remember like how much later --

24  I don't remember all of that.  I just know this

25  person had a schedule change of -- of more than

1              - TINA McDONALD -

2      fifteen minutes.

3           Q.     How did you determine that that

4      partner had not been paid for that?

5           A.     Looking at the timecard in the global

6      labor scheduling system at the time.

7           Q.     And did you check for that during the

8      first visit or is that something you did later?

9           A.     That was -- that was later.  I don't

10     think that was on the first visit, no, cause on

11     the first visit I wasn't -- you know, I wasn't

12     thinking anything about any e-mail

13     communication -- like none of that was relevant,

14     but the intent of going to the store was because

15     we received a complaint from the Department of the

16     Consumer Affairs to look into Rafael Fox's

17     scheduling practices in regards to the Fair

18     Workweek legislation.  That was the sole reason we

19     went to the store.  There was no other reason.

20          Q.     In connection with that first visit,

21     did you give Mr. Fox any instructions or

22     directions to do any particular things during that

23     visit?

24          A.     That first visit, I don't -- I don't

25     recall giving him a specific instruction at the

                      - TINA McDONALD -

1

2      time because at that point we're in a discovery

3      phase, you know; we're just trying to understand,

4      get a pulse of how compliance is showing up in the

5      store.  So there was no -- it wasn't like hey,

6      Rafael, go do this now as a result, because we're

7      in a discovery.  We're trying to figure out at

8      this point is -- are these concerns that are being

9      raised are they accurate, are they valid, is

10     there -- are we in compliance with the Fair

11     Workweek legislation.

12          Q.    I had understood from some prior

13     answers that you noticed that certain things were

14     not in compliance during that first visit.  During

15     that visit, did you direct Mr. Fox to correct any

16     of the specific things that you observed and

17     believed to be noncompliant?

18          A.    I'm sorry, can you repeat the

19     question.  I apologize.

20              MR. GRAFF:  Maybe the court reporter

21          could read it backs, please.

22              (The question requested was read back

23          by the reporter.)

24          Q.    I can ask the question again.  During

25     that first visit, did you tell Mr. Fox to correct

1                    - TINA McDONALD -

2    any specific things that you believed to be not in

3    compliance?

4        A.    Well, there were things that you just

5    can't correct.  So for example if your schedule is

6    posted late, there's not going to be a correction

7    for that; it was already posted late.  So if a

8    schedule change log is not in place, there's not

9    going to be -- or if the consents are missing, you

10   know, you may not be able to go and get consent,

11   especially if you filled it out yourself.  So the

12   partner did not actually write that information

13   and the store manager did.  So there are things

14   that you might not be able to correct.

15            In regards to payment of partners, I

16   don't recall us aligning or taking any action on

17   that particular day because, like I said before,

18   we were in a discovery phase and trying to

19   understand was this an isolated matter or was it

20   more to the situation, and so we had to look at it

21   objectively.  So the only one thing that -- sorry.

22       Q.    I'm sorry, I thought you were done.

23   I didn't mean to cut you off.  Please continue

24   your answer.

25       A.    Well, I would say the only -- and

1                  - TINA McDONALD -

2       this is a typical direction I would give any store

3       manager going into a store, where schedules are

4       not posted in -- on time is more so about ensuring

5       that moving forward that is not something that

6       continues.  Because he had shared that schedules

7       were always posted on time, but what the documents

8       said that showed different.

9            Q.     Are you done answering?

10           A.     Yes.

11           Q.     When was your second visit to Mr.

12      Fox's store?

13           A.     I -- I'm not sure of the date of the

14      second visit.  It could have been within the next

15      week or, you know, it could have been within a few

16      weeks.  Because looking into the concerns, that

17      did require me to go back to assure that

18      everything was looked at relative to the

19      complaint.

20           Q.     Did anybody accompany you on the

21      second visit?

22           A.     I believe Tim.  I believe Tim was

23      there.

24           Q.     All right, are you guessing or do you

25      remember Tim being there?

1                  - TINA McDONALD -

2          A.      I believe that Tim was there.

3          Q.      Anyone else?

4          A.      Not that I can recall.

5          Q.      Did you notify Mr. Fox in advance

6    that you would be making a second visit?

7          A.      Yes, I communicated.

8          Q.      What was your objective or agenda

9    going into the second visit?

10         A.      The second visit was really him

11   trying understand the payment of the partners

12   based on what I had identified from the first

13   visit, cause it's the first -- it's the second

14   visit that I -- I think is where I really

15   identified that oh, you know, even after receiving

16   guidance to pay partners that wasn't applied,

17   because it required me to go back into the

18   timecards.  It not like it's something I would

19   have access to remotely.  So in order to look at

20   partners' timecards, I would have to physically be

21   in the store.

22         Q.      When you're referring to the guidance

23   to make payment to partners, is that the same

24   incident that we already talked about where he

25   asked you if payment was required in a particular

1                    - TINA McDONALD -

2      situation?

3          A.     Correct.

4          Q.     Other than that one partner and

5      incident, did you direct Mr. Fox to make any other

6      payments that you believed he did not make?

7          A.     At some point payments had to be

8      applied and I can't remember when that direction

9      was given because after really looking into

10     everything, partners was owed a significant amount

11     of predictability pay due to the late schedules as

12     well as what was captured on the schedule change

13     log where partners had experienced a loss of hours

14     in some instances or worked additional hours and

15     were not compensated properly.

16              So it was -- so I don't know if it

17     was -- I don't recall it being directly in that

18     second incident, because I think we still needed

19     to validate how much the amount would be that we

20     needed to pay the partners.

21         Q.     Did you ever direct Mr. Fox to pay

22     any partners and find that he did not timely do

23     so, other than what you've already testified to?

24         A.     I -- well -- when we had the

25     conversation about -- we did a have a conversation

1                    - TINA McDONALD -

2      about the initial communication of the partner not

3      being paid and during that conversation is when it

4      was -- I inferred it as him making a decision to

5      not pay, as he had shared that he didn't agree

6      with them being paid for staying the additional

7      time and he had some -- he said he was quite

8      familiar with the law based off of some personal

9      relationship with someone.  I don't know if it was

10     like a girlfriend, a friend, someone he said very

11     familiar with the law that he had a relationship

12     with and so he felt like the guidance being

13     provided, he didn't agree with it.

14          Q.    When did that discussion that you

15     were just describing take place?

16          A.    That was, I believe, on the second

17     visit, because I believe it was also the second

18     visit where I identified that he was not

19     responding to a communication around the available

20     shift postings for partners.

21          Q.    How did you identify that second

22     item?

23          A.    Well, that's a part of the Fair

24     Workweek legislation and what led to the concern

25     around the external hire, and so we talked about

1                    - TINA McDONALD -

2      what is the process and what does that look like

3      and he shared that partners did respond to the

4      available shift postings that he had submitted,

5      but he chose not to engage them because of the

6      fact that he feared that partners would come to

7      his store with their bad habits as opposed to

8      hiring someone externally who you're able to

9      groom.

10          Q.     Just to be clear, is it your

11     testimony that you directed Mr. Fox to make a

12     payment to an associate that he had previously

13     been told to make and Mr. Fox told you he was not

14     doing that because he disagreed with your

15     instruction?

16          A.     To be clear, he said the reasons he

17     did not do it was because he did not agree.

18          Q.     How, if at all, did you respond to

19     him saying he was not following your direction?

20          A.     Well, at that point I just informed

21     him I understand his interpretation or what he

22     thought to be accurate because everyone is

23     entitled to their opinion, however this is the

24     expectation.

25          Q.     Did you document that communication

1                   - TINA McDONALD -

2      with Mr. Fox at all?

3           A.    Document that communication?  I

4      don't -- I don't know if I recall documenting that

5      communication.

6           Q.    Was it your perception that Mr. Fox

7      was being insubordinate in connection with not

8      following your direction?

9           A.    Well, as a compliance specialist I'm

10     there to support and I'm the subject matter expert

11     around the Fair Workweek legislation, so I provide

12     guidance.  Him choosing not to follow the guidance

13     is just him -- you know, I don't really take it

14     personal against me specifically, but he just

15     chose not to follow the expectations in compliance

16     with the law.

17          Q.    Did you see that choice as

18     insubordinate under the circumstances?

19          A.    Under those circumstances, I would

20     say, yes, he made a choice to not follow

21     directions.

22          Q.    Did you report that event to anyone?

23          A.    I did communicate that.

24          Q.    At what point in time did you first

25     communicate that episode to anyone?

1                     - TINA McDONALD -

2          A.     That was event -- communicated

3    eventually in the overall recap of what was the

4    identified gaps in compliance and so, yeah --

5    that's --

6          Q.     How long after you --

7          A.     So that would be -- that was

8    communicated after visiting the store.

9          Q.     Did you take notes during your second

10   site visit?

11         A.     I believe I did take notes during the

12   second site visit as well.

13         Q.     Did you mention Mr. Fox declining to

14   follow your directions to make payment to that

15   associate in your notes?

16         A.     I can't recall that was captured

17   specifically in the notes.  It's possible.

18         Q.     Can you think of any particular

19   reason why you would not have chosen to document

20   that exchange in the notes?

21              MR. MOY:  Objection.

22         A.     I mean, that's assuming that I

23   didn't.  Right now I can't recall whether I did or

24   not or what was the approach around that

25   specifically at that time.

1                    - TINA McDONALD -

2          Q.     Why did you choose to take notes

3     during that site visit?

4          A.     Well, in order to be -- in order to

5     have information in regard to what we're looking

6     into regarding the New York City Department

7     Consumer Affairs complaint, I would have to

8     capture notes specific to the concern; and

9     I -- and it may have been --

10         Q.     When you --

11         A.     Sorry, go ahead.

12         Q.     No, no, no.  I thought you were done.

13    I apologize.  Please continue and finish your

14    answer.

15         A.     No, I was just saying that I -- you

16    know, it may -- a lot of what was needed was

17    gathering the information, gathering the

18    documents.  You know, so for example with the

19    schedules, I had to gather the schedules.  He said

20    that they were all posted on time, I needed to

21    gather those schedules and validate that.  I had

22    to gather the schedule change logs to identify

23    what was captured on it.  So a lot of time was

24    spent reviewing those documents to see where we

25    were in regards to compliance.

1                    - TINA McDONALD -

2          Q.     You had mentioned earlier that

3    something with the change log made it unclear or

4    impossible to determine whether certain changes

5    had been made with the partner's consent; is that

6    correct?

7          A.     Yes, that is correct.

8          Q.     Did you at any point in time, either

9    yourself or in coordination with anybody else,

10   have inquiries of the partners to determine

11   whether they had or had not consented to changes?

12         A.     I feel like I did speak to some

13   partners, but I can't recall specifically who I

14   may have -- I may have connected with some

15   partners, but I cannot recall specifically.

16         Q.     Was it part of your investigation to

17   determine whether changes had been made without

18   partner consent?

19         A.     Yes.

20         Q.     Did you ask all of the partners about

21   all of the changes that pertained to them?

22         A.     I recall connecting with

23   the partners.  I can't remember everything

24   specifically at this time.

25                There were some -- they had some

1                    - TINA McDONALD -

2        instances where they put reason code 2 on the

3        schedule change log which means that you're

4        supposed to pay them and he didn't; and then there

5        were -- for example with the late schedules, he

6        would post them late and that means you're

7        supposed to pay the partners.  They don't even

8        have to tell you that -- they don't have to

9        request to be paid.  We know that that's the

10       expectation and he did not.  Even though he said

11       that all the schedules were posted on time, but

12       they were not so that wasn't -- that wasn't

13       honest.

14               So though overall I -- honestly the

15       gaps in compliance, I've never encountered a

16       situation, as I said before, where it's a hundred

17       percent there's not an opportunity to improve; but

18       in this particular situation with the store, the

19       concern and the honesty or the lack of

20       transparency was evident or the decision to not

21       compensate partners and the time worked equals

22       time paid, and so making that decision it's not

23       okay; it's just not okay.

24               And the reality is that when it comes

25       to for example posting late schedules in a city

1                    - TINA McDONALD -

2     where there's legislation, that violation alone is

3     typically a final.  However in an instance where

4     we're posting schedules late, we're being provided

5     guidance to pay a partner and we don't, we're not

6     responding to the partner's communication in

7     regards to available shift postings and we're not

8     even following the standards, so -- and we're not

9     being honest about it, so there's a lot of

10    concerns there; and so a partner doesn't have to

11    tell you that hey, you didn't pay me.  You know as

12    a store manager that you have to pay your

13    partners, you know the expectation is that time

14    worked equals time paid, and you posting schedules

15    with notice of less than 14 days and not paying

16    partners is not okay.

17         Q.    Are you finished with your answer?

18         A.    Yes.

19         Q.    My question had been targeting

20    something very specific.  You had earlier said

21    that there were certain entries in change logs

22    from which you could not determine if the change

23    had been initiated at the partner's request or

24    made with the partner's consent.  My question now

25    is:  Did you ever document the results of any

1                  - TINA McDONALD -

2        inquiries posed to those partners to confirm

3        whether or not they had consented or initiated the

4        changes?

5              A.    I can't remember specifically.  What

6        I can recall is entries where they were supposed

7        to be paid and they weren't.

8              Q.    What, if anything, did you do to

9        correct the nonpayment?

10             A.    In the end to correct the nonpayment

11       for the partners we -- we identified, you know,

12       how much each partner was owed based off of the

13       late schedule, schedule change logs and we

14       processed payment for them.

15             Q.    How much money was owed to partners

16       at Mr. Fox's store in connection with

17       noncompliance with predictability pay?

18             A.    I don't remember.

19                  MR. MOY:  Objection.

20             A.    I don't remember a specific dollar

21       amount.  I know it was -- I believe it was a

22       couple thousand.

23             Q.    Well, do you believe it was less than

24       $5,000?

25                  MR. MOY:  Objection.

1                    - TINA McDONALD -

2        Q.      Do you believe it was less than

3    $5,000?

4        A.      I'm not sure because I don't remember

5    the specific dollar amount.  The dollar amount

6    wouldn't be relevant to doing what's expected, so

7    I don't -- I wasn't focused on the dollar amount

8    as far as that being a concern.  It's more so the

9    action behind it.

10       Q.      Were you involved at all in -- in

11   investigating whether there were compliance issues

12   regarding predictability pay at any other stores

13   in New York City?

14       A.      Yes.  I was involved in anything in

15   regard to the Fair Workweek legislation, because

16   the Fair Workweek legislation is not just about

17   predictability pay.

18       Q.      Did you conduct any sort of audit to

19   determine the existence of any noncompliance as to

20   any aspect of the Fair Workweek Law at stores

21   other than Mr. Fox's?

22       A.      Yes, I did.

23       Q.      How did you go about conducting that

24   audit; what was in involved with the audit?

25              MR. MOY:  Objection.

1                - TINA McDONALD -

2       City, is that what you're asking?

3            Q.     Broader than what you did.  Was there

4       any discussion of broadening your audit or review

5       beyond the level that you accomplished?

6            A.     No, I don't recall being told that I

7       needed to go broader than what I had accomplished,

8       because I had accomplished a lot in regards to

9       visiting the amount of stores that I did within

10      the first year.

11           Q.     When ws your third site visit to Mr.

12      Fox's store?

13           A.     I can't remember that specifically

14      and I don't recall it being a long visit.  I think

15      I was just -- I just went there to get the daily

16      records book.

17           Q.     Was Mr. Fox present?

18           A.     I believe he was there because I

19      wouldn't go into his store -- I would contact him

20      before going to his store.  I would never just go

21      there without his awareness.

22           Q.     For what reason -- withdrawn.

23                  Was your purpose in going to the

24      store on that occasion to collect the records

25      book?

                    - TINA McDONALD -

1
2       A.      Yes.

3       Q.      Did you do anything else while you

4   were there?

5       A.      I don't recall doing anything

6   additional.

7       Q.      Other than the site

8   visits -- withdrawn.

9               Did you have any communications

10  with operations management concerning your

11  investigation and findings regarding Fair Workweek

12  compliance in Mr. Fox's store?

13      A.      Yes, I did share my findings.

14      Q.      With whom did you share your

15  findings?

16      A.      I share my findings with my manager,

17  legal counsel, the regional director, and the

18  partner resources manager at the time.

19      Q.      Who was the regional director at the

20  time?

21      A.      Carla Ruffin.

22      Q.      Who was the partner resources manager

23  at the time?

24      A.      Bradley Jennison.

25      Q.      Did you communicate your findings to

1                      - TINA McDONALD -

2      any of those individuals in writing?

3           A.    I believe I may have communicated

4      some of the findings in writing.

5           Q.    Did you communicate any of the

6      findings exclusively in spoken words to any of the

7      individuals?

8           A.    Yeah, there's a possibility.  I'm

9      sure it was a combination.

10          Q.    Was there any particular reason why

11     you would elect to put some of your findings in

12     writing and others only spoken?

13               MR. MOY:  Objection.

14          A.    No.  I think honestly it was -- an

15     audit was done, I was responsible for

16     communicating the findings, and that was not

17     necessarily all in e-mail format.

18          Q.    Did you ever meet with the different

19     individuals, who you've mentioned, as a group or

20     with any of them together to discuss your finding?

21          A.    I did share my findings with them as

22     a group.

23          Q.    Was that at a meeting that had been

24     convened specifically for that purpose?

25          A.    Yes.

1                  - TINA McDONALD -

2        Q.      Who participated in the meeting?

3        A.      My leader, Rachel, legal counsel,

4    Carla, Bradley.

5        Q.      Carla Ruffin and Bradley Jennison?

6        A.      Correct.

7        Q.      Did you present any documentation

8    during that meeting?

9        A.      I -- I may have presented the e-mail

10   exchanges, the -- possibly the time details, the

11   timecards to indicate the nonpayment, the

12   schedules that were posted with notice of less

13   than 14 days, and the schedule change log.

14       Q.      When you say you might have, are you

15   guessing because those are documents you can think

16   of that might have been relevant to the subject of

17   the meeting or do you recall?

18       A.      Those -- yeah, I recall having a

19   folder with those documents.

20       Q.      Did you distribute copies of the

21   documents to any of the other attendees?

22       A.      I did not distribute copies of the

23   documents.

24       Q.      Did you pass them around the table?

25               MR. MOY:  Objection.

1                    - TINA McDONALD -

2     be fair to the matter and so I would just say a

3     few weeks.

4          Q.    Did you investigate compliance at any

5     other Starbucks stores to the same extent as you

6     did Mr. Fox's store?

7                 MR. MOY:  Objection.

8          A.    Yes, I did.

9          Q.    How long was the meeting?

10         A.    The meeting may have been about an

11    hour or less.

12         Q.    Did you take any notes during the

13    meeting?

14         A.    I -- I don't recall taking any

15    specific notes during that meeting.

16         Q.    Did anybody else that you saw take

17    notes?

18         A.    Not that I can recall specifically.

19    My focus was more on sharing the facts with the

20    group; that was my role.

21         Q.    Were all of the members of the group

22    present for the meeting from start to finish?

23         A.    I cannot definitively say yes or no.

24    I can't recall specifically.

25         Q.    On the day of that meeting, did you

1                    - TINA McDONALD -

2          off the record until 6:05 p.m.

3                    MR. MOY:  All right.

4                    (Whereupon, there was a brief recess

5          in the proceedings.)

6          Q.     During this last break, Ms. McDonald,

7     did you communicate with anyone or read anything?

8          A.     No, I did not.

9          Q.     During the meeting that we had been

10    talking about before the break where you

11    communicated your findings to a group of people,

12    was there any determination made during the course

13    of that meeting as to how to proceed in light of

14    your findings?

15         A.     No.

16                   MR. MOY:  Objection.

17         A.     I don't recall that.

18         Q.     After that meeting, did you

19    subsequently have any communications with anybody

20    at Starbucks about Mr. Fox prior to his

21    termination?

22         A.     No, not that I recall.  My role was

23    only to communicate the findings and then as far

24    as any action, employment action that that's

25    not -- that's not what was within my scope as a

1                    - TINA McDONALD -

2      compliance specialist, so I did not -- they do not

3      involve me in those -- those type of decisions.

4           Q.    Even if you were not involved as a

5      decision-maker or contributor to the decision, did

6      anybody else in the group speak to you about Mr.

7      Fox after the meeting prior to Mr. Fox's

8      termination?

9           A.    I don't recall speaking about him

10     with anyone after that meeting.

11          Q.    Did you, yourself, have any further

12     contact with Mr. Fox?

13          A.    Not that I could specifically recall.

14          Q.    Is the next thing that you heard

15     concerning Mr. Fox after that meeting the article

16     that you read about the lawsuit that you referred

17     to earlier today?

18          A.    Pretty -- yes.  So after he was no

19     longer partner, then I heard about a lawsuit.

20          Q.    Were any other management employees

21     at Starbucks, as far as you know, subject to any

22     sort of disciplinary or corrective action in

23     connection with compliance with the Fair Workweek

24     Law?

25          A.    Yes.  Several managers were subjected

1                    - TINA McDONALD -

2       to accountability, up to and including separation,

3       in regard to Fair Workweek legislation.

4              Q.     How many partners other than Mr. Fox,

5       that you're aware of, were separated involuntarily

6       from their employment due to noncompliance with

7       that legislation?

8                    MR. MOY:  Objection.

9              A.     Now, this is -- now of course, you

10      know -- can you repeat the question.

11             Q.     Other than Mr. Fox, how many

12      Starbucks managers were terminated in connection

13      with noncompliance with the Fair Workweek Law?

14                   MR. MOY:  Objection.

15             A.     So just to be clear, I may not have

16      always been aware of every single separation,

17      right, to be honest with you because a concern

18      could be listened to and it could be different

19      components of the Fair Workweek legislation.

20      However in regards to that, I might be aware of it

21      maybe around eight.

22             Q.     Were you involved in investigating

23      compliance by those eight managers who were

24      ultimately separated?

25             A.     From what I'm recalling, yes -- well,

1                    - TINA McDONALD -

2       no, actually, not.  I believe there was maybe one

3       or two that it fell in regards to scheduling or

4       labor compliance, but not necessarily Fair

5       Workweek legislation specifically.  I'm not sure.

6            Q.     Over what period of time were the

7       approximately eight managers who you're referring

8       to separated from their employment?

9            A.     Over the course of a year.

10           Q.     Were they all separated after Mr. Fox

11      was fired?

12           A.     I don't remember all the specific

13      timings of everyone.  Possibly, yes --

14           Q.     Did you --

15           A.     -- and the reason being that we

16      consistently hold partners accountable for

17      violating time worked equals time paid because of

18      the egregiousness of it.

19           Q.     To be clear, they were all separated

20      after Mr. Fox was fired?

21           A.     I'm not -- I don't know all the

22      dates, to be fully honest, because that's not -- I

23      don't make the decision in regards to that, right.

24      So there could have been something that happened

25      prior to his separation.  I'm not like a hundred

1                    - TINA McDONALD -

2      percent sure.  I just know that with his situation

3      specifically, you know, it was egregious enough

4      that it warranted separation from the company.

5            Q.    Who decided to terminate Mr. Fox, if

6      you know?

7            A.    That -- a decision -- employment

8      action decisions are made by the operators in

9      partnership with legal.  They have to receive

10     legal guidance on that.

11           Q.    Other than the approximately eight

12     managers who you think might have been separated

13     due to noncompliance with the Fair Workweek Law,

14     are there any managers you're aware of who

15     received a lesser form of discipline?

16           A.    I've seen managers receive maybe a

17     final written warning for late schedules.

18           Q.    Are you aware of any other managers

19     who have received written coaching or warnings,

20     other than what you've testified to?

21           A.    I am aware of receiving maybe a

22     written warning if you do not post a shift, an

23     available open shift.

24           Q.    How many such written warnings were

25     issued, that you know of?

1               - TINA McDONALD -

2          A.    That I can't recall specifically.

3     The level of severity is determined based on the

4     actual violation.  So for example as I shared

5     posting schedules late in a city where there's

6     a legislation, that's a final warning.

7     Typically -- and so it really depends on what the

8     actual violation is in regards to the level of

9     severity.

10               So in the case of the store managers

11    being separated for example, in the instances that

12    I recall what led to the separation was that the

13    matters were so egregious as well as the integrity

14    concern.

15         Q.    I'm posting a document that I've

16    labeled Exhibit McDonald 21.  It is a one-page

17    document bearing Bates number DEF0463.

18               Ms. McDonald, if you can, please open

19    the file.  My first question will be:  After

20    you've had a chance to look at it, do you

21    recognize this document?

22         A.    Okay.

23               (Whereupon, Exhibit 21 was marked at

24         this time.)

25         A.    Okay, I have the e-mail in front of

1                   - TINA McDONALD -

2          Q.    How did you select the other stores

3    to visit for the purpose described in this e-mail?

4          A.    I -- I can't -- I don't remember if

5    I'm the one who even selected the stores, to be

6    honest.

7          Q.    As sit here today, do you know

8    whether there was any methodology for selecting

9    the stores that you visited as anticipated in the

10   e-mail?

11         A.    No, because I don't -- I don't recall

12   being the person to select what locations to visit

13   cause I was -- I was a compliance specialist.

14   Bradley was the partner resources manager, so in

15   that regard I would have been following his lead

16   based on his familiarity with store managers and

17   the district.

18         Q.    Did you fill out notes on your laptop

19   in connection with each of the visits to the other

20   stores that day?

21         A.    I -- I believe I did capture notes

22   because the intent was -- the intent was to get an

23   understanding of is there -- is this just

24   specific -- is what we're seeing specific to

25   Rafael only or is this a districtwide concern.  So

1                    - TINA McDONALD -

2       ultimately it was important to be fair and

3       objective to see okay, are we seeing something

4       differently under Rafael's leadership and how

5       compliance is showing up in comparison to his

6       peers.  That was the intent.

7                    And as a result what I recall was

8       identified was that -- as I shared prior, I never

9       met a store that was a hundred percent in

10      compliance.  I think there is always an

11      opportunity to improve, so it was similar in that

12      regard that there were opportunities within the

13      district where improvement could be made in

14      regards to compliance.

15                   However, in Rafael's store the

16      violations were much more egregious.  Actually,

17      they were not egregious in the other stores at

18      all.  It was just things like, okay, we need to

19      work on this, we need to establish a better

20      cadence.

21                   However, in Rafael's store it was

22      more -- it was severe.  So we had all the late

23      schedules.  We had the lack of transparency

24      because he said he always posted the schedules on

25      time, but that was not the case.  We had schedules

1                    - TINA McDONALD -

2      that were missing.  We had schedule change logs

3      filled out by him and missing consent.  We had the

4      indications of partners capturing things on the

5      log and not being paid.  That was not identified

6      in all the other stores, thankfully.

7          Q.     Did you identify and come to the

8      conclusions that you've just been describing on

9      January 16, 2018?

10         A.     I came to the conclusion that this

11     was ultimately a real concern.  I would say that,

12     yes, I did come to a conclusion this was a real

13     concern, but ultimately, you know, I still wanted

14     to, like I said, take the time because ultimately

15     we're talking about a partner, right.

16                Rafael was a store manager.  We want

17     to make sure we do our due diligence, and look

18     into the concern objectively, make that sure that

19     there's nothing missing here.  And so, yeah, I

20     came to a conclusion that there's a real concern

21     here, yes, based off of the observations of what I

22     saw.  In comparison to the other store managers in

23     the district, there was a difference.

24         Q.     Is it your understanding that the

25     Department of Consumer Affairs conducted an

1                    - TINA McDONALD -

2      investigation to assess compliance within Mr.

3      Fox's store based on the complaints that you

4      already mentioned?

5          A.    Yes.  To my understanding what led to

6      the -- what ultimately resulted -- what led to all

7      of this was a partner filing a complaint with the

8      DCA in regards to what was happening in the

9      location, to my understanding.

10         Q.    Did you ever read anything about the

11     evidence that the investigator compiled?

12         A.    From the DCA?

13         Q.    Yes.

14         A.    No, I don't recall.  I don't recall

15     reading anything from the DCA.

16         Q.    Is that true all the way up until

17     this moment?

18         A.    The only thing I ever saw was the

19     complaint itself.  I can't recall -- I can't

20     recall any other documents outside of the

21     complaint form in itself, given that outside --

22     regardless of the complaint in itself, as a

23     company we still have a responsibility to look

24     into it.  So I don't think that would have changed

25     the outcome unfortunately based off of what was

1                    - TINA McDONALD -

2          Q.      Who is Tasmin Abocci?

3          A.      A district Manager.

4          Q.      Who is Tamit Ashebir?

5          A.      A district manager.

6          Q.      The subject line on this e-mail chain

7     is "Audit Store Number Symbol 15685."  My question

8     is --

9          A.      Yes.

10         Q.      -- apart from what's summarized in

11    this e-mail, did your audit of that store extend

12    to any other findings?

13         A.      Aside from what was in -- identified

14    in this e-mail?

15         Q.      Yes.  Are there any things that your

16    audit uncovered that you didn't include in this

17    specific e-mail?

18         A.      I mean, not that I can recall

19    specifically.  I just know this manager was

20    separated as well having integrity concerns

21    similar to Rafael's.

22         Q.      Did you participate in the decision

23    to terminate this manager?

24         A.      That was -- that was -- I was not --

25    no, that decision was made by the regional

1                  - TINA McDONALD -

2      else at Starbucks?

3          A.    I can't recall if I discussed this

4      specifically.

5          Q.    And is it the case, now that you've

6      seen a couple of examples, do you recall whether

7      you at any point in time after Mr. Fox's

8      separation looked to see if you had text message

9      communications with him?

10         A.    No, I don't recall looking for

11     communication with him.

12         Q.    You can put that document aside.

13               Ms. McDonald, I just posted a

14     document labeled Exhibit McDonald 32.  It is a

15     five-page document produced by defendant bearing

16     Bates numbers Defendant 45359 through 45363.

17               If I could direct your attention

18     first to the first two pages of the exhibit and,

19     if you could, take a look to see was there and let

20     me know when you've read it.

21         A.    Okay.

22         Q.    Once you've had a chance to look at

23     it, my question will be whether you can identify

24     what are the first two pages of this document.

25               (Whereupon, Exhibit 32 was marked at

           - TINA McDONALD -

1            - TINA McDONALD -

2        this time.)

3        A.    Okay, yes, I've -- I looked at the

4    document.

5        Q.    What are these first two pages, if

6    you know?

7        A.    These are basic observations

8    of what -- these are notes captured specific to

9    compliance and predictability pay to partners in

10   the store between the time period of November 26th

11   and January 16th.

12       Q.    What store specifically?

13       A.    Store 15751.

14       Q.    Was that Mr. Fox's store?

15       A.    That is correct.

16       Q.    Did you create this document?

17       A.    I did.

18       Q.    On the first page of the document

19   there's a number of places where it's indicating

20   that something is missing consent.  Do you see

21   those references?

22       A.    I do.

23       Q.    How did you determine whether consent

24   had or had not -- withdrawn.

25            Apart from the consent not being

1                    - TINA McDONALD -

2      listed where you expected to see it, did you do

3      anything to determine whether consent had in fact

4      been given by the referenced employees?

5          A.     This was specific to the schedule

6      change logs, so that was what was referenced to

7      capture this document.

8          Q.     Did you do anything to find out

9      whether the employees, whose consent was not

10     recorded, in fact did or did not actually consent

11     to the specific changes?

12         A.     I -- I don't recall specifically

13     because ultimately when going into his

14     store -- this is about an overview of compliance

15     in the store and what -- unfortunately what came

16     out of it was --

17         Q.     If I could --

18                MR. MOY:  Don't interrupt the

19         witness.  Let her finish.

20                Go ahead, Tina.

21         A.     So I went to look and evaluate

22     compliance in the stores, so these were the

23     findings.

24                So what led to Rafael Fox's situation

25     where we are today, unfortunately was around the

1                    - TINA McDONALD -

2      integrity piece and the overall violations

3      relative to compliance and so -- and just the late

4      schedules where we know we're supposed to pay a

5      partner.  Partners, the law -- partners are not

6      really familiar with their rights.  So we have a

7      responsibility as those leading them to ensure

8      that we're in compliance.  Hence, why the store

9      managers went through training on compliance.

10                    And even outside of that, three weeks

11     of schedules were expected to be posted prior to

12     the Fair Workweek legislation and that was not

13     happening.  And then when asked about those

14     behaviors in the location, he said that he was

15     postings schedules which he was not.  He was given

16     guidance before to pay partners and he chose not

17     to, so I'm just trying to understand where we're

18     going specifically with this.

19                    MR. GRAFF:  Move to strike the

20          entirety of the preceding response as not

21          responsive.

22          Q.    I'm going to ask a specific question

23     and, if you could, try to answer it specifically.

24     Did you ask --

25          A.    Sure.

1                   - TINA McDONALD -

2          Q.     -- any of the partners in Mr. Fox's

3     store whether they had, in fact, consented to any

4     of the changes that you believed may not have been

5     consented to?

6          A.     I can't recall.

7          Q.     Could I ask you, please, to scroll

8     down to the third page of this document, Bates

9     numbered DEF45361.

10         A.     Sure.

11                Yes, okay.  I'm -- we're at the top

12    where it says "Compliance"?

13         Q.     Yes.

14         A.     Okay.

15         Q.     The date there is Thursday, January

16    11, 2018, 10:12 a.m.

17         A.     Yes.

18         Q.     Does that mean that you drafted the

19    text that appears on this page at approximately

20    that time?

21         A.     Yes, that's what that would mean.

22         Q.     Generally, what are you describing in

23    this page of the exhibit?

24         A.     This was in regards to period of rest

25    violations.  So partners are allowed -- are

1                    - TINA McDONALD -

2     required to have 11 hours in between shifts and so

3     this is capturing relative to the rest between

4     shifts report that came out.

5          Q.    Does this pertain to Mr. Fox's store?

6          A.    Yes, it does.

7          Q.    Scrolling forward please to the next

8     page, Page 4 Bates numbered 45362, the top of the

9     page says "Questions," the date Thursday, January

10    11th at 11:57 a.m.  Did you type the text that

11    appears below that on this page?

12         A.    Yes.  Yes, I did.

13         Q.    Did you type all of the text at or

14    around 11:57 a.m. or did you write it perhaps in

15    two stages?

16         A.    I believe I captured it all at the

17    same time.

18         Q.    If you look at each paragraph, it

19    appears to be laid out as a question followed by

20    an answer.  Do you see that?

21         A.    Yes, I do.

22         Q.    Were you writing down in these notes

23    the questions and the answers as you were asking

24    and receiving them?

25         A.    Yes, that is correct.

1                    - TINA McDONALD -

2          Q.      Did you have any of these questions

3    prewritten going into whatever meeting?

4          A.      I can't recall.

5          Q.      Who did you pose these questions to?

6          A.      Rafael Fox.

7          Q.      And you recorded his answers to the

8    questions?

9          A.      That's correct.

10         Q.      Did you ever show him a copy of your

11   summary of this meeting for him to review and let

12   you know if he had any corrections for accuracy?

13         A.      I don't recall.

14         Q.      Can I direct your attention, please,

15   to the final page of the document, Bates numbers

16   Defendant 45363.  This page is headed or captioned

17   "Compliance Notes 15751."  Beneath that there's a

18   date, January 23, 2018 at 12:23 p.m.  Ms.

19   McDonald, did you write all of the text on this

20   page?

21         A.      Wait, which one?  I'm sorry.

22         Q.      The last page in this exhibit.

23         A.      Okay, sorry.  From January 23rd,

24   2018; is that correct?

25         Q.      That's the page, yes.

1               - TINA McDONALD -

2        A.      Yes, I did capture these notes.

3        Q.      Did you write them all in one sitting

4   at approximately 12:23 p.m.?

5        A.      Yes, I believe so.  I can't recall

6   specifically, but yes.

7        Q.      And do these notes pertain to Mr.

8   Fox's store?

9        A.      Yes, they do.

10        Q.      What was the purpose of drafting this

11   page of the document?

12        A.      So the purpose was to -- it goes back

13   to the Fair Workweek legislation and analyzes what

14   the compliance -- the gaps in compliance in the

15   location.

16               So, for example with the schedules,

17   it's capturing the amount of notice provided to

18   partners and the amount of violations for each

19   category; so schedules, schedule change logs for

20   example, a period of rest violations, and the good

21   faith estimate form, all of those are part of the

22   Fair Workweek legislation and so this was -- the

23   intent was to just capture an overall view of

24   that.

25        Q.      Do you see there's a section towards

1                    - TINA McDONALD -

2    the bottom of the document in bold that says;

3    "Period of Rest Violations"?

4         A.    Yes, I do.

5         Q.    On that line it says "zero

6    violations" and then below that there's two more

7    sentences.  Do those sentences each describe --

8         A.    Yes.

9         Q.    Do those sentences describe

10   violation?

11        A.    We don't -- those are not considered

12   to be violations due to the 15-minute rule, where

13   partners are allowed a schedule change of 15

14   minutes or less without resulting in a period of

15   rest violation or a schedule change premium.

16             MR. GRAFF:  Let's take a break off

17        the record until 7:05 p.m.

18             THE WITNESS:  Okay.

19             (Whereupon, there was a brief recess

20        in the proceedings.)

21        Q.    Ms. McDonald, did you communicate

22   with anyone or read anything during the break?

23        A.    No, I did not.

24        Q.    Quick question:  Going back to the

25   last page of the Exhibit 32 that we've just been

1              - TINA McDONALD -

2         Q.    I'm going to direct your attention

3    now to another line of questions posed by Mr.

4    Graff.  Earlier Mr. Graff asked you whether Mr.

5    Fox raised the issue of the use of DDVP with you,

6    do you recall?

7         A.    Yes, I recall being asked that.

8         Q.    Did Mr. Fox raise this issue with you

9    before your investigation of Mr. Fox began?

10        A.    No.

11        Q.    Do you recall when Mr. Fox first

12   raised the issue of DDVP with you?

13        A.    The conversation happened in his

14   store after receiving the DCA complaint and I just

15   happened to be there auditing the timecards and

16   that's when he made the comment.

17        Q.    Did you perceive him to have made a

18   complaint to you about the use of DDVP at the

19   store?

20             MR. GRAFF:  Objection.

21        A.    Honestly speaking, I did not take it

22   as a complaint.  I took it as more of an asking a

23   question and I directed him to the correct

24   resource.

25        Q.    And that resource, I believe you

1                  - TINA McDONALD -

2       mentioned earlier, was from the district manager?

3            A.      Correct, I directed him to his

4       district manager because when typically a store

5       manager has a concern, the person they should

6       escalate the concern to is their district manager

7       because they are the resource.

8            Q.      During this conversation with Mr.

9       Fox, did he suggest that the use of DDVP was

10      widespread at Starbucks stores?

11               MR. GRAFF:  Objection.

12           A.      No, I -- I don't recall him making

13      that suggestion.

14           Q.      What, if anything, do you recall

15      about what Mr. Fox said to you with respect to

16      DDVP?

17           A.      I just recall him saying that or

18      like asking about, you know, if it -- I

19      believe -- okay, I believe that he believed it was

20      being used in a specific store.  I don't recall

21      him saying widespread.  I -- I recall it more

22      about a specific location and kind of like what

23      should he do.  That's what I recall.

24           Q.      Did you refer this conversation with

25      Mr. Fox concerning DDVP to any other employee at

1              - TINA McDONALD -

2     Starbucks?

3              MR. GRAFF:  Objection.

4         A.     No.  No.  After that conversation, I

5     did not -- I, honestly, did not take it as a

6     complaint or anything of that nature.  I just took

7     it as him asking a question and me directing him

8     to the resource, because when I was in his store

9     it was to look into compliance -- schedule and

10    compliance in relation to Fair Workweek

11    legislation and the DCA complaint.  That -- that

12    was within my scope of work.  Anything outside of

13    at that, you know, didn't fall within my work.

14        Q.     I have another line of questions for

15    you regarding your investigation or audit of Fox's

16    store.

17             When you commenced your audit of

18    Fox's store, were you aware of any concerns raised

19    by Fox regarding the alleged underpayment or

20    nonpayment of wages to store employees?

21             MR. GRAFF:  Objection.

22        A.     No.  No, I was not aware of any other

23    concern.  No.

24        Q.     At any point during the course of

25    your investigation or audit of Fox's store, were

1                      - TINA McDONALD -

2     you aware that Fox raised any such concerns

3     regarding the alleged underpayment or nonpayment

4     of wages to store employees?

5                MR. GRAFF:  Objection.

6          A.    No, I was not aware of that.

7          Q.    I'm going to refer you to Mr.

8     Graff's questions to you regarding employees'

9     signatures in the schedule change logs.  Does an

10    employee consent for a schedule change have to be

11    in writing?

12         A.    Yes, partners are required to consent

13    in writing.

14         Q.    If there is no handwritten consent by

15    a store partner there is no consent for compliance

16    purposes, correct?

17               MR. GRAFF:  Objection.

18         A.    Of course -- in regards to

19    compliance, that would be considered that the

20    partner did not consent.

21         Q.    If there is no handwritten consent

22    for a schedule change that is a violation,

23    correct?

24               MR. GRAFF:  Objection.

25         A.    Correct.

1                    - TINA McDONALD -

2          Q.     And the requirement that a store

3     employee actually consent in writing is a

4     requirement imposed by law?

5          A.     That is correct.  That is a part of

6     the Fair Workweek legislation, that partners

7     provide written consent for all schedule changes

8     outside of their already posted schedule.

9          Q.     I believe you testified earlier that

10    there were several hundred Starbucks stores,

11    correct?

12                MR. GRAFF:  Objection.

13         A.     Correct.  Yes, there are hundreds

14    of -- yup, that is accurate.

15         Q.     And do you know how many employees

16    Starbucks has?

17         A.     Thousands, thousands of employees.

18         Q.     Okay.  Sitting here today, do you

19    know how long it would take for you to call every

20    single employee for whom a store manager signed

21    rather than having the store employee sign?

22                MR. GRAFF:  Objection.

23         A.     I -- I don't know how long that would

24    take, but that -- honestly, that would have been

25    unrealistic.  As a compliance specialist