# EXHIBIT 3

1                   PAUL D'AURIA

2            UNITED STATES DISTRICT COURT

3           SOUTHERN DISTRICT OF NEW YORK

4              Case No. 19-CV-4650

5

6    _____

7    RAFAEL FOX, PAUL D'AURIA, and JILL        )

8    SHWINER,                                  )

9                        Plaintiffs,           )

10       v.                                     )

11   STARBUCKS CORPORATION d/b/a STARBUCKS     )

12   COFFEE COMPANY,                           )

13                        Defendants.           )

14   _____          )

15

16

17

18          DEPOSITION OF PAUL D'AURIA

19      TAKEN REMOTELY BY VIDEO CONFERENCE

20              September 9, 2020

21

22

23

24   Reported by:  Mary Ann Payonk

25   Job No. 183853

1                    PAUL D'AURIA

2    say, let's call it a shelf life where they were

3    good for a certain period of time to keep the

4    pests under control?

5        A.   It would depend on the product.  The

6    stores were getting serviced once a month at

7    Starbucks' request.  Some bait gels they say

8    would last weeks depending on the environment

9    of the store, humidity.  Things like fly sticks

10   would last probably longer because it's not a

11   chemical.  The fruit fly traps would probably

12   only last as long as they were allowed to

13   remain in the store.  Most chemicals break

14   down, so water or sunlight would degrade them.

15   Dirt would degrade them.

16       Q.   Okay.  And other than communicating

17   with the managers of the store by way of giving

18   them a report, did you communicate with anyone

19   else from Starbucks about your work, your

20   evaluation?

21       A.   Yeah, if there was a particularly bad

22   problem, I would be in direct contact with --

23   by email with the facilities managers of the

24   corresponding stores.

25       Q.   And who was the facility manager

```
 1                    PAUL D'AURIA
 2   during the '13 to '18 period of time?
 3        A.   There were many.  If you want me to
 4   name as many as I can, it was probably six or
 5   seven.
 6        Q.   Yes.  Yeah, please do if you can.
 7        A.   There was Tom Nassiri (ph).
 8   Margaret -- I don't know if I pronounce her
 9   last name correctly.  Her name was Kis or
10   Margaret Kis, K-I-S.  Neal Opalka.  Keith
11   Costello was a manager.  Rich Letts.  Alloy
12   Vilabrera.  Kim Healy.  Noelle Perez.  One man
13   named Walter.  I don't know if he was there in
14   2013.  I forgot his last name.  Off the top of
15   my head, that's all I can think of right now.
16        Q.   Those were the facility managers that
17   you can recall communicating with from '13 to
18   '18?
19        A.   Yes.
20        Q.   Who would you -- okay, who provided
21   those names to you to communicate with?
22        A.   Usually Ms. Shwiner.  We would
23   include each other on our emails if there was a
24   problem.  So I would let AVP know what I found
25   and I would let the specific facility manager
```

```
1                    PAUL D'AURIA
2   know of a problem.
3        Q.   And did you communicate with the
4   facilities managers when there was a
5   particularly difficult problem at the store?
6        A.   Yes.
7        Q.   And did they communicate back to you?
8        A.   Sometimes.
9        Q.   And was it your responsibility to
10  bring to their attention problematic stores
11  that had greater pest problems?
12       A.   Yes, they would ask for us to keep in
13  touch with them on bigger problems.
14       Q.   And over the last five-year period
15  that you worked with Starbucks, were the
16  conditions of the stores pretty much the same
17  during that period?
18       A.   Yeah, pretty consistent, the
19  conditions.
20       Q.   Got it.  And other than the store
21  managers and the facilities managers, did you
22  communicate with anybody else at Starbucks on
23  an as-needed basis?
24       A.   Sometimes the -- I guess his title
25  would be the director of facilities for
```

1              PAUL D'AURIA

2   New York.  Sometimes I would include them in

3   the email.

4        Q.   And do you recall their names?

5        A.   From 2013 to 2018 there was Bill

6   Miko, Stephen Gallant.  There was an interim

7   manager, but I don't remember his name.  And

8   the last was Keith Costello.

9        Q.   Did you have keys and codes to access

10   all the stores during that five-year period?

11        A.   Yes.

12        Q.   Anybody else that you worked with at

13   Starbucks that you haven't mentioned?

14        A.   Excuse me?  Could you repeat that?

15        Q.   I'm sorry?

16        A.   Could you repeat that?  I didn't hear

17   you.

18        Q.   Oh, sure.  I'm sorry.  Other than the

19   individuals that you mentioned just now from

20   Starbucks, was there anyone else that you

21   communicated with who worked at Starbucks

22   regarding your job?

23        A.   No.  Unless I saw a manager who was

24   working late, it was usually those people.

25        Q.   Okay, got it.  Have you ever heard of

1                        PAUL D'AURIA

2    a product called DDVP?

3         A.   Yes, I have.

4         Q.   And what's that short for?

5         A.   The full name is Dichlorvos.

6         Q.   I'm sorry, could you say that again?

7         A.   It's Dichlorvos, D-I-C-H-L-O-R-V-O-S.

8         Q.   And what is that product?

9         A.   That product is an organophosphate

10   that's used for insects.

11        Q.   Organic phosphate?

12        A.   Yes.

13        Q.   And when did you first learn of that

14   product?

15        A.   I first learned of that product

16   probably around 2004 or '05 in a book.

17        Q.   And how did you learn of it?

18        A.   In a book.

19        Q.   When you say "in a book," what kind

20   of -- what kind of book?

21        A.   It was called the Truman Scientific

22   Guide to Pest Management, I believe.

23        Q.   Were you required to use that book in

24   your employment?

25        A.   No, I wasn't.  It wasn't a book

1          PAUL D'AURIA

2    that -- that they would give us.  I had to

3    purchase that myself.

4          Q.   And was there a reason why you

5    purchased that book?

6          A.   I like to keep informed so I would

7    buy various books or trade magazines.

8          Q.   Got it.  So in '04, '05 you purchased

9    a book and you learned about Dichlorvos; is

10   that right?

11         A.   Yes.

12         Q.   And what did you learn about the

13   product, this organic phosphate product?

14         A.   I learned it was a product -- it

15   wasn't used that much in the United States.  It

16   was used mostly -- it had been used, I think,

17   first in the '50s and '60s.  It hadn't had too

18   many commercial applications until sometime in

19   the 2000s, it started being used in Nuvan pest

20   strips.

21         Q.   And you said it became more in use in

22   the 2000s?

23         A.   Yes.  At a certain point, the EPA

24   allowed companies to sell it over the counter

25   as opposed to the more commercial -- for

1                    PAUL D'AURIA

2    commercial applicators, it was called Nuvan

3    Strips.  Then at some point, the EPA allowed

4    them to be branded under other companies to

5    make it.

6         Q.   And other than reviewing or

7    researching or learning about DDVP in that

8    book, did you ever do any independent research

9    about the product?

10        A.   I did read more as I would come

11   across it in magazines or blogs.

12        Q.   Beginning in the 2000s did you ever

13   see that product used in any place where you

14   worked where you were assigned?

15        A.   Only Starbucks.

16        Q.   And did you start to see that in the

17   early 2000s when you worked at Starbucks?

18        A.   I saw them -- first time I saw them

19   in Starbucks was about 2007 or 2008.

20        Q.   And do you recall the first place you

21   saw them in 2007, 2008?

22        A.   The particular store, I don't

23   remember.

24        Q.   How about generally?

25        A.   Generally, I would find them on the

1                  PAUL D'AURIA

2   floors in the stores.  I would find them on

3   shelves, under the sink.

4        Q.   And in this time period, 2007, 2008,

5   is it your testimony, or -- strike that -- is

6   it correct that was the first time you started

7   to see the DDVP product show up?

8        A.   Correct, yes.

9        Q.   And how often would you find this

10  product during that 2007, 2008 time period?

11       A.   I was starting to see them more

12  frequently.

13       Q.   Of the stores that you were visiting

14  and evaluating, approximately how many

15  percentage-wise had that product in it?

16       A.   Back then, I serviced about 100.  In

17  each store, I would say probably more than half

18  at that time.

19       Q.   Right.  And when you saw those

20  products what, if anything, did you do?

21       A.   I would document it on the work order

22  or email it to the facility manager or to

23  Ms. Shwiner.

24       Q.   When you say "or," was it either/or

25  or did you do both?

PAUL D'AURIA

1

2      A.   If I didn't tell the facilities

3  manager, Ms. Shwiner would let them know that

4  these products were in the store.

5      Q.   And what did you say in your

6  communications, first to the Starbucks

7  personnel?

8      A.   Basically, these products are not

9  supposed to be in food establishments.  They

10  shouldn't be around people.  It wasn't a

11  chemical you would want sitting in a food

12  establishment where people were.

13      Q.   Okay.  And during that '07, '08 time

14  period where approximately half the stores used

15  the products, was it your experience that the

16  stores continued to use DDVP over the period of

17  time that you worked for AVP?

18          MR. GRAFF:  Objection.

19      A.   Yes.

20      Q.   You can answer.

21      A.   Yes, I continued to see them even

22  after we told them they were not to be used.

23      Q.   And was the frequency similar over

24  time to what you mentioned, about half the

25  stores used them over time?

1                      PAUL D'AURIA

2        A.   At that time, yes, I would say it was

3   pretty consistent.

4        Q.   And other than the '07, '08 time

5   period, in the other periods that you worked

6   for Starbucks -- and let's focus on the '13 to

7   '18 -- did you see that product, DDVP, a

8   similar amount of times when you were working

9   for AVP?

10       A.   I started --

11            MR. GRAFF:  Objection.

12       A.   I started to see them more

13   frequently.

14       Q.   I'm sorry, I didn't hear you.

15       A.   I started to see them more

16   frequently.

17       Q.   More frequently?  More than

18   50 percent of the time?

19       A.   Yes.

20       Q.   Was your practice the same when you

21   would see them in that 2013-2018 time period?

22       A.   Yes.

23       Q.   Okay.  When you brought to the

24   attention of Starbucks personnel, what, if any,

25   response did you receive from them regarding

1                          PAUL D'AURIA

2    the DDVP product?

3         A.   Sometimes no response.  Sometimes

4    they would say okay, you know, we got it, we'll

5    pass it along.  But usually it was very little

6    action to our emails.

7         Q.   Do you recall any occasions when you

8    advised a manager of a store that you observed

9    the DDVP product in his or her store that they

10   removed the product from the store?

11        A.   On occasions I would see either

12   sometimes a manager or assistant manager or

13   shift supervisor, and I would tell them.

14   Sometimes they would tell me they used the pest

15   strips, and I would advise them against it.

16        Q.   And did you tell anybody at AVP about

17   the product?

18        A.   Yes.

19        Q.   And who did you tell at AVP?

20        A.   Usually Ms. Shwiner.

21        Q.   Anybody else?

22        A.   Maybe in passing to the co-owners.  I

23   can't recall exactly.

24        Q.   Anyone else you can recall?

25        A.   Not at AVP, no.

1                    PAUL D'AURIA

2        Q.   Okay.  Other than communicating with

3   Starbucks and AVP about the products being in

4   the Starbucks stores, did you communicate with

5   anyone else about those products being in

6   Starbucks stores?

7        A.   I did contact someone who wrote a

8   blog about these strips, and I --

9        Q.   And when was that?

10       A.   I would say around 2015 or '16.

11       Q.   Okay.  And who was the person that

12  wrote the blog?

13       A.   Dr. Matt Frye, Cornell University.

14       Q.   Could you spell that name?

15       A.   Sure.  It's Matt Frye.  Last name is

16  F-R-Y-E.

17       Q.   And who was the individual again?

18       A.   He's Dr. Matt Frye.  He's an

19  entomologist at Cornell University.  He heads

20  up their IPM program.

21       Q.   Okay.  And how often did you

22  communicate with that doctor in that time

23  period?

24       A.   Over the course of a few years, maybe

25  10, 15 times.

1                    PAUL D'AURIA

2        Q.   And do you have those communications?

3        A.   Yes.

4        Q.   And have you produced them in this

5    case?

6        A.   Yes.

7        Q.   Tell me the substance of the

8    communications that you had with the doctor.

9        A.   At first, I told him that I enjoyed

10   reading what he had been writing previously,

11   and I was especially curious about the strips

12   and how to communicate to my customer -- I

13   didn't tell him who on it was -- how to

14   communicate the dangers of the strips.

15            He told me to document it, you know,

16   give them any kind information that was online

17   to maybe help them out, give them a copy of the

18   label, the safety data sheet.  Basically told

19   me to document it.

20       Q.   And when's the last time you

21   communicated with the doctor through his or

22   her -- his blog?

23            MR. GRAFF:  Object.

24       A.   My last email concerning pesticides

25   with Matt was probably 2019, 2018.  I'm not

1                    PAUL D'AURIA

2   sure.

3        Q.   Okay.  And over that four or five

4   period of time that you communicated with the

5   doctor, approximately how many emails or other

6   types of communications did you have with him?

7        A.   Besides the emails, I texted him

8   once.  He just had a baby.  I congratulated him

9   on his baby.  Maybe I -- I followed him on

10  Twitter.  I probably commented on things he

11  wrote.

12       Q.   And have you produced all those

13  communications to your attorney in response to

14  our document request?

15       A.   If I had them saved.  And I had many

16  accounts that were actually closed down by

17  Twitter.

18       Q.   And do you have his email address?

19       A.   Yes.

20       Q.   And what is it?

21       A.   It's a Cornell University address.  I

22  don't know it off the top of my head.

23       Q.   Okay.  Well, if you recall, we'll

24  leave a blank in the transcript and you can

25  fill it in if you recall.

Page 54

1          PAUL D'AURIA

2     A.   Okay.

3 INFORMATION TO BE SUPPLIED:

4 _____

5 _____

6     Q.   Did you ever talk to him on your cell

7 phone?

8     A.   I believe I had one conversation with

9 him on my cell phone.

10    Q.   And what did you discuss?

11    A.   Mostly the dangers of the DDVP and

12 pest strips in general.

13    Q.   Okay.  Anyone else you communicated

14 with other than the doctor outside of Starbucks

15 and AVP on the DDVP product?

16    A.   I did contact another entomologist at

17 Texas A&M University.  I wanted to be sure that

18 I had done everything I could to notify

19 Starbucks of the dangers and I kind of wanted a

20 second opinion on whether or not I was doing

21 the right thing as far as documenting it the

22 way I did.

23    Q.   And who was that person?

24    A.   His name is Dr. Michael Merchant.

25    Q.   And where is the doctor located?

1                    PAUL D'AURIA

2       A.   Texas A&M University.

3       Q.   And how many communications did you

4  have with that doctor?

5       A.   Two or three, I think.  Just a short

6  chain of emails.

7       Q.   And what was the substance of the

8  communications?

9       A.   Basically, it's the best way to

10 communicate dangers of that product.

11      Q.   And did you receive communications

12 back from the doctor?

13      A.   Yes.

14      Q.   What were the substance of his

15 responses?

16      A.   Basically, to make sure you document

17 everything, put it in writing.

18      Q.   Other than these two doctors, was

19 there anyone else you communicated with outside

20 of Starbucks or AVP during the last five or six

21 years of your employment?

22      A.   Before the lawsuit or after?

23      Q.   Both.  Let's take -- let's start with

24 before.

25      A.   Before the lawsuit, no.

1                    PAUL D'AURIA

2       Q.   And after the lawsuit?

3       A.   I spoke with New York State DEC.

4       Q.   And when did you talk to the DEC?

5       A.   I spoke to them in emails and on the

6  phone once in 2018 and then again in 2019.

7       Q.   And who did you speak with?

8       A.   The first time -- the first time was

9  someone at the Long Island City Office.  I

10  think his name was Malik.

11       Q.   Okay.

12       A.   We talked once over the telephone and

13  in emails, and then --

14       Q.   What was Malik's position?

15       A.   He was in the pesticide enforcement,

16  I believe.

17       Q.   Tell me what your communication was

18  with him.

19       A.   I wanted to ask him how to report a

20  chemical that was being used improperly.

21       Q.   Okay.  And what did he say to you?

22       A.   He told me to send whatever

23  information and photo documents that I could

24  provide to him.

25       Q.   And did you do that?

1                    PAUL D'AURIA

2        A.   At that company, I don't know if

3   Ms. Shwiner might have emailed other people.

4   I'm not sure.

5        Q.   So you recall doing the same thing at

6   Le Pain Quotidien that you did at Starbucks by

7   alerting the facilities manager; is that right?

8        A.   Yes.

9        Q.   And after you alerted the facilities

10  manager there, did you see any change of use of

11  the pest strips at that organization?

12       A.   No, I did not.

13       Q.   Do you recall seeing these products

14  anywhere else other than where you've

15  mentioned?

16       A.   No.

17       Q.   When you were reporting the pest

18  strips to individuals at Starbucks, both the

19  managers and the facilities managers, did they

20  advise you to remove these pest strips?

21       A.   On one occasion, they did.  And

22  Ms. Shwiner informed them that we wouldn't take

23  responsibility to remove those because they

24  had -- they had to be disposed of a certain way

25  such that they were brand new.  So we told

1                    PAUL D'AURIA

2   Starbucks we were not going to touch those

3   devices.

4        Q.   So you were never directed to remove

5   them; correct?

6        A.   We were told to remove them, but we

7   refused to remove them for liability reasons.

8        Q.   And did you communicate that request

9   to anyone at AVP?

10        A.   Jill, I believe, Ms. Shwiner was also

11   copied on that email, or maybe she was -- it

12   was sent to her, and it might have been -- she

13   might have forwarded it to me, but we were both

14   told to remove them when we see them.

15        Q.   Do you ever recall going to a

16   Starbucks location, seeing a pest strip,

17   reporting it to a manager, a facilities

18   manager, returning to the same store and seeing

19   the pest strip was gone?

20        A.   Not that I can remember, no.

21        Q.   And would you memorialize that

22   observation in your report to the manager of

23   the store that it remained there after you'd

24   reported it before?

25        A.   Yeah, usually I would, you know,

```
 1                    PAUL D'AURIA

 2        finished reviewing it.

 3             THE WITNESS:  I've read it.

 4        (D'auria Exhibit No. 1 was marked for

 5        identification.)

 6   BY MR. WEBER:

 7        Q.   Tell me what this is.

 8        A.   This looks like a forward to Tom

 9   Masseria from Ms. Shwiner.

10        Q.   And who is it sent to?

11        A.   It looks like it was sent to Thomas

12   Masseria.

13        Q.   And who is he?

14        A.   He was a facilities manager.

15        Q.   And when was this sent?

16        A.   July 2013.

17        Q.   So do you believe that you advised

18   Jill shortly around that time about the pest

19   strip?

20        A.   Yes.

21        Q.   Okay.

22        A.   I can't see the photo.  I don't know

23   if there's a photo there or not.  I can see the

24   text.

25        Q.   Got it.  And when she says "next to
```

                              PAUL D'AURIA

1   the air vent," what did you understand that to

2   mean?

3        A.    If it's the store that I kind of

4   remember where this was, it was hanging in

5   front of either an air intake or an air

6   conditioning vent in the store.

7        Q.    It says in this email the product is

8   being used in violation of the package

9   direction; correct?

10            Do you see that?

11       A.    Correct.  I see it.

12       Q.    And do you understand "the package

13  direction" to mean that it's not licensed to be

14  used at a food establishment?

15            Is that your understanding?

16       A.    Yeah, the label for the products

17  specifically state they're not to be used in

18  food establishments, food areas, anywhere where

19  people occupy that space.

20       Q.    And do you know what, if anything,

21  happened as a result of Jill's email to Tom?

22       A.    I don't remember.

23       Q.    Did you follow up at all with it?

24       A.    I don't think I did.

```
 1                   PAUL D'AURIA
 2             MR. WEBER:  Okay, that's Exhibit 1.
 3        Okay, let's go to 00075, put that one
 4        up.
 5        (D'auria Exhibit No. 2 was marked for
 6        identification.)
 7   BY MR. WEBER:
 8        Q.   I'll show you Exhibit 2.  Can you
 9   identify that document?
10        A.   Yes, I see it.
11        Q.   What is it?
12        A.   An email from me to Margaret at
13   Starbucks and to AVP.
14        Q.   And what was this about?
15        A.   If I recall, this was a store I
16   was -- I can't see the photo.  It sounds like
17   they have a large overhang over the bar, and I
18   was going to place a fly trap up there and I
19   saw a whole bunch of pest strips up there.  I
20   had to climb a large ladder to get up there,
21   and I used my camera to be able to see what was
22   up there after I put the trap up there and I
23   saw the pest strips.
24        Q.   So it looks like you took five
25   pictures of the pest strip and attached it to
```

```
 1                    PAUL D'AURIA
 2   the email you sent to Margaret.  Would that be
 3   accurate?
 4        A.   It looks like photos, yes.  I can't
 5   see if there's any photos attached.
 6        Q.   Got it.  And what, if anything, did
 7   Margaret do in response to your email?
 8        A.   I believe that might have been one
 9   she asked us to remove them, and I told her I
10   wouldn't even be able to reach them.  It was
11   about probably 15 to 20 feet off the floor and
12   it wasn't in a safe area.
13        Q.   So why were you -- I'm sorry, go
14   ahead.
15        A.   I never went back up on the ladder,
16   so I --
17        Q.   So why were you looking up there 15
18   or 20 feet up in the ceiling there?  What
19   caused you to go up there?
20        A.   I was trying to find a place out of
21   sight where I could put a fly stick or probably
22   an organic fruit fly trap.
23        Q.   And did you do that, in fact, leave
24   that fly trap up there?
25        A.   I believe I did.
```

```
                        PAUL D'AURIA
 1
 2              MR. WEBER:  All right.  Next
 3         exhibit, 44.
 4         (D'auria Exhibit No. 3 was marked for
 5         identification.)
 6    BY MR. WEBER:
 7         Q.   I show you Exhibit 3, and if you
 8    could take a look at that document, tell me if
 9    you recognize it.
10         A.   Yeah, it looks familiar.  I wrote
11    that.
12         Q.   Okay.  And who did you write it to?
13         A.   I sent that to Ms. Shwiner.
14         Q.   Okay.  And what was the purpose of
15    your email?
16         A.   To let her know that the strips were
17    sitting in -- basically on the floor at the
18    counter in a puddle.  I was quite angry.
19         Q.   You say:  "I need to be copied."
20              What does that mean?
21         A.   I just wanted to be notified that we
22    are sending all this information to Starbucks.
23         Q.   And you said:  "I'm not getting this
24    crap in my lungs."
25              Do you see that?
```

```
 1                    PAUL D'AURIA

 2        Q.   Looks like -- is this from you from

 3   your mobile?

 4        A.   Yes.

 5        Q.   On, well, on July 5, 2015?  See that?

 6   To whom are you communicating?

 7        A.   That is to Jill.

 8        Q.   And are your texts in the gray and

 9   hers in the green?

10        A.   I'm gray in that top one.

11        Q.   And then purple on the others?

12        A.   Yeah, pink or purple.  She looks like

13   she's green.

14        Q.   Got it.  And I think you say:

15   "Reporting the DDVP use on them."

16             What do you mean, "on them"?

17        A.   Starbucks.

18        Q.   Starbucks?

19             "I've had it."  Those are your words;

20   correct?

21        A.   Right.

22        Q.   And it appears Jill then says:

23   "Which stores and pics?  I'll email to Bill."

24             Do you know who bill is?

25        A.   Bill Miko, head of facilities for
```

1                        PAUL D'AURIA

2    New York.

3         Q.   Okay.  And then you say:  "They won't

4    listen.  Done warning them.  I'm inhaling this

5    shit without knowing it."

6              Were those your words?

7         A.   Correct.

8         Q.   All right.  And then you say:  "I'm

9    including it on the work order."

10             Are those the reports that you would

11   give to the manager?

12        A.   Yes.

13        Q.   Okay.  Then you say:  "If I file a

14   complaint, I'm getting a list of DMS."

15             What's DMS?

16        A.   I probably meant district managers,

17   plural.  "District managers" should have been a

18   small lowercase S.

19        Q.   And what's the "Someone is telling

20   stories [sic] to buy this shit."

21             What are you referring to?

22        A.   Someone was telling the employees at

23   the stores to buy these strips.

24        Q.   And who do you think was buying these

25   products?

1                    PAUL D'AURIA

2        A.   I believe that's Jill, probably

3    talking about rodents coming into the store

4    because their vendor would leave the door open

5    making deliveries so looks like mice were

6    probably running in from the street.

7        Q.   And who says:  "Ugh, okay"?

8        A.   I think that's me.  I say:  "That

9    sounds about right.  Haven't seen any holes in

10   the store."  I told her sorry she had to go

11   because she had to go in in the morning if I

12   had to work nights so Jill would take calls in

13   the morning.

14       Q.   And who wrote the words in the gray

15   box:  "I'm not going in"?

16       A.   I think that's Jill.

17       Q.   So you think she said:  "I'm not

18   going go in.  I'll chance it.  If something

19   happens, I'll go in later"?

20       A.   Yes.

21       Q.   And who is she referring to there in

22   that portion of the text?

23            MR. GRAFF:  Objection.

24       A.   It looks like -- it looks like she's

25   talking -- it looks like she's having a

```
                              PAUL D'AURIA
 1
 2    conversation with Margaret at facilities.  And
 3    she told her about Penn Station and we were
 4    having a problem with our supplies missing.
 5    And we would find our fly traps missing and we
 6    would find DDVP strips in the stores.  And all
 7    of our items that we placed in the store for
 8    rodents and flies were vanishing.  She also --
 9         Q.   Is she -- go ahead.  I'm sorry.
10         A.   And she also was talking about
11    putting in, installing fly lights to catch the
12    flies.
13         Q.   Is she saying that the AVP products
14    are missing from the store?
15         A.   Yeah, things like mousetraps and fly
16    traps.  They were being thrown away by
17    Starbucks employees.
18         Q.   Did you have any understanding of why
19    Starbucks employees would throw away AVP
20    products?
21         A.   Truthfully, no.  I think they were
22    told by EcoSure, who was a third-party
23    inspector that they used, that fly traps or
24    mousetraps were against regulations, and they
25    were just throwing away our product.
```

1                    PAUL D'AURIA

2       Q.   Was it your understanding that AVP

3  was responsible for installing mousetraps and

4  similar products?

5       A.   Yeah, mousetraps, fly traps, yes.

6            MR. WEBER:  Let's go to the next

7       exhibit.

8       (D'auria Exhibit No. 6 was marked for

9       identification.)

10  BY MR. WEBER:

11      Q.   Let's take a look at Exhibit 6.

12  Could you tell me what this is?

13      A.   I can't see the photo, but it looks

14  like an email to Ms. Shwiner about a store

15  where they were putting the pest strips in the

16  drains in the basement.

17      Q.   Okay.  And these are pest strips

18  again?

19      A.   Yes.

20      Q.   Are pest strips allowed in basements

21  where there are no patrons?

22      A.   It's not allowed -- they're not

23  allowed to be anywhere where there are people

24  or food, food supplies, things of that nature.

25      Q.   Okay.  So let me ask you this:  Where

PAUL D'AURIA

1
2  are pest strips allowed to be used?

3      A.   Pest strips are allowed in a garbage

4  room, a sealed room, a shed, crawlspaces,

5  things of that nature where people normally

6  aren't present.

7      Q.   And do you know what, if anything,

8  Jill did in response to your September 23,

9  2015, email?

10     A.   I assume she forwarded it on to

11 whoever the facilities manager was.

12     Q.   You don't know that for sure;

13 correct?

14     A.   I'm not for sure.  There were so many

15 emails, I might have seen it, I might not have.

16     Q.   Okay.  And what was Jill's position

17 in 2015 at AVP?

18     A.   Jill was basically the operations

19 manager for Starbucks and from AVP

20 specifically.  Mainly Starbucks was the big

21 account.

22     Q.   Was she responsible for any other

23 companies that were clients of AVP?

24     A.   I believe she also put in bids for

25 jobs that AVP was trying to win.  She also did

```
 1                  PAUL D'AURIA
 2        see now a text with a picture of a pest
 3        strip and a fly light.
 4             MS. GOLDSTEIN:  Did the page just
 5        switch on you?
 6             MR. WEBER:  Yeah.
 7             THE WITNESS:  Yeah, now I see it
 8        back.
 9             MS. GOLDSTEIN:  You should be able
10        to toggle it yourself.  I just gave you
11        permission to, to see if you can -- see
12        if you can flip through the messages
13        yourself.
14   BY MR. WEBER:
15        Q.   Yeah, if you would, Mr. D'aurio, take
16   control and go from the first page and walk us
17   through it.
18        A.   Is that the one dated March 23, 2017?
19        Q.   I believe that's correct.
20        A.   Okay.  "DDVP all over."  Skull.
21   "DDVP toxic."  And it looks like I was showing
22   Jill that somebody logged into my -- I don't
23   know if that was Twitter.
24        Q.   If you could take control and just
25   walk us through the first page throughout, can
```

```
 1                    PAUL D'AURIA

 2  you do that?

 3       A.   Sure.

 4            MR. GRAFF:  That looks to me like

 5       you're referring to the third page of

 6       the exhibit.  I think he's asking to go

 7       to the very first page.

 8            THE WITNESS:  Oh, first?  Okay,

 9       sorry.

10            MR. WEBER:  Yeah, there we go.

11       Q.   Okay.  So that's page 1 of Exhibit 7.

12  Explain to us who's -- are you in the green

13  again?

14       A.   Yes, I'm the -- I think that's Jill

15  in the green and that's me in the pink, looks

16  like pink.  Sometimes it's gray, it looks like,

17  for me.

18       Q.   So whose words are:  "Sorry, waiting

19  to hear from cardiologist.  My heart rate won't

20  drop below 130"?

21       A.   That's Jill.

22       Q.   And what is she referring to on:

23  "I'm sorry, I thought I had text you.  Congrats

24  on the preggo announcement"?

25       A.   I think my niece was pregnant.
```

1                    PAUL D'AURIA

2        Q.   Okay.   Then it says:   "Okay, sorry,

3   let me know about the Starbucks email and the

4   DDVP."

5             Who's that from?

6        A.   That looks like it's me to Jill.

7        Q.   And that looks like it's dated

8   August 1, 2016; is that correct?

9        A.   Correct.

10        Q.   All right, let's go to the next page.

11   There's a picture there on top?

12        A.   Yes.

13        Q.   Do you know who took that picture?

14        A.   I believe it was me.

15        Q.   And what is it a picture of?

16        A.   Looks like the back line of the

17   Starbucks.

18        Q.   I'm sorry, say that again.   What is

19   it?

20        A.   It looks like the back line of the

21   counter area of Starbucks, maybe the back

22   line --

23        Q.   Okay.

24        A.   -- or the front line.

25        Q.   Okay.   Are there any pest strip

1               PAUL D'AURIA

2  products in this picture?

3     A.  I can't blow this up.  I can't see.

4  All I can see is a couple of -- can I blow it

5  up?  Let me look.

6     Q.  Yeah, the little bottom plus sign and

7  a microscope -- or, not a microscope, but a --

8         MS. GOLDSTEIN:  Magnifying glass.

9         MR. WEBER:  See the little --

10        MS. GOLDSTEIN:  It should be

11      towards the bottom left.

12        THE WITNESS:  I can make it full

13      screen but I don't see the pest strip in

14      that photo, not from here.

15        MR. WEBER:  Okay.

16        THE WITNESS:  I can't see -- I see

17      the line.

18        MR. WEBER:  Let's finish this.

19     Q.  Who says:  "Holy shit, that little

20  turd was fast"?

21     A.  I believe that was Jill.  We must

22  have been talking about a mouse on some store.

23     Q.  Okay.  You don't know who she's

24  referring to?

25     A.  Not offhand, no.  A rodent probably

1                    PAUL D'AURIA

2    of some kind.

3        Q.   Okay, finish what you're referring

4    to.  In the gray, who says that?

5        A.   "Stuck to the walls, floor, and

6    pastry rack.  I'll email Alloy when I get up.

7    No rush.  Store No. 7446 hopefully gets shut

8    down.  Then all the stores will be forced to

9    clean and throw out DDVP."

10       Q.   Next page.

11       A.   "DDVP all over again.  Feel ill

12   again."

13            I think -- changes color, I think

14   that's Jill with the skull.  And I put:  "DDVP

15   is toxic," then something about somebody

16   logging into my account somewhere.

17       Q.   What do you mean, logging into your

18   account?

19       A.   Looks like something from Twitter.

20   Sometimes I would get an email.  If you log in

21   from a different device you would get something

22   that said "We noticed a recent log in to your

23   account."

24            Sometimes it's, depending on where

25   you are, it's a different location from where

```
 1                    PAUL D'AURIA
 2   you actually are so I just showed that to Jill.
 3        Q.   Okay.  Let's go to the next page.
 4        A.   That's DDVP.
 5        Q.   Who took this picture?
 6        A.   That was me.  I took that.
 7        Q.   And what's that a picture of?
 8        A.   That is a pest strip in a fly light.
 9   It has a cover over it, and when I lifted up
10   the cover to change the glue board, the strip
11   had fallen down.
12        Q.   Whose words are in the gray:  "I'm
13   mailing everyone at Starbucks"?
14        A.   That was me.
15        Q.   And is there a next page or is that
16   the end of the text?
17        A.   Let's see if there's another.
18        Q.   Okay.
19        A.   I --
20        Q.   When you say -- who says:  "I need
21   everyone's email address, Rami, DMS."
22             Who's Rami and who wrote that?
23        A.   That was me.  I was pretty fed up,
24   and I said I would just email Rami, who was in
25   charge of quality assurance and the district
```

```
 1                        PAUL D'AURIA

 2   managers.  I then said:  "They were told to get

 3   rid of them.  The email said Starbucks would

 4   tell them.  This was moved and placed in the

 5   fly light.  May be time to take legal action."

 6              I emailed Jill, saying:  "I emailed

 7   Rami to call me tomorrow, I'm dropping the

 8   account."

 9        Q.   And when you said it may be time to

10   take legal action, what were you referring to?

11        A.   Reporting them.

12        Q.   To whom?

13        A.   The New York State DEC and the EPA.

14        Q.   Did you ever do that?

15        A.   Not at that time, no.  Jill asked me

16   to -- for time to resolve it.

17        Q.   Say that again.

18        A.   Jill had already asked me to give her

19   time to try and get Starbucks to resolve the

20   situation we were having with them.

21        Q.   Got it.  Did you ask Jill to take

22   legal action?

23        A.   No.

24        Q.   All right.  Is that the end of the

25   document or is there another page?
```

```
                     PAUL D'AURIA
 1
 2      A.   Let's see.
 3           MS. GOLDSTEIN:   There should be
 4      more.
 5      Q.   Whose words are in the purple?
 6      A.   Purple looks like me.
 7      Q.   And would you read the first two
 8  entries there?
 9      A.   "Fuck every last one of these people.
10  This bitch is first on my list.  Didn't reply
11  to me."
12      Q.   Who are you referring to there when
13  you say "this bitch"?
14      A.   I'm not sure.
15      Q.   And who says:  "I don't blame you"?
16      A.   I believe that's Jill.
17      Q.   And is your -- is that your next
18  words in the gray?
19      A.   Yes.
20      Q.   And what did you say there?
21      A.   "Do you have the email where she said
22  for me to dump the DDVP?  If you do, I need
23  it."  I go -- then I asked -- then I asked her,
24  I think, if Rami replied and I think Jill says:
25  "I'll look for it."
```

1                      PAUL D'AURIA

2       Q.   Okay.  Anything else in that text?

3       A.   Next page:  "I'm going to ask to talk

4    to Rami about the fly calls, filth, and

5    Dichlorvos."

6       Q.   Did you do that?  Did you talk to

7    her?

8       A.   That was Jill, I believe, and --

9       Q.   Okay.

10      A.   "Okay, good."  She said:  "Can you

11   send me that pic of the blocks when you get a

12   chance?"

13      Q.   What's that a picture of?

14      A.   Let me blow it up.  I can't see the

15   bottom.  It looks like a piece of equipment.

16   But I believe it was rodenticide that someone

17   was throwing out.  If I referred to them as

18   blocks -- if she referred to them as blocks,

19   it's probably eight blocks that were purchased

20   by Starbucks.

21      Q.   Do you see any pest strips in this

22   picture?

23      A.   From this picture?  No, I can't see

24   anything except a plug and some wires some kind

25   of device behind that counter.

```
 1                  PAUL D'AURIA
 2      Q.   Okay.  And anything more in this
 3  text?
 4      A.   "I sent Matt Frye a pic of pest
 5  strips (nothing to ID the account).  He said
 6  jaw is still dropped from it."
 7      Q.   September 15, 2015; is that right?
 8      A.   September of 2015.
 9      Q.   And Matt Frye is the doctor you
10  referred to before?
11      A.   Yeah, correct.
12      Q.   And whose words are in the gray?
13      A.   The gray?  The gray is me, and
14  sometimes it's purple.
15      Q.   Got it.  And then you say:  "I sent
16  Matt Frye a pic of pest strips (nothing to ID
17  the account)."
18           What were you referring to?
19      A.   I was telling Jill that I sent a
20  photo of pest strips that I found in the store
21  to Matt without showing that it was a
22  Starbucks.
23      Q.   And then is that what -- who says:
24  "Hope you got those shoes off him"?
25           What's that referring to?
```

1                    PAUL D'AURIA

2        A.   Some joke about somebody in the

3   street, the way he was dressed, and I sent a

4   picture of him.  And it was just a joke between

5   us about how someone were dressed.

6        Q.   How were they dressed?

7        A.   Big baggy khaki pants and some kind

8   of weird shoes.

9        Q.   Okay.  Anything else?  All right,

10  anything in that -- further in that text?

11       A.   I don't see anything else.

12            MR. WEBER:  Okay, let's go to the

13       next exhibit.

14       (D'auria Exhibit No. 8 was marked for

15       identification.)

16  BY MR. WEBER:

17       Q.   Looking at Exhibit 8, it appears to

18  be an email from you to Jill November 9, 2015.

19       A.   Correct.

20       Q.   You say:  "Grand Central 7800."

21            Is that the Starbucks store at Grand

22  Central?

23       A.   Yes, it is.

24       Q.   And it looks like you have attached a

25  couple photographs; is that right?

```
 1                   PAUL D'AURIA

 2        A.   Yes.  I can't see them, but it looks

 3   like they were attachments.

 4        Q.   Okay.  What are you saying to Jill in

 5   this email?

 6        A.   "That's all we caught.  Plus, they

 7   have DDVP on top of air doors."  I believe they

 8   called us to troubleshoot a store that they

 9   were having in Grand Central, and I think we

10   made a visit there together, me and Jill.  And

11   when I went back to check traps, they had put

12   the air -- DDVP strips on top of the air doors.

13   Sometimes they're referred to as air curtains.

14   It would just blow air on an angle to keep

15   flies out of the store so they had put the DDVP

16   strips on top of those.

17        Q.   So when you used the words "that's

18   all we caught," what are you referring to?

19        A.   Probably whatever, a mouse --

20             MR. GRAFF:  Objection.

21        A.   Probably a mouse.  Either one mouse,

22   or -- but I'm not sure.

23        Q.   And then you say:  "Plus, they had

24   DDVP on top of the air doors."

25             What's that referring to?
```

1               PAUL D'AURIA

2      A.   They put those pest strips on top of

3 the air doors at the entrances to the store in

4 Grand Central.

5      Q.   Did you remove them from the

6 location?

7      A.   I did not, no.

8      Q.   By the way, do you know how to remove

9 pest strips from a location?

10          Is there a proper protocol on how to

11 do it?

12     A.   The labeling for those say to contact

13 local waste management to see how to properly

14 dispose of them.

15     Q.   And do you know how they removed

16 them?

17     A.   No, I never -- I never called to ask.

18     Q.   You never inquired about the best way

19 to remove pest strips?

20     A.   No.  I didn't place them there so I

21 wouldn't remove them.

22          MR. WEBER:  Okay, let's go to the

23          next exhibit.

24          (D'auria Exhibit No. 9 was marked for

25          identification.)

```
 1                    PAUL D'AURIA

 2  BY MR. WEBER:

 3      Q.    Exhibit 9, review this document.

 4      A.    I'm trying to enlarge it.

 5      Q.    There we go.  Okay?

 6      A.    Looks like I attached a couple of

 7  photos to an email telling Ms. Shwiner that

 8  they added at least two new strips that I could

 9  see.

10      Q.    And again, photographs again?

11      A.    I don't see the photographs.  I see

12  that there were attachments.  But I did send

13  pictures, obviously.

14      Q.    How do you know they were new pest

15  strips?

16      A.    You can tell when they're right out

17  of the package.  It's a very bright white

18  plastic.  You can tell they haven't been around

19  for more than a couple of days.

20      Q.    And where did you see them?

21      A.    If this was -- I believe this was

22  Port Authority.  Port Authority, they had them

23  all over the store, so --

24      Q.    825 8th Avenue?

25      A.    Yeah, I'm pretty sure that's
```

1              PAUL D'AURIA

2   Port Authority.

3       Q.   Was it your practice that when you

4   went into a store and saw pest strips you

5   photographed them and reported them to Jill?

6       A.   I didn't always photograph them.  I

7   would report them or write them on the work

8   orders.

9       Q.   So was it your practice to, at a

10  minimum, report them to Jill when you saw them?

11      A.   At a minimum, I would --

12           MR. GRAFF:  Objection.

13      A.   At a minimum I -- I would report

14  them.  At a minimum, I would always report them

15  on the work orders and also to Jill if it was

16  becoming a bigger problem.  Sometimes it

17  progressed to a much bigger problem so I

18  would -- I would let Ms. Shwiner know

19  regularly.

20           MR. WEBER:  Okay.  Next exhibit,

21      please.

22      (D'auria Exhibit No. 10 was marked for

23      identification.)

24  BY MR. WEBER:

25      Q.   Okay, let's take Exhibit 10.  Tell me

```
                        PAUL D'AURIA
 1
 2   what that is.
 3        A.   Email from Jill.  Sent an email to
 4   Stephen about Dichlorvos.  Jill sent that to
 5   Alloy about the pest strips, the pastry case,
 6   and one on a light above the bar.  She's
 7   telling Alloy that "organophosphate for
 8   everyone.  Yum.  I sent him those pics labeled
 9   and linked from the DOH, how it affects the
10   body."
11        Q.   So this is from Jill to Starbucks.
12        A.   Right.
13        Q.   And you're not copied here; right?
14        A.   I don't think so.  It doesn't look
15   it.  I wasn't always copied on her -- her
16   emails.
17        Q.   Was this a situation where you
18   brought to her attention and then she brought
19   it to Starbucks' attention?
20        A.   Yes.
21        Q.   When it says "I sent to Stephen about
22   the Dichlorvos.  Friday, Paul found one of the
23   stores (not yours) not only took it out of the
24   plastic case but put one in the plastic case,"
25   what is she referring to there, if you know?
```

1                          PAUL D'AURIA

2        A.    Someone removed the yellow resin

3    strip from the plastic case that the strip

4    comes in, and they took it out and placed it

5    somewhere in the store.  It happened several

6    times so I don't know which exactly this refers

7    to, but they would remove the strips and cut

8    them into pieces and put them around the store.

9        Q.    How often did that happen, in your --

10   from your observation?

11       A.    I would say at least three occasions

12   they would remove the strips from the plastic

13   casing and cut them and put them around the

14   store.

15       Q.    Do you know what Jill's referring to

16   when she says:  "Friday, Paul found one of the

17   stores (not yours)"?

18       A.    I believe she meant that I found one

19   in a store, but not Alloy's.

20       Q.    But not what?

21       A.    But not one of Alloy's.  Alloy is

22   the -- at that time, she was the facility

23   manager.

24       Q.    Okay.  When you -- do you know what

25   Jill means when she says:  "Organophosphate for

1                    PAUL D'AURIA

2   everyone.  Yum"?

3            Do you know what she's referring to?

4       A.   Yeah.  She's basically saying that

5   everybody's probably breathing in this

6   chemical.  They're touching it, handling it.

7       Q.   And do you know what Alloy's position

8   was at Starbucks on July 29, 2016?

9       A.   I believe he was the facilities

10  service manager.

11      Q.   Okay.  Do you know what, if anything,

12  Alloy did in response to Jill's email?

13      A.   I'm not sure, unless there's more

14  emails that I can read.

15      Q.   Is she saying that you took a pest

16  strip out of the plastic case and put it in

17  the -- somewhere else?

18      A.   No, she's saying employees took it

19  out of the case.  I found it, and someone had

20  taken it out of the case, and they, meaning

21  Starbucks employees, put one in the pastry

22  case.

23      Q.   You don't know that firsthand, you

24  just assume that; right?

25      A.   Well, I know it wasn't me, so --

```
 1                    PAUL D'AURIA

 2        Q.   You don't know who it was, do you?

 3        A.   I know it wasn't me.  I assume it was

 4   a Starbucks employee, not specifically who.

 5             MR. WEBER:  Got it.  Okay, let's go

 6        to the next exhibit.

 7        (D'auria Exhibit No. 11 was marked for

 8        identification.)

 9   BY MR. WEBER:

10        Q.   Let's look at Exhibit 11.  Looks like

11   an email dated September 16, 2016.

12             Do you see that email?

13        A.   Yes.

14        Q.   From Jill to Margaret.  You were

15   copied on that.

16        A.   Yeah, let me just get it in the

17   center of my screen.  It's shifting.  Margaret

18   asking Jill for a list of stores that had pest

19   strips found.

20        Q.   And do you know what, if anything,

21   Jill did?

22        A.   I -- I don't know if I was copied on

23   the email, but I believe she -- she put

24   together a list of stores for Margaret.

25        Q.   Do you understand what is said on the
```

1                    PAUL D'AURIA

2   bottom there, "Roach call for BOH"?

3           Do you know what that is?

4       A.   Yeah.  It means they called in a

5   roach from the back of house, "BOH" meaning

6   back of house.

7       Q.   And what does -- what does "roach

8   call" mean?

9       A.   Roach call means they probably called

10  in a cockroach sighting of some kind.  So when

11  I inspected the store, it looked like I was

12  under the three-compartment sink and a pest

13  strip was on the floor and I treated it.

14      Q.   And what did you do?

15      A.   Treated the area and --

16      Q.   You treated --

17      A.   I treated the store or the area for

18  cockroaches.

19      Q.   What's 3COM sink means?

20      A.   Three-compartment sink.

21      Q.   And you were inspecting under it?

22      A.   Yes.

23      Q.   And what were you looking for?

24      A.   Roaches, signs of roaches.

25      Q.   And what are typical signs of

1               PAUL D'AURIA

2  roaches?

3      A.   Oh, you might find roach feces, you

4  might find dead roaches.  If we had a monitor

5  under the sink, a glue trap that we would put

6  out to monitor the roaches, sometimes we'd find

7  them in the areas on the traps.

8               MR. WEBER:  Okay, next exhibit.

9               MR. GRAFF:  My video for Michael

10         has stopped.  I don't know if there's

11         any connection problem for anyone.

12               MR. WEBER:  I see mine is --

13               MR. GRAFF:  You're frozen.  I don't

14         know if it's affecting anyone.

15               MR. WEBER:  I'm back now, I'm back.

16         Let's look at Exhibit 12.

17         (D'auria Exhibit No. 12 was marked for

18         identification.)

19  BY MR. WEBER:

20      Q.   Looks like it's from you to Margaret.

21      A.   Yes.

22      Q.   And what is that about?

23      A.   Margaret --

24               (Reporter clarification.)

25      A.   It's an email from myself to Margaret

```
 1                    PAUL D'AURIA
 2   telling her that I treated the bar area.  And I
 3   attached a photo the bar area was buckling.
 4   There's a typo there.  It says "bucking."  I
 5   could only pull out the machinery part of the
 6   way because the countertop was buckling, and I
 7   couldn't pull the refrigerator out.  I told her
 8   I'd only seen one roach in the back of house,
 9   one roach in the front of house.  The store has
10   been over-cluttered and DDVP strips strewn
11   about.
12        Q.   When you say "strewn about," what did
13   you mean by that again?
14        A.   I'm finding them on the floors, under
15   the equipment, throughout the store.
16        Q.   And did you ever get a response from
17   Margaret?
18        A.   I don't remember if I did or not.
19             MR. WEBER:  Okay, next exhibit.
20        (D'auria Exhibit No. 13 was marked for
21        identification.)
22   BY MR. WEBER:
23        Q.   Looks like -- Exhibit 13, can you
24   identify this document?
25        A.   It looks like an email from Leif
```

1                   PAUL D'AURIA

2  Ericksen to Neal -- he's a facilities

3  manager -- to Ms. Shwiner:  "Thanks, all.

4  Neal, did you submit a work order for the base

5  tile and leak?"

6      Q.   And what's that about?

7      A.   It looks like there was an issue.

8  And Leif, I'm not sure.  I don't know if he's

9  the district manager.  He's telling Neal or

10  asking Neal if he submitted a work order for a

11  broken base tile, probably, and some kind of a

12  leak.

13      Q.   And what's the relevance of this

14  communication?  Why is that important?

15         MR. GRAFF:  Objection.

16      A.   I don't know, telling from this

17  email, what came before or after.  I'm not

18  sure.  I'd have to see the rest.

19      Q.   What's your understanding?

20      A.   It sounds like there's an issue with

21  base tiles either broken or missing, and a

22  water leak in the store, which would probably

23  cause pest issues.  And that's why Jill was

24  involved in it, in the email.

25         MR. WEBER:  Okay, next email.

```
1                  PAUL D'AURIA

2        (D'auria Exhibit No. 14 was marked for

3        identification.)

4   BY MR. WEBER:

5        Q.   Okay, let's look at Exhibit 14.

6   Again, it looks like July 5, '17.  Starts, I

7   think, at the bottom.  Is that from Neal?

8        A.   At the bottom?  The very bottom is an

9   email from Neal to Jill.

10        Q.   And who's Neal?

11             MR. GRAFF:  It's a three-page

12        document.  When you say the very bottom,

13        what page are you looking at?

14             MR. WEBER:  The bottom one.  I'm

15        sorry, on the first page, the bottom

16        one.

17             MR. GRAFF:  The bottom of the first

18        page?  Okay.

19        A.   Looks like Neal's telling Jill thank

20   you.  This is what the DM is seeing, and will

21   have them removed as soon as possible.  He is

22   reaching out to his DM counterparts with the

23   info as well.  I forwarded it to the FS team so

24   they are aware, as we have new folks.

25        Q.   Tell me about this communication, if
```

1                 PAUL D'AURIA

2    you can summarize what was taking place here.

3              MR. GRAFF:  Objection.

4         A.   At the top of the email is an email

5    from Jill to Neal:  "Tech just sent me pics,

6    strips on the floor."  It looks like Jill was

7    informing Neal that I sent photos of pest

8    strips, puddles of water on the floor with

9    felt, and the back room is cluttered, and we

10   didn't have much space to inspect the back of

11   the store.  And it was also due for their

12   inspection.

13        Q.   Okay.  And is this a three-page

14   email?

15        A.   Yes, but it looks like -- should I go

16   to the next one?

17        Q.   Yes, please.

18        A.   Looks like Jill mailing a copy of the

19   labels for the no-pest strips to Neal.

20        Q.   And there's a link to an article.

21   Did you send that article to Jill to send to

22   Neal?

23        A.   I don't know.  I probably told her

24   about it.  There was a lot of articles being

25   written because the CDC put out a warning about

```
 1                    PAUL D'AURIA

 2   the misuse of pest strips.  And we were also

 3   including that to try and get the point across

 4   that they were dangerous.

 5        Q.   Let's go to the next page.  Are those

 6   pictures that you forwarded?

 7        A.   I don't see photos, but I see that

 8   there were attachments.

 9             MR. WEBER:  Right.  Okay, let's go

10        to the next document.

11             MR. GRAFF:  When you get to a good

12        spot for a short restroom break, that

13        would be great.

14             MR. WEBER:  That's fine.  Take a

15        break now.  Come back at 12:15.

16             MR. GRAFF:  Okay, thank you.

17        (Recess taken.)

18             MR. WEBER:  Let's get our next

19        exhibit up, please.

20        (D'auria Exhibit No. 15 was marked for

21        identification.)

22   BY MR. WEBER:

23        Q.   Look at Exhibit 15, please, if you

24   can identify this document.

25        A.   Yes, I see it.
```

1               PAUL D'AURIA

2        Q.   Okay.  Could you tell me what this is

3   about?

4        A.   This is an email.  I believe I'd

5   walked in on a store that I was about to

6   service and there were bug bombs or pest

7   foggers that had just been set off in the

8   store.  And I believe Jill probably relayed

9   that information to Stephen Gallant, and it

10  looks like he sent out an email.

11       Q.   And which store is this at 36th and

12  6th?  Do you know where it is, the location?

13       A.   I remember the -- yeah, it's 36th and

14  6th, right on the corner.

15       Q.   And why do you recall that incident?

16       A.   I recall because when I walked in,

17  the vapors of the chemicals from the bug bombs

18  was filling the air when I walked in.

19       Q.   Was this after the store was closed

20  that day?

21       A.   Yes.

22       Q.   And somebody set off some kind of bug

23  bomb?

24       A.   Yeah, there were several, if I

25  remember right.

```
1                    PAUL D'AURIA
2        Q.   And how do you know that?
3             MR. GRAFF:  I believe that the
4        marked exhibit is a two-page document.
5        I'm not sure if the witness is able to
6        see what's on the second page or if
7        that's -- thank you.
8             MR. WEBER:  Okay, we can pull it
9        up.
10       Q.   All right, so let's take a look.  It
11   says:  "My service manager called me."
12            Who is the service manager?
13       A.   That would be me.  He always called
14   me the service manager for the account.  "I
15   entered the store.  It was full of pesticide
16   from the store having just set off three Hot
17   Shot brand fogger bombs.  There were no --"
18       Q.   Let me stop you there.  Let me ask
19   you a question about the first sentence.
20       A.   Okay.
21       Q.   How did you know there were three Hot
22   Shot brands?
23       A.   Because I saw them.
24       Q.   What I mean is what did you see?
25       A.   I seen at least one Hot Shot bomb
```

1              PAUL D'AURIA

2  sitting, I think, on the counter.  I went

3  outside, I got my mask, I came back inside and

4  took photos of it.

5        Q.   Okay.  What else did you observe?

6        A.   There was no warning posted on the

7  door.  I believe this is what I relayed to Jill

8  on the phone.  We were doing service -- daily

9  service as requested.  I believe that back then

10  it was for fruit flies.  And that's the

11  incident that I had called Jill and told her.

12  And I corrected Jill at the top of the email.

13  It wasn't the store on Waverly Place, it was

14  actually the store up on 36th Street and 6th

15  Avenue.

16        Q.   Okay, got it.  Okay, let's go to the

17  first page again.

18        A.   Okay.

19        Q.   And do you know what, if anything,

20  happened with respect to this incident?

21             Did someone follow up with the store

22  manager, to your knowledge?

23        A.   Only that -- it's switching to page

24  2.  I think it looked like Stephen Gallant told

25  people.  I don't know who, what their titles

```
 1                    PAUL D'AURIA

 2   are.  He did send them an email.

 3        Q.   Do you know who Stephen Gallant is?

 4        A.   He's the head of facilities for New

 5   York City.

 6        Q.   And you received a copy of this

 7   email?

 8        A.   I believe I was copied on it, yes.

 9        Q.   Last sentence says:  "This store is

10   currently receiving daily pest control services

11   from AVP, and if this is not working, we need

12   to partner with AVP to increase or change our

13   focus."

14             Do you see that?

15        A.   Yes.

16        Q.   Do you know if that occurred, if

17   there was a change or increase?

18        A.   We were doing daily at the time, and

19   that's pretty much all we could do.  The store

20   wasn't being cleaned properly, and without

21   proper sanitation, there was nothing else we

22   could do.  I was told the stores were cleaned

23   and the breeding sites removed.  Chemicals

24   won't do the job, but I believe we pushed them

25   to clean the --
```

1                          PAUL D'AURIA

2        Q.   I'm sorry to interrupt you.  What did

3   you say about chemicals?

4        A.   I said chemicals really won't do

5   anything at the point where the flies are

6   breeding and so chemicals really won't work in

7   that situation.

8        Q.   So what's the solution?

9        A.   Solution to getting rid of most flies

10  that breed in organic matter is to remove the

11  organic matter.  Any spills, spill, drains, if

12  drains need to be cleaned, that's usually how

13  you get rid of the problem.

14       Q.   When you say get rid of the organic

15  matter, what do you mean by that?

16       A.   Any kind of spilled coffee beans, any

17  spilled milk.  Condiments like blueberries or

18  strawberries that might have fallen on the

19  floor.

20       Q.   If you observed those products on the

21  floor, would you typically report them to the

22  store manager and Jill?

23       A.   Yes.  We would --

24            MR. GRAFF:  Objection.

25       A.   We would make recommendations that

```
 1                     PAUL D'AURIA
 2  the store be cleaned properly.
 3            MR. WEBER:  Got it.  Let's go to
 4        the next document.
 5        (D'auria Exhibit No. 16 was marked for
 6        identification.)
 7  BY MR. WEBER:
 8        Q.   This is Exhibit 16.  Can you identify
 9  this document?
10        A.   Looks like an email from Rami to
11  Jill.  No-pest strip at store number 9467
12  sitting on the desk.  "Hi, Jill.  I'll send out
13  an email to the RDs tomorrow morning.  My
14  apologies to the tech."
15        Q.   What is she referring to, if you
16  know?  What is Rami referring to, if you know?
17            MR. GRAFF:  I'll note again there's
18        a second page to the exhibit that hasn't
19        refreshed.
20        Q.   Okay, let's go to the second page.
21  There we go.
22        A.   "Hi, Rami.  The tech just found a
23  pest strip on the desk, the second store since
24  yesterday.  We found these yesterday.  Tech was
25  working under the counter and turns his head
```

1                    PAUL D'AURIA

2    and he was inches from a strip.  This is the

3    same tech who two weeks ago walked into a store

4    that had just set off bombs.  He is extremely

5    upset.  Is it possible to send a memo out to

6    advise stores these are illegal to use, let

7    alone toxic?"

8          Q.   Are you the "he" where it says "he is

9    extremely upset"?

10         A.   Yes, that's me.

11         Q.   Okay.  And then let's go to the first

12   page.  This is an email from Rami to Jill:

13   "I'll send an email to RDs tomorrow."

14              What's Rami referring to?

15         A.   I imagine RDs are regional directors,

16   and he apologized.

17         Q.   So Rami is saying he will send out a

18   message to all RDs about not using pest strips?

19   Is that what your understanding was?

20         A.   I believe so, yes.

21              MR. WEBER:  Okay, next exhibit,

22         please.

23         (D'auria Exhibit No. 17 was marked for

24         identification.)

25   BY MR. WEBER:

1                    PAUL D'AURIA

2        Q.   Exhibit 17.  If you could look at

3   that document.  Again, is this one page or

4   more?

5             MS. GOLDSTEIN:  It's 16 pages.

6             MR. WEBER:  16?  Okay.

7        Q.   If you would, take a second,

8   Mr. D'auria, and review the entire series of

9   emails so we get a better context of what we're

10  talking about here.

11       A.   Okay.  Okay.

12       Q.   Okay.  Can you summarize what this

13  communication is about and who made those

14  pictures and who wrote the comments on the

15  pictures?

16       A.   It looks like most of the pictures

17  were taken by myself.  Looks like Jill was

18  pointing out to, I believe, Rami that the

19  strips were placed in various locations

20  throughout a lot of stores.

21             In one picture, you can see that they

22  removed the resin strip from the plastic case

23  of the Hot Shot pest strip.  In another

24  instance, they cut a piece of that off and put

25  it over a light, on top of a light that was

```
 1                    PAUL D'AURIA

 2    right where the customer sits and right where

 3    the drinks are made.

 4              There's also some photos of wet

 5    buildup of organic filth, and Jill was pointing

 6    out that this is one of the root causes of fly

 7    issues in the stores.

 8        Q.   Did you on behalf of AVP use products

 9    that should keep the flies away?

10        A.   We would put out organic --

11              MR. GRAFF:  Objection.

12        A.   We would put out products that would

13    catch the fruit flies naturally using vinegar

14    and preservatives.  Servicing the store once a

15    month.  Basically, there's very little

16    chemicals that you could use to ward off flies.

17              We would sometimes use a bio cleaner

18    to treat the drains and to sort of hope eat

19    away some of the organic stuff with the enzymes

20    in the bio cleaner, but there was nothing that

21    we could apply that would keep flies away, no.

22    There was no --

23        Q.   Nothing -- no product that AVP used

24    to keep the flies away?

25        A.    There are no products that keep
```

1                    PAUL D'AURIA

2    like I attached a photograph.  One was probably

3    a spill from a leaky coffee dispenser, and I

4    emptied it out.  "No flies found, just some

5    roaches at the three-compartment sink and the

6    sanitizer area.  Also, new DDVP strips."

7         Q.   And again, who's Keith Costello?

8         A.   At the time, I think Keith Costello

9    was just a facilities manager and not the

10   director of facilities for New York.

11        Q.   And do you know what, if anything, he

12   did in response to this email?

13        A.   I do not.

14        Q.   And subject is 7920.  Is that a store

15   location?

16        A.   Yeah, that's the store number.

17        Q.   And do you know which store?

18        A.   Off the top of my head, no.  I knew

19   stores by the addresses rather than store

20   numbers.  It was too hard to remember all the

21   store numbers.

22        Q.   You said earlier your job required

23   you to spend between 45 minutes and an hour and

24   a half per store; is that right?

25        A.   Sometimes, yeah, I --

1          PAUL D'AURIA

2    I was -- used the same email when I had to

3    specifically address something with facilities.

4    And in this case, I was using the company email

5    to tell Kim Healy about an issue.  I went on to

6    tell her that there was a few issues with flies

7    in the pastry case, and I was vacuuming the

8    live and dead flies and saw that the pest strip

9    was hidden under the bagels.  The food in the

10   case was rotting.  Meat and eggs in the case

11   for days would -- will cause fly breeding.  And

12   I went on to say that food needs to be changed

13   more often and strips should never be placed

14   there.

15        Q.   Okay.  And who's Kimberly?

16        A.   Kimberly was a facilities manager.

17        Q.   Subject 28168, is that a store

18   location?

19        A.   Yes, it is.

20        Q.   Do you know which one?

21        A.   I believe that may have been the

22   store on, I believe, West 45th Street.

23        Q.   Okay.  And when you say "I was

24   vacuuming the live and dead flies and saw some

25   pest strips," is that part of your job

1                    PAUL D'AURIA

2  responsibility, to do the vacuuming of the

3  pests and rodents?

4       A.   I would vacuum.  I would use a vacuum

5  cleaner to vacuum up the flies rather than

6  spray chemicals.

7       Q.   Got it.  Was that typical that you

8  would do both or -- strike that.

9            Was that typical that you would do

10 some vacuuming at a store if you found flies or

11 things of that nature?

12      A.   Yeah, I would do that often because

13 Starbucks requested that we use as little

14 chemicals as possible.

15      Q.   Say that again.  I didn't hear you.

16      A.   Starbucks requested that we would use

17 as little chemicals as possible.

18      Q.   And do you know why they requested

19 that?

20      A.   Because they're an environmentally

21 friendly company.

22      Q.   I'm sorry, I didn't hear you.

23      A.   They were an environmentally friendly

24 company and I guess they didn't want --

25      Q.   Okay.

```
 1                    PAUL D'AURIA

 2        A.    -- the pesticides in stores.

 3             MR. WEBER:   Okay, next exhibit.

 4        (D'auria Exhibit No. 21 was marked for

 5        identification.)

 6   BY MR. WEBER:

 7        Q.    Okay, let's look at Exhibit 21.   It's

 8   a one-page document.

 9        A.    I see it.

10        Q.    Okay.   July 6, 2016, I think it says.

11   Is this from you to somebody at the DEC?   Is

12   that right?

13        A.    Correct.

14        Q.    And you sent this on about July 6; is

15   that right?

16        A.    Correct.

17        Q.    Tell me what communication's about.

18        A.    Oh, basically, this just is -- I had

19   a phone call with Mr. Malik probably an hour

20   before this before, a few hours before this,

21   and asked me to put everything in writing and

22   send it to him with any photographs I might

23   have and explain the situation to him.   And

24   that's what this email was about.

25        Q.    Okay.   And did you communicate with
```

1                    PAUL D'AURIA

2  anyone at AVP about this communication and your

3  conversation with Malik?

4       A.   No, I did not.

5       Q.   Did you communicate with anybody at

6  Starbucks regarding your communication with

7  Malik?

8       A.   No, I did not tell anybody about that

9  email, no.

10      Q.   Did you send this -- excuse me.

11           Did you forward this email to anybody

12  else other than sending it to Malik?

13      A.   I don't remember if --

14           MR. GRAFF:   Objection as to timing.

15      A.   I don't remember if I did.  I don't

16  know.  I don't remember if I forwarded this

17  email other than maybe to my attorney.

18      Q.   Anybody on or after July 6, 2018,

19  other than your attorney that received this

20  email?

21      A.   I don't believe so.

22      Q.   You say:  "This is Paul D'auria,

23  applicator, ID BA26411."

24           What is that number?

25      A.   That's my pesticide applicator

1                    PAUL D'AURIA

2   license from the New York State DEC.

3        Q.   And you have to be licensed to do

4   your job; correct?

5        A.   Correct.

6        Q.   Is there anything you have to do

7   annually to maintain your license?

8        A.   You would have to -- every three

9   years you would have to have enough credits to

10  renew your license.

11       Q.   And credits?  What kind of credits?

12       A.   Online learning.

13       Q.   And did you --

14       A.   You actually have to --

15       Q.   -- do that?

16       A.   I would do that either online or in

17  seminars in person, given by various pesticide

18  retailers, or chemical companies would come in

19  and they would give us a seminar and we would

20  obtain points towards our recertification.

21       Q.   And do you have a record of those

22  courses you took?

23       A.   Whatever I had online.  Usually the

24  paperwork is sent in to the DEC to renew the

25  license so they get the original copies.

```
1                    PAUL D'AURIA

2        Q.   So you had to submit to the DEC

3   whatever courses you took on an annual basis?

4        A.   Yeah.  If we took them in person, we

5   would get a letter notifying us that we took

6   the course and were present for the hours and

7   how many credits each seminar was.  If we did

8   it online, the people that run the

9   recertification, they would directly send our

10  recertification credits directly to the DEC.

11       Q.   Okay.  And you testified before about

12  your communications with Malik.  I think you

13  had a phone call.  After you sent this email to

14  him, did he speak to you or send you a

15  follow-up email?

16       A.   I had not heard from him, and I

17  waited.  I don't remember how long I waited,

18  but I asked him -- I think I might have sent

19  him a second email and I might have asked him

20  if he could keep me apprised of the situation.

21  And then I emailed him at some point, I believe

22  in 2018, and I asked him if anything had come

23  of this.  And I believe he told me there was no

24  investigation at the time.

25       Q.   Did you say that he said there was no
```

```
 1                    PAUL D'AURIA
 2   investigation?
 3        A.   He told me in an email there was no
 4   investigation.  And I believe he told me he was
 5   no longer in that pesticide enforcement office
 6   and I should not contact him again.
 7        Q.   Did you contact anybody else from the
 8   DEC after you received that communication from
 9   Malik?
10        A.   Then I went ahead and I contacted --
11   actually, I might have asked for the Freedom of
12   Information Act and requested all the documents
13   from my Complaint.  And then I also emailed
14   Joyce Rodler at the DEC, and she said that
15   there was an investigation done and she
16   received the Freedom of Information Act request
17   because it comes across her desk.  And she said
18   basically, you know, I would -- I would get
19   that information from them when it was ready
20   once they searched through all the documents
21   and I would be sent the investigation results.
22        Q.   And who was that person?
23        A.   Joyce Rodler.  She was, I believe,
24   head of the Long Island City, or the Region 2.
25   She was the, I believe, head of Pesticide
```

1              PAUL D'AURIA

2    Enforcement.

3        Q.   And did you communicate with her

4    after this response?

5        A.   After I had received the

6    investigation, I did speak with her by

7    telephone.

8        Q.   When was that?

9        A.   I don't remember exactly when we

10   spoke.

11       Q.   And what did you say to her and what

12   did she say to you when you spoke?

13       A.   Well, we -- I discussed the

14   investigation, and I basically told her I was

15   pretty surprised that the DEC did not warn

16   Starbucks of their practices of what they were

17   doing, because the DEC investigators did find a

18   Dichlorvos strip in at least one store that he

19   visited.

20       Q.   And do you know if any actions were

21   taken after you communicated with her?

22       A.   After I communicated with her, she

23   told me that there was going to be some

24   outreach to the Department of Health about

25   basically stopping the practice and to inform

```
1                    PAUL D'AURIA

2    them more about the use of these insecticides

3    in food establishments.  She was also going to

4    use, I believe she told me, some of Matt Frye's

5    materials that he's written on the subject.

6    And that never happened either.  She never sent

7    me that.  She was -- actually told me that she

8    was going to send it to me to look at before it

9    was published on the DEC website.

10        Q.   And she didn't; right?

11        A.   No, she didn't.

12        Q.   Was it published on the website?

13        A.   I don't think she -- anything was

14   ever published in regards to this, to the

15   insecticides, no.

16        Q.   Any other communications with anybody

17   from the DEC?

18        A.   Other than my conversation with Joyce

19   and that phone call, no.  I only spoke to

20   Joyce.

21             MR. WEBER:  Okay, next exhibit,

22        please.

23        (D'auria Exhibit No. 22 was marked for

24        identification.)

25   BY MR. WEBER:
```

1              PAUL D'AURIA

2      Q.   All right, let's take a look at

3  Exhibit 22.  If it's more than one page, let me

4  know.

5      A.   Okay.

6      Q.   Tell me what this is.

7      A.   This is my -- an email from Matt.  I

8  told him about, you know, keeping him in the

9  loop about the Dichlorvos, and he was pretty

10  shocked by it.  The DEC are the people supposed

11  to be looking out for things like this and

12  protecting the public, and they -- he was

13  shocked that they failed.

14      Q.   Your email of September 16, that was

15  to Joyce and to Matt; right?

16           And then Matt responded the next day;

17  correct?

18      A.   Right.  He responded, I believe, to

19  me only.

20      Q.   Do you know, when Matt refers to

21  stakeholders, do you know who he's referring

22  to?

23      A.   I believe basically the stakeholders

24  are anyone in the -- actually, in New York

25  State, anyone who has anything to do with the

```
 1                    PAUL D'AURIA
 2   DEC, people who might be in the agriculture
 3   business, pesticides, the general public.  I
 4   think anybody was invited to go there.
 5              MR. WEBER:  Okay.  Next exhibit,
 6        please.
 7        (D'auria Exhibit No. 23 was marked for
 8        identification.)
 9   BY MR. WEBER:
10        Q.   Okay.  Let's look at Exhibit 23, the
11   July 31, '17.  I don't know if it's one or more
12   pages.  Take a look.
13        A.   It says 43 pages.
14        Q.   Okay.  Can you skim them and tell me
15   what's it about?
16        A.   I will.
17              MR. GRAFF:  Objection.
18              MR. WEBER:  I just lost the --
19              MS. GOLDSTEIN:  So did I.  We may
20        have to all log out and log back in.
21              MR. WEBER:  Try to get that exhibit
22        back on.
23              MS. GOLDSTEIN:  I'll pull it up
24        now.  Okay, you should see it again.
25   BY MR. WEBER:
```

1                     PAUL D'AURIA

2        Q.    If you could again try to go through

3    that again, Mr. D'aurio.

4        A.    Okay.

5        Q.    All right.  Tell me generally what

6    this communication's about.

7        A.    Looks like me and Matt were

8    discussing Dichlorvos strips, actions taken,

9    actions not taken, what I had been doing after.

10   I was no longer doing pest control.  A lot of

11   photos that we had turned over, some that were

12   part of the lawsuit originally and some that

13   were turned over later.  There's also some

14   pictures that Matt had sent me.  It looks like

15   photos he had taken of looks like a new vent

16   strip.

17       Q.    What, if anything, did you do with

18   this communication other than share it between

19   you and Matt?

20       A.    What do you mean by that?

21       Q.    In other words, did you send this

22   communication to anybody?  Did you forward the

23   pictures?  Did you share it with anybody else?

24       A.    Other than my attorney and -- no, I

25   don't think so.  I showed Matt examples of, you

1                    PAUL D'AURIA

2    know, what I was dealing with.

3              (Reporter clarification.)

4         A.    There's also pictures of chemicals

5    that had been sprayed by Starbucks that were

6    dripping down onto the counters, splashing on

7    food items and also that splashed on myself.

8    There's also photos in there of that.

9              MR. WEBER:  Okay, maybe we should

10         take a half an hour lunch break at this

11         time if this works for everybody.

12              MR. GRAFF:  Fine.

13              THE REPORTER:  We are off the

14         record for a lunch break.

15         (A recess was taken for lunch.)

16    BY MR. WEBER:

17         Q.    On all the exhibits that we've seen

18    and all the emails that you sent, Mr. D'auria,

19    do you know personally of any individual who

20    put these pest strips in the Starbucks

21    restaurants?

22              MR. GRAFF:  Objection.

23         Q.    You can answer.

24         A.    Specific names of people, I do not

25    know.

1              PAUL D'AURIA

2        Q.   Okay.  You didn't know Mr. Fox,

3   Rafael Fox, when you worked at the AVP, did

4   you?

5        A.   No, I did not.

6        Q.   You didn't meet him until some months

7   after --

8        A.   I met him in --

9        Q.   -- you left Starbucks?

10       A.   Yeah, I met him in April of 2019.

11            MR. WEBER:  Okay, Rebecca, whenever

12       you're ready.

13       (D'auria Exhibit No. 24 was marked for

14       identification.)

15  BY MR. WEBER:

16       Q.   Okay, let's look at this Exhibit 24.

17  See if you can identify it, tell me what it is.

18       A.   That looks like a -- 43 pages?  Do

19  you want me to look through each one?

20       Q.   Yeah, just skim it and tell me

21  generally what it is.

22       (Off the record to resolve a technical

23       issue.)

24  BY MR. WEBER:

25       Q.   Can you tell us what this document

1          PAUL D'AURIA

2    is?

3          A.    It looks like a spreadsheet of stores

4    for a certain period of time.

5              MR. GRAFF:  Pull up each one to see

6          the dates, if there are any dates on

7          there.

8          Q.    And what does it contain, generally?

9          A.    It looks like all issues within the

10   stores, housekeeping issues, pest issues.

11         Q.    Do you know who prepared it?

12         A.    I believe Jill did.

13         Q.    There's a column in the beginning, is

14   it DOH of investigation?  Let me go back.

15             MR. GRAFF:  Since it's 43 pages,

16         could you specify which page to begin

17         at?

18             MR. WEBER:  In the first five.

19         A.    Yes, I see that.

20         Q.    I lost the picture again.  Says DOH

21   inspection date?

22         A.    Yes.

23         Q.    And what's that about?

24         A.    That was the date that the DOH was, I

25   believe, either due or the last time they had

1                    PAUL D'AURIA

2  visited the store.

3       Q.   And what does DOH stand for?

4       A.   Department of Health.

5       Q.   And what is your understanding about

6  how often the DOH visits Starbucks stores?

7            MR. GRAFF:  Objection.

8       A.   They inspect the stores usually once

9  a year, give or take, just about 12 months from

10  the date of their last inspection if they

11  received an A.

12       Q.   And what are they inspecting?

13       A.   I believe they inspect all areas of

14  the store, but I don't know exactly what areas,

15  what they look for, what they do.

16       Q.   Are you aware of any occasions where

17  the DOL issued any kind of fine against

18  Starbucks?

19            MR. GRAFF:  Objection.  If you

20       could just clarify the name of the

21       agency you're referring to.

22            MR. WEBER:  DOH.

23       A.   DOH?  I know they were written up for

24  pesticides on several occasions.

25       Q.   How many?

                        PAUL D'AURIA

1

2        A.    Several.  More than five.  I'm not

3    sure exactly.

4        Q.    How do you know that?

5        A.    It was available on the Department of

6    Health website.

7        Q.    And when did you look on that site to

8    see the times they were written up?

9        A.    Well, we would usually look up the

10   Department of Health inspection date so we

11   could give Starbucks a heads-up that they were

12   due and they should make a better effort to

13   clean, if necessary.  So we would kind of give

14   them a reminder that the Department of Health

15   was probably going to inspect pretty soon.  So

16   it was more of a courtesy that the DOH was

17   imminent.

18       Q.    So how would you get knowledge of

19   that?

20       A.    It's on the -- their website.  Every

21   Starbucks has a date of when they were last

22   inspected, so it's usually about a 12-month

23   period.

24       Q.    Got it.  So over the years that you

25   worked with Starbucks, you believe there were

```
 1                    PAUL D'AURIA
 2  five times that DOH issued some type of fine?
 3       A.   Every time --
 4            MR. GRAFF:  Objection to form.
 5       A.   I think it was five to 10, maybe,
 6  somewhere in that area.
 7       Q.   Okay, got it.  And, for example, when
 8  you worked at Le Pain Quotidien, did they
 9  similarly have DOL fines?
10            MR. GRAFF:  Objection.  Specify the
11            name of the agency.  You're saying DOL.
12            I think you're asking about a different
13            department.
14            MR. WEBER:  DOH, DOH.
15       A.   DOH?  I don't think back then -- I
16  don't know if we -- if they had that
17  information up on the website with the letter
18  grading.  I don't know what year the letter
19  grading started so I wouldn't know about that.
20  I don't think we looked them up back then.
21       Q.   When were you again working at
22  Le Pain Quotidien?
23       A.   I think that was 2011 to 2013 or
24  2014.
25       Q.   Got it.  And I think you said they
```

```
1                    PAUL D'AURIA
2   also used pest strips; correct?
3        A.   They had an outside vendor who was
4   placing the pest strips in the store.  And we
5   let them know basically the same way we let
6   Starbucks know, and they terminated our
7   contract.
8        Q.   During the period you worked there,
9   '11 to '14, did you observe pest strips at
10  Le Pain Quotidien during that period?
11       A.   Towards the end, yes.  I forget what
12  year the end was, either -- we either lost the
13  account in 2013 or 2014, I'm not sure.
14       Q.   Toward the end, you observed the pest
15  strips?
16       A.   Yes.
17            MR. WEBER:  Okay.  All right, let's
18       go to the next exhibit, please.
19       (D'auria Exhibit No. 25 was marked for
20       identification.)
21  BY MR. WEBER:
22       Q.   Okay, let's take a look at
23  Exhibit 25.  Let me just verify that.  Can you
24  identify this document?
25       A.   The first page or all nine?
```

```
 1               PAUL D'AURIA

 2      Q.   Take a look at the nine.  And again

 3  if you could summarize it, just go through

 4  them.

 5      A.   Okay.

 6      Q.   All right.  Tell me what this

 7  document is.

 8      A.   Looks like -- it looks like the

 9  chemical list by AVP.

10      Q.   Okay.  These are chemicals that AVP

11  purchased?

12      A.   That's what it looks like, yes.

13      Q.   And were they to be used in the

14  facilities that you monitored and evaluated?

15           MR. GRAFF:  Objection.

16      A.   No.

17      Q.   What was the purpose of AVP

18  purchasing these products?

19      A.   A lot of --

20           MR. GRAFF:  Objection.

21      A.   A lot of -- a lot of techs, when they

22  do bedbug jobs, a lot of companies will use

23  Nuvan strips to place inside of sealed plastic

24  bags.  If they have items or clothing that have

25  bedbugs in them, they would be placed in a bag
```

1                     PAUL D'AURIA

2    and sealed up with the objects that were

3    infested with bedbugs.

4         Q.   There's some red lettering on the

5    first page there.  Do you know who put that on

6    there?

7         A.   I believe that was Jill Shwiner.

8         Q.   And do you know why she put that on

9    there?

10        A.   She turned over the documents to our

11   attorney, but she wanted to make it clear that

12   we --

13             (Reporter clarification.)

14        A.   That we didn't use that product in

15   Starbucks.

16        Q.   So --

17             MR. GRAFF:  Pardon me.  It sounds

18        from the answer that this may have been

19        inadvertently produced as a

20        communication from the client.  You'll

21        have to, I guess, continue.

22        Q.   I only have two questions.  One, were

23   the DDVP products purchased by AVP?  Yes or no.

24        A.   I believe they were, yes.

25        Q.   And two --

```
 1                     PAUL D'AURIA

 2        A.   That's the professional --

 3   professional strips that are only sold to

 4   certified applicators, not to the general

 5   public.

 6        Q.   Okay.  And my second question was,

 7   where did AVP use DDVP products?

 8             MR. GRAFF:  Objection.

 9        A.   I wouldn't know.  There's other

10   people in the company, so one of the other

11   techs probably requested it for a bedbug job.

12        Q.   Got it.  So the company used pest

13   strips in certain facilities, but not in places

14   like Starbucks; correct?

15        A.   Usually people's homes, not in

16   facilities.

17        Q.   So not in --

18        A.   They wouldn't be brought into --

19   yeah, usually used in people's homes who wish

20   to get rid of their bedbug infestation.

21        Q.   And is that one of the purposes for

22   DDVP pest strips, to get rid of bedbugs?

23        A.   Correct, yes.

24             MR. GRAFF:  Objection.

25        A.   That would be.
```

1              PAUL D'AURIA

2       Q.    That would be typically used in a

3    residential place?

4       A.    That would be --

5              MR. GRAFF:  Objection.

6       A.    That would be used -- that would be

7    used inside of a sealed bag, an enclosed space

8    such as a bag with clothing or electronic

9    equipment to kill the bedbugs.  It wouldn't be

10   used in a --

11      Q.    Got it.

12      A.    It wouldn't be used in a restaurant

13   or food establishment.

14      Q.    If bedbugs were in a mattress, how

15   would you use DDVP?

16      A.    You wouldn't, unless you had a --

17             MR. GRAFF:  Objection.

18      A.    You wouldn't, unless you had --

19             THE REPORTER:  I'm sorry.  This is

20         the reporter.  I need you to be aware of

21         one speaker at a time.  You're cutting

22         each other off, and all the words need

23         to get into the transcript.  Thank you.

24      A.    You wouldn't put those in with a

25   mattress.

1                      PAUL D'AURIA

2        Q.   Okay.

3        A.   I mean, you could, but it shouldn't

4   be done.

5        Q.   Is Nuvan Strips another word for pest

6   strips?

7        A.   That's the professional grade that's

8   sold in pest control companies, the same

9   product.  It's the same active ingredients.  I

10  think the Nuvan Strips come in two different

11  sizes.  Other than that and the branding of the

12  product, it's the same product, same active

13  ingredient, same release formulation.

14       Q.   Okay.  When you were at AVP, did AVP

15  employ other technicians like yourself?

16       A.   Other -- other certified applicators?

17  Yes.

18       Q.   Yes?

19       A.   Yes.

20       Q.   And how many did they employ?

21       A.   A quick count --

22       Q.   During the last five years you were

23  there.

24       A.   Last five years?  There were probably

25  five certified applicators and a couple of

1                       PAUL D'AURIA

2    trainees.

3         Q.   Can you recall their names?

4         A.   Of the regular full-time employees?

5         Q.   Regular technicians like yourself.

6         A.   There were Adam Alamonte (ph), Mark

7    Shwiner, Jerry Mazur, Mike Delbianco (ph), and

8    myself.

9         Q.   Is Mark related to Jill?

10        A.   I believe they are ex-spouses.

11        Q.   You're breaking up.  I didn't hear

12   you.

13        A.   Ex-spouse.  Former spouses.

14        Q.   Former spouses?  Okay.

15             I see on the first page there are a

16   significant number of Nuvan pest strips that

17   are purchased, the price of almost $2,000.

18             Do you see that?

19             MR. GRAFF:  Objection.

20        A.   I think that's the total.  I don't

21   think that's the amount of strips, but I could

22   be wrong.  I don't -- it's hard to see.

23        Q.   Well, I'm seeing under the first

24   item, it says 16 P strip, 12 strip per pack, 6

25   packs, 6 boxes per master.  Do you have any

1                    PAUL D'AURIA

2    understanding of what the $1,945 relates to?

3         A.   I guess that's the price of the whole

4    order, I assume.

5              MR. WEBER:  Okay, let's go to the

6         next document.

7         (D'auria Exhibit No. 26 was marked for

8         identification.)

9    BY MR. WEBER:

10        Q.   Showing you Exhibit 26.  Can you

11   identify this document or documents, how many

12   pages there are?

13        A.   It looks like a text message.  I

14   don't know who that is.

15        Q.   Okay.  Did you ever see this document

16   before?

17        A.   I don't think so, no.

18             MR. WEBER:  Was this produced by

19        the plaintiff?

20             MR. GRAFF:  Is that a question for

21        me?

22             MR. WEBER:  Was this your document

23        that you produced?

24             MR. GRAFF:  We produced more than

25        40,000.  I can't recall if this was a

```
1                    PAUL D'AURIA

2         page from that or not.

3              MR. WEBER:  Rebecca, do you know?

4              MS. GOLDSTEIN:  Yeah, this was in

5         plaintiff's production, from their first

6         production.

7              MR. WEBER:  Okay.

8    BY MR. WEBER:

9         Q.  All right, so take another look at it

10   and see if you can identify any aspects of it.

11             First of all, do you know anybody

12   named Elijah?

13        A.   Not at AVP.  The only name that looks

14   familiar is Sam.  I believe Sam owns one of the

15   construction vendors that did maintenance

16   inside a Starbucks.  I think that was his name.

17   But I'm not sure who Elijah is.

18             MR. WEBER:  Okay, let's move on

19        from this document.

20        (D'auria Exhibit No. 27 was marked for

21        identification.)

22   BY MR. WEBER:

23        Q.   Okay, Exhibit 27.  Can you identify

24   this document?

25        A.   Yes, I see it.
```

1              PAUL D'AURIA

2      Q.   Tell me what it is.

3      A.   It's an email from me about the pest

4   strips.  It looks like I attached photos.  And

5   I told her I can't imagine floating down onto

6   people and any food or drinks.  And I said a

7   lawsuit isn't even a far-off idea at this

8   point.

9      Q.   And who did you send it to?

10     A.   That was my sister.

11     Q.   So Laraine Diaz is your sister?

12     A.   Correct.

13     Q.   And why were you sending it to your

14   sister on July 25, 2015?

15     A.   I just shared it with her just to

16   share it.

17     Q.   And you say:  "Lawsuit isn't even a

18   far-off idea at this point."

19          See that?

20     A.   Uh-huh.

21     Q.   And what lawsuit were you referring

22   to?

23     A.   I was referring to someone getting

24   sick at Starbucks and Starbucks getting sued.

25     Q.   I'm sorry, I didn't hear you.  Could

```
 1                  PAUL D'AURIA
 2   you repeat that?
 3        A.   I was referring to the possibility
 4   that Starbucks may get someone sick and they
 5   would be sued.
 6        Q.   By whom?
 7        A.   Whoever was basically standing
 8   underneath those air vents.
 9        Q.   Did you seek any counsel in 2015, any
10   attorney representation?
11        A.   No, I did not.
12        Q.   What does Laraine Diaz do for a
13   living?
14        A.   She works for an Italian bank in New
15   York City handling trades, I believe.
16        Q.   And what's her job title?
17        A.   Her exact job title, I don't know.
18        Q.   And were you sending her pictures of
19   pest strips that you saw in the restaurants --
20             MR. GRAFF:  Objection.
21        Q.   -- or any stores?
22             MR. GRAFF:  Objection.
23        A.   At Starbucks, yeah.  At Starbucks,
24   this one, yeah.
25             MR. WEBER:  Okay, next exhibit.
```

```
 1                    PAUL D'AURIA
 2         (D'auria Exhibit No. 28 was marked for
 3         identification.)
 4              MR. GRAFF:  While we're switching,
 5         Michael, I can also confirm that the
 6         prior exhibit, Exhibit 26, was produced
 7         by plaintiffs, but it's for Ms. Shwiner.
 8              MR. WEBER:  Got it, okay.
 9    BY MR. WEBER:
10         Q.   Okay, let's look at 28.
11         A.   Uh-huh.  Okay.
12         Q.   Tell me what this document is,
13    please.
14         A.   This is an email I sent to
15    Ms. Shwiner concerning a store that was a huge
16    problem.  The store wasn't cleaned, literally,
17    for years.  And every time I told her, she
18    would want more and more photos, meaning
19    Margaret.  Margaret at Starbucks.  And every
20    month, I would take the same 15 or 20 photos.
21    And she just kept asking us to send her emails
22    of the same thing.  And I told Jill I've got
23    years of emails.  You know, they just keep
24    pushing for more, so I told her I'm not taking
25    any more photos --
```

```
1                    PAUL D'AURIA

2        Q.   And do you --

3        A.   -- of this part.

4        Q.   And do you know that Margaret was at

5   store 7403?

6        A.   Yeah, I'm pretty sure that's the

7   store on 34th and 7th.  I think they're now

8   closed up, but pretty sure that's the store.

9   It was one of the worst stores in the City.

10       Q.   And do you know Margaret's last name?

11       A.   It's K-I-S.  I'm not sure how to

12  pronounce it.  I don't want to mispronounce it.

13       Q.   Got it.

14       A.   It could be Kis, Kis.

15       Q.   Got it.

16            To the best of your recollection, are

17  the attachments photos that you took of her

18  store and sent to her?

19            MR. GRAFF:  Objection.

20       A.   Could you repeat that?  I'm sorry, I

21  didn't even hear the first part.

22       Q.   You attached, looks like, photographs

23  to the email you sent to Jill.

24       A.   Yes.

25       Q.   Do you recall sending them to
```

```
 1                    PAUL D'AURIA
 2  Margaret?
 3       A.   Usually, yes, I'd send them almost
 4  all the time, or I would send them to Jill and
 5  Jill would put them in a report to Margaret.
 6            MR. WEBER:  Okay, next document.
 7       (D'auria Exhibit No. 29 was marked for
 8       identification.)
 9  BY MR. WEBER:
10       Q.   Okay, again looks like 29 here.  Let
11  me know how many pages we have here.
12       A.   I only see one photo.
13       Q.   Okay.  Can you tell me what it is?
14       A.   It looks like --
15            MS. GOLDSTEIN:  Sorry, let me add
16       page 2.
17       Q.   Can you tell me what these documents
18  are?
19       A.   The beginning -- let me go back.
20  First one is a filthy floor photo.  The second
21  one is --
22       Q.   Let me interrupt you.  Are these
23  photographs you took?
24       A.   It looks like many of them, but not
25  all.
```

1                      PAUL D'AURIA

2        Q.   Okay.  Please continue.  I'm sorry.

3        A.   Okay.  The second one is a photograph

4   of a package sent to Starbucks of pesticides.

5   The third one --

6        Q.   I'm sorry, you said the one before

7   that was a package of pesticides sent to

8   Starbucks?

9        A.   That Starbucks had delivered to them.

10       Q.   And how do you know this again?

11       A.   Because I saw the box, and they had

12   pesticides on the desk.

13       Q.   Okay.  So walk me through this.  By

14   looking at this document, tell me what you

15   understand was in the box.

16       A.   In the box was, I believe, according

17   to what was on the package, there were two

18   bottles of CB-80 Contact Aerosol that was

19   delivered to a store from a seller on Amazon.

20       Q.   And who was it sent to?

21       A.   The Starbucks store.  I don't know

22   the number offhand.  I believe it was Grand

23   Central Tower or -- I don't know the store

24   number or address exactly.

25       Q.   And how do you know that from looking

1                    PAUL D'AURIA

2    at this package label?

3         A.   Everything was sitting up top of the

4    package.

5         Q.   I didn't hear you.

6         A.   Everything was sitting with the

7    package, on top of the package, the contents of

8    the box and the shipping receipt, I guess.

9         Q.   And who was it addressed to?

10        A.   Starbucks.

11        Q.   Just the name of the store, not any

12   individual?

13        A.   Correct, I believe.  Just the store

14   name or the store number.

15        Q.   And do you know who the manager was

16   at that store on November 12, 2015?

17        A.   No, I do not.

18        Q.   And do you know what that aerosol

19   product is?

20        A.   It's an aerosol used for various

21   insects.

22        Q.   Used for what?

23        A.   All kinds of insects.

24        Q.   Okay.  And do you know what are the

25   prohibitions, if any, in using that aerosol in

1                      PAUL D'AURIA

2    a store?

3         A.    Prohibitions as far as -- you want

4    the Department of Health prohibitions, or do

5    you want general label prohibitions?  There's

6    several I could give you.

7         Q.    Both.

8         A.    Department of Health says that only

9    pesticide applicators should be making

10   applications in a store of pesticide.

11              As far as the labeling of that

12   particular pesticide, everything in the store

13   would have to be covered up.  Any food items

14   would have to be covered.  Food contact

15   surfaces would have to be covered.  And you

16   should be wearing at least a face respirator to

17   apply that chemical.

18        Q.    Are there any circumstances when this

19   product could be used in a store?

20              MR. GRAFF:  Objection.

21        Q.    Go ahead.

22        A.    By licensed individuals for the pests

23   that are defined on the label.

24        Q.    Right.  So if there's a licensed

25   technician, that product could be used in the

                     PAUL D'AURIA
1
2   store?

3        A.   Could be used in a --

4             MR. GRAFF:  Objection.

5        A.   Could be used in the store by a

6   licensed applicator by the New York State DEC.

7             MR. WEBER:  Okay.  All right, let's

8        go to the next document.

9        (D'auria Exhibit No. 30 was marked for

10       identification.)

11  BY MR. WEBER:

12       Q.   Okay, what's this document?

13       A.   That looks like some kind of an

14  inspection for a Starbucks store.  I don't know

15  who made that.  I'm not sure who gave that over

16  in the document.  Jill might have turned that

17  over.  It doesn't look familiar to me.  I think

18  that might have been a report she wrote up to

19  Starbucks, but I'm not sure.  And I don't

20  remember seeing that.

21       Q.   There's a sentence or a phrase that's

22  underlined in red.  Can you see that?

23       A.   "Pesticide application not supervised

24  by a certified applicator."  Actually that says

25  2008, I believe, so I -- I don't know what this

1                    PAUL D'AURIA

2   is.

3        Q.   Okay, let's go to the next page.

4        A.   We didn't service Briarcliff Manor.

5        Q.   Did you take this picture?

6        A.   That, I believe I took that picture

7   at -- I think that's Spring Street and Crosby

8   in SoHo.

9        Q.   And where is this location?

10       A.   That's at the front counter

11  underneath the bar.

12       Q.   Okay, next picture.

13       A.   This looks like a screenshot of a

14  Starbucks inspection by the Board of Health.

15       Q.   Did you take this picture?

16       A.   I don't know if I might have taken

17  the screenshot, but Jill may have put that date

18  on there.  I'm not sure.

19       Q.   What was the current grade that the

20  store received?

21       A.   It says it was given an A.

22       Q.   Okay, next page.

23       A.   Also DOH inspection from 95 West

24  Broadway.

25       Q.   And the grade they received?

1                    PAUL D'AURIA

2        A.    An A.

3        Q.    Can you read the sanitary violations

4    on this document?

5        A.    Let me just get it.  "Filth flies, or

6    food/refuse/sewage-associated flies," also

7    known as FRSA, "flies present in facility food

8    and/or nonfood areas.  Filth flies include

9    flies, little house flies, blowflies, bottle

10   flies, and flesh flies.

11   Food/sewage/refuse-associated flies include

12   fruit flies, drain flies, and foreign flies.

13   Food contact surface not properly washed,

14   rinsed, and sanitized after each use and

15   following any activity when contamination may

16   have occurred.  Facility not vermin proof."

17   That's it.

18       Q.    Okay, next page.  Tell me what this

19   is.

20       A.    That's a pest strip on the floor of a

21   store at the counter.

22       Q.    Which store?

23       A.    Could be any.  This was associated

24   with an email I sent.

25       Q.    Okay, next picture.

PAUL D'AURIA

1

2      A.   That's my -- that's my license for

3  the New York State DEC.

4      Q.   Okay.  And that was -- that expires.

5  Got it, okay.  Next?

6      A.   That looks like a photo in an email

7  from myself to Ms. Shwiner in 2014.

8      Q.   What were you saying to her?

9           MR. GRAFF:  Would it be possible to

10         rotate the document so that he can see

11         the text horizontally?

12          THE WITNESS:  I might be able to do

13         it.  I'm sorry.  I got it.

14     A.   Yeah, it's a DDVP strip in a store in

15  the East Village, and I wrote:  "Fly caught at

16  dirty bar drain with a DDVP strip nearby."

17     Q.   Okay, next page.

18     A.   Those are two pest strips at

19  Port Authority on the floor of the counter.

20     Q.   And that was March 1 of 2017?

21     A.   Yes, correct.

22     Q.   And did you -- strike that.

23          What does that indicate you do with

24  that picture?

25     A.   I sent that to either --

1              PAUL D'AURIA

2          (Reporter clarification.)

3     A.   I sent that to either Ms. Shwiner at

4  AVP or to Margaret or whoever the facilities

5  manager was for that store.

6     Q.   You don't remember for sure which

7  one; correct?

8     A.   I don't remember for sure which one,

9  no.

10    Q.   Next page.

11    A.   That is a screenshot of a Board of

12 Health inspection at Starbucks at Kings Plaza

13 in Brooklyn.

14    Q.   And did you obtain this document?

15    A.   I may have, or Jill.  One of us put

16 the date and the location on there in red.  It

17 may have been Jill.

18    Q.   Do you know if you did anything with

19 this document?

20    A.   I may have sent it through our

21 attorney, or Jill sent it into the attorney,

22 but I think this is Jill's.

23    Q.   Okay, next document.  And what's that

24 page say?

25    A.   This looks like an inspection from a

1              PAUL D'AURIA

2    Starbucks in Bronxville, New York, from 2010

3    and 2012.

4         Q.   And what, if anything, did you do

5    with this document when you got it?

6         A.   I don't -- I think Jill probably sent

7    this to our attorney.

8         Q.   Okay, next page.

9         A.   I think that's it, 12.

10        Q.   Is that it?

11             MS. GOLDSTEIN:  Yes.

12             MR. WEBER:  Okay, next document.

13        Q.   Okay, this is Exhibit 30.

14        A.   Do you want me to scan through all

15   16?

16        Q.   I can't see the document.  Here we

17   go.  Okay, can you identify this document?

18        A.   The first page is -- it's blank for

19   me.  1 of 16 is blank.  I don't see anything.

20             MR. WEBER:  Maybe Rebecca can go to

21        the second page.

22             MS. GOLDSTEIN:  Yeah, the first

23        page is blank.  I just gave the witness

24        control so you can scroll through the

25        remainder of this exhibit.

1                      PAUL D'AURIA

2        A.    Second one is a no-pest strip inside

3   of a pastry case.  There's some bags.  Number 3

4   looks like -- number 3 looks like an old

5   inspection at Starbucks from maybe the

6   Department of Health.  I'm not sure.

7        Q.    Okay, next page.  Did you take that

8   picture?

9        A.    Yes, I did.

10       Q.    Where and when?

11       A.    That was a no-pest strip taken at

12  23rd Street and Third Avenue.  That's a

13  refrigerator, and I think they just call that a

14  pull-out.  Underneath the bar there's a no-pest

15  strip zip tie.

16            (Reporter clarification.)

17       A.    There's a no-pest strip zip tie to

18  the back of the refrigerator.

19       Q.    Next page, same question.  Can you

20  identify that, what that is?

21       A.    That looks like another Department of

22  Health inspection for a store on First Avenue.

23       Q.    And what, if anything, did you do

24  with that document when you got it?

25       A.    I think Jill put the date on this one

```
1                    PAUL D'AURIA

2    and the location.

3              MR. GRAFF:  Please don't guess if

4         you're not sure.

5         A.   Yeah, I'm not sure.  Yeah, I didn't

6    put the red lettering on there, so I think

7    anything with that is -- Jill was just

8    highlighting that for our attorney.

9         Q.   Okay.  Next document or next page.

10        A.   Also another Health inspection report

11   for a store on First Avenue, it looks like.

12        Q.   Next page.  Do you know what that is?

13        A.   Looks like dead flies inside of a

14   pastry case.

15        Q.   So would this have been after hours,

16   after the restaurant was closed?

17        A.   Yes, when I was in the stores, yes.

18        Q.   Do you know if Starbucks had a

19   protocol of cleaning all their cases before the

20   start of every day?

21             MR. GRAFF:  Objection.

22        A.   I don't know what their regular

23   maintenance schedule was for that.

24        Q.   And do you know which store this

25   picture was taken at?
```

1                    PAUL D'AURIA

2        A.   This looks like the store where I

3   used the vacuum to clean up those dead flies.

4        Q.   How can you tell from this picture?

5        A.   Because the flies were dead.  And I

6   looked further to see flies that were flying

7   around.  So I got a vacuum and I vacuumed up

8   the live ones and the dead ones.

9        Q.   Is this the only Starbucks store you

10  recall having flies at?

11            MR. GRAFF:  Objection.

12       A.   No.  There were many flies, many

13  stores.

14       Q.   But this one, you remember?

15       A.   I remember this one because I think

16  this is the one where I found the DDVP strips

17  actually in the case itself.

18       Q.   Okay, next picture.  Where was the

19  picture taken?  Where and when?

20       A.   That looks like something that was

21  taken in probably a Penn Station store on top

22  of the cabinets behind the counter.

23       Q.   Anything --

24       A.   Sorry.

25       Q.   No, go ahead.  I'm sorry.

1                    PAUL D'AURIA

2        A.   That red thing behind the pest strip

3   is a fly stick that we would put out to catch

4   flies that might be flying around and landing

5   on the area at night.

6        Q.   And when did you take this picture?

7        A.   Sometime between 2013 and 2018.

8   Can't be exact.

9        Q.   Okay.  And during that time period,

10  do you know what you did with it after you took

11  it?

12       A.   Probably sent it in to either Jill or

13  somebody at facilities.

14       Q.   You don't recall?

15            MR. GRAFF:  Thank you.

16       A.   Yeah, I don't recall exactly.

17       Q.   Okay, next picture.  Can you tell me

18  what that is?

19       A.   Let me flip it over.  That is the box

20  that we, I believe, spoke about earlier, the

21  photo that was delivered to Starbucks on East

22  45th Street with pesticides.

23       Q.   Have you ever heard of Pest Control

24  Pros?

25       A.   No.

```
1                    PAUL D'AURIA

2              MR. GRAFF:  Objection.

3         A.   I think it's some -- somebody, an

4    Amazon seller.

5         Q.   All right.  Next picture.

6         A.   That's the --

7         Q.   What is that?

8         A.   That's the pastry case where I found

9    the pest strip underneath the bagel rack.

10        Q.   Is that your hand in the picture?

11        A.   With the arm and glove, that's me,

12   yes.

13        Q.   And what is that?  Was that a case, a

14   refrigerated case that you're in?

15        A.   That's the pastry case that's facing

16   outward towards the customer area.  I'm behind

17   the counter.

18        Q.   And this is after hours; correct?

19        A.   Correct.

20        Q.   Okay.  And again, what, if anything,

21   did you do with this picture when you took it?

22        A.   I believe we sent the picture to the

23   facilities manager.

24        Q.   And who was that?

25        A.   I forget who the facility manager was
```

```
1                    PAUL D'AURIA
2   for this store.
3        Q.   And you don't know exactly what year
4   this was; correct?
5        A.   No.  Sometime after 2013.
6        Q.   Okay.
7        A.   Might have been 2015 or '16.
8        Q.   Next picture.
9        A.   That's a photo of -- photo of behind
10  the counter at Starbucks near the condiments.
11  There are two pest strips in the photo near the
12  food.  Three, I'm sorry, three --
13       Q.   When was it --
14       A.   -- pest strips.
15       Q.   When was it taken?
16       A.   2015 or 2016, but I'm not positive.
17       Q.   And what, if anything, did you do
18  with it when you took it?
19       A.   I took a lot of photos in that store,
20  and I know we -- pretty sure Jill emailed that
21  particular store to facilities because I found
22  about 15 of those in the store that night.
23       Q.   Next picture.
24       A.   That's an email from me to Alloy at
25  facilities.  I carbon copied Ms. Shwiner.  I
```

1                    PAUL D'AURIA

2    said:  "Hi, Alloy.  I found some roaches at bar

3    area and back line.  They need to clean a bit

4    more."  Typo.  "Also have pest strips sitting

5    at the CBS counter."

6         Q.   What's CBS?

7         A.   CBS is, I believe, the cold beverage

8    station for Starbucks.

9         Q.   Okay.  Did Alloy respond to you in

10   connection with this email?

11        A.   He may have responded to me or Jill.

12   I don't remember exactly.

13        Q.   Next picture.

14        A.   Looks like it's a Department of

15   Health inspection for store at Union Square

16   West.

17        Q.   Next picture.

18        A.   This is a Department of Health

19   inspection for a store in Queens.

20        Q.   What, if anything, did you do with

21   this document when you received it?

22             MR. GRAFF:  Objection.

23        A.   If I took a screenshot of it, I might

24   have sent it to my attorney, but I don't

25   remember this one.  We didn't service Queens,

```
 1                    PAUL D'AURIA

 2   so I don't know.  I don't know why.

 3        Q.   Next picture.

 4        A.   This is a Health inspection at 330

 5   Madison for pesticide use.  Either me or Jill

 6   did that.  I don't remember who put the --

 7        Q.   Next picture.

 8        A.   And this is a picture, I believe, of

 9   the same box from earlier in the set.

10        Q.   Okay.  Next picture.

11        A.   I think that's it.

12             THE REPORTER:  If we could pause

13        just a moment.

14        (Recess taken.)

15             MR. WEBER:  Any more documents,

16        Rebecca?

17             MS. GOLDSTEIN:  We do have a few

18        more.

19             MR. WEBER:  Okay.

20        (D'auria Exhibit No. 31 was marked for

21        identification.)

22   BY MR. WEBER:

23        Q.   Let's look at Exhibit 31, if you

24   would.  Tell me what that is.

25        A.   It's an email from myself to
```

```
 1                    PAUL D'AURIA
 2   Ms. Shwiner.  Looks like I was telling her the
 3   floors weren't being cleaned properly and they
 4   were buying cans of Raid --
 5        Q.   What location --
 6        A.   -- for --
 7        Q.   -- was this?
 8             (Reporter clarification.)
 9        A.   West -- 7403?  I'm not sure.  I think
10   that's 35th Street, 34th and 7th, but I'm not
11   positive.
12        Q.   Okay.  You say:  "Worse than last
13   week.  They buy bleach and fly spray.  No fan
14   or cleaning.  My patience gone."
15             What are you referring to?
16        A.   They weren't cleaning the floors.  We
17   had told them that a good opportunity after
18   cleaning the floors was to buy a floor fan to
19   dry out the cracks and crevices in the tiles,
20   and that would help stop the breeding of the
21   fruit flies.
22        Q.   And what, if anything, did you do
23   with this document other than send it to Jill?
24        A.   That's all I did was send that to
25   Jill.
```

1                    PAUL D'AURIA

2        Q.   Okay.  Next page or document.  What

3    do we have here?

4        A.   That looks like the aerosol cans

5    from -- the aerosol receipt from the pesticides

6    earlier in the last exhibit.

7        Q.   Next page.  What do we have here?

8        A.   That's a picture of a fly strip, a

9    pest strip on a desk at 50 Lexington Avenue on

10   the manager's desk, I believe.

11       Q.   And who was the manager there?

12       A.   I do not know.

13       Q.   And do you know who put the pest

14   strip there?

15       A.   No, I do not.

16       Q.   And when was this?

17       A.   I couldn't tell you.  Not sure what

18   date.

19       Q.   And what, if anything, did you do

20   with this photograph?

21       A.   I gave it to Jill.

22       Q.   Okay, next page.  What do we have

23   here?

24       A.   Some kind of inspection for

25   Starbucks, which I'm not familiar with it.

                      PAUL D'AURIA

1

2       Q.   Okay, next page.

3       A.   I believe that's the same photo from

4  a few pages back.

5       Q.   Got it.  Okay, what do we have here?

6       A.   Looks like an inspection from

7  Starbucks.

8       Q.   What, if anything, did you do with

9  that document?

10      A.   I don't -- I don't recall seeing that

11 document.

12      Q.   Okay.  Next page. what is that?

13      A.   That is a manager's desk, and there's

14 a email -- let me just blow it up.  I can't

15 read that.  That's an email from me to

16 Ms. Shwiner about the 50 Lexington Avenue

17 store.

18           And I wrote:  "I didn't notice the

19 DDVP strip until after I sat down and wrote out

20 the work order."

21           And the photo shows my receipt on the

22 desk and a pest strip sitting in the corner of

23 the desk.

24      Q.   And was this a private office?

25      A.   No, this is the manager's office in

```
 1                    PAUL D'AURIA
 2   the open back room.
 3       Q.   And you were authorized to enter the
 4   office?
 5       A.   Yes, I was.
 6       Q.   Who gave the authorization?
 7       A.   Starbucks.
 8       Q.   Okay.  And did you ask the manager
 9   how the pest strip got there?
10       A.   No.  I never saw the manager.
11       Q.   Did you ask on your report of how the
12   pest strip got there?
13       A.   No, I did not.
14       Q.   Did you ever follow up with anyone at
15   Starbucks as to why and how that pest strip got
16   there?
17       A.   Not that particular strip, no.
18       Q.   Did you follow up with anyone at AVP
19   on how that pest strip got there?
20       A.   I emailed to Jill, and I -- as far as
21   I know, she would always email my concerns to
22   Starbucks, someone at Starbucks.
23       Q.   Okay, next page.
24       A.   That's a pest strip on a counter, an
25   email that I showed my sister that's sitting on
```

1                    PAUL D'AURIA

2    the bar near an open mocha container.

3         Q.   Is that the sister you referred to

4    before?

5         A.   Yes, same sister.

6         Q.   Laraine?

7         A.   Correct.

8         Q.   And why did you send it to her?

9         A.   I would tell her about it, and every

10   once in a while I would show her a picture.

11        Q.   Okay, next picture.

12        A.   I'm not seeing anything on page 9.

13             MS. GOLDSTEIN:  That page is a

14        blank.

15             MR. GRAFF:  I'm showing blanks

16        until page 14.

17             MR. WEBER:  All right, there we go.

18        Q.   Identify this document, or this page.

19        A.   I'm not -- I'm not familiar with

20   that.  That's a document from Mr. Fox's time at

21   Starbucks.

22        Q.   How did you get this document?

23        A.   I'm not aware of this document.

24        Q.   Did you ever see it before?

25        A.   Never.

```
 1                    PAUL D'AURIA

 2        Q.   Okay, next document.  Ever see this

 3   one?

 4        A.   No.

 5        Q.   Next document or page.  What's this?

 6   Ever see it before?

 7        A.   Never, no.

 8        Q.   Who's in this picture?

 9        A.   That looks like Rafael.

10        Q.   Which one is Rafael?

11        A.   I believe he's the one in the dark

12   shirt holding a Starbucks bag.

13        Q.   Know anybody else in the picture?

14        A.   No, I do not.

15        Q.   Okay, next picture.  Same question.

16        A.   Just looks like Rafael.

17        Q.   Okay, next picture.

18        A.   That's it.

19             MR. WEBER:  Let me ask you a

20        question.  Here we go.  Let me show you

21        Exhibit 32 and ask you if you can

22        identify it.

23        (D'auria Exhibit No. 32 was marked for

24        identification.)

25             MR. GRAFF:  This appears to be 15
```

```
 1                     PAUL D'AURIA

 2       pages of text.  Is there anywhere you

 3       want him to start?

 4   BY MR. WEBER:

 5       Q.   Well, let me just ask, did you

 6   receive any of these pages?

 7       A.   Page 1, I don't think I've ever

 8   received that.  Go to the next one.  No, I

 9   don't think I received that.

10       Q.   Okay.

11       A.   Want me to just go through each one?

12       Q.   Yeah, go through quickly and see if

13   you received any of them.

14       A.   Okay.  These were not emails that I

15   was copied on.  These were about a store which

16   had a phorid fly problem, I believe, that was

17   originated in the French drains.

18            MR. WEBER:  Okay.  We will go to

19       the next document, then.

20       (D'auria Exhibit No. 33 was marked for

21       identification.)

22   BY MR. WEBER:

23       Q.   Showing you Exhibit 33, I'll ask you

24   if you've ever seen this document.

25       A.   No, I've never seen this.
```

```
 1                    PAUL D'AURIA

 2          MR. WEBER:  Okay.  Next document.

 3          (D'auria Exhibit No. 34 was marked for

 4          identification.)

 5   BY MR. WEBER:

 6          Q.   All right, let's look at this

 7   Exhibit 34.  Have you seen this document

 8   before?

 9          A.   I believe I saw this.  Maybe they

10   forwarded it to Jill or Jill showed me an email

11   about this particular situation.

12          Q.   And what, if anything, did you do

13   when Jill brought it to your attention?

14          A.   I told her that the employee who did

15   that was totally wrong, and I believe she

16   subsequently fired him.

17          Q.   Did you ever leave pesticides at any

18   Starbucks store for any use by anybody else?

19          A.   Not me.  No, I never did.

20          Q.   Do you know of anybody who did?

21          A.   Other than this one person who worked

22   for us for a short time, that was the only time

23   that I know of.

24          Q.   Who was that?

25          A.   I think his name was Mark or Marco.
```

1                    PAUL D'AURIA

2        Q.   Last name?

3        A.   I don't know what his last name is.

4        Q.   Okay, next document.

5             MS. GOLDSTEIN:  That's all the

6        documents.

7        Q.   Mr. D'auria, have you given us, to

8   your best recollection, all the communications

9   with Starbucks regarding use of pest strips at

10  the stores?

11       A.   Yes, I believe I've given everything.

12  I've searched everywhere all my devices,

13  drives.

14       Q.   And your testimony today is your best

15  recollection of all the times that you

16  communicated with Starbucks about pest strips

17  in the stores?

18       A.   Yes.  Was it included?  May have been

19  deleted over the years, but I've given

20  everything that I could find.

21       Q.   Okay.  And when you alerted someone

22  at Starbucks regarding pest strips, did you

23  also alert someone at AVP regarding the pest

24  strips in a particular store?

25       A.   Yes.

1                    PAUL D'AURIA

2        Q.    And you've testified today about all

3    those communications?

4        A.    Yes.

5        Q.    Were you aware of any actions

6    Starbucks took once they received

7    communications from you about pest strips in

8    the stores?

9             MR. GRAFF:   Objection.

10       A.    I don't know of any actual actions

11   that were taken.  Besides an email or two sent

12   out, I don't think any actual action was taken

13   to stop this.

14       Q.    Well, were you aware of email sent

15   out from Starbucks managers to store managers?

16            MR. GRAFF:   Objection.

17       A.    Sent to store managers?

18       Q.    If you know.

19       A.    I wouldn't know.  I wouldn't know.

20       Q.    Did you ever see any communications

21   from Starbucks managers to store managers

22   regarding the use of pest strips?

23       A.    I believe there was one where someone

24   said FYI.  I think that was in one district,

25   and that was --

```
 1                    PAUL D'AURIA

 2        Q.   Are you aware of any action -- I'm

 3   sorry.

 4        A.   No, I think that was the only one I

 5   recalled.

 6        Q.   Are you aware of any actions that

 7   Starbucks took to prevent the use of pest

 8   strips in the stores?

 9        A.   I'm not aware of any actions to

10   prevent that, no.

11        Q.   Let me ask you this question.  When

12   did you first meet Rafael Fox?

13        A.   In April of 2019.

14        Q.   And how did you meet him?

15        A.   We met at a meeting --

16        Q.   And who --

17        A.   -- at our attorney's office.

18        Q.   And who arranged the meeting?

19        A.   Our attorney.

20        Q.   And how did you get to meet your

21   attorney?

22        A.   You mean in person, or the first

23   contact?

24        Q.   How did you learn of your attorney?

25             How did you first become aware of
```

1                      PAUL D'AURIA

2    him?

3         A.   I was first sent an email by

4    Mr. Graff in November of 2018.

5         Q.   And how did Mr. Graff become aware of

6    you?

7         A.   I believe they found a video I had

8    posted on YouTube of pest strips in a

9    Starbucks.

10        Q.   And this is in April of '18?

11        A.   No, he -- the email that Mr. Graff

12   sent me was in November of 2018.

13        Q.   Got it, okay.  And what did he say in

14   that email?

15        A.   He asked me if I was the person that

16   had posted the video, and he was representing a

17   client and wanted to know if he could speak

18   with me.

19        Q.   Okay.  What did you say?

20        A.   I told him that it was me who posted

21   the video, and I was in the middle of moving

22   out of New York and I would contact him in a

23   few days.

24        Q.   And did you contact him a few days

25   later?

1                     PAUL D'AURIA

2        A.   Yes.

3        Q.   How did you contact him?

4        A.   I believe we spoke on the phone.

5        Q.   And what did you say to him and what

6   did he say to you?

7        A.   Just wanted to know about DDVP.

8        Q.   Tell me the whole conversation.

9        A.   I wouldn't remember the whole

10  conversation now.

11       Q.   Give me the overview.

12       A.   He wanted to know basically the

13  amount of DDVP that I encountered.  If, you

14  know, what his client was telling him was

15  valid.  Wanted to know if anything happened to

16  me in Starbucks concerning pesticides.

17       Q.   And What'd you tell him?

18       A.   I confirmed what his client told him,

19  and I told him my story.

20       Q.   Tell me what you said.  When you say

21  your story, what did you say?

22       A.   I told him I was exposed to these

23  chemicals for years.  I told him I was

24  basically walking into stores and the bug bombs

25  or foggers were going off, and it was --

1                    PAUL D'AURIA

2  happened on, you know, a number of occasions.

3       Q.   And how long did that telephone

4  conversation take?

5       A.   I don't remember.  Probably at least

6  half an hour.

7       Q.   And you mentioned a couple things

8  that you said to him.  What else did you say to

9  him?

10       A.   I don't remember.

11       Q.   What'd he say to you?

12       A.   Basically asking me about my time

13  servicing Starbucks and the chemicals and

14  pesticides that I encountered when I was

15  employed at Starbucks.

16       Q.   And what pesticides did you tell him

17  you encountered?

18       A.   The no-pest strips, various other

19  store-bought chemicals like Raid, Hot Shot,

20  aerosol cans.  The CB-80 was also used.  Mostly

21  over-the-counter stuff like Raid.

22       Q.   You say mostly over-the-counter

23  stuff.  Is there any materials that you

24  mentioned to him that was not over the counter?

25       A.   CB-80 isn't really an

1                    PAUL D'AURIA

2   over-the-counter product.  You can't walk into

3   a Home Depot and order it.  You can't walk into

4   a hardware store.  Usually, you have to buy

5   those by -- buy those from a licensed pesticide

6   salesperson or company.

7        Q.   Where did you see the CB-80?

8        A.   CB-80 I saw in a number of stores in

9   the City.

10       Q.   How many?

11       A.   Many.  Too many to count.  I couldn't

12  give you a number.

13       Q.   Approximately how many?

14       A.   Probably over 25 to 50 stores.

15       Q.   Over the years that you worked at the

16  Starbucks stores?  And --

17       A.   Right.

18       Q.   Did you ever mention to anybody that

19  you saw CB-80 in the stores?

20       A.   Yes.

21       Q.   Would that be in your email

22  communications that we've seen today?

23       A.   I believe somewhere, yeah, we've

24  emailed Starbucks with that information.

25       Q.   I want to be sure I understand this.

```
 1                   PAUL D'AURIA
 2   Have you given us all communications that you
 3   have, that you made with Starbucks or AVP
 4   concerning chemicals in their stores?
 5        A.   Yes.
 6        Q.   Okay.  All right, so what else did
 7   you say to your attorney in November 2018
 8   regarding the chemicals that you came across?
 9             MR. GRAFF:  And to be clear, he was
10        not -- I was not his attorney at the
11        time in question.
12             MR. WEBER:  Correct, correct.
13        A.   Basically, that's all I remember,
14   and --
15        Q.   Okay.
16        A.   And whatever questions he had for me.
17        Q.   And what other questions did he have
18   for you?
19        A.   I said whatever others he had, I
20   don't remember, but mostly involved --
21        Q.   What was the --
22        A.   -- chemicals.
23        Q.   What was the next communication you
24   had with Mr. Graff?
25        A.   I don't remember.  He probably should
```

1                    PAUL D'AURIA

2    have called --

3         Q.   Approximately.

4         A.   -- probably within a couple of weeks.

5    I don't know.  I don't --

6         Q.   Did he call you or did --

7         A.   -- remember.

8         Q.   Did he call you or did you call him?

9         A.   He probably called me.

10        Q.   And what was the discussion?

11        A.   I don't remember, truthfully.  Don't

12   remember what we talked about.

13        Q.   Can you give me the general substance

14   of the call?

15        A.   Probably Starbucks and pesticides.

16        Q.   So that was a couple -- what, is that

17   into December 2018?

18        A.   Yes, November, December, then from

19   there on.

20        Q.   What was the next communication you

21   had with Mr. Graff?

22        A.   Don't remember.  I don't remember.

23        Q.   Did you have any emails with him in

24   November, December 2018?

25        A.   Whatever we had, we turned over.

1                    PAUL D'AURIA

2        Q.   Okay.  Did there come a time when you

3   retained him?

4        A.   Yes.

5        Q.   When was that?

6        A.   I don't have the specific date.

7        Q.   What year?

8        A.   I believe it was the end of 2018,

9   sometime in --

10        Q.   Did you -- did you meet with him when

11   you retained him?

12        A.   No.

13        Q.   Over the phone?

14        A.   Yes.

15        Q.   Did he send you a retainer or

16   engagement letter?

17        A.   Yes.

18        Q.   And what's your financial arrangement

19   with him?

20        A.   Contingency arrangement.

21        Q.   I'm sorry, I didn't hear you.

22        A.   A contingency arrangement.

23        Q.   And what's the contingency?

24        A.   I believe it's 35 or 40 percent.

25        Q.   Okay.  And when you were retained by

1                     PAUL D'AURIA

2    him, did anyone else retain Mr. Graff at that

3    time?

4         A.   I believe only Rafael Fox was there

5    with me at the time on a retainer.

6         Q.   Okay.  And did you bring in Jill

7    Shwiner into the case?

8         A.   Ari Graff asked me if I could get in

9    touch with Jill and -- because she might have

10   more information.

11             MR. GRAFF:  I'd like to caution you

12        that if this happened after you signed

13        the retainer agreement, then that is an

14        attorney-client communication, so try to

15        be careful on the topic.

16             THE WITNESS:  Okay.  Could you

17        repeat the question?

18             MR. WEBER:  Sure.

19        Q.   Did you reach out to Jill to ask her

20   if she wanted to join the lawsuit?

21        A.   I never asked her that, no.

22        Q.   Do you know how Jill became a

23   plaintiff in your lawsuit?

24        A.   I don't know the conversation they

25   had, so I couldn't answer that.

```
 1                 PAUL D'AURIA
 2       Q.   Were you in touch with Jill after you
 3  left AVP?
 4       A.   No, not for six months.
 5       Q.   When did you leave AVP?
 6       A.   Oh, sometime mid June of 2018.
 7       Q.   And why did you leave?
 8       A.   Basically, we lost the account and
 9  there was no work for me.
10       Q.   When you say they lost the account,
11  what account?
12       A.   Starbucks account.
13       Q.   Did they still have the Stock
14  Exchange and Methodist Hospital?
15       A.   No.  The American Stock Exchange, I
16  believe, was sold and closed.  New York
17  Methodist was being used -- being serviced by
18  another company.
19       Q.   Okay.  So they lost all three
20  accounts in the middle of 2018?
21       A.   No, that was previous.  Previous
22  years, those accounts were terminated.  The
23  Stock Exchange was sold, I think, in 2007
24  maybe.  And Methodist Hospital, I think, you
25  know, that was a bidding account and I believe
```

1                    PAUL D'AURIA

2    another company won the contract.

3         Q.   In 2017 and '18, what companies were

4    you personally working at or for?

5         A.   In 2017, I worked for AVP Pest

6    Control.

7         Q.   No, what I mean is where did AVP

8    assign you in 2017 and 2018?

9         A.   Starbucks.

10        Q.   Anywhere else?

11        A.   Occasionally -- occasionally, I would

12   do a service for Walgreens or Duane Reade if

13   they needed help.

14        Q.   Did you ever see any pest strips in

15   Walgreens?

16        A.   I never did, no.

17        Q.   So AVP lost the Starbucks account in

18   mid 2018; is that right?

19        A.   That's correct.

20        Q.   Is that when they closed the

21   business?

22        A.   Not that I know of.  I left in June

23   of 2018.  I don't know exactly what happened

24   after I left.

25        Q.   And did anybody tell you why AVP lost

```
 1                    PAUL D'AURIA
 2   the Starbucks account?
 3        A.   I believe that they were taking away
 4   a lot of stores and giving them to another
 5   company, and I think they were going to give us
 6   like 20 stores maybe.  And I said basically,
 7   you know, nothing I can do with that.  I can't
 8   really work full time, so I think they just
 9   said, you know, we -- we can't keep Paul on, so
10   I -- I was gone.  I don't know exactly what
11   happened after that.
12        Q.   Do you know when Jill left?
13        A.   Truthfully, I don't know.
14        Q.   And where did you work after AVP?
15        A.   After AVP, I started putting in
16   applications, a City job, couple of other
17   companies.  I was engaged at the time, and then
18   I decided I was going to move to Pennsylvania,
19   and I didn't work anymore in New York.
20        Q.   Did you stop looking for work in
21   New York after June '18?
22        A.   I stopped looking probably September,
23   October.  A lot of companies have their summer
24   hires already done.  By that time, there's
25   really not a lot of openings, especially in the
```

1                    PAUL D'AURIA

2   fall.

3        Q.   When did you -- got it.  When did you

4   first start looking for work after June '18?

5        A.   Within a week.

6        Q.   And where did you look for work?

7        A.   I checked a lot on the internet.  I

8   was looking at a lot of City postings for

9   different jobs not related to pest control.  I

10  was looking for a lot of City jobs.  Couple of

11  pest control jobs I put in for.

12       Q.   What's the first job or work you had

13  after June '18?

14       A.   The first work I had, I would have --

15  in Pennsylvania, I started working for a

16  medical alarm installation company.

17       Q.   When?

18       A.   That was June of 2019.

19       Q.   Between June 2018 and June 2019 were

20  you employed?

21       A.   From 2018 to 2019?  No.

22       Q.   And how did you live?

23       A.   On --

24            MR. GRAFF:  Objection.

25       A.   On my savings.

1                    PAUL D'AURIA

2       Q.   What income?

3       A.   Yeah.  On savings.

4       Q.   Savings?

5       A.   Yeah.

6       Q.   And in June '19, where did you begin

7   working?

8       A.   A company in Pennsylvania called

9   MedScope.

10      Q.   And that's the medical installation

11  company?

12      A.   Correct.

13      Q.   How long did you work there?

14      A.   I worked there up until -- from June

15  of 2019 to March of this year, when the COVID

16  virus started.

17      Q.   What was your job at the medical

18  alarm installation company?

19      A.   Basically, I would take the different

20  alarm systems that the local counties would

21  give to elderly and disabled people and I'd go

22  out to their homes and show them how to

23  operate, how to test the equipment should they

24  ever need it.

25      Q.   And what was your salary?

1                   PAUL D'AURIA

2        A.   Salary went by the amount of miles

3   that I drove.

4        Q.   Approximately how much did you earn?

5        A.   Oh, like per day?  Per week?

6        Q.   Either.

7        A.   Oh, sometimes 200, 2- to $300 a week.

8        Q.   Okay.  And since March 2020, have you

9   been working?

10       A.   No.

11       Q.   And what form of income, if any, have

12  you been receiving?

13       A.   I got unemployment after I stopped

14  working because of the virus, and I collected

15  unemployment for maybe four weeks, five weeks.

16            And then I received my 9/11 Victims

17  Compensation Fund, and I --

18       Q.   Is that the 225?

19       A.   Yes, right.

20       Q.   And when did you receive that?

21       A.   I think it was July 3.

22       Q.   Of this year?

23       A.   Correct.

24       Q.   What is your claim for damages in

25  this case?

```
 1                    PAUL D'AURIA

 2             MR. GRAFF:  Objection.

 3        Q.   What are you claiming?

 4        A.   Could you rephrase that?  What do you

 5   mean, what am I claiming?

 6        Q.   Yeah.  You know, what are you seeking

 7   from Starbucks in this case by way of damages?

 8             What do you want to recover?

 9             What's your request for damages?

10        A.   The maximum that --

11             MR. GRAFF:  Objection.

12        A.   The maximum that --

13        Q.   Let me ask you a different way.  What

14   damages did you suffer?

15             What have you suffered as a result of

16   Starbucks' actions?

17        A.   I've suffered a lot of emotional

18   distress.  I was always being exposed to

19   chemicals that -- pretty unexpected.  I had

20   numerous occasions of pesticides.  I would walk

21   into vapors when I wasn't prepared for it.  I

22   was walking in on, you know, chemicals dripping

23   from the ceiling at times.  I suffered

24   emotionally.  I was worried about people's

25   health.  I was worried about my own health, the
```

PAUL D'AURIA

1

2    long-term effects of chemicals.  I would worry

3    that if anybody ever sued Starbucks, I would --

4    you know, could lose my license or my

5    livelihood over the course of all those years

6    of those incidents.

7         Q.   During the times that you were

8    exposed to pest strips, did you see any doctors

9    because of that exposure?

10        A.   No.

11        Q.   Did you see any kind of healthcare

12   professional as a result of your exposure to

13   pest strips?

14        A.   No.

15        Q.   Did you see any psychologist or

16   psychiatrist or mental health worker as a

17   result of your --

18        A.   No.

19        Q.   -- exposure to pest strips or any

20   similar products?

21        A.   No, I did not.

22        Q.   Do you take any medicines,

23   prescription or over the counter, as a result

24   of your exposure to any chemicals while working

25   for Starbucks?

```
 1                    PAUL D'AURIA

 2       A.   No.

 3       Q.   Have you been examined by a physician

 4  over the last five years?

 5       A.   Yes.

 6       Q.   What doctor?

 7       A.   For -- it would depend on what you

 8  want to know, what health.  I've seen a lot of

 9  doctors because of my lymphoma.

10       Q.   Okay.  Not related to your lymphoma.

11  Have you seen any doctors unrelated to your

12  lymphoma?

13       A.   A regular family physician for --

14       Q.   Just for checkups?

15       A.   -- general medical -- yes.

16       Q.   And which doctors did you see as your

17  general internist?

18       A.   I saw regular doctors in Staten

19  Island, and I have a regular doctor here in

20  Pennsylvania.

21       Q.   And other than your lymphoma, was

22  there a -- did they examine you and found that

23  you were in reasonably good health?

24       A.   Yes.

25            MR. GRAFF:  Objection.
```

1                  PAUL D'AURIA

2      Q.   What'd you answer?

3      A.   Yes.

4      Q.   As a result of the conditions that

5  you claim you experienced when you were at

6  Starbucks, tell me what effect those -- that

7  exposure had on you.  What was the impact?

8      A.   The impact was I was generally afraid

9  of what was happening at the time in Starbucks.

10 Just blatant disregard for safety by Starbucks

11 for myself, their own employees, customers,

12 other vendors.  I worried about -- like I said,

13 I worried about losing my license should anyone

14 ever try to blame me for pesticides that

15 Starbucks was applying.

16     Q.   Anything else?

17     A.   Worried about my livelihood, worried

18 about losing my job.

19     Q.   Right.  And did that have any --

20 other than worrying, did those concerns have

21 any other impact on your life?

22     A.   Those concerns?  I would be extra

23 careful when I worked, more than usual.  After

24 I had my lymphoma, I was sort of in a

25 heightened state of alert, knowing that

1               PAUL D'AURIA

2   chemicals in the long run or down the road

3   could have a chronic effect on my health.

4       Q.   And when did you first get lymphoma?

5       A.   I was diagnosed with lymphoma in

6   February of 2017.

7       Q.   And did your doctors advise you that

8   that lymphoma was a result of the 9/11

9   exposure?

10      A.   They did not, no.

11      Q.   Did anybody tell you what the cause

12  of the lymphoma was?

13      A.   Of the doctors that I saw, they did

14  not, no.  The only people that said it was due

15  to 9/11 was the 9/11 health program because of

16  my exposure time near the World Trade Center.

17      Q.   And how long did you work after 9/11

18  in lower Manhattan?

19      A.   I continued working regularly in

20  lower Manhattan as pest control from 2001 all

21  the way up to 2009.

22      Q.   And where did you physically work

23  during those years?

24      A.   I worked -- after 9/11, I worked for

25  Starbucks during the downtown locations.  I

1                    PAUL D'AURIA

2    also worked at the American Stock Exchange two

3    days a week, which is about a block and a half

4    from the World Trade Center.

5        Q.   Okay.  Any other effects on your

6    mental or physical health while working at

7    Starbucks?

8        A.   Other than the mental stress, no.

9    Mental duress.

10       Q.   Okay.  Did you ever speak to a lawyer

11   by the name of David Gottlieb?

12       A.   Yes.

13       Q.   And when did you speak to him?

14       A.   I spoke to David -- I think I met

15   David in April of 2019, or March.  April --

16       Q.   Did you retain him?

17       A.   -- or March.

18       Q.   Did you retain him?

19       A.   I believe we retained his law firm,

20   Wigdor & Associates.

21       Q.   All right.  And did you meet with

22   Doug Wigdor?

23       A.   Yes.

24       Q.   And did you retain Mr. Wigdor?

25       A.   At one point we did, yes.

PAUL D'AURIA

1

2      Q.    And prior to retaining either

3  Mr. Gottlieb or Mr. Wigdor, did you have any

4  discussions with them about your work at

5  Starbucks?

6      A.    Other than the facts of this case.

7      Q.    I'm sorry, other than the fact what?

8      A.    Other than the facts of the case, I

9  think we discussed the case with Mr. Wigdor and

10  Mr. Gottlieb.

11      Q.    Before you retained them?

12      A.    I believe so, yes.

13      Q.    I think you said you got engaged

14  about 18 months ago.  Is that right?

15      A.    Give or take.  I mean, we knew we

16  were going to get married.  It was --

17      Q.    And you got married; right?

18      A.    Yes, correct.

19      Q.    And when did you get married?

20      A.    May of 2019.

21      Q.    Okay.  So you met a couple years

22  before that; is that right?

23      A.    Correct.

24      Q.    And how did you meet your wife?

25      A.    We actually met online on Instagram.

```
 1                    PAUL D'AURIA

 2        Q.   Congratulations.

 3        A.   Thank you.

 4             MR. WEBER:  Take a five-minute

 5        break.

 6        (Recess taken.)

 7   BY MR. WEBER:

 8        Q.   You just mentioned some of the

 9   effects of working at Starbucks.  Since you

10   left Starbucks, do you no longer have those

11   conditions or feelings?

12             THE WITNESS:  You're breaking up a

13        little bit.  It sounds like --

14             MR. WEBER:  Okay.  Let me -- is

15        that any better?

16             THE WITNESS:  Could be my phone.

17             MR. WEBER:  Okay, let me ask you

18        again.

19        Q.   You just testified about the

20   conditions you experienced while working at

21   Starbucks.  Since you left Starbucks, do you no

22   longer experience those feelings or conditions?

23        A.   I'm still very wary of chemicals, of

24   any chemicals in general.  I have the

25   rhinosinusitis, which is always bothering me.
```

1              PAUL D'AURIA

2  It bothers my throat.  As far as mental stress,

3  if I think about Starbucks, I'm in distress.

4       Q.   Does your lymphoma cause you any

5  stress?

6       A.   Yeah.  It's the kind of lymphoma that

7  can recur.  More than 50 percent of the time it

8  comes back, so that's always a worry, that it

9  could come back.

10      Q.   Right now, it's in remission?

11      A.   Yes, it's -- I have been in remission

12  since 2017.

13      Q.   Okay, great.  Did you say that your

14  lymphoma was caused by the 9/11 exposure?  I

15  think you said that.

16      A.   Yeah.  When I went to -- and had the

17  exam, they certified me for my lymphoma and my

18  rhinosinusitis.

19           MR. WEBER:  Got it.  Okay,

20       hopefully Rebecca will get on shortly

21       and we'll finish up.

22           MS. GOLDSTEIN:  I'm on the phone,

23       I'm just having technical difficulties

24       downloading.  Hopefully I'll be on in a

25       minute.

1                    PAUL D'AURIA

2          THE WITNESS:  I'm going to call

3      back in since you're still breaking up.

4      I don't know if it's my phone or the

5      connection.

6          MR. WEBER:  I hear you fine.

7      (Off the record to resolve a technical

8      issue.)

9    BY MR. WEBER:

10     Q.   You said you worked at Starbucks and

11   Le Pain Quotidien, where there were pest

12   strips.  Have you ever been in any other

13   restaurant or store that had pest strips in it?

14     A.   Not when I was working, no.

15     Q.   What about when you were not working?

16     A.   I once went into a pizzeria or a

17   cafe, and there was one hanging up in the food

18   area right above where everybody was standing,

19   eating.

20     Q.   What did you do when you saw it?

21     A.   Took a photo of it and reported it.

22     Q.   I'm sorry, took a photo and then

23   what?

24     A.   Took a photo and reported it to the

25   Department of Health.

```
1                    PAUL D'AURIA

2         Q.    Who did you report it to?

3         A.    Department of Health.

4         Q.    During the period 2007 to 2018,

5    during the periods of time you worked for AVP,

6    did you ever look for any other employment?

7         A.    In 2009, after we -- Starbucks

8    terminated our contract in 2009, I did get

9    another job, and I worked for a company in

10   Manhattan.  And I worked there for several

11   years.

12        Q.    What company?

13        A.    AKA Pest Control.

14        Q.    Okay.  And how long did you work

15   there?

16        A.    I worked there from 2009.

17   November 2009 until, I think, February of 2013.

18        Q.    And what did you do there?

19        A.    Basically the same thing.  I did pest

20   control.  I serviced all commercial accounts.

21        Q.    And what was your compensation there?

22        A.    Oh, I worked there, I was making

23   about -- I think when I left there I was making

24   about 875 a week.

25        Q.    I'm sorry, I didn't hear you.
```

```
1                    PAUL D'AURIA

2        A.    I was making about $875 a week.

3        Q.    Okay.  And why did you leave?

4        A.    I was already doing work with AVP

5   servicing the Le Pain location, so I was doing

6   both jobs.  And then Starbucks was basically

7   asking AVP if they would service them again, so

8   Ms. Shwiner asked me if I would come back full

9   time to service Le Pain and Starbucks.  So I

10  left the other company and went back to AVP.

11       Q.    And you were making less money at AVP

12  when you went back; correct?

13       A.    No, I -- they paid me more money to

14  come back.

15       Q.    Did your compensation decrease while

16  working at AVP?

17       A.    No.  I made more money working for

18  AVP.

19       Q.    And what were you making in AVP in

20  2017 and 2018?

21       A.    I was making about a thousand dollars

22  a week.

23       Q.    Okay.  And during the period of time

24  2013 to 2018, did you look for any other

25  employment?
```