# EXHIBIT 5

```
 1                  - RAMI KRANZ -

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    --------------------------------X

 5    RAFAEL FOX, ET AL.,

 6                   Plaintiffs,

 7              v.              CIVIL CASE NO.

 8                        1:19-CV-04650-AJN-SN

 9

10    STARBUCKS CORPORATION,

11                   Defendant.

12    --------------------------------X

13    DATE:  September 15, 2020

14    TIME:  10:00 A.M.

15

16              VIDEOCONFERENCE DEPOSITION OF RAMI

17    KRANZ, pursuant to Notice, before Hope Menaker, a

18    Shorthand Reporter and Notary Public of the State

19    of New York.

20

21

22

23

24

25
```

```
 1                  - RAMI KRANZ -

 2         Q.     What year did you complete that

 3    course?

 4         A.     I completed that in the year 2019.

 5    I've done it twice, actually.  It was 2019 and

 6    2004 is the first time -- not '4, sorry.  2014.

 7         Q.     Does the HACCP certificate also

 8    include education on pesticides and their use with

 9    food?

10         A.     Only for the source of contamination.

11         Q.     If you describe -- you touched on it,

12    but could you describe generally what your current

13    duties are in your position as regional quality

14    assurance?

15         A.     So my duties and my role and

16    responsibility is really to ensure that our stores

17    maintain the Starbucks policies, the Starbucks

18    standards to liaise with the food for the health

19    inspectors at the Department of Health, to liaise

20    with the Department of Agriculture and any other

21    department I think that will, you know, evolve

22    around food safety.

23                I'm also considered more of a

24    consultant for the operations team on food safety

25    matters, cleanliness, and anything to do with the
```

```
 1               - RAMI KRANZ -

 2      newly transferred to it so I was not talking

 3      about -- when I mean opportunities, I mean with

 4      the Starbucks language that's just deficiencies

 5      that we see, deficiencies in standards that

 6      they're not upholding.  So we were more talking

 7      about and coaching Rafael on how to get the store

 8      back into standard, seeing that he was just newly

 9      transferred into it.

10          Q.     Did you have any discussion about

11      pesticides or pest control?

12          A.     We had discussion about fruit flies

13      because they were still having some fruit fly

14      issues then, but nothing about pesticides.

15          Q.     Did you ever have any communication,

16      as best you can remember, with Mr. Fox concerning

17      Hot Shots or DDVP?

18          A.     So one-on-one conversation with him,

19      I don't recall.  I don't remember any e-mails, you

20      know, phone calls with him.  If he was in one of

21      the shift supervisor workshops, then possibly, but

22      I don't remember if he attended any; and I don't

23      believe I attended the huddles with him either.

24          Q.     Does Starbucks have a policy that

25      bears on permissibility of Hot Shots in its
```

```
 1                  - RAMI KRANZ -

 2   stores?

 3        A.    Absolutely.  So in the food safety

 4   manual, it states clearly that the store

 5   manager or our partners are prohibited to use any

 6   pesticides and that only the pest vendors can use

 7   them.

 8        Q.    Are there any exceptions to that

 9   policy?

10        A.    I don't believe so, no.

11        Q.    Is the food safety manual something

12   that's made available to all store employees?

13        A.    Yes, it is.

14        Q.    As to the best of your memory as you

15   sit here today have any pesticides, to your

16   knowledge, been applied in Starbucks stores by

17   Starbucks personnel apart from the one Hot Shot

18   incident that you referred to?

19             MR. MOY:  Objection.

20        A.    So through my duties and my days with

21   the district managers we had seen from time to

22   time different types of products, yes.

23        Q.    What types of products, if you could

24   just name as many as you're aware of, that you are

25   aware have been used by employees in stores?
```

```
 1                  - RAMI KRANZ -

 2        A.     Apple Cider Vinegar is one product,

 3   you know, that I've seen used.  You know, I have

 4   seen, you know, some -- I don't remember.  No,

 5   Apple Cider Vinegar has mainly been the one

 6   outside of what you've asked for.

 7        Q.     What about CB-80, is that a chemical

 8   that you're familiar with?

 9        A.     I'm very familiar with CB-80.

10        Q.     What is it?

11        A.     CB-80 is a pesticide localized spray.

12        Q.     Is that something, to your knowledge,

13   that has been used by employees in Starbucks

14   stores?

15             MR. MOY:  Objection.

16        A.     I believe it could be, yes.

17        Q.     Did any Starbucks employee ever

18   communicate to you that they were using CB-80 in

19   Starbucks stores?

20        A.     To the best of my knowledge, I don't

21   recall.  It something I'll have go through and

22   check.

23        Q.     Would it be permissible for employees

24   of Starbucks to use the CB-80 in Starbucks stores?

25        A.     No, it would not.
```

```
 1                   - RAMI KRANZ -

 2        Q.     If an employee, say a store manager,

 3   were to inform you that they intend to use CB-80

 4   in a store, is there anything in your role as

 5   quality assurance manager that you would typically

 6   say to guide such an employee in their practices?

 7             MR. MOY:  Objection.

 8        A.     Yes, there would.

 9        Q.     What would that be?

10        A.     I would remind them of the food

11   safety manual and the Starbucks protocol.

12        Q.     Did you ever encourage any Starbucks

13   employees to use any pesticide in an unapproved

14   manner in Starbucks stores?

15        A.     What do you mean by "an unapproved

16   manner"?

17        Q.     I understood that employees are not

18   to use pesticides in Starbucks stores; is that

19   correct?

20        A.     That's correct.

21        Q.     Is there any manner in which it is

22   permissible for employees to use pesticides in

23   Starbucks stores?

24        A.     No, there isn't.

25        Q.     Did you ever direct any Starbucks
```

```
 1                    - RAMI KRANZ -

 2     employees to use pesticides in Starbucks stores?

 3          A.     I have once, yes.

 4          Q.     When was that?

 5          A.     Possibly 2013/2014.  Possibly around

 6     there.  I don't recall the exact date or year.

 7          Q.     Could you describe that circumstance

 8     or context you're referring to?

 9          A.     So there was house flies in the

10     store which is not a cleanliness issue and there

11     was -- and that was my solution at the time, but I

12     was wrong and I admitted it.

13          Q.     Who did you direct to do what in

14     connection with house flies on that occasion?

15          A.     I spoke with the regional director

16     and discussed it with them, but then afterwards we

17     discussed it again and again and I would reiterate

18     that I was wrong, right, and that I didn't follow

19     the Starbucks policy at that time and that's when

20     we stopped it, too.

21          Q.     What was the particular chemical at

22     issue then?

23          A.     CB-80.

24          Q.     Did you know at the time that you

25     encouraged the use of CB-80 that it was not
```

```
 1                    - RAMI KRANZ -

 2    consistent with Starbucks policy?

 3              MR. MOY:  Objection.

 4        A.    Was I fully aware?  I was aware,

 5    which is why I said I was wrong.

 6        Q.    Well, why did you choose to direct

 7    employees to use CB-80?

 8        A.    Because I was trying to solve the

 9    problem, but I did it in the wrong manner and I

10    learned my lesson from it.

11        Q.    Subsequent to that event, did you

12    ever have any communications with any Starbucks

13    employees about the use of CB-80 in Starbucks

14    stores?

15        A.    I have had communication with

16    Starbucks employees about the use of it and that

17    they shouldn't be using it.

18        Q.    What is the danger -- withdrawn.

19              To your understanding, what is the

20    reason why CB-80 is not allowed in Starbucks

21    stores?

22              MR. MOY:  Objection.

23        A.    Because Starbucks employees are not

24    allowed to use any pesticides according to the

25    food safety manual.
```

```
 1                      - RAMI KRANZ -

 2        Q.     Going back to this instance with the

 3    CB-80 and you recognized that you were wrong, was

 4    there a person who brought it to your attention

 5    that the use of CB-80 was not consistent with

 6    Starbucks policy?

 7        A.     No, it was just my attention

 8    that it was a possibility that if I didn't, more

 9    employees would then go against the Starbucks

10    policies which was not for me to be encouraging.

11    I was meant to uphold the policies and that was

12    the mistake and the lesson that I learned.

13        Q.     In what form did you the encourage

14    employees to use CB-80; that is, was it spoken

15    words, was it an e-mail, something else?

16        A.     I believe it was spoken words.

17        Q.     How long after you spoke those words

18    did you finish the thought process and realize

19    that this may be a problem and correct your

20    guidance to those employees?

21        A.     It wasn't that long after.

22        Q.     Was it the same day?

23        A.     No, it was not the same day; but I

24    couldn't tell you exactly how many days or weeks

25    or months; but it certainly wasn't a long time.
```

```
 1                    - RAMI KRANZ -

 2         Q.     What was the location specifically?

 3         A.     I couldn't tell you without looking

 4    back in my records.

 5         Q.     Do you remember who any of the

 6    employees involved were?

 7         A.     Not at this time.  We're talking many

 8    years ago.

 9         Q.     Did you give any guidance to the

10    employees on that occasion as to how to go about

11    procuring the CB-80?  In other words, did you tell

12    them where to buy it, did you tell them whose

13    money to use, anything like that?

14                MR. MOY:  Objection.

15         A.     The money used, I don't know anything

16    about.  Where to buy it, no, I didn't.  It's not

17    that I remember that I did.

18         Q.     As far as you know, did the employees

19    actually use the CB-80 between the time when you

20    encouraged it and the time you corrected yourself?

21         A.     I --

22                MR. MOY:  Objection.

23         A.     I did not observe it.

24         Q.     Did anybody inform you that in that

25    interval it had been used?
```

```
1                    - RAMI KRANZ -

2         A.     No, they did not.

3         Q.     Did you ask?

4         A.     No, I did not.

5         Q.     Was there a particular reason why you

6    didn't ask to confirm if it had been used or not?

7         A.     Yeah, there was no reason.  I just

8    didn't follow up on it.  So if the issue was still

9    persistent, they would have contacted me.

10        Q.     Other than what you've already

11   mentioned, can you recall any other interactions

12   or communications with Rafael Fox?

13        A.     No, I can't.

14        Q.     What about with Jill Shwiner?

15        A.     Joel or Jill?

16        Q.     Jill.

17        A.     Jill, yes.

18        Q.     In what context did you interact with

19   her?

20        A.     I -- I've interacted with Jill via

21   phone, e-mail, and I've toured with Jill as well.

22   I must have met her at stores, too.

23        Q.     And Paul D'Auria?

24        A.     Paul, I don't remember if I met him

25   once when I was touring with a -- with Jill or
```

```
 1                    - RAMI KRANZ -

 2    not; but I do remember that someone came over and

 3    I think needed -- someone needed to drop something

 4    off to her, so -- but I'm not sure if I recall

 5    meeting him or not.

 6         Q.     Did you exchange e-mails with him,

 7    that you can remember?

 8         A.     With Paul, no.  Only with Jill.

 9         Q.     Did you have an understanding of what

10    Paul's job was in connection with Starbucks?

11         A.     Paul worked for AVP as a pest

12    applicator.

13         Q.     Is a pest applicator the same as a

14    pest control technician?

15         A.     Uh-huh, yes.

16         Q.     Is one of them more official than the

17    other or are those interchangeable words?

18         A.     Interchangeable words.

19         Q.     What was AVP's role in connection

20    with your work in Starbucks?

21         A.     So my connection -- AVP's role with

22    my connection in Starbucks is that -- as I said,

23    my role and responsibility dealt with the Health

24    Department.  The Health Department deals with pest

25    issues, so in a way my role overlaps slightly with
```

1                    - RAMI KRANZ -

2    facilities when it comes to pest issues.

3         Q.    Was it your understanding that AVP

4    was contracted to provide pest control services at

5    certain Starbucks stores in Manhattan?

6         A.    Yes, it was.

7         Q.    Do you know during what period of

8    years within your tenure they provided those

9    services?

10        A.    I couldn't be -- I couldn't tell you

11   exactly what period.  I don't manage in those

12   facilities.

13        Q.    Who was the -- who do you believe is

14   the most likely person to have been responsible

15   for managing them in facilities, is there an

16   individual?

17             MR. MOY:  Objection.

18        A.    It would have been the facility

19   manager and the senior facility manager.

20        Q.    In your role as quality assurance

21   director, did you ever provide instructions or

22   directions to AVP concerning how they do their

23   jobs?

24             MR. MOY:  Objection.

25        A.    So I've -- I spoke with Jill quite a

                        - RAMI KRANZ -

1

2    few times and, yes, we discussed treatment

3    options.

4         Q.    Did you ever have involvement in the

5    decision to discontinue AVP services at Starbucks?

6         A.    Again, the facility -- the senior

7    facility manager manages that vendor, so I have no

8    decision in that process at all.

9         Q.    Do you know who replaced AVP at the

10   stores in Manhattan?

11        A.    There has been a few different

12   companies, but who replaced AVP in certain stores

13   again I don't know.

14        Q.    As far as you know, has any outside

15   pest control vendor ever been determined to have

16   placed Hot Shots in stores?

17        A.    I remember Ecolab, but I'm not sure

18   if it was Hot Shots per se.  I've got to -- again,

19   I'm not a hundred percent sure.

20        Q.    Is Eco -- I'm sorry, I didn't mean to

21   speak over you if you were still answering.

22        A.    No, go ahead.

23        Q.    Is Ecolab a pest control vendor?

24        A.    Ecolab was our pest control vendor,

25   yes.

```
 1                    - RAMI KRANZ -

 2          Q.     Is there something that you're

 3      familiar with called EcoSure?

 4          A.     Yes, absolutely.

 5          Q.     What is that?

 6          A.     EcoSure is our third-party auditor.

 7      So the QA, the quality assurance team, we manage

 8      EcoSure.

 9          Q.     Could you describe the process of

10      their audits; what's they're auditing for, how

11      often they do it?

12          A.     So it has changed, but when I first

13      started with Starbucks they audited the stores

14      twice a year; and they're auditing it, again, on

15      our facilities' cleanliness and food safety

16      standards.

17          Q.     Would they generate a report of some

18      sort for the stores that they audited?

19          A.     Yes, they do.

20          Q.     Is that --

21          A.     Pardon me?

22          Q.     I -- I made a mistake again.  I

23      started talking before you had completely

24      finished.  I'd -- I would like to get your full

25      answers.
```

```
 1                    - RAMI KRANZ -

 2        A.     They do generate a report.  They used

 3   to print it up and hand it to the store onsite.

 4        Q.     Would that also be sent to your

 5   attention?

 6        A.     No.  Back then it wasn't sent to my

 7   attention, but I had access to the Ecolab and

 8   EcoSure website where I routinely went in there

 9   and looked at them.

10        Q.     And then at some point did that

11   change in terms of handing it to store managers

12   and you're looking up in the database?

13        A.     The system did change.  We went

14   digital, so they no longer printed it up.  They

15   just e-mail in 24 hours and I'm part of that

16   e-mail chain.

17        Q.     Do you review the audits that are

18   e-mailed to you?

19        A.     I don't review every single one, but

20   I do pull reports every month.

21        Q.     Has EcoSure noted or cited any of the

22   Starbucks stores in Manhattan for improper

23   pesticide use, as far as you know?

24        A.     I would have to go back and check the

25   reports, but from my memory right now I couldn't
```

September 15, 2020                              76

```
 1                    - RAMI KRANZ -

 2     tell you.

 3         Q.    Do you have any memory of being

 4     involved at all in following up on any information

 5     from EcoSure about the use of pesticide in

 6     Starbucks stores?

 7         A.    No, I don't remember following up.  I

 8     don't remember reading it, but without going back

 9     and checking it so -- I mean, we're talking about

10     seven years' worth now.

11         Q.    I'm going to post another exhibit,

12     this one is labeled Exhibit Kranz 47.  It's a

13     two-page document Bates numbered DEF 17223 to 24.

14     When I post it, Mr. Kranz, I would ask that you

15     open it and begin reviewing it while the court

16     reporter does the marking.

17         A.    Understood.

18               (Whereupon, Kranz Exhibit 47 was

19         marked at this time.)

20         A.    Okay.

21         Q.    First of all, I will note for the

22     record it appears to me, I don't want to be hiding

23     the ball, you were cc'd on the e-mail at the top

24     which was the end of the chain.

25         A.    Okay.
```

```
1                  - RAMI KRANZ -

2        Q.    Do you recall receiving this e-mail?

3        A.    I actually don't recall receiving

4    this e-mail.

5        Q.    The e-mail that starts around the

6    middle of the first page was addressed by

7    Jillavptermite@aol.com on September 15, 2016 to a

8    Margaret Kis, do you know who that person is?

9        A.    Yes, I know Margaret Kis.

10       Q.    What position did she have in 2016,

11   if you know?

12       A.    She's a facilities manager and she

13   was back then too.

14       Q.    In that e-mail it starts "Hi,

15   Margaret.  I just got a call from Paul.  He was

16   about to service Store 15359 and noticed they were

17   locking up, so he waited for them to leave.  He

18   then entered the store and walked into a face full

19   of two bug bombs the store had just set off.  The

20   store had no warning signs posted and also did not

21   cover any surfaces, so everything including food,

22   utensils, equipment should be washed down and any

23   food products condiments should be disposed of."

24              Mr. Kranz, do you have an

25   understanding maybe in the industry what a bug
```

```
 1                    - RAMI KRANZ -

 2     bomb is?  Does that have a standardized meaning?

 3                    MR. MOY:  Objection.

 4          A.     I can only tell you from my

 5     experience about what that means.

 6          Q.     What does it mean in your experience?

 7          A.     In my experience would be a can that

 8     you set and it disperses a pesticide.

 9          Q.     Are there any devices like that that

10     are permissible for employees to use in Starbucks

11     stores?

12          A.     No, there is not.

13          Q.     I know you've indicated you don't

14     remember the specific e-mail.  Do you remember the

15     events that are described in the e-mail, at least

16     the part that I read?

17          A.     No, I don't.

18          Q.     Do you have any information at all

19     about whether there was or wasn't any followup on

20     this particular e-mail?

21          A.     I couldn't tell you.  I -- I don't

22     even remember the incident happening.  I don't

23     remember the e-mail.  Sorry.

24          Q.     In that case, we can put it aside.

25          A.     Okay.
```

```
 1                    - RAMI KRANZ -

 2         Q.     I've just posted a document labeled

 3    Exhibit Kranz 2.  It's a one-page document Bates

 4    number Defendant 1371.  And again, Mr. Kranz, if

 5    you can, open it and read it while the court

 6    reporter marks it.

 7                  (Whereupon, Kranz Exhibit 2 was

 8         marked at this time.)

 9         A.     Okay.

10         Q.     Mr. Kranz, do you remember this

11    e-mail chain?

12         A.     I remember the incident, yes.

13         Q.     What do you remember of this

14    incident, if you could describe in your own words?

15         A.     So the store -- I don't remember all

16    the violations.  The store failed Department of

17    Health.  I don't remember all the violations, but

18    I do remember there was a rodent issue and that

19    was one of the citations that they got.

20         Q.     Toward the top, but not the very

21    first, the second e-mail in the chain is sent on

22    November 22nd, 2016, 8:36 a.m., Rami Kranz, and

23    there's an e-mail address.  Is that your Starbucks

24    e-mail address?

25         A.     That is, yes.
```

```
1                    - RAMI KRANZ -

2          Q.    Do you recognize the text below that

3     as an e-mail that you wrote?

4          A.    Yes, I do.

5          Q.    A couple of questions about some of

6     the language in the bullet.  The second to the

7     last bullet in that e-mail you wrote, "We are

8     restricted to what we can do legally."  Could you

9     explain what you're referring to?

10         A.    Absolutely.  So we weren't allowed to

11    use any pesticide, but I did have a plan that I

12    learned when I was in Victoria Fine Foods from the

13    pest control technician there, but that plan was

14    not something that we could do before the

15    Department of Health reinspected us.

16               So the plan basically was set up 20

17    snap traps, bait them but not set them, and wait

18    for the seven days and let the rodents get used to

19    eating out of those snap traps, and then on the

20    seventh date we bait them and we set them and then

21    you catch everything in the store; but again they

22    were on a high risk of a second audit, so it was

23    not something -- so we did not have the time for

24    it which is what that bullet was, we were

25    restricted with what we could do legally, you
```

```
 1                      - RAMI KRANZ -

 2      know; but if you read at the top too, you know,

 3      "We can step up pest control to daily."

 4                      So, you know, I spoke about and I

 5      coached Selena, who was the district manager,

 6      right, on maintaining a high level of cleanliness

 7      in the store, right, maintaining the Starbucks

 8      procedures, Starbucks policy, you know, of how to

 9      keep the stores, right, especially under the

10      counter.  So what we were trying to do is we're

11      trying to help pest control by keeping the store

12      clean.

13          Q.    Could I ask you to read for the

14      record the last bullet, the one immediately after

15      the one I just read.

16          A.    "After the inspection, I have a plan

17      with Selena to raise this to drastic levels and

18      deal with the rodent issues."

19          Q.    What are you referring to in that

20      bullet?

21          A.    I'm referring to my plan with the

22      snap traps.  So that we were going to set up 20

23      snap traps, bait them but not set them, get the

24      rodents used to eating off of them, and then on

25      the seventh day we bait and we set them all off,
```

```
 1                   - RAMI KRANZ -

 2    and -- set the snap traps and then we'll catch

 3    everything.  That's the drastic levels that we can

 4    do because I was actually going to ask not only

 5    pest control, but ask that the store partners

 6    don't dispose of them either, the snap traps that

 7    is.

 8         Q.    Are store partners allowed to

 9    manipulate or remove or move pest control devices

10    placed by vendors?

11               MR. MOY:  Objection.

12         A.    You're asking me are they allowed?

13         Q.    Yes.  So I understood from your prior

14    answers, they're not allowed to place such

15    devices.  I'm asking:  Are they allowed to modify

16    them or move them or touch them?

17         A.    There's no regulation on --

18               MR. MOY:  Objection.

19         A.    There's no regulation about that, so

20    it's -- in the process of cleaning if they happen

21    to damage one, yes, they can throw it out.

22         Q.    Is that a written policy?

23         A.    No.  That's what I said, there's no

24    policy on that.  We're not allowed to use any

25    pesticides, but there's no policy on what happens
```

```
 1                  - RAMI KRANZ -

 2     if we -- you know, we see a snap trap that gets

 3     caught in a broom, you know, when you're sweeping

 4     underneath.

 5          Q.    When that happens, is there any

 6     direction or guidance as far as what employees

 7     should due to notify anyone or there's just no

 8     policy there?

 9                MR. MOY:  Objection.

10          A.    So officially, no, there isn't.  What

11     I would coach is that just put it to the side and

12     leave a note for the pest vendors and let them

13     know, you know, where it is; and that's if we're

14     talking snap traps, just to be clear.

15          Q.    With respect to Hot Shots if an

16     employee at a store discovers that a Hot Shot is

17     present, do you know if Starbucks has any rules or

18     guidelines as to what that employee should do?

19          A.    There are no rules or guidelines

20     because we're not allowed to put the pesticide

21     there.

22          Q.    So if an employee sees that it is

23     there --

24          A.    Yes.

25          Q.    -- to your understanding is there a
```

1                    - RAMI KRANZ -

2      process they're supposed to initiate?

3          A.    I haven't seen a process officially

4      in any of the -- in any of the Starbucks

5      guidelines, no.

6          Q.    Have you ever given instructions to

7      employees as to how they should respond if they

8      discover such a device in their store?

9          A.    When asked by operations, my

10     advice has always been grab a rubbish bag, grab

11     the -- you know, the pesticide, put it in, you

12     know, holding the rubbish bag, tie a knot, and

13     dispose of it in the rubbish bin.

14         Q.    Are there any legal or Health

15     Department standards that bear on how to

16     permissibly safely dispose of Hot Shots?

17         A.    There are legal requirements, but not

18     Health Department requirements.  It's the Label

19     law.  So on the label of the product would tell

20     you how to dispose of them.

21         Q.    And you just referred to or used a

22     phrase "label law" and what are you referring to,

23     what is that phrase?

24         A.    On all pesticides, there's a label;

25     and any pest control technician, you know, when

```
 1                    - RAMI KRANZ -

 2    you go through the course will learn that the

 3    label is the law that you have to follow.

 4         Q.     With respect to Hot Shots as far as

 5    you can remember as you sit here today, did the

 6    label give any guidance on safe disposal?

 7                 MR. MOY:  Objection.

 8         A.     I believe it has to so, yes; and from

 9    my memory from back then, you were safe to dispose

10    of in the regular like rubbish bin.

11         Q.     Is that still your understanding as

12    you sit here today, that it's safe to just throw

13    it in the trash?

14         A.     I believe so.  I mean, I'll have to

15    review the label to, you know, determine a hundred

16    percent, but I do remember that it was safe to

17    dispose of in the rubbish bin, you know.

18         Q.     Are there other pesticides that

19    you're familiar with having been used at Starbucks

20    stores in Manhattan that are not safely disposable

21    in normal garbage bins?

22         A.     Not that I know of.

23                 MR. MOY:  Objection.

24         Q.     Are there any restrictions, that you

25    know of, on how to dispose of CB-80?
```

```
 1                    - RAMI KRANZ -

 2         A.     I don't remember if there are or not.

 3    I'll have to look at the label to refresh my

 4    memory.

 5         Q.     I'm posting another document.  This

 6    is Exhibit Kranz 46.  It is a three-page e-mail

 7    chain bearing Bates numbers DEF 126 to 128.  I

 8    again ask you, Mr. Kranz, if you could open and

 9    review the document while the court reporter marks

10    it and let me know when you're done.

11         A.     Okay.

12                (Whereupon, Kranz Exhibit 46 was

13         marked at this time.)

14         A.     I'm good.

15         Q.     Mr. Kranz, do you recognize all or

16    any part of this document?

17         A.     I do.

18         Q.     Do you recall having seen this chain

19    at or about the date that it was sent -- actually,

20    let me break it down a little bit more.

21                On the first page, on the top half of

22    the page this appears -- please correct me, it

23    appears to be an e-mail to you from the company's

24    inhouse counsel on February 26, 2019.  The body

25    says, "Stephen Gallant on 8/2016."  Was that just
```

```
 1                    - RAMI KRANZ -

 2      you forwarding the e-mail chain to company

 3      counsel?

 4           A.     That is correct upon a request, yeah.

 5           Q.     Okay, and I don't want to talk about

 6      counsel.

 7                  Let's jump down though to the

 8      original chain that you forwarded, which is from

 9      Stephen Gallant on August 2nd, 2016 to you

10      "Subject:  Forward to Dichlorvos No-Pest Strips."

11      Mr. Kranz, do you remember from this point to the

12      bottom having received and read it on or about

13      August 2nd, 2016?

14           A.     I remember receiving this e-mail,

15      yes, and the other e-mail, correct.

16           Q.     Stephen's e-mail states "Rami, we

17      have passed on to ops not to use these pest

18      strips.  It might have more weight coming from

19      you.  Stephen Gallant."  Mr. Kranz, do you have an

20      understanding about what he meant as far as "have

21      more weight coming from you."

22           A.     So I can't --

23                  MR. MOY:  Objection.

24           A.     So I can't say exactly what Stephen,

25      you know, was thinking back then.  I can tell you
```

 1                    - RAMI KRANZ -

 2      from my side of the story what I -- what I saw

 3      when I first started with Starbucks.  I can

 4      explain that, but I can't tell you what Stephen

 5      was writing.

 6           Q.    Of course I'm asking for what your

 7      interpretation was in your own mind as you read

 8      his words.

 9           A.    So facilities went through a change

10      around 2017, and what I mean by "a change" was

11      when I was started with Starbucks they -- they

12      didn't have the -- they didn't have the voice with

13      the operations team like QA did at the time.  So I

14      know that -- I know that, you know, especially

15      when it came to Health Department issues, you

16      know, I had more voice with operations, but that's

17      my side; so what he meant by "more weight" I'm not

18      sure, but I know what I saw when I first started.

19           Q.    Did you understand that Mr. Gallant

20      was asking you to do anything in particular?

21           A.    What I understood was Mr. Gallant

22      just wanted me to emphasize, you know, the point

23      that he made with the operation leadership team.

24      That was my understanding of it.

25           Q.    Did you do that?

```
 1                  - RAMI KRANZ -

 2        A.     Absolutely.  I -- I was on the

 3   leadership team every -- every week, so every

 4   Monday I met with the regional vice president and

 5   the four HDs at the time.  I'd -- the assistant

 6   was also there and I brought this up and I

 7   mentioned it; and then Ross also, you know,

 8   emphasized the point where he did not want to see

 9   anything and that's what started, you know,

10   everything.  That's what started me, you know,

11   joining the regional directors huddle with their

12   district managers and emphasizing the point and

13   then the regional director emphasizing it again on

14   top of me.

15              I also joined, you know, some

16   district manager huddles, not all of them, where

17   we emphasized the point to the store managers; and

18   I also included into the shift safety workshops

19   that I did once a month and we emphasized it there

20   as well.

21              So, I mean, the minute it was brought

22   to our attention, I mean, we really -- you know,

23   we really took it as very serious and we started

24   speaking to everyone, and I can tell you the

25   leadership team was all onboard about getting the
```

```
 1                    - RAMI KRANZ -

 2     message out and not to use this at all.

 3          Q.     And within what period of time had

 4     those actions resolved the problem of Hot Shots in

 5     stores?

 6                 MR. MOY:  Objection.

 7          A.     I can't tell you.  It says Tuesday,

 8     so it would have already started that following

 9     Monday.  So I would have spoken to them, but the

10     official meeting would have been on Monday and

11     that's -- it just started and then every week,

12     I -- I was bringing it up just to make sure that

13     it was emphasized.

14          Q.     At some point in the course of doing

15     all of that emphasis, did you feel confident that

16     the message had gotten through and that the

17     problem was handled?

18          A.     I felt confident that the message had

19     got through.  That the problem was solved, I

20     can't -- I couldn't answer that because I don't go

21     into -- I'm confident that the message got

22     through.  I can't be confident that the problem

23     was resolved because I wasn't in every store to

24     follow up.  I was only in select          stores

25     with the district managers and some   direct --
```

```
 1                  - RAMI KRANZ -

 2    regional directors.

 3         Q.    Did you make any inquiries of anyone

 4    in operations or elsewhere at the company to

 5    ascertain whether --

 6               MR. GRAFF:  Let's go off the record.

 7               (Whereupon, a brief discussion was

 8         held off record.)

 9         Q.    Mr. Kranz, before the stretch break I

10    had been asking you whether you ever followed up

11    with operations management to determine whether

12    your efforts to spread the word about Hot Shots

13    had been successful.  Did you make such inquiries?

14         A.    Well, with the district managers I

15    spoke to them about it.  I spoke to -- with the

16    regional directors during our one on ones.

17         Q.    Did they advise you that Hot Shots

18    had been resolved as a going problem?

19               MR. MOY:  Objection.

20         A.    They advised me that -- that they'd

21    been speaking about it and it was a priority to

22    them and that they'd been speaking about it with

23    their team and advised their team to keep, you

24    know, pushing it down all the way down to the

25    barista level and advised everyone it was not
```

```
 1                 - RAMI KRANZ -

 2     Starbucks standards to use them.

 3         Q.    Was there ever any communication that

 4     you were a part of about whether efforts that were

 5     being made were sufficient to deter the misuse of

 6     Hot Shots in stores?

 7              MR. MOY:  Objection.

 8         A.    I remember one e-mail from Ron

 9     Schuler who was a regional director that confirmed

10     that the message was being handed out; and it was

11     also not an e-mail, but in the leadership team,

12     you know, I also got confirmation that they'd been

13     mentioning it with their team every time the

14     regional directors were out in stores.

15         Q.    Do you have any information from any

16     source as to whether anyone at the company ever

17     conducted an investigation to determine the origin

18     of any particular Hot Shot in the Starbucks store?

19              MR. MOY:  Objection.

20         A.    Can you just repeat that one more

21     time, please; do I have any --

22         Q.    I'll ask something different.  As

23     far as you know, did Starbucks ever identify

24     specifically any individual who had placed a Hot

25     Shot in a store?
```

```
 1                    - RAMI KRANZ -

 2               MR. MOY:  Objection.

 3          A.     That's out of my role and

 4     responsibilities, so that's part of operations.

 5     I'm not privy to that information.

 6          Q.     In terms of what has been

 7     communicated to you, if anything, in the course of

 8     your work, to your knowledge has Starbucks

 9     identified who was responsible for placing any

10     particular Hot Shot in a store?

11          A.     Again, it's not my role and

12     responsibility so, no, I'm not part of that chain.

13     They wouldn't be telling me.  I'm a coach or a

14     consultant to them on food safety issues,

15     cleanliness issues, Health Department issues,

16     pests because that overlaps with the Health

17     Department and facilities.  So I'm a coach and

18     consultant, but I don't know anything more

19     about if they've identified anything.

20     It -- it's not part of my role and

21     responsibility.

22          Q.     Did anyone ever communicate to you

23     that they were unable to determine who was

24     responsible for placing a Hot Shot in the store?

25               MR. MOY:  Objection.
```

```
 1                  - RAMI KRANZ -

 2         A.      I don't recall, but it's -- I really

 3    don't recall.  It's possible, but again I may have

 4    been on an e-mail chain; but that's what I don't

 5    recall.

 6         Q.      Turning back into the document, we

 7    had been looking at the e-mail that Jill Shwiner

 8    sent on August 1st, 2016 that's on the second page

 9    of this exhibit.

10         A.      Yes, 2016, here you go.  Yes.

11         Q.      Jill wrote -- in the first long

12    paragraph Ms. Shwiner wrote, "We occasionally find

13    them, Hot Shots, in some stores but recently there

14    has been an increase in the amount of stores we

15    find them in."

16                 Mr. Kranz, did you ever reach out to

17    Ms. Shwiner to get any further information about

18    where she was finding Hot Shots?

19         A.      I have spoken to Jill about that and

20    Jill e-mailed me and we've spoken about it, yes.

21         Q.      Okay, and when you were forwarded

22    this e-mail where she said "recently there has

23    been an increase in the amount of stores we find

24    them in," did you discuss that specific statement

25    in her e-mail with her at or around the time you
```

```
 1                     - RAMI KRANZ -

 2      read it?

 3           A.    I don't recall if I had a

 4      conversation specifically regarding that with Jill

 5      around that time.  I do recall, though, that I did

 6      have a specific conversation about that with the

 7      operation leadership team.

 8           Q.    The next paragraph begins, "We

 9      generally find them on top of the cabinets or

10      below the FOH counters."  In this context, do you

11      know what "FOH" refers to?

12           A.    Front of house.

13           Q.    On the occasion that you had been

14      relating when you were present and watched the

15      health inspector conduct an inspection in the

16      store, did the inspector get up on a ladder and

17      look above the tops of cabinets as part of the

18      inspection that you observed?

19           A.    The heath inspector had not gone on

20      top of ladders that I've ever seen.

21           Q.    What about under the front of house

22      sink; was any part of the inspection that you

23      observed focused on that?

24           A.    Absolutely.

25           Q.    After this e-mail, when is the next
```

```
 1                    - RAMI KRANZ -

 2     specific time that you can remember being informed

 3     that a Hot Shot had again been found in a store?

 4          A.     I can't recall.  I mean, this

 5     is -- this is actually more than four years ago.

 6     I don't recall specifically what time or the date.

 7          Q.     Do you believe that there were

 8     subsequent occasions where you were told about Hot

 9     Shots in stores beyond the date of this e-mail?

10          A.     By who?

11          Q.     Anyone.

12          A.     Yes.

13          Q.     Was that something that you would be

14     notified about periodically, but on a relatively

15     consistent ongoing basis or something else?

16               MR. MOY:  Objection.

17          A.     No, it was not something that I was

18     regularly informed of.

19          Q.     Did you, yourself, come to the

20     conclusion or form a belief that the problem was

21     at any point in time waxing or weaning in terms of

22     its severity?

23               MR. MOY:  Objection.

24          A.     I hadn't come to that conclusion.  I

25     actually haven't come to any conclusion.  When I
```

```
1                    - RAMI KRANZ -

2      was in stores with district managers and regional

3      directors, I was still keeping an eye out for it.

4      I still do today.

5              Q.    Have you personally observed a Hot

6      Shot in a store while physically there?

7              A.    Yes, I have.

8              Q.    When is the most recent time?

9              A.    I have not found one in -- that I can

10     recall in probably about two-and-a-half, three

11     years.

12             Q.    So, approximately, do you remember

13     the month or year of the last time?

14             A.    Not at all.

15             Q.    Do you remember where you found it?

16             A.    No, don't even remember that.  It's

17     been that long ago.

18             Q.    Do you remember any other occasions

19     when you personally observed a Hot Shot in a

20     Starbucks store?

21             A.    There has been a couple of occasions

22     where I found them personally, yes.

23             Q.    When is the most recent occasion,

24     that you can remember?

25             A.    That was what I just recalled that I
```

```
 1                    - RAMI KRANZ -

 2     just spoke to you about.  It was about two years

 3     ago, two-and-a-half years ago.

 4          Q.     And you don't remember the store

 5     location specifically?

 6          A.     No, I go to a lot of stores.  I don't

 7     remember the store location or where I even like

 8     found it in the store.  It's that long ago.

 9          Q.     Do you remember what, if anything,

10     you did when you found it?

11          A.     Absolutely.  I contacted Tracy

12     straightaway.  The district manager was there and

13     I contacted the regional director, right, and just

14     informed them.

15               MR. MOY:  Can you clarify who Tracy

16          is.

17               THE WITNESS:  Oh, Tracy is the

18          regional vice president.  She took over after

19          Ross Shadix left.

20          A.     One thing that I'd like to add too

21     that the last one that I found about two,

22     two-and-a-half years ago was very old.  It had a

23     lot of dust on it.

24          Q.     Have you ever personally -- apart

25     from the one occasion we talked about early on in
```

```
 1                    - RAMI KRANZ -

 2     your tenure where you had encouraged CB-80,

 3     putting that aside --

 4                MR. MOY:  Objection.

 5                MR. GRAFF:  That wasn't a question.

 6          Q.     -- did you at any point yourself

 7     observe CB-80 present in any Starbucks store?

 8          A.     No, I haven't.

 9          Q.     Is that something you also check for

10     on your store visits?

11          A.     Part of our store visits and back

12     in -- prior to 2018 we were looking for

13     unauthorized -- like unauthorized chemicals, and

14     that's not just pesticides.  That could also be

15     Ice Melt that wasn't purchased from Starbucks, it

16     could be Apple Cider Vinegar.  Anything we haven't

17     purchased from Starbucks is considered an

18     unauthorized chemical.

19          Q.     Are you familiar with a product

20     called D-Force?

21          A.     Yes.

22          Q.     What is it?

23          A.     D-Force is very similar to CB-80 in

24     that it's an aerosol pesticide.

25          Q.     Did EcoSure ever in its audits make
```

```
 1                  - RAMI KRANZ -

 2      any notations about the use of CB-80 in Starbucks

 3      stores?

 4            A.     Not that I observed.

 5            Q.     Is that something that EcoSure would

 6      generally, as part of their audits, be on the

 7      lookout for?

 8                  MR. MOY:  Objection.

 9            A.     They would also be looking out for

10      unapproved products.

11            Q.     I'm posting a two-page document

12      marked Exhibit Kranz 15 bearing Bates numbers DEF

13      139 to 140.

14                  (Whereupon, Kranz Exhibit 15 was

15            marked at this time.)

16            Q.     Mr. Kranz, do you recognize this

17      document?

18            A.     Yes, I do.

19            Q.     What is it?

20            A.     It's an e-mail from myself to the

21      region -- or the operations leadership team,

22      including the RVP and the RDs and including

23      Jasmine Onumah who was my quality assurance tech

24      back then.

25            Q.     Just for the record before we get
```

```
 1                    - RAMI KRANZ -

 2      into the substance to clarify, the top half of the

 3      first page appears to be an e-mail from you

 4      forwarding the rest of the chain to Robyn Ruderman

 5      on February 6, 2019; is that a correct

 6      interpretation?

 7           A.     Yes, that's correct.

 8           Q.     She's the company counsel and you

 9      were forwarding it to her as requested?

10           A.     Correct.

11           Q.     Okay.  So putting that part of the

12      e-mail aside, I think your prior response you were

13      describing the e-mail from you on September 29,

14      2017 to a number of individuals.  Who are those

15      individuals; why did you select them as the

16      recipients?

17           A.     They're the -- so

18      previous --

19                  MR. MOY:  Objection.

20           A.     Previously when I was discussing

21      that, I would mention this in the operations

22      leadership team meetings.  This is the operations

23      team.  So these are the regional directors; Alexis

24      Vatucci, Carla Ruffin, Ron Schuler and Kate

25      McShane, and Ross Shadix was the regional vice
```

```
 1                    - RAMI KRANZ -

 2    president.  So again my role was coaching,

 3    consulting on anything to do with cleanliness,

 4    food safety, Health Department which also included

 5    pests.

 6              So, again, I was emphasizing, you

 7    know, the point, right, and keeping the

 8    communication fresh in everyone's mind to ensure

 9    that our team knows this is not a Starbucks

10    protocol, right, and that we should not be using

11    it at all.  If they've got a problem, Starbucks

12    has the resources to fix the problem.  So if it's

13    a pest control problem, we've got vendors.  If

14    it's a facilities issue, we also have vendors and

15    handymen to come in and do that.  If it's a

16    cleanliness issue, you know, they've got that; an

17    HVAC issue, we've got people for that.  You know,

18    the store managers shouldn't be, you know, doing

19    this themselves.

20        Q.    The last thing you just said, "the

21    store managers shouldn't be doing this

22    themselves," what do you mean?

23        A.    Well, I mean the stores themselves,

24    the partners, right, shouldn't be taking this

25    under themselves as -- as per Starbucks' guidance
```

```
 1                  - RAMI KRANZ -

 2      and protocol, all right.  If they've got a

 3      problem, call the FPC and the pest vendors will

 4      come in and look after it.  It's the store

 5      managers and our partners' responsibility to keep

 6      the store clean, right, and keep the store

 7      according to Starbucks standards.

 8           Q.    Could I ask you to read the last

 9      sentence on the first page that you wrote here,

10      starts "According."

11           A.    Yep.  According to the label

12      regulations, partners can only work in a store

13      with the pest strips for no more than four hours.

14      Otherwise, the partners may become ill."

15           Q.    Why did you write that sentence?

16           A.    Again, it was --

17                 MR. MOY:  Objection.

18           A.    It was to emphasize my point with

19      regional directors.  Starbucks is all about

20      partner safety, partner care, you know, so

21      everything to do with the partners is very

22      important with the company.  So to emphasize

23      that this, you know, may potentially or could be,

24      you know, something that could, you know, not be

25      healthy for a partner, right, is the way that I
```

```
 1                    - RAMI KRANZ -

 2     can emphasize the strength of this.

 3         Q.    On occasions when Hot Shots were

 4     discovered in Starbucks stores, was there a

 5     notification provided to partners who had worked

 6     in that store to let them know that they may have

 7     had this dangerous exposure to their health?

 8              MR. MOY:  Objection.

 9         A.    I can't talk about that because I

10     don't know.  Again, that's part of operations.

11         Q.    Did you ever become aware -- from

12     operations or anything you saw or anything that

13     was told to you, did you ever become aware of a

14     communication to partners notifying them that they

15     may have been exposed to Hot Shots or Dichlorvos?

16         A.    So I -- I don't recall any

17     communication and I wasn't personally told.

18     Again, it not's part of my role and

19     responsibilities.  Operations would take that.

20         Q.    Would you expect that operations

21     would have informed partners?

22              MR. MOY:  Objection.

23         A.    I don't know how to answer that

24     either.

25         Q.    As you sit here today, do you know
```

                        - RAMI KRANZ -

 1

 2    one way or another whether any Starbucks employees

 3    became ill in connection with Hot Shots?

 4         A.     I have not heard of any partner

 5    becoming ill with a Hot Shot.

 6         Q.     And you've never heard of partners

 7    being asked if they felt ill after exposure to Hot

 8    Shots; is that correct?

 9         A.     Personally, I've never seen anyone

10    being asked that.

11         Q.     Are you aware of any legal or

12    regulatory standard or guideline for providing

13    notice to employees if they're exposed to hazards

14    in the workplace?

15         A.     I'm not aware of what the legal

16    requirements are.  It's out of my role and

17    responsibility.

18         Q.     What, if anything, prompted you to

19    write this e-mail on September 29, 2017?

20              MR. MOY:  Objection.

21         A.     I don't recall what prompted me, so I

22    don't know what the situation was that prompted me

23    to do that.  That, I don't recall.

24         Q.     Did you have any discussions with

25    anybody about the substance of your e-mail after

```
 1                  - RAMI KRANZ -

 2      sending it?

 3           A.    Yes, I brought it up to the

 4      leadership team like I was doing every week.

 5           Q.    To the best of your knowledge and

 6      information was there ever a systematic effort

 7      made to search through stores, locate any Hot

 8      Shots, and remove them in a systematic way all at

 9      once?

10                  MR. MOY:  Objection.

11           A.    Systematic way all at once, no, I

12      cannot answer that; but what I can say is that

13      through the communication from the leadership team

14      and through my in-field days with the district

15      managers and the regional directors, there was

16      very high awareness on the Hot Shots and while the

17      operations was in stores they were looking for

18      them.

19           Q.    Again, is it the case that you have

20      no information as to whether operations ever

21      reached any conclusion as to the source of any

22      particular Hot Shots?

23                  MR. MOY:  Objection.

24           A.    It's very difficult to answer because

25      for argument sake the Hot Shot that I found two,
```

1                    - RAMI KRANZ -

2     two-and-half years ago was extremely dusty.  I had

3     no idea how old it was or how even they go back

4     about trying to track anyone who may have put it

5     up there.  So it's very difficult to try and

6     determine who put it up there and to try to

7     determine the age of the actual product as well.

8          Q.    Were you ever informed by anybody

9     that on any occasions it had been determined that

10    a particular individual put a Hot Shot?

11         A.    I was never informed about anyone

12    putting out a Hot Shot, but again it's not my role

13    and responsibility.  Operations looks after that

14    and that's not something they discuss with me.

15         Q.    I'm going to post another document.

16    This one is Exhibit Kranz 13.  It's a two-page

17    document produced by plaintiffs.

18              (Whereupon, Kranz Exhibit 13 was

19         marked at this time.)

20         A.    I see it.

21         Q.    Mr. Kranz, do you recognize this

22    document?

23         A.    I -- yes, I do.

24         Q.    Do you remember that document?

25         A.    I do remember it, yes.

```
 1                      - RAMI KRANZ -

 2        Q.    The second page is an e-mail from

 3   Jillavptermite@aol.com on September 26, 2017 to

 4   Kranz, "Subject:  No-Pest Strip - Desk Pound

 5   9467."

 6              Mr. Kranz, as far as you know how

 7   often did AVP technicians conduct regular

 8   inspections or -- at stores?

 9              MR. MOY:  Objection.

10        Q.    I'll ask it differently.  Did AVP

11   have technicians that serviced stores on a

12   particular regular schedule?

13              MR. MOY:  Objection.

14        A.    Yes, so AVP had to service our stores

15   on a monthly basis according to the law.

16        Q.    So each store would be once a month?

17        A.    Once a month unless there was an

18   issue that they called in, and then they could

19   increase the frequency.

20        Q.    In the e-mail from Jill she writes,

21   "Hi, Rami.  Tech just found No-Pest Strip on desk.

22   This is second store since yesterday we found

23   these.  Yesterday tech was working under counter

24   and turned his head and he was inches from a

25   strip."  Do you know what store Ms. Shwiner was
```

1                     - RAMI KRANZ -

2     referring to?

3          A.     I'll answer, I have not memorized the

4     store numbers.

5          Q.     She said this is the second store

6     since yesterday and she does provide the Number

7     9467.  Do you know what the first store was, the

8     one that had been referenced?

9          A.     Yeah, I don't recall that.

10         Q.     Did you ask her?

11         A.     I don't even remember if I asked her

12    or not.  I'd like to review e-mails.

13         Q.     Going to your response to her on the

14    first page, could I ask you to just read the text

15    for the record.

16         A.     Yes.  "Hi, Jill.  I'll send out an

17    e-mail to RDs tomorrow morning.  My apologies to

18    the tech.  Thank you."

19         Q.     To the best of your memory, did you

20    send such an e-mail?

21         A.     If I said I'll send it out then, yes,

22    to the best of my memory I would have sent it out.

23         Q.     When you say that you would send it

24    to RDs, who are you referring to?

25         A.     Regional directors.

```
 1                    - RAMI KRANZ -

 2         Q.     Are there specific individuals who

 3    were the regional directors in 2017 for Starbucks?

 4         A.     Yes.  So if we look at Exhibit Kranz

 5    15, if you look at the e-mail that I sent out to

 6    it says it lists the regional directors and the

 7    regional vice presidents.

 8         Q.     That's very helpful, thank you.

 9                Would those be the individuals who

10    you would have had in mind to send this next

11    e-mail to?

12         A.     Yes.

13         Q.     Do you know what, if anything, was

14    actually done in response to your e-mail?

15         A.     Can you clarify that; what was done

16    by who?

17         Q.     By the regional managers in response

18    to your e-mail which was prompted by Jill's report

19    here.  Do you know what happened after you sent

20    your e-mail?

21         A.     Yes.  So, again, I would have

22    mentioned it in the leadership team meeting on

23    Monday, which would have been the following

24    Monday.  They would have mentioned it in their

25    huddles with their district managers and then
```

```
 1                    - RAMI KRANZ -

 2     district manager huddles with the store manager

 3     and the store manager huddles with the shift

 4     supervisors.

 5          Q.    When you would mention such things,

 6     would you identify the stores where the issue had

 7     been identified?

 8          A.    No, it wasn't necessary to identify

 9     the stores specifically.  It was just necessary to

10     get the communication back out again and the

11     awareness that, you know, it's still being found.

12          Q.    Did you track in any way the

13     incidents where Jill or anybody else informed you

14     that Hot Shots were found?

15          A.    Can you repeat that, did I what?

16          Q.    Did you track the incidents that you

17     were informed of by Jill or anybody else

18     concerning Hot Shots in stores?

19          A.    I personally --

20                MR. MOY:  Objection.

21          A.    I personally didn't track anything

22     else.

23          Q.    So you didn't keep a log of store

24     numbers and dates, something like that?

25          A.    No.
```

```
 1                    - RAMI KRANZ -

 2        Q.     When you would communicate the

 3   message that Hot Shots aren't allowed to all of

 4   the leaders, did you ever communicate to any

 5   specific individual leaders that you had

 6   identified the problem in their stores in

 7   particular rather than somewhere just generally in

 8   the region?

 9              MR. MOY:  Objection.

10        A.     So on occasion I had -- on my

11   one-on-one meetings with the regional directors I

12   would mention that, you know, I'd been informed

13   that Hot Shots were found in some of their stores.

14        Q.     Who had you mentioned that to

15   specifically?

16        A.     From my memory now, I can recall

17   mentioning to Ron Schuler.

18        Q.     Anyone else?

19        A.     I don't recall.  You know, it's very

20   possible, but I just don't recall if I mentioned

21   it to anyone else.  Ron I just remember.

22        Q.     Did Ron report back to you that he

23   had looked into it or done anything in particular

24   after you had that communication with him?

25        A.     Ron told me during a meeting, that he
```

```
1                    - RAMI KRANZ -

2      was going to reiterate the message again with his

3      district managers, right, and that -- you know,

4      reiterate the message that it's not going to

5      be -- that it's not a Starbucks standard, right,

6      and that we should not be using it at all.

7            Q.    Are there other Starbucks standards

8      that are violated without disciplinary

9      consequences, that you're aware of?

10                 MR. MOY:  Objection.

11           A.    No, I don't know anything about

12     disciplinary actions because, again, it's not part

13     of my role and responsibility and I'm not privy to

14     that information.

15           Q.    When we have been talking about the

16     policy and how you've reiterated it that Hot Shots

17     aren't to be used, to be completely clear your

18     understanding was that it was a mandatory policy,

19     not like an advisory guideline; is that fair?

20           A.    Yes, it's a Starbucks standard

21     written in the food safety manual.

22           Q.    I've just posted a document, Kranz

23     Exhibit 44.  It's a one-page document Bates

24     numbered DEF 27788.

25                 (Whereupon, Kranz Exhibit 44 was
```

```
 1                    - RAMI KRANZ -

 2          marked at this time.)

 3          A.    Okay.

 4          Q.    Mr. Kranz, do you recognize this

 5     document?

 6          A.    Yes, I do.

 7          Q.    What is it?

 8          A.    It's an e-mail from Margaret Kis to

 9     myself and the other facility managers.

10          Q.    And I'm trying to break down kind of

11     the form of the e-mail.  It appears to be a chain.

12     The e-mail at the bottom is sent by you Friday,

13     September 29th.

14          A.    Uh-huh.

15          Q.    Who responded to you?

16          A.    Okay.  If I go up there --

17          Q.    The only reason I ask is it appears

18     that you respond to yourself "FYI, thank you" and

19     I'm not sure if I'm misinterpreting.

20          A.    Yes, I did.  So I e-mailed that to

21     Stephen Gallant and the facilities team just to

22     let them know, to inform them.

23          Q.    So you were forwarding them on your

24     prior e-mail?

25          A.    On my prior e-mail to the operations
```

```
 1                    - RAMI KRANZ -

 2     team, yes.

 3          Q.    And then which e-mail did Margaret

 4     Kis reply to?

 5          A.    They replied to the original one

 6     which I forwarded to them.

 7          Q.    Did you have any communications with

 8     Margaret Kis about the subject, apart from what's

 9     in the text of the e-mail?

10          A.    From my recollection, no, I don't

11     recall.

12          Q.    We can put that aside.

13                I'm posting a document, Exhibit Kranz

14     16.  It's a two-page document Bates numbered DEF

15     141 to 142.

16                (Whereupon, Kranz Exhibit 16 was

17          marked at this time.)

18          A.    Okay.

19          Q.    Mr. Kranz, do you recognize the

20     document?

21          A.    Yes, I do.

22          Q.    And I think from the formatting it's

23     again an e-mail chain, with the e-mail on the

24     first half of the first page that appears to be

25     you forwarding the prior chain to counsel; is that
```

```
 1                    - RAMI KRANZ -

 2      correct?

 3           A.     That's correct.

 4           Q.     So let's put that aside and focus on

 5      the prior e-mail.

 6           A.     Yes.

 7           Q.     Have you had a chance to read what's

 8      written there?

 9           A.     Yes, I have.

10           Q.     So the e-mail is from you on October

11      16, 2017 to Ross Shadix and cc'd to other people.

12      Who are these individuals again?

13           A.     They're the regional directors and

14      Ross Shadix is the regional vice president.

15           Q.     The subject line is "Hot Shots for

16      insecticide in store DOH violation."

17           A.     Uh-huh.

18           Q.     Earlier you had mentioned that you

19      could remember there being one citation from DOH.

20      Do you believe that's what you're referring to in

21      this e-mail?

22           A.     Yes, it is.

23           Q.     You had been using the word

24      "citation" when we had earlier talked about this

25      incident.  Is that a different term in this
```

```
 1                  - RAMI KRANZ -

 2    context than violation?

 3         A.    It's just a Department of Health

 4    verbiage for it.

 5         Q.    You wrote "The DOH are hot for citing

 6    Hot Shots in stores."  Mr. Kranz, why did you

 7    write that?

 8         A.    To emphasize the fact.  So, again,

 9    this whole e-mail was emphasizing and trying to

10    push the point that operations, you know, again

11    should be relaying the communication all the way

12    down and cascading it down from the RDs to the

13    DMs, to the store managers, to the ASMs, to the

14    shifts and get the word out.  So, again, my method

15    is just using words to emphasize it and knowing

16    the Starbucks culture of what words are going to

17    work the most.

18         Q.    Could I ask you to read, for the

19    record, the sentence that starts as the last

20    sentence on the first page and continues to the

21    next page.

22         A.    Last sentence, "Please see attached

23    video which shows one store with nine Hot Shots on

24    top of the front of house cabinets."

25         Q.    Do you know what store that was?
```

```
 1                    - RAMI KRANZ -

 2          A.      Without checking it, no, I don't; but

 3     I do remember that the video was sent to me

 4     by -- by Jill.

 5          Q.      Had she sent you videos prior to this

 6     one?

 7          A.      Jill and I were in communication

 8     about Hot Shots and there were, yes, I -- I

 9     believe.  I don't recall how many there were or

10     what there were, but there's a good possibility

11     there were others.

12          Q.      Did Ms. Shwiner send you that video

13     on October 16th or at some other prior time?

14          A.      I can't tell you the exact date that

15     she sent to it me.  I do remember the video,

16     though.

17          Q.      And you write -- that paragraph ends,

18     "Attached is also a DOH violation for Hot Shot in

19     one of our stores."  So the DOH violation was for

20     something different than what was in the video; is

21     that correct?

22          A.      The video was not of the same store.

23          Q.      Do you remember, now that you've been

24     thinking about it for a bit, which store was the

25     subject of the DOH violation?
```

 1                    - RAMI KRANZ -

 2              MR. MOY:  Objection.

 3        A.     Without checking the inspection

 4   report, I don't recall.

 5        Q.     Could I ask you to read the last full

 6   sentence.

 7        A.     "Please, I ask again for our

 8   partners' safety, health, and brand (protecting A

 9   grade) pass on this message onto the DM, SM and

10   have them all removed."

11        Q.     To the best of your knowledge, did

12   the message get passed on and lead to all of the

13   Hot Shots being removed?

14        A.     To the best of my knowledge, the

15   communication was -- you know -- cascaded down.  I

16   know that they were looking for Hot Shots; and the

17   district managers and regional directors when they

18   were in stores, I know they were taking it very

19   seriously.

20              Were all of them removed, I can't

21   tell you if all of them were removed because I

22   don't know if they found everything; but I know

23   they were actively looking for it and taking it

24   very seriously.

25        Q.     You had mentioned before that you did

```
1                    - RAMI KRANZ -

2      not keep a log of incidents, like what days and

3      location and any information about the Hot Shots

4      being discovered in stores.  As far as you know,

5      did anybody at the company keep track of that?

6           A.    As far as I know no one kept track of

7      it from an exact date, time, store, no.

8           Q.    Were you ever part of any

9      conversation or communication where there was any

10     discussion of perhaps designating somebody to keep

11     a log of these incidents?

12          A.    No, I was not part of any

13     conversation or meeting for that.  You know, just

14     to reiterate, you know, my role was coaching,

15     consulting.  Operations is the one that leads the

16     stores and ensures that they're complying with

17     Starbucks standards.

18          Q.    Let's put this document aside.

19                I've just posted a document, Exhibit

20     Kranz 5.  It's one page, Bates DEF 4962.

21                (Whereupon, Kranz Exhibit 5 was

22          marked at this time.)

23          A.    Okay.

24          Q.    Mr. Kranz, do you recognize the

25     document?
```

```
 1                    - RAMI KRANZ -

 2        A.     I recognize it as an e-mail and I

 3   recognize that I'm cc'd on it, but I don't

 4   remember this.

 5        Q.     Is this an e-mail that you reviewed

 6   in preparation for the deposition?

 7        A.     In preparation -- can you please be

 8   more specific?

 9        Q.     Do you believe that you saw this

10   e-mail more recently than when it was sent?

11             MR. MOY:  Insofar as -- I'm going to

12        object.  Insofar as counsel is asking the

13        witness what documents he reviewed with

14        counsel, I instruct the witness --

15             MR. GRAFF:  The witness never

16        indicated he reviewed documents with counsel.

17             MR. MOY:  I'm objecting to the form

18        of the question and so let me state my

19        objection to the form of the question.

20             Insofar as you are seeking -- the

21        question seeks the identity of any documents

22        that were reviewed by counsel, again insofar

23        as the witness at the direction of legal

24        counsel reviewed any documents selected and

25        complied by legal counsel, I instruct the
```

```
 1                    - RAMI KRANZ -

 2          witness not to answer and to refrain from

 3          disclosing any such documents.

 4                  However if the witness independently

 5          reviewed any documents to prepare for his

 6          deposition, the witness may answer.

 7          Q.    Okay, Mr. Kranz, I'm going to

 8     rephrase the question and then ask you if you can

 9     answer the question or if you cannot answer it in

10     light of your counsel's instruction.

11                  The question is; did you review this

12     document more recently than the date it was sent?

13                  MR. MOY:  Same objection.

14          A.    I can't answer that.

15          Q.    So when you said you don't remember

16     it, what did you mean?

17          A.    I don't remember the incident and I

18     don't remember reading this e-mail.  I know I did,

19     but I just don't remember it.

20          Q.    Could I ask you to -- first, it's

21     sent by Noelle Perez.  Who is she?

22          A.    Noelle Perez was a facilities

23     manager.

24          Q.    Who are the four individuals on the

25     "To" line?
```

```
 1                    - RAMI KRANZ -

 2          A.      Laney Alfaro would have been the

 3     store manager, but I'll have to double-check on

 4     that.  Timinit Ashebir is a district manager.  Ron

 5     Schuler is the regional director.  Keith Costello,

 6     whose cc'd here, will be the senior facility

 7     manager.  Then there's myself and Jasmine Onumah

 8     who is the QA specialist.

 9          Q.      The subject line, do you understand

10     what that language means?

11          A.      "7612" is the store number, "60th and

12     First" is our reference to where the store is, and

13     then it says "Tuesday evening visit."

14          Q.      Could I ask you to read the second to

15     the last the paragraph of the e-mail for the

16     record.

17          A.      "Over the weekend" -- and this is

18     from Noelle Perez too.  "Over the weekend I was

19     also informed that the store is leaving the Raid,

20     a store-bought chemical out.  This is not a

21     Starbucks approved product, at the very least

22     let's make sure we conceal it.  Rami - thoughts."

23          Q.      Do you have an understanding of what

24     product she's referring to as "Raid" or "the

25     Raid"?
```

```
 1                    - RAMI KRANZ -

 2         A.     You would have to ask Noelle to be

 3    more specific on what product she was referring

 4    to.  I can only guess at that.

 5         Q.     Is there one or two or three products

 6    that come to mind just most likely when you would

 7    have seen somebody refer to this?

 8              MR. MOY:  Objection.

 9         A.     So if you want my opinion on

10    it --

11         Q.     Yes.

12         A.      -- not knowing what Noelle was

13    discussing, I can only tell you that, you

14    know -- and, again, I wasn't brought up in the

15    country so I only know of one Raid in the country.

16         Q.     Do you have any understanding

17    yourself of what she may have been trying to

18    communicate when she wrote, "This is not a

19    Starbucks approved product, at the very least

20    let's make sure we conceal it"?

21              MR. MOY:  Objection.

22         A.     You'll have to ask Noelle about that.

23    I'm note a hundred percent sure.

24         Q.     In terms of Starbucks policy --

25         A.     Yes.
```

```
 1                    - RAMI KRANZ -

 2          Q.      -- is there any different

 3     requirements or rule that applies if a pesticide

 4     is concealed versus used openly?

 5               MR. MOY:  Objection.

 6          A.      According to Starbucks policy again

 7     I'll reiterate where our store partners aren't

 8     allowed to use pesticides, they should be calling

 9     all problems into the FPC and allowing the pest

10     vendors to deal with that.

11          Q.    Okay.  So would your understanding be

12     that what Noelle Perez appears to be suggesting

13     would not be consistent with policy?

14               MR. MOY:  Objection.

15          A.     I'm not sure what she was suggesting.

16     You'd have to ask Noelle.

17          Q.    Okay.  So she wrote the words, "At

18     the very least let's make sure we conceal it" and

19     then she wrote "Rami - thoughts."

20          A.     Like I don't remember the e-mail, but

21     I don't remember replying to it too so...

22          Q.     Okay.  So is your thought upon

23     reading this sentence that she's describing

24     something that, to your understanding, would be

25     consistent with Starbucks policy?
```

```
 1                  - RAMI KRANZ -

 2                  MR. MOY:  Objection.

 3        A.     I can't answer that because I can't

 4    tell you exactly what she was thinking about that.

 5        Q.     I'm asking how you read the words on

 6    the paper, though, because I'm --

 7                  MR. MOY:  Objection.

 8        Q.     -- interested in your interpretation

 9    if you had any understanding or have any

10    understanding of what she was saying; and for

11    Gary's benefit, part of the reason I'm asking

12    about that is that she says "Rami - thoughts" and

13    I'm trying to get at:  What, if anything, do you

14    think about her suggestion?

15                  MR. MOY:  Objection.

16        A.     I mean, I know she said

17    "Rami - thoughts."  I don't remember replying to

18    the e-mail.  I don't even really remember the

19    e-mail and I don't -- I don't know if I can answer

20    the question fully because I don't remember

21    everything.  So I don't even remember what I

22    wrote, if I wrote anything.

23        Q.     Do you remember having any subsequent

24    communication with anybody relating to this

25    e-mail, except your counsel?
```

```
 1                    - RAMI KRANZ -

 2         A.      No, I don't.

 3                 MR. MOY:  Objection.

 4         Q.      Is the use of Raid or store-bought

 5    chemicals in Starbucks the kind of thing that

 6    operations people would typically seek your

 7    guidance for?

 8                 MR. MOY:  Objection.

 9         A.      To clarify, what do you mean seek my

10    guidance?

11         Q.      In your role as quality assurance

12    manager, is that the type of thing that you would

13    be an appropriate person to be a recipient of such

14    a question?

15                 MR. MOY:  Objection.

16         A.      The answer is they wouldn't seek my

17    guidance because it's not an approved Starbucks

18    chemical and Starbucks has specifically stated

19    that stores should not be using any sort of

20    pesticides, that they should be pushing that off

21    to the pest vendors.  So it's not even a question

22    of ask guidance from anyone because they won't.

23         Q.      With respect to what's written here,

24    "This is not a Starbucks approved product, at the

25    very least let's make sure we conceal it, Rami -
```

```
1                    - RAMI KRANZ -

2      thoughts," did you interpret that as her

3      requesting guidance on that issue or not?

4           A.      I'm not sure.  I probably would have.

5      Again I'm assuming because I don't remember it,

6      but I probably would have reached out to get more

7      clarification on what she was saying.

8           Q.      Did you at any point search your

9      records for any further information or materials

10     that might relate to this e-mail?

11                  MR. MOY:  Objection.

12          A.      No, I haven't because I don't recall

13     it.

14          Q.      Do you keep notes in a regular

15     systematic way at your job that you store?

16          A.      No, I don't keep notes so -- and what

17     sort of notes are you talking about?

18          Q.      So are there any writings or records

19     that you could think of that you might be able

20     to refer to that might add to your present

21     understanding and scope of information about this

22     e-mail?

23          A.      I -- the only thing I could think is

24     if I could go back through my e-mails to see if I

25     replied to her.  I wouldn't have any records of a
```

```
 1                      - RAMI KRANZ -

 2     phone call and the only records I have of store

 3     visits usually are kept at the store with the

 4     district manager.

 5          Q.    To the best of your memory, did you

 6     at any point actually search to see if there was a

 7     reply that you sent on this e-mail?

 8          A.    I haven't searched.

 9               MR. MOY:  Objection.

10               MR. GRAFF:  There's an answer.  It's

11          1 p.m.  We had talked about lunch at this

12          point.  Let's go off the record.

13               (Whereupon, a lunch break was taken

14          from 1:00 p.m. to 1:40 p.m.)

15               MR. GRAFF:  Let's go back on the

16          record.  It's 1:43.

17          Q.    Mr. Kranz, did you communicate with

18     anybody in words or writing during the break?

19          A.    I called up a friend of mine, but we

20     spoke about everything else except this.

21          Q.    Did the friend who you called ever

22     work at Starbucks?

23          A.    No, he doesn't.

24          Q.    Did you read anything during the

25     break?
```

```
 1                    - RAMI KRANZ -

 2        A.     No, I haven't read anything.

 3        Q.     Other than your friend, did you

 4   communicate with anyone else during the break?

 5        A.     I spoke to my -- both my daughters

 6   and just asked them how school is going.

 7        Q.     Are they at homeschooling or --

 8        A.     Yes, they are.  Fully remote right

 9   now.

10        Q.     I'm posting an Exhibit Kranz 49.  It

11   is a two-page e-mail chain produced by defendants

12   Bates numbered DEF 1914 and 1915.

13             (Whereupon, Kranz Exhibit 49 was

14        marked at this time.)

15        Q.     Mr. Kranz, I'm not sure if you're

16   maybe reading to yourself a little bit out loud.

17   That's very difficult for the court reporter.  I

18   apologize, if you could -- thank you.

19        A.     Okay.

20        Q.     Do you recognize this document or any

21   part of it?

22        A.     I mean, I recognize it that I wrote

23   it, but do I remember the exact incident, no, I

24   don't recall.  It was a few years ago, but I am

25   reading through it.
```

```
 1                    - RAMI KRANZ -

 2         Q.     Okay.  Let's start with the earliest

 3    e-mail in the chain; and I'm not sure if maybe the

 4    way it's formatted with successive e-mails in a

 5    chain might have taken out some of the information

 6    here that would normally go on the subject line,

 7    so I'll point to the spot and then ask you if you

 8    know what's missing.

 9                MR. MOY:  Objection.

10         Q.     "On May 21, 2018 at 2:56 p.m. Rami

11    Kranz wrote," do you know who you sent that e-mail

12    to?

13         A.     No, It's not -- I don't see any, like

14    any information there.  I have no idea.

15         Q.     Do you understand what subject you

16    were writing about?

17         A.     No, it would help if I had that.

18    I'm -- it would help, like it would help if I had

19    the subject; that would possibly help.  It would

20    also help going back to the records and see what

21    happened, you know, that day.

22         Q.     Sure, and that -- that format of the

23    document is the way it was provided to us, so I

24    can't help that.  When you referred a moment ago

25    that you would go back to look at something, what
```

```
 1                    - RAMI KRANZ -

 2     were you referring to?

 3           A.    I -- you know, I'll go back and try

 4     and look in my -- my planner and see, you know, if

 5     I wrote anything in there about where I was going

 6     that day.

 7           Q.    Okay.  Can I ask you to read the one

 8     sentence paragraph under the last bullet on this

 9     page.

10           A.    "Recommending investigating possible

11     breeding source and continuing to use CB-80 to

12     ensure minimal, if not zero, flies in store."

13           Q.    As you sit here today, do you have

14     any memory or information about why you wrote that

15     sentence?

16           A.    No, but I -- just reading it I can

17     tell you what I was, you know, aiming at and what

18     the meaning was.

19           Q.    What would that be?

20           A.    So the meaning was that one

21     investigating the possible breeding source, so

22     we're trying to find where the fruit flies are

23     coming from; and then continuing to use CB-80 to

24     ensure minimal, if not zero, flies in the store,

25     that would be for the pest control to be using;
```

```
 1                  - RAMI KRANZ -

 2      that's not for our store partners.  At the time

 3      this was the product that I was recommending the

 4      pest vendors use to knock -- know down the fruit

 5      flies.  It did a really good job.

 6           Q.    Okay, let's keep trying to

 7      deconstruct the document.  If we go up to the next

 8      e-mail, it starts at the bottom of the first page.

 9      Do you see it's May 21, 2018 at 2:06 p.m.  Can you

10      read the name that's there?

11           A.    Taz Mbodje.

12                 MR. GRAFF:  The first name for the

13           court reporter is T-A-Z, the last name

14           M-B-O-D-J-E.

15           Q.    Mr. Kranz, what position did that

16      individual hold in 2018?

17           A.    District manager.

18           Q.    Of what district?

19           A.    I couldn't tell you the district name

20      or the number of it, but the district manager.

21           Q.    His e-mail also doesn't include some

22      of that standard e-mail heading lines.  What he

23      writes begins, "Rami, Thank you for your thorough

24      walkthrough."  Does that at all jog your memory or

25      refresh your memory about what your e-mail was
```

```
 1                    - RAMI KRANZ -

 2      about?

 3           A.    No.  When he's talking about the

 4      thorough walkthrough is the observation that I

 5      wrote in the initial e-mail that we -- that we're

 6      looking at.  No.

 7           Q.    Okay.  So those observations, you

 8      think, would be the walkthrough that he's

 9      referring to?

10           A.    Yes, that would be.

11           Q.    The next e-mail up is from Keith

12      Costello also May 21st, 2018.  This one is at 3:16

13      p.m. to a number of individuals, cc you and some

14      individuals.  Can you read the subject line on

15      that e-mail?

16           A.    It says "Re: Store Number 837 QAZOH

17      orders 5/21/18."

18           Q.    In the context of your work, are you

19      able to explain what that subject line means?

20           A.    So what that means is that -- it can

21      mean one of two things.  It can either mean we did

22      at the time of the audit or an inspection, an

23      internal one, just, you know, what we do, or it

24      was a followup to a Department of Health audit.

25           Q.    If you could read through the brief
```

```
 1                    - RAMI KRANZ -

 2      text of this e-mail, just let me know when you've

 3      seen it.

 4           A.     Seen what?

 5           Q.     What it says.

 6           A.     Read the text and see what what says?

 7           Q.     Just read it so that you are able to

 8      see what's written there and then I'll ask you a

 9      question, but I would like you to have had a

10      chance to read it first to yourself.

11           A.     Okay, I read it.

12           Q.     Does anything in this e-mail refresh

13      your recollection or add any information to your

14      understanding of your very first e-mail in the

15      chain?

16           A.     No, it doesn't.  But all I can tell

17      you is that sometimes I do get the store numbers

18      mixed up, so I may have sent it to the wrong group

19      thinking it was one number instead of another.

20      I -- you know, I see on -- on average, I can see

21      up to six stores in a day.  So sometimes I may

22      type in the wrong one, so -- but it hasn't jumped

23      on what exactly this was about.

24           Q.     Okay.

25           A.     I can talk to you about what my
```

```
 1                  - RAMI KRANZ -

 2     observations were and I can read them and I can

 3     let you know what I'm saying.

 4          Q.     I appreciate it.  If you don't

 5     remember the answer to the question I've been

 6     going at, that's fine.  It's only as good as your

 7     memory.  We can put that aside.

 8                 I'm posting an exhibit labeled Kranz

 9     34.  It's a two-page e-mail produced by plaintiff.

10                 (Whereupon, Kranz Exhibit 34 was

11          marked at this time.)

12          A.     Okay.

13          Q.     Mr. Kranz, do you recognize all or

14     part of the document?

15          A.     I do recognize my part it, yes, and

16     Jill's.

17          Q.     Do you have a memory of what's

18     written here from around the time it was sent?

19          A.     So I remember -- I remember writing

20     the e-mail, yes.

21          Q.     Okay, if I could direct you to

22     the second page, October 15, 2017 from

23     Jillavptermite@aol.com.  She writes "Rami, my

24     service manager just sent me a pic of a DDVP strip

25     that was placed in the fly light.  I myself came
```

```
1                      - RAMI KRANZ -

2      across two in the past two nights while inspecting

3      under counter cabinets and were inches from my

4      face.  When you get a moment tomorrow, if you

5      could give me a call.  Thank you."

6                  Mr. Kranz, do you remember having a

7      subsequent conversation with Ms. Shwiner about

8      this e-mail?

9          A.    I don't recall the -- the phone

10     conversations I've had with Jill and I don't

11     recall this one in particular.

12         Q.    Do you have any information about the

13     fly -- the Hot Shot in a fly light that she refers

14     to?

15         A.    No more than what's -- than what's

16     stated in the e-mail.

17         Q.    When she writes that she came across

18     two in the past two nights, do you know what store

19     she's referring to?

20         A.    Not at all.  You'll have to ask Jill.

21         Q.    Did you ask Jill?

22         A.    I don't recall if I called her or

23     not.  If I did, I probably would have.

24         Q.    Let's go to your e-mail responding to

25     the one we were just looking at on October 16,
```

```
 1                 - RAMI KRANZ -

 2    2017, 5:42 a.m., "Subject:  Re: Dichlorvos Strips.

 3    Mr. Kranz, do you believe that you would have sent

 4    it at that time, 5:42 a.m.; does that make sense?

 5              MR. MOY:  Objection.

 6         A.    Yes.

 7         Q.    Can I ask you to read the body of

 8    your e-mail.

 9         A.    Certainly.  So it says "Hi, Jill.

10    I'll call you around 10.  Which stores had these

11    in them?  I sent out the e-mail to all the last

12    time you asked and I mentioned it during my

13    leadership presentation to Ross and the regional

14    directors just last week.  I can have another talk

15    with the team and stress the importance of

16    breaking this habit."

17         Q.    Why did she -- I'm sorry, did

18    someone --

19         A.    No, that was the end of it words

20    missing.

21         Q.    Okay, I couldn't tell if Gary was

22    saying something.

23              MR. MOY:  No, I'm sorry, if I made

24         any sounds.

25         Q.    Mr. Kranz, what were you referring to
```

```
 1                    - RAMI KRANZ -

 2       in that last sentence?

 3            A.     The last sentence?

 4            Q.     Yes.

 5            A.     I was referring to I'll talk to the

 6       team again, stress the importance, right, that

 7       none of our partners should be using pest strips

 8       at all.

 9            Q.     When you wrote "The importance of

10       breaking this habit," what's the habit?

11            A.     It was just a phrase that I was

12       using.  So I wasn't referring to anything and I

13       certainly wasn't referring to, you know, us

14       overusing or underusing or -- it was just a phrase

15       that I used.

16            Q.     And what information were you

17       intending to communicate by that choice of word?

18            A.     So the intention was just to stress

19       to Jill, right, that we are taking this very

20       seriously, right, and that not only have I had,

21       you know, multiple meetings right, with, the

22       leadership teams, that I was going to continue

23       doing it and we're going to continue stressing the

24       importance of this.

25            Q.     So when you wrote "stress the
```

```
 1                    - RAMI KRANZ -

 2     importance of breaking this habit," what is it

 3     that you were going to stress the importance of?

 4          A.     Just the importance of our partners

 5     should not be using any pesticides.

 6          Q.     Is that what you were referring to by

 7     "this habit," the use of pesticides by Starbucks

 8     employees?

 9          A.     No, I was just using that as a phrase

10     that I use, but not referring or -- to, you know,

11     anything else.

12          Q.     When you used the phrase, did you

13     intend it to impart information to the reader?

14          A.     No more --

15               MR. MOY:  Objection.

16          A.     No more than just stressing the

17     importance of it.

18          Q.     What does habit mean to you?  You

19     said it's a phrase that you used.

20               MR. MOY:  Objection.

21          A.     So that phrase was just another way

22     of me saying nowhere seeing it in stores.

23          Q.     So when you used the word "habit" or

24     the phrase "this habit," do you have some type of

25     meaning that's different than the ordinary usage
```

```
 1                    - RAMI KRANZ -

 2     or dictionary meaning that it holds for you --

 3              MR. MOY:  Objection.

 4         Q.      -- personally?

 5              MR. MOY:  Objection.

 6         A.      Again, it was just a phrase that I

 7     was using.  It was not meant to -- meant to mean

 8     anything else, you know, no other meaning.  It was

 9     just letting Jill know that I was going to be

10     talking to the leadership team and that we're

11     taking it very seriously.

12         Q.      What, if anything, did you do in

13     connection with this after you sent the e-mail?

14              MR. MOY:  Objection.

15         A.      So again at the leadership team

16     meetings on Monday, you know, I mentioned it to

17     them.  Ross again reiterated the importance of it.

18     The regional directors, you know, again agreed

19     and, you know, understood the importance of it;

20     and also agreed to continue talking to their team

21     and cas -- cascade it all the way down the barista

22     level.

23         Q.      What, if anything, to your

24     understanding was done that had not already been

25     done before by you or the leadership team in
```

```
 1                    - RAMI KRANZ -

 2     connection with this e-mail?

 3               MR. MOY:  Objection.

 4         Q.    I can ask the question differently.

 5     Back to the last sentence that you wrote that

 6     we've been looking at, at the beginning it says "I

 7     can have another talk with the team and stress the

 8     importance of breaking this habit."  Had you

 9     previously had a talk with the team where you

10     stressed the importance of not using Hot Shots?

11         A.    I had previously talked to the team

12     about stressing the importance, right, of not

13     using any pesticides, yes.

14         Q.    How many times prior to this had you

15     had such discussions with the team?

16         A.    I couldn't recall an exact number,

17     but it had been multiple times.

18         Q.    Would you be able to say if it was

19     more or less than ten?

20         A.    I'll be guessing --

21               MR. MOY:  Objection.

22               Rami, give me an opportunity to

23          object.

24               THE WITNESS:  Sorry.

25               MR. MOY:  All right, go on.
```

```
 1                  - RAMI KRANZ -

 2        Q.    Would you be able to say if it's more

 3   or less than a hundred?

 4              MR. MOY:  Objection.

 5        A.    Again, I'll be guessing.  I can't say

 6   a number.

 7        Q.    Do you believe that it was more than

 8   five?

 9              MR. MOY:  Objection.

10        A.    I believe it was multiple times.

11        Q.    Do you believe it was twice?

12              MR. MOY:  Objection.

13        A.    Again, I -- I can't give you an exact

14   number because that's going to be a guess.

15        Q.    Did you have in mind that this

16   anticipated next discussion with the talk with the

17   team again was going to be different in content

18   than your prior discussions?

19              MR. MOY:  Objection.

20        A.    What do you mean by "different in

21   content"?

22        Q.    When you spoke with the team, were

23   you going to tell them something different from

24   what you had previously told them?

25              MR. MOY:  Objection.
```

Rami Kranz
September 15, 2020                                          144

```
 1                  - RAMI KRANZ -

 2          A.     Nothing different, just reiterating

 3     the importance of it and reiterating the

 4     importance of cascading it down to that their team

 5     and getting the communications down to everyone

 6     and ensuring that everyone understood.

 7          Q.     So on the multiple prior occasions

 8     when you had the discussion, was it your

 9     understanding that the information was pushed down

10     cascading to the teams and understood?

11          A.     Not only was it understood by me, but

12     I'd also personally seen it too.

13          Q.     Other than what's written here, did

14     you have any further followup with Ms. Shwiner

15     about this issue?

16                  MR. MOY:  Objection.

17          A.     Again, it's a possibility because I

18     spoke with Ms. Shwiner numerous times over the

19     phone.  Not just always through e-mail, sometimes

20     even texts as well.  So I can't tell you what

21     followup I had with this, but I'm sure there was

22     some.

23          Q.     Is there anything else beyond what

24     you did that you believe you could have done to

25     address the ongoing recurrence of Hot Shots in the
```

```
 1                   - RAMI KRANZ -

 2      stores?

 3                   MR. MOY:  Objection.

 4           A.      So in my role and responsibility I

 5      believe that I was doing everything that I could,

 6      okay, in my power at Starbucks to communicate, to

 7      coach, to consult the operations team.

 8           Q.      Do you believe that the operations

 9      team should have done anything different or

10      additional beyond what it did to address the

11      problem?

12                   MR. MOY:  Objection.

13           A.      Again, I can't talk about the

14      operations team because I wasn't privy to

15      everything that they did.

16           Q.      When you had another discussion with

17      the operations team about the subject, did you ask

18      them to look into how it was that Hot Shots were

19      becoming present in their stores, if any were

20      present?

21           A.      So during our conversations we

22      reiterated that AVP and specifically Jill, right,

23      had contacted me, right, and we reiterated the

24      importance of our partners following our

25      standards.
```

```
 1                    - RAMI KRANZ -

 2         Q.     Did you ever personally feel any

 3    glimmer of a doubt that perhaps the message you

 4    were communicating was not being understood by the

 5    operations people you were communicating it to?

 6              MR. MOY:  Objection.

 7         A.     So being a part of the leadership

 8    team meetings, there was no doubt in my mind that

 9    the regional vice president and the regional

10    director understood the importance, right, and

11    acted upon that importance.

12         Q.     And in terms of what actions they

13    took, do you have any information that you haven't

14    already shared?

15         A.     No.  So the action that I can talk

16    about is only the action that I observed, which

17    was the invitations to the regional directors

18    huddle with the district managers where they

19    reiterated the importance of it.  Then the

20    district managers huddles with their store

21    managers where they reiterated the importance and

22    the store manager huddles to the shift

23    supervisors.  Outside of that, I -- I can't tell

24    you what other actions they took.

25         Q.     Posting a document, Kranz 17, it's a
```

1                    - RAMI KRANZ -

2     three-page e-mail chain bearing Bates numbers DEF

3     151 through 153.

4                    (Whereupon, Kranz Exhibit 17 was

5          marked at this time.)

6          A.    Okay.

7          Q.    Mr. Kranz, if you could please, let

8     me know when you've had a chance to review the

9     document and then I'll begin questions.

10         A.    I'm ready.

11         Q.    Do you recognize all or any part of

12    this document?

13         A.    Yes, I do.

14         Q.    What is it?

15         A.    This was an e-mail that Tracy sent me

16    after the New York Metro leadership team meeting

17    where I presented, and she had to drop off a

18    (unintelligible).  I believe it was ten, fifteen

19    minutes, so she missed some of it; and Tracy's

20    e-mail was just asking me if I had actually

21    elaborated on the information that I spoke with

22    her during our one-on-one conversation.

23         Q.    And what is the weekly meeting that's

24    referred to here?

25         A.    So it's a New York Metro leadership

```
 1                    - RAMI KRANZ -

 2     team meeting.  So it's the weekly meeting that the

 3     leadership team gathers around.

 4          Q.    And I think we've touched on it, but

 5     could you by position identify the participants in

 6     a normal weekly leadership meeting?

 7          A.    Yes.  Back when Ross was in charge

 8     and the regional vice president it was the

 9     regional directors, it was QA, and sometimes

10     facilities.  When Tracy came onboard, she also put

11     in a lot of the other cross-functional teams so

12     there was design, there was construction, there

13     was real estate, facilities was there, QA was

14     there, the PNAP was there; so -- yep.

15          Q.    And the format for these meetings

16     would typically be a conference call or something

17     else?

18          A.    No, it was a in-person meeting, but

19     it could also be -- you could also dial in.

20          Q.    In connection with this specific

21     meeting, were you in person or on the phone?

22          A.    I was on the phone with this.

23          Q.    Did you have a pre-drafted list of

24     points or talking points or notes about what you

25     were going to say on the call on this subject?
```

```
 1                  - RAMI KRANZ -

 2        A.     I believe I did, yes.

 3        Q.     If -- when you refer -- sorry.  On

 4   the e-mail on the first page on the second half

 5   from you to Tracy Gaven-Bridgeman on January 23rd,

 6   2018, when you write "I did elaborate during the

 7   call" and then you put these bullet points, is it

 8   your testimony these bullet points are a summary

 9   of what you communicated orally during the call?

10        A.     My testimony will be that this is a

11   summary of the highlights of some of the things

12   that I mentioned during the call, not everything.

13        Q.     How -- in terms of the organization

14   or that agenda for the meetings do you have a

15   regular speaking slot, is there a particular role

16   that you play in addressing the group?

17        A.     So this is a new -- so this is a

18   leadership team meeting, so they do a business

19   update and then everyone -- they do a round-robin,

20   so everyone gets a chance to talk.

21        Q.     And would this have been -- would

22   this have been something that you communicated to

23   the group during your slot to speak in the

24   rotation?

25        A.     Yes, it would have.
```

```
 1                    - RAMI KRANZ -

 2        Q.      How long do you believe it took you

 3   to communicate this on the phone?

 4        A.      I believe I took about fifteen

 5   minutes.

 6        Q.      In the bullet points, I would like to

 7   just focus in on a couple of them.  The third,

 8   could I ask you to read what's -- what you wrote

 9   there.

10        A.      "Partners have been abusing Hot Shots

11   in the stores using up to ten Hot Shots on top of

12   the menu board counters."

13        Q.      Earlier we had seen an e-mail that

14   referred to what -- that referred to nine or more

15   Hot Shots on a counter, is that what you were

16   referring to here?

17        A.      If we can be specific, that was

18   Jill's e-mail that referred to nine Hot Shots on

19   the counter; only not nine or more.

20        Q.      So when you wrote up to ten on top of

21   the menu board, what were you referring to?

22        A.      I was referring to that e-mail.  I

23   just obviously made a mistake.

24        Q.      The beginning of the sentence you

25   wrote, "Partners have been abusing Hot Shots in
```

```
 1                  - RAMI KRANZ -

 2    stores."  Did you have in mind anything, other

 3    than the one example that you go on to give in

 4    that sentence.

 5               MR. MOY:  Objection.

 6         A.    Unless I look through my notes and,

 7    you know, what I mention there, I can't recall

 8    exactly what examples I used.

 9         Q.    Could I ask you to read the second to

10    the last bullet point on that page.

11         A.    "This is a serious condition that can

12    cause food cross-contamination and food illness."

13         Q.    Thank you, and then going up to the

14    prior page, could I ask you to please read the

15    second to the last bullet on -- at the bottom of

16    that page.

17         A.    Second to the last?

18         Q.    Yes, on that first page.

19         A.    Yes.  Okay.  "This would be discussed

20    a few times before and the situation was

21    improving."

22         Q.    What are you referring to in that

23    sentence.

24         A.    So I'm referring to the communication

25    that I had been giving the leadership team
```

September 15, 2020                                    152

```
 1                     - RAMI KRANZ -

 2    regarding the use of pesticides; and obviously at

 3    that time I had not been hearing of the, you know,

 4    Hot Shots or other pesticides being used, so my

 5    opinion was that it was improving.

 6          Q.      During what period of time did you

 7    believe that it was improving versus being

 8    constant or getting worse, like what is the date

 9    range of time that you're referring to, if you're

10    able to express it that way in the sentence?

11                MR. MOY:  Objection.

12          A.      So the date would be the first time

13    Jill brought it to our attention to that

14    particular time.

15          Q.      Do you remember what month or year

16    Jill first brought it to your attention?

17          A.      I remember it being 2016.

18          Q.      So from 2016 until January 23rd,

19    2018, do you believe that the situation with Hot

20    Shot use was improving in stores?

21          A.      From my notes here, yes.

22          Q.      And that's based on reports or

23    information communicated to you about the

24    existence of Hot Shots in stores?

25          A.      What reports are you referring to?
```

```
1                      - RAMI KRANZ -

2          Q.     I'll ask a different question.

3      Just -- I just want to be clear when it was your

4      perception that from the first time Jill brought

5      it to your attention through January 23rd, 2018

6      that the situation had been improving, what is

7      your source of information for that conclusion?

8          A.     My source of information was the fact

9      that I wasn't being notified anymore about that

10     and not that they weren't notifying me, I hadn't

11     heard anything.  So that's why I said the

12     situation seems to be improving.

13         Q.     When you say you hadn't heard

14     anything, more specifically haven't heard anything

15     about what from whom?

16         A.     I hadn't been notified about

17     any -- any unauthorized, you know, chemical use in

18     a store.

19         Q.     Could I ask you about the last bullet

20     on the first page.  Could you please read it for

21     the record.

22         A.     "Unfortunately, pest control recently

23     found a Hot Shot located in the pastry case under

24     the bagels."

25         Q.     Do you have any information, beyond
```

```
 1                    - RAMI KRANZ -

 2      what's written there, about that incident?

 3           A.    I don't remember the store, but I do

 4      remember the photo.

 5           Q.    Was there any investigation or

 6      inquiry made of anybody to determine how in the

 7      heck a Hot Shot got into the pastry case under the

 8      bagels?

 9           A.    Again, that's a --

10               MR. MOY:  Objection.

11           A.    Sorry.  Again, that's operations and

12      I don't have privy.  I'm not privy to that

13      information.

14           Q.    Do you have any information at all

15      about how there came to be a Hot Shot under the

16      bagels in the pastry case, as you've described it

17      there?

18           A.    No, I don't.

19           Q.    And I know you've referred to

20      operations and I appreciate it's not your job, but

21      to the extent that you have any understanding at

22      all is there a particular position level or

23      individual in operations who you believe was the

24      most responsible for overseeing the operations

25      side based on your reports?
```

```
 1                      - RAMI KRANZ -

 2                 MR. MOY:  Objection.

 3          A.     So the regional vice president is in

 4     charge of the whole region.  So if there's one

 5     person that's in charge of what's going on in the

 6     region, then that's the person.

 7          Q.     Did anybody make any comments or ask

 8     any questions when you presented on this issue

 9     during the meeting?

10          A.     I'm sure they did, but I don't

11     remember what the comments or questions were.  It

12     was two years ago.

13          Q.     Have you ever been present for any

14     communication where it was discussed what actions

15     operations would take to resolve the issue?

16          A.     The only -- the only time I was

17     present was during a New York, you know,

18     leadership team meeting where the regional

19     directors -- you know, where the regional

20     directors said that they'll communicate and

21     cascade that message down and they kept

22     reiterating the importance of it.

23          Q.     And was that also that course of

24     action that was discussed when you presented at

25     this meeting?
```

```
1                    - RAMI KRANZ -

2          A.    I don't remember if we discussed it

3    there at this specific meeting or not.

4          Q.    I have a question just about the

5    e-mail footer in your forwarding e-mail to

6    opposing counsel.  It says "company counsel" on

7    top.  The title there for you is "Manager, Quality

8    Assurance, New York Metro and New Jersey region."

9    Was that the title throughout your tenure or did

10   it change at some point?

11         A.    It changed.  So when I was promoted

12   in Starbucks, when you put manager first and then

13   quality assurance second, that manager then notes

14   that you're a people manager.

15         Q.    Did any of the -- withdrawn.

16               Could you confirm, what was Tracy

17   Gavin-Bridgeman's position at the time?

18         A.    She was the regional vice president.

19         Q.    Is there a reason why you cc'd all of

20   the other individuals who you included in your

21   e-mail to Tracy?

22         A.    Yes, because the e-mails.  Sorry,

23   Tracy's e-mails to me cc'd everyone.

24         Q.    Did any of the individuals who are

25   listed as cc's there follow up or communicate with
```

```
 1                    - RAMI KRANZ -

 2     you at all about the subject of the e-mail?

 3          A.    Not that I can recall; and if there

 4     isn't any other pages to this, then I would say

 5     no.  Again my -- my e-mail was to Tracy just

 6     to -- just to let her know what I discussed at the

 7     New York Metro leadership team meeting with

 8     everyone that was cc'd, so they were already there

 9     for it.

10          Q.    So apart from in response to this

11     e-mail -- I'll ask differently.  After that

12     meeting that's summarized in this e-mail, did any

13     of the participants ever follow up with any

14     questions or followup information in response to

15     your presentation?

16          A.    Not that I recall.

17          Q.    One of the individuals listed as a cc

18     here is Carla Ruffin.  Were you familiar with her?

19          A.    Yes.

20          Q.    What was her position?

21          A.    Carla was the regional director.

22          Q.    Did you ever communicate with Ms.

23     Ruffin about Hot Shots or pesticides in any kind

24     of one-on-one communications separate from these

25     group meetings?
```

```
 1                    - RAMI KRANZ -

 2         A.    Yes.  So during my one on ones I

 3    reiterated the same a message that I had at the

 4    New York Metro leadership meeting; not all of

 5    these points specifically, but specifically just

 6    be aware of, you know, past usage and be aware in

 7    stores, and keep the message alive and keep it

 8    important with the district managers and store

 9    managers and ASMs and shifts.

10         Q.    Do you know what number, if any, Hot

11    Shot devices were located in Carla Ruffin's region

12    during your tenure?

13         A.    I didn't keep any reports and I

14    didn't keep any track of Hot Shots, not stores nor

15    where they were, so I -- I couldn't give you a

16    number.

17         Q.    As far as you know, did anybody at

18    the company in any form keep track?

19         A.    As far as I know, no.

20         Q.    You can put this document aside.

21              Posting a two-page document labeled

22    "Exhibit Kranz 45, Bates numbered DEF 144, 145.

23              (Whereupon, Kranz Exhibit 45 was

24         marked at this time.)

25         A.    Okay, I'm ready.
```

```
1                    - RAMI KRANZ -

2            Q.    Mr. Kranz, this appears to be an

3      e-mail chain comprised of only two e-mails.  The

4      e-mail at the top again looks like it's a forward

5      of the original e-mail by you to the company's

6      counsel in February, 2019; is that a correct

7      interpretation of the document?

8            A.    Yes, it is.

9            Q.    So focusing on the e-mail below that,

10     who was Ron Schuler at the time that you wrote

11     this January 23rd, 2018?

12           A.    Ron Schuler was a regional director.

13           Q.    And who was Taz Mbodje at that time?

14           A.    District manager.

15           Q.    The subject line is "Hot Shot in

16     Pastry Case Number 28168.  Why did you write this

17     e-mail to those two individuals?

18           A.    So obviously the Store Number 28168

19     is in Ron's district and he has a -- this district

20     as well.

21           Q.    Can I ask you to please read the text

22     of your short e-mail for the record.

23           A.    It says "Hi, Ron:  A Hot Shot was

24     found in the pastry case under the bagels in store

25     numbered 28168.  Please advise team that Hot Shots
```

```
 1                    - RAMI KRANZ -

 2      are insecticides and can cause foodborne illness

 3      if located near food items" and then just says

 4      "Thank you."

 5           Q.    When you in that last sentence asked

 6      him to advise the team that information, is that

 7      something that you had already urged regional and

 8      district managers to pass along to their team?

 9                 MR. MOY:  Objection.

10           A.    No, it wasn't.  So my communication

11      with the regional directors and the regional vice

12      president and the leadership team was more about

13      the Starbucks policy about not using any

14      pesticides and following the Starbucks standards.

15                 This sentence of "Please advise team

16      that Hot Shots are insecticides and can cause

17      foodborne illness if located near food items,"

18      that was me emphasizing the point with Ron and

19      Taz, Starbucks counter food is a part of safety

20      and is very high in the culture.  It's in the

21      mission statement, it's part of, you know, our

22      whole culture and using that statement was just a

23      way to emphasize it more with them.

24           Q.    Have you -- okay.  So previously

25      prior to this e-mail, had you communicated to Mr.
```

```
 1                     - RAMI KRANZ -

 2      Schuler that "Hot Shots are insecticides and can

 3      cause foodborne illness if located near food

 4      items"?

 5           A.    I'm sure that previously I would have

 6      probably during a one on one.  I'm not sure if I

 7      did it in other e-mails, but yes.  You know it was

 8      a way of me emphasizing the importance to them.

 9           Q.    And is that something you had also

10      previously communicated to Taz Mbodje?

11           A.    If I talked with Taz before this

12      then, yes, it would have been; so but during our

13      one on one with the district managers, that's

14      something that I probably would have mentioned to

15      them, again, to emphasize the importance of it on

16      the inside.

17           Q.    What is the source of your

18      information or knowledge of the statement that

19      "Hot Shots can cause foodborne illness if located

20      near food items"?  Where did you learn that?

21           A.    Well, so that's just

22      cross-contamination what we're talking about here

23      or what I'm talking about here.  So if there is

24      any chance of cross-contamination happening then,

25      yes, it can -- can cause a foodborne illness.
```

Rami Kranz

```
 1                 - RAMI KRANZ -

 2        Q.    Did you ever ask anybody anything or

 3   take any action to determine whether there had

 4   been cross-contamination, as referenced here, in

 5   any stores?

 6        A.    There was no incident that I'm aware

 7   of any of any of our partners being ill or feeling

 8   any ill effects.

 9        Q.    Were partners ever asked purposefully

10   hey, do you feel ill, you might have been exposed

11   to something?

12              MR. MOY:  Objection.

13        A.    Again, I'm not aware of that and,

14   again, it wouldn't have been my role or

15   responsibility for them to report to me that.

16        Q.    Do you know one way or another, as

17   you sit here today, whether any partners have

18   become ill in connection with Hot Shots?

19        A.    As of -- as I said before, I'm not

20   aware of anyone being ill from anything in our

21   stores related to pesticide use.

22        Q.    Is that information that you expect

23   would have been shared with you if it had ever

24   found to -- have been found to be true?

25        A.    It's a possibility that it could be
```

```
 1                  - RAMI KRANZ -

 2     shared with me, but it may not have been either.

 3         Q.     Did you ever yourself investigate or

 4     direct anybody else to investigate whether the

 5     manner in which Hot Shots had been placed in any

 6     store did or did not cause cross-contamination?

 7                MR. MOY:  Objection.

 8         A.     It was -- there's been no cases of

 9     cross-contamination nor pesticides in any of our

10     stores so there was no investigation, there was

11     nothing needed.

12         Q.     How do you know that there wasn't

13     cross-contamination if there was no investigation

14     to ascertain whether there might have been?

15         A.     That is part of my role and

16     responsibility and I would have been informed

17     about that.

18         Q.     I just want to be clear, I'm

19     trying -- maybe I'm not asking the question

20     clearly.  I understood cross-contamination is when

21     a chemical moves from one place into something

22     nearby it, is that how you're using the phrase?

23         A.     Cross-contamination will be when a

24     product is contaminated with another product.

25         Q.     How do you determine whether that
```

```
 1                    - RAMI KRANZ -

 2      contamination has occurred?

 3           A.     Usually we'll --

 4                  MR. MOY:  Objection.

 5           A.     Well, first of all, it hasn't

 6      occurred; but how -- how do I get notified?

 7           Q.     I'll ask differently.

 8           A.     Okay.

 9           Q.     In general, how is it possible to

10      determine whether a particular food item has been

11      cross-contaminated by a Hot Shot; How would one go

12      about determining if that had happened or not?

13                  MR. MOY:  Objection.

14           A.     You -- you need to be a little more

15      specific on that because -- are you asking how do

16      I determine if I'm looking at a product if it's

17      been contaminated.

18           Q.     Yes, yeah.  What are the means of

19      determining whether a product is contaminated that

20      you're familiar with?

21                  MR. MOY:  Objection.

22           A.     So, okay, if a product is in close

23      proximity, right, of the pesticides where there's

24      a chance that it can cross-contaminate it then,

25      yes, you can figure out that this product may have
```

```
 1                    - RAMI KRANZ -

 2      been cross-contaminated; but that's not what we

 3      were talking before.

 4                    So we -- we were discussing, you

 5      know, how I'd get notified or how do I find out,

 6      and that's usually through the Department of

 7      Health and the Department of Health finds out

 8      through the medical doctors.  So if someone is ill

 9      and they go to a doctor, they determine what

10      happened, they then have to report that to the

11      Department of Health and that comes across my desk

12      and that's my role and responsibility.

13          Q.    As far as you know, were customers

14      ever notified that they may have been exposed to

15      DDVP at Starbucks?

16                    MR. MOY:  Objection.

17          A.    Again, that's not my responsibility I

18      don't deal with customers at all.

19          Q.    Other than getting reports of

20      illness, are there other methods that you're

21      familiar with from your training or experience at

22      Starbucks for determining whether a particular

23      food item has been cross-contaminated?

24          A.    No.

25          Q.    Is there any reason to imagine that
```

1                   - RAMI KRANZ -

2    Hot Shots in Starbucks stores if placed in close

3    proximity to food would not result in

4    cross-contamination?

5               MR. MOY:  Objection.

6       A.      I need more clarity on that, please.

7       Q.      You had mentioned that generally if

8    two items are close to each other, then you can

9    infer that there may have been

10   cross-contamination?

11      A.      Correct.

12      Q.      As far as you know, were Hot Shots

13   ever placed in Starbucks stores in a method that

14   would prevent cross-contamination?

15              MR. MOY:  Objection.

16      A.      What do you mean by "prevent

17   cross-contamination"?

18      Q.      Eliminate the concern or inference

19   that cross-contamination may have occurred.

20              MR. MOY:  Objection.

21      A.      Just to clarify, are you asking me if

22   I've seen a Hot Shot placed in a store that

23   wouldn't cross-contaminate any food?

24      Q.      Yes.

25      A.      Then, yes, I have.

```
 1                  - RAMI KRANZ -

 2        Q.     Where have you seen Hot Shots in

 3   stores in a way that would not risk

 4   cross-contamination with food?

 5        A.     I've seen them in the back of house

 6   on top of the double-door refrigerator.

 7        Q.     For people who aren't intimately

 8   familiar with the layout of the Starbucks, could

 9   you explain where in the store that would be?

10        A.     The back of house?

11        Q.     And the refrigerators that you're

12   referring to, yes.

13        A.     They're double-door refrigerators

14   probably about six-and-a-half foot tall.

15        Q.     And where are they in the back of

16   house area?

17        A.     They're --

18               MR. MOY:  Objection.

19        A.     It's -- you can't give -- I can't

20   give you a specific spot because every store

21   layout is different.

22        Q.     In this specific instance when you

23   saw Hot Shots in that location back of house on

24   top of the refrigerators double-doors.

25        A.     Okay, so that one was -- I don't
```

```
 1                    - RAMI KRANZ -

 2    remember the exact store, but I do remember it

 3    wasn't next to the manager's desk.  It wasn't next

 4    to the three-comp sink as well.

 5         Q.    How far was it from the manager's

 6    desk?

 7         A.    I didn't measure it, but it wasn't

 8    close enough.

 9         Q.    Do employees work in the back of

10    house?

11         A.    No.  So they do some prep area, but

12    their work is actually the front of house.

13         Q.    How far from back of house in terms

14    of feet or yards at this location?

15         A.    I can only guess.  I didn't measure

16    anything.

17         Q.    How many Hot Shots did you see on

18    that occasion?

19         A.    One.

20         Q.    Is that something you saw in person

21    while you were physically present or a photograph?

22         A.    I believe it's something that I found

23    physically.

24         Q.    Do you remember when that happened?

25         A.    I don't remember the date, time, or
```

```
1                      - RAMI KRANZ -

2      store number.

3           Q.     What, if anything, did you do if you

4      remember once you saw that it was there?

5           A.     Well, I notified the leadership

6      teams.  I notified the RVP and the regional

7      directors, the district manager would have been

8      right with me and I disposed of it; and from my

9      memory, I believe it was also, you know, an older

10     Hot Shot.  I can't tell you how old, but it was

11     very dusty.

12          Q.     If you remember earlier in the

13     deposition you had referred to one instance when

14     you had found an old Hot Shot, is this one and the

15     same or two instances?

16          A.     I think the last one -- this could be

17     the last one.  Two instances; two separate.

18          Q.     You can put aside Exhibit 45.

19               MR. GRAFF:  Why don't we take a short

20          break, it's 2:36.  Let's come back at 2:45.

21          Off the record.

22               (Whereupon, there was a brief recess

23          in the proceedings.)

24               MR. GRAFF:  Let's go back on the

25          record, 2:47.
```

```
 1                    - RAMI KRANZ -

 2         Q.      Mr. Kranz, during the break did you

 3    communicate with anyone other than counsel?

 4         A.      No, I didn't.

 5         Q.      Did you read anything?

 6         A.      No, I haven't.

 7         Q.      Earlier we had been talking about

 8    illness that could result from cross-contamination

 9    of food and DDVP.  Do you have any knowledge or

10    understanding of what sort of symptoms or

11    manifestations an illness caused by that exposure

12    might take?

13              MR. MOY:  Objection.

14         A.      So for cross-contamination of food

15    no, I don't.  I can only tell you from -- from an

16    EMT what organophosphate looks like.

17         Q.      Could you the explain that please?

18         A.      We got taught the acronym SLUDGEM,

19    S-L-U-D-G-E-M, for organophosphate poisoning; and

20    then we also got taught that the antidote or the

21    -- or the treatment would be Atropine, 2

22    milligrams IVIN.

23         Q.      As far as you know, could DDVP

24    trigger an asthma attack in an asthmatic if they

25    were exposed?
```

```
 1                    - RAMI KRANZ -

 2              MR. MOY:  Objection.

 3       A.    As far as I know, I don't -- unless I

 4   read the label, I don't recall ever hearing that.

 5       Q.    Are you familiar with something

 6   called an HHCP manual in Stores?

 7       A.    A HHCP manual?

 8       Q.    Yes.

 9       A.    No.

10       Q.    The SLGM acronym, what does that

11   refer to?

12       A.    So what acronym?

13              MR. MOY:  Objection.

14       Q.    The SLUDGEM acronym in connection.

15       A.    SLUDGEM.

16       Q.    SLUDGEM.

17       A.    Salivation, lacrimation, urination,

18   defecation, gastric emesis and miosis.

19       Q.    If I could refer you back to a prior

20   exhibit, Exhibit 13 for just a moment.

21       A.    Yes.

22       Q.    If you need to take a second to

23   remind yourself what this is, let me know.

24       A.    Okay.

25       Q.    Why did you write "My apologies to
```

```
 1                  - RAMI KRANZ -

 2     the tech" in your response to Ms. Shwiner's

 3     e-mail?

 4          A.     I was being nice.  So Jill said that

 5     the tech had found No-Pest Strip on the desk.  She

 6     also mentioned that yesterday's tech was working

 7     under the counter and turned and his head was

 8     inches from the strip.  She was complaining about

 9     it and she was obviously upset, that I gathered

10     from the e-mail that she sent me.  So I thought it

11     was appropriate to apologize.

12          Q.     Were you aware at the time -- in

13     Jill's e-mail she writes "This is the same tech

14     who two weeks ago walked into a store that had

15     just set off bombs."  Do you know the identity of

16     the tech, who she's referring to?

17          A.     I -- no, I don't believe I do.  She

18     didn't mention it.

19          Q.     You can put that aside.

20          A.     Okay.

21          Q.     I posted a document labeled Exhibit

22     Kranz 3.  It's one page Bates numbered 29994.

23                 (Whereupon, Kranz Exhibit 3 was

24           marked at this time.)

25          A.     Okay.
```

```
 1                  - RAMI KRANZ -

 2         Q.     Do you recognize any of this

 3   document?

 4         A.     I don't remember the specific

 5   incident, no.

 6         Q.     Do you recognize the form of the

 7   document as an e-mail chain that you are copied on

 8   and responded to?

 9         A.     Yes.

10         Q.     I would like to direct your attention

11   toward the bottom of the page.  The first e-mail

12   in the sequence is from Kimberly Healy on January

13   19, 2018 to you and the three other individuals,

14   "Subject:  Hot Shot Citing."  Do you see that part

15   of the document?

16         A.     Yes, I do.

17         Q.     Who was Kimberly Healy at the time?

18         A.     She was a facility manager.

19         Q.     Do you know who she reported to?

20         A.     She reported to Stephen at the time.

21         Q.     Could you state his full name just,

22   so the record is clear?

23         A.     Stephen Gallant.

24         Q.     Do you believe you read the e-mail at

25   the time or around the time it was sent?
```

```
 1                  - RAMI KRANZ -

 2         A.     If I read the e-mail?  Yes, I would

 3    have read the e-mail.  I don't see it, though.

 4         Q.     Do you know if you -- could I ask you

 5    to read the sentence, the longer sentence, that

 6    makes the body of her e-mail.  It has some jargon.

 7    I'll ask you if you can explain what the words

 8    mean.

 9         A.      "In addition to the 3 - DRs reaching

10    fridge, missing its top cover, having excessive

11    buildup and debris, five Hot Shots found.  Also

12    found another two in the base of the hot water

13    heater.  (Jasmine similar to 7465, 59th and

14    Columbus with Carey)."

15         Q.     Do you have an understanding of what

16    she's describing as far as "two in the base of the

17    hot water heater"?

18         A.     Again, I'm -- I'm not Kim and I can't

19    tell you what she was thinking when she was

20    writing it.  I can just explain, you know -- from

21    my point of view, you know, I could tell you what

22    I'm thinking, but I can't tell you what Kim's

23    thinking.

24         Q.     Sure.  When you see those words, what

25    do they mean to you?
```

```
 1                    - RAMI KRANZ -

 2        A.    So the hot water heaters have like a

 3   metal lip around them, almost like a basin; you

 4   know, it's a two-inch basin in case it leaks.  I'm

 5   assuming that Kim meant that it was in the base of

 6   that hot water heater, but again I'm not Kim and I

 7   don't know what she was thinking when she wrote

 8   it.

 9        Q.    Did you ever have any followup

10   communications with Ms. Healy, other than what's

11   in this e-mail?

12        A.    I don't remember.  I don't even

13   remember like the e-mail being sent out until you

14   just showed me now.

15        Q.    Right above that part that you read

16   it says, "Sharing M - Rockefeller Concourse."

17   Does that mean anything to you in the context of

18   Starbucks?

19        A.    Yes -- so, well, Rockefeller

20   Concourse is one of our stores.

21        Q.    Is sharing a store or --

22        A.    So sharing is not a store.

23        Q.    Okay.

24        A.    So, you know, again, you know, just

25   to -- I could tell you what I took from that, but
```

```
 1                - RAMI KRANZ -

 2    not what Kim was writing up; but sharing is the

 3    sharing her thoughts on the business from

 4    Rockefeller Center.

 5        Q.    Thank you.  Thank you.  I wasn't sure

 6    if sharing meant something beyond that.

 7        A.    No.

 8        Q.    In the parenthetical at the end of

 9    the sentence that she writes she says, "(Jasmine

10    similar to" I guess the store number and address.

11    Do you have any information about what she's

12    referring to there, is the reference familiar?

13        A.    This reference isn't jogging my

14    memory, but again, you know, it's -- it's over two

15    years ago now.

16        Q.    Apart from what's in this e-mail, did

17    you ever give any direction to Ms. Healy or

18    anybody in facilities about how to handle Hot

19    Shots if they discovered them?

20              MR. MOY:  Objection.

21        A.    So again, you know, I've been asked,

22    you know, by some of the -- again, I can't, you

23    know, remember who exactly, you know, a safe way

24    of disposing of them.  So my personal opinion was

25    to -- like I mentioned prior, was to grab a
```

```
 1                    - RAMI KRANZ -

 2      rubbish bag, invert it, grab the Hot Shot, pull it

 3      through, tie a knot and dispose of it in the

 4      rubbish bin.

 5           Q.    It appears that Ms. Healy sent a

 6      followup e-mail on April 13th at 7:40 p.m. and

 7      that you then responded to her followup e-mail; is

 8      that how you're reading the chain?

 9                 MR. MOY:  Objection.

10           Q.    Another way to ask it:  Your e-mail

11      at the top of the page to, what e-mail below were

12      you responding?

13           A.    So, yup, I was responding back to

14      Kim, Kim Healy.

15           Q.    What did you write?

16           A.    I wrote "Thank you, Kim.  I'll

17      discuss with leadership team."

18           Q.    Did you discuss it with the

19      leadership team?

20           A.    Yes.  If I said to Kim I'll discuss

21      it then, yes, I would have.

22           Q.    Do you know whether the leadership

23      team or any members of the leadership team decided

24      to take any action based on the information?

25                 MR. MOY:  Objection.
```

```
 1                - RAMI KRANZ -

 2         A.     Again, you know, I'm the consultant,

 3    I'm the coach.  That's -- you know, that's not my

 4    role and responsibility.  That was the regional

 5    vice president, the regional director's, role and

 6    responsibilities, to ensure that our standards are

 7    upheld.  So after I give them the information and

 8    after I coach them, right, they do take that, but

 9    what they do with it specifically I don't know

10    because I wasn't privy.

11         Q.     In connection with the weekly

12    leadership team meetings, is there a written

13    agenda that's distributed in connection with the

14    meeting?

15         A.     No, there isn't.

16         Q.     Is there a meeting summary that gets

17    circulated after the meeting?

18         A.     No, there isn't.

19         Q.     If you wanted to determine with

20    certainty the dates of meetings when you addressed

21    that pest use concerns, would there be any

22    document or source that you could refer to for

23    that information?

24         A.     No, there wouldn't; and I can tell

25    you that at that period from -- you know, from the
```

```
 1                    - RAMI KRANZ -

 2      time that Jill sent me the first e-mail that on a

 3      regular basis, almost weekly, I was discussing it

 4      in the leadership team meetings, just keeping it

 5      at the forefront of everyone's mind.  Even though

 6      the leadership team already knew about it and even

 7      though they were already discussing it and

 8      communicating with their team that I saw, you

 9      know, myself, you know, I said -- I still kept

10      talking about it and discussing it.

11          Q.     Was it your impression that whatever

12      the leadership team was doing, I know you weren't

13      privy, was sufficient to curtail the problem?

14                 MR. MOY:  Objection.

15          A.     Hard to tell because I wasn't privy

16      to what they were -- how they were handling it, so

17      I wasn't privy to how it was working or not.

18          Q.     Was there ever any discussion that

19      you were a part of about why it was that this

20      problem was recurring and not stamped out?

21                 MR. MOY:  Objection.

22          A.     There wasn't a discussion per se

23      about why they kept doing it.  There was just a

24      discussion about ensuring that the partners knew

25      the Starbucks standards and ensuring that, you
```

```
 1                - RAMI KRANZ -

 2     know, the message was clear that we -- we don't

 3     allow, you know, the store managers or the store

 4     partners to treat the stores' pest issues.

 5               That's why, you know, Starbucks has

 6     got a lot of resources; you know, we can utilize

 7     the resources.  And one of the resources are the

 8     pest vendors, another one is the cleaning crew,

 9     another one is having cross-functional teams.

10     We've got a facilities manager that will help you.

11     You've got the QA manager that can help.  We've

12     even got design people, you know, and handyman

13     people that can help if there's other issues that

14     we need to solve.

15         Q.    Do you have any theory or something

16     better than a guess as to why it would be that

17     people would continue to place Hot Shots in

18     stores, what their motivation could be?

19               MR. MOY:  Objection.

20         A.    So you're asking me to -- you're

21     asking me to discuss what store partners were

22     thinking when they did that.  I can't answer that

23     I don't know.

24         Q.    In the course of your work in

25     quantity assurance and all of the messages you've
```

```
 1                  - RAMI KRANZ -

 2    given about this, did you ever wonder what the

 3    motivation was for people to not be following your

 4    guidance or did you have some sense of why they

 5    were motivated to violate it?

 6         A.     I often wondered and I often try to

 7    think about why those do that but again, you know,

 8    I'm not a store partner and I wasn't the one doing

 9    it and I, you know, couldn't tell you for certain

10    what they were thinking when they did that.  I

11    personally, you know, think that it's a lot easier

12    to pick up a phone, right, make a call to the FPC

13    and get the pest vendors in there and let them

14    treat it than it is, you know, to do anything

15    else.

16         Q.     Posting a document labeled Exhibit

17    Kranz 1.  It a three-page document.  It's a

18    depiction of the label on a Hot Shot product.

19              (Whereupon, Kranz Exhibit 1 was

20         marked at this time.)

21         Q.     Mr. Kranz, have you had an

22    opportunity to review the document?

23         A.     So I'm still reading Page 2.

24         Q.     Take your time.

25         A.     Okay.
```

```
 1                    - RAMI KRANZ -

 2          Q.     Do you recognize the document?

 3          A.     Yes, I do.  It's a label for No-Pest

 4     Strip.

 5          Q.     Is this something that you've seen or

 6     reviewed before?

 7          A.     Yes, I have seen this.

 8          Q.     When we've been referring to Hot

 9     Shots and DDVP strips in stores, is it your

10     understanding this is the product?

11          A.     Yes, it is.  Or one of the products,

12     I guess.  I mean, I don't know how many of them

13     are out in the market.

14          Q.     Could I direct your attention,

15     please, to the third page toward the top.  There's

16     just some details there.

17          A.     What does it start with, "Garages"?

18          Q.     Yes.  So you if go down three lines

19     towards the middle, do you see it says "165 gram

20     strip" --

21          A.     Yes.

22          Q.     -- "will treat 900 to 1,200 cubic

23     feet, which is about equal to an average room 10

24     feet by 13 feet with an 8 foot ceiling."

25                    Earlier I know you said layouts, it
```

```
1                    - RAMI KRANZ -

2      varies; but generally the back of house by the

3      refrigerators where you had noted that you saw

4      DDVP strips that were being used not improperly,

5      is that back of house space generally bigger or

6      smaller than 10 feet by 13 feet?

7           A.    The --

8                 MR. MOY:  Objection.

9           A.    I apologize, I can't answer that

10     because I don't work in feet.  I'm sorry.  I work

11     in like meters, kilometers, centimeters.  I

12     apologize; and I'm not sure what 10 by 13 is.  I

13     mean, I know what's 10 by 13 feet, but I don't

14     know how big that is.

15          Q.    Okay.  Just give me twenty seconds,

16     I'll ask the Internet.

17                MR. MOY:  I'll object to that.

18          Q.    So it looks like ten feet is about 3

19     meters and 13 feet is about 4 meters?

20          A.    Okay.

21          Q.    Mr. Kranz, is the back of house area

22     in the Starbucks store that you saw bigger or

23     smaller than 3 meters by 4 meters.

24                MR. MOY:  Objection.

25          A.    Which incident are you referring to?
```

```
 1                   - RAMI KRANZ -

 2          Q.     I'm sorry, I can't hear if there was

 3     a response.

 4          A.     Which incident are you referring to?

 5     You're asking me to mention if the back of house

 6     was bigger than 3 by 4 meters?

 7          Q.     Yeah.  Earlier you had mentioned -- I

 8     had asked if you ever saw a Hot Shot used in a

 9     permissible way and you had referenced in the back

10     of house there were some refrigerators and that

11     was a permissible space.  With reference to that

12     back of house area, can you estimate if it was

13     bigger or smaller than 3 meters by 4 meters?

14          A.     I can estimate now.

15                 MR. MOY:  Objection.

16          A.     I can estimate that it was bigger

17     than 3 to 4 meters; but then that's just from my

18     recollection when I found it and just seeing it,

19     but I can't recall the exact store.

20          Q.     Slightly below that, there is a

21     subsection headed "Storage and Disposal."  Do you

22     see what the instruction is for "disposal if

23     empty"?

24          A.      "Place in trash or offer for

25     recycling, if available."
```

```
 1                    - RAMI KRANZ -

 2        Q.     And what does empty mean in the

 3   context of one of these devices?

 4        A.     Well --

 5               MR. MOY:  Objection.

 6        A.     So according to the label, empty

 7   would mean when there's no more pesticide on the

 8   strip.

 9        Q.     And then do you see it goes on to say

10   what to do if it's partly filled?

11        A.     Uh-huh.

12        Q.     What does it say to do there?

13        A.     "Call your solid waste agency for

14   disposal instructions.  Never place unused product

15   down an indoor or outdoor drain."

16        Q.     Did you ever seek a disposal as

17   disposal -- excuse me.  Did you ever seek disposal

18   instructions from any waste agency in connection

19   with the disposal of Hot Shots?

20        A.     There was no need.  So if you

21   remember, I said that the Hot Shot was very dusty

22   and very old.  It was obviously older than four

23   months; there was no need for it.

24        Q.     I believe you also mentioned that you

25   had encouraged operations people to bag it and
```

```
 1                   - RAMI KRANZ -

 2    throw it out, if they found it.  Did I

 3    misunderstand or was that also part of your

 4    testimony?

 5              MR. MOY:  Objection.

 6         A.    I didn't encourage them, but when

 7    they asked me a safe way then, yes, that was what

 8    I -- you know, what I explained to them.

 9         Q.    And on the occasions when that's come

10    and you've explained the disposal, have you ever

11    made the distinction to the person who is asking

12    you as between an empty versus a partially full

13    Hot Shot device?

14         A.    One of the questions that I did ask

15    was if it was dusty or not or if it looked old or

16    not.

17         Q.    Did you ask if it was empty of the

18    pesticide?

19         A.    I wasn't sure if they were aware

20    enough for that, so I asked if it looked old and

21    then I can ask probing questions after that

22    depending on what the answers were.

23         Q.    On how many occasions, if you can

24    estimate, did you have an inquiry and discussion

25    like that with somebody at Starbucks?
```

```
 1                    - RAMI KRANZ -

 2         A.    I can't give you an exact number, but

 3    it wasn't that many.

 4         Q.    As far as you know -- withdrawn.

 5               Do you know what guidance -- I had

 6    asked you -- sorry.  I had asked you before if you

 7    had ever contacted the solid waste agency.  I'm

 8    asking now more generally:  Are you aware of what

 9    any guidance from such an agency is with respect

10    to disposing of partially full Hot Shot devices in

11    New York City?

12               MR. MOY:  Objection.

13         A.    The answer is no, I don't.

14         Q.    Okay, we can put this document aside.

15               I've just posted a document labeled

16    Exhibit Kranz 48.  It's a four-page e-mail

17    produced by plaintiffs.

18               (Whereupon, Kranz Exhibit 48 was

19         marked at this time.)

20         A.    Okay.

21         Q.    Do you recognize all or part of this

22    e-mail chain?

23         A.    I remember the tour that I had with

24    Jill and I do remember parts of this e-mail chain,

25    yes.
```

```
 1                    - RAMI KRANZ -

 2         Q.     Is the tour that you're referring to

 3    with Jill something that happened or similar

 4    meetings on a regular basis or was this a one=time

 5    special event?

 6         A.     It wasn't a regular basis.  It was

 7    just as needed.

 8         Q.     And what do you remember of this

 9    particular visit with Jill?

10         A.     That we went to the Port Authority

11    store and that it was actually very eye-opening.

12    We did find the fruit fly breeding site and we

13    found it under the counter, but on the base

14    in -- inside the baseboard tiles.

15              So what was happening was, liquid was

16    leaking from the partner side to the customer side

17    through the baseboard tiles and it created an

18    environment where fruit flies were -- I guess,

19    were breeding.  So the store was clean, but there

20    was no way for them to access it.  So until we

21    actually popped open a tile and we saw underneath

22    it and behind it, we actually didn't find it.

23         Q.     Can you determine from the dates of

24    the e-mail chain what date you and Ms. Shwiner

25    visited the Port Authority store?
```

```
 1                    - RAMI KRANZ -

 2          A.     I'm going to have a look.  Do you me

 3     find the 31st -- so it was November 1st because I

 4     did an e-mail here that states "Which store do you

 5     want to meet tomorrow night" and that was dated

 6     Tuesday, 31st of October.

 7          Q.     Could I direct your attention,

 8     please, down to the third page of the document

 9     toward the top, there's an e-mail on October 30,

10     2017, 8:26 a.m. Jill@avptermite@aol.com?

11          A.     I'm there.

12          Q.     Could you read that, the paragraph of

13     that e-mail to yourself?

14          A.     Okay.

15          Q.     In the second line she writes, "I

16     spoke to Rami last Wednesday before our meeting

17     about the cleanliness issues and excessive use of

18     the 'No-Pest Strips.'"

19                My question, Mr. Kranz, do you have

20     any memory of meeting with Jill and having a

21     discussion like that prior to your Port Authority

22     visit?

23          A.     Having a meeting with Jill?

24          Q.     Having a discussion with Jill about

25     that subject.
```

```
 1                 - RAMI KRANZ -

 2        A.     No, this was -- she wrote that to

 3   Margaret.

 4        Q.     Right.

 5        A.     Yes.

 6        Q.     I'm asking if -- she's referring to a

 7   conversation with you.  I'm asking if you have a

 8   memory of what conversation that might be.

 9        A.     No, I don't.  I don't remember that

10   exact conversation.

11        Q.     We can put that document aside.

12               Posting a one-page document marked

13   Kranz Exhibit Kranz 18.  It's Bates stamped 45453.

14               (Whereupon, Kranz Exhibit 18 was

15        marked at this time.)

16        A.     Okay.

17        Q.     Have you ever seen this document

18   before?

19        A.     It looks familiar, but I'm not sure

20   if I have.  I'm not sure if it's something that

21   maybe, you know, Tracy or someone else sent me.

22   I'm not sure.

23        Q.     So I'm going to ask you to just read

24   some of the information and then I'll ask you some

25   questions about it if you know the answer or not,
```

```
1                   - RAMI KRANZ -

2      mindful that you might not have seen the document

3      before.

4                   Could I ask you to read the short

5      paragraph that begins "To reiterate."

6           A.      "To reiterate, the on background

7      information product used in our stores must meet

8      high safety standards in order to comply with our

9      company guidelines.  Upon hearing reports that

10     employees have used a product that violated

11     company guidelines, Starbucks immediately

12     instructed local leadership to remove these

13     products.  We can confirm that these products have

14     been removed."

15          Q.      My question as it relates to you is

16     whether you were ever furnished with any kind of

17     confirmation that Hot Shots have been removed from

18     Starbucks stores in Manhattan?

19          A.      No.  So -- but then again, you know,

20     just to expand on that a little bit too, that's

21     operations and the operations team is the one

22     that's responsible for it.  So it's not my role

23     and responsibility, so they wouldn't have reported

24     to me for this.

25          Q.      Okay.  I ask you to read, please, the
```

                            - RAMI KRANZ -

 1

 2      next sentence.

 3          A.     "Additionally I can confirm that we

 4      consulted with experts and concluded that based on

 5      how the strips were used in stores, employees and

 6      customers were not exposed to health risks."

 7               MR. GRAFF:  And I'll note for record

 8          that the phrase "employees and customers were

 9          not exposed to health risks" is in bold and

10          underlined.

11          Q.     My question, Mr. Kranz, do you have

12      any knowledge or information about what's being

13      described in that sentence?

14          A.     No, I don't.

15          Q.     As far as you know, were experts

16      consulted that you're aware of to determine

17      whether Hot Shots were used in a dangerous way in

18      Starbucks stores?

19               MR. MOY:  Objection.

20          A.     First of all, no one said that they

21      were used in a dangerous way in Starbucks stores,

22      okay.

23          Q.     I'll ask the question differently.

24      As far as you're aware, did any part of Starbucks

25      ever consult with experts to confirm that the

```
 1                    - RAMI KRANZ -

 2      manner in which Hot Shots were used in Starbucks

 3      stores did not expose employees and customers to

 4      health risks?

 5              MR. MOY:  Objection.

 6         A.     I've not been aware of any experts

 7      that conducted any tests.

 8         Q.     Have you ever heard anybody at any

 9      level of management in Starbucks assert that Hot

10      Shots are safe to use in Starbucks stores?

11         A.     Can you clarify more.

12         Q.     I know you were very involved in

13      passing on the message that Hot Shots should not

14      be used for the reasons we've discussed.

15         A.     Clarify the question a little bit

16      better, please, for me.

17         Q.     Let me withdraw the question.  Did

18      anybody ever tell you -- anybody at any level of

19      management at Starbucks ever disagree with your

20      warnings and the message that you were giving

21      about Hot Shots?

22         A.     At what time?

23         Q.     Ever.

24         A.     Ever.  No one disagreed with my

25      wording, my emphasis on it.
```

```
 1                    - RAMI KRANZ -

 2          Q.     Did anybody express that in their

 3     view this was not a problem?

 4                 MR. MOY:  Objection.

 5          A.     No one in the leadership team, no one

 6     in the district manager team, no one in the store

 7     manager teams that I observed during huddles or in

 8     field visits, you know, with the operations team,

 9     did I ever hear that anyone said that it isn't a

10     problem.

11          Q.     Did you ever hear anyone at all who

12     was employed or who had performed work for

13     Starbucks assert that Hot Shots used in stores

14     wasn't really a problem?

15                 MR. MOY:  Objection.

16          A.     No one says that Hot Shot use in

17     stores -- no one said that we had a problem with

18     Hot Shots used in stores so we did have them

19     there, but no one was -- sorry, please repeat the

20     question one more time.

21          Q.     Did any person ever communicate to

22     you that the use of Hot Shots in Starbucks stores

23     would not create a risk to health or safety?

24          A.     Could you be more specific in that.

25          Q.     I don't think I can.  Are you able to
```

```
 1                  - RAMI KRANZ -

 2      answer the question as I've worded it?

 3           A.     Did anyone --

 4                  MR. MOY:  Objection.

 5           A.     Just repeat that one more time,

 6      sorry.

 7           Q.     Did anyone ever communicate to you

 8      that, in their view, using Hot Shots in Starbucks

 9      stores wasn't a significant problem?

10                  MR. MOY:  Objection.

11           A.     What do you mean by "significant

12      problem"?

13           Q.     Wasn't a problem of any degree.

14                  MR. MOY:  Objection.

15           Q.     I'll -- I'll re-ask it all in a row.

16      Did any current or former employee of Starbucks

17      ever communicate to you, in substance, that they

18      believed that the use of Hot Shots in any

19      Starbucks store was not a matter of concern?

20                  MR. MOY:  Objection.

21           A.     We -- can you clarify what you mean

22      by "not a matter of concern"?  I just need more

23      specifics to answer it.

24           Q.     That what you were identifying as a

25      problem, that is the use of Hot Shots in stores,
```

```
 1                  - RAMI KRANZ -

 2    was not in fact a concern that people needed to

 3    worry about.  Did anybody ever say, in substance,

 4    words to that effect?

 5              MR. MOY:  Same objection.

 6         A.    Okay.  So again just to give you the

 7    answer, in my communications with the leadership

 8    team no one ever pushed back and said that it's

 9    not a problem.  If you're asking are there -- are

10    there legal uses for a Hot Shot in a store, the

11    answer is yes, there are, but that's what I'm

12    trying to clarify when you say areas of concern.

13         Q.    Okay, that's helpful.  What I was

14    trying to narrow my question to if any people

15    other than the leadership team -- you've explained

16    that that they were very in agreement with your

17    message.  Was there anybody else at Starbucks who

18    expressed disagreement with your message about Hot

19    Shots being a problem and should not be used in

20    stores?

21              MR. MOY:  Objection.

22         A.    No.  No one disagreed that it should

23    not be used in stores.

24         Q.    Okay.

25              Just posted a document Kranz Exhibit
```

```
 1                    - RAMI KRANZ -

 2    8.  It's three pages Bates numbered DEF 154

 3    through 156?

 4                 (Whereupon, Kranz Exhibit 8 was

 5          marked at this time.)

 6          Q.    Mr. Kranz, do you recognize this

 7    e-mail chain?

 8          A.    Yes, I do.

 9          Q.    Is it again the case that on the

10    first page, the e-mail at the top is a forward

11    from you to the company's counsel?

12          A.    That is correct.

13          Q.    Could I direct your attention to the

14    e-mail toward the bottom half of Page 2 from Keith

15    Costello on July 12th, 2018.

16          A.    I'm at it.

17          Q.    Do you see that you're one of the

18    noted cc recipients of the e-mail?

19          A.    Yes, I do.

20          Q.    Did you read the e-mail at or around

21    the time it was sent?

22          A.    Yes, I did.

23          Q.    The subject line is "Stores

24    Purchasing Pest Control Items FYI Importance

25    High."  Prior to reading this e-mail, had you ever
```

```
1                    - RAMI KRANZ -

2      been told by anybody that any stores were

3      purchasing their own pest control items?

4           A.     So are you -- well, this is 2018.  So

5      the first e-mail that I got from Jill was 2016, so

6      we knew that stores had them in there.  How they

7      got them in there and who purchased them, I don't

8      know.

9           Q.     Okay.  So would this be the first

10     time that it was communicated to you, in words or

11     in writing, that stores were purchasing such

12     items?

13                 MR. MOY:  Objection.

14          A.     From what I can remember, yes, that

15     will be the first time.

16          Q.     What position did Keith Costello hold

17     on the date of this e-mail?

18          A.     Keith was senior facility manager.

19          Q.     Did you discuss this e-mail with

20     anyone after you received it?

21          A.     I'm sure I did.

22          Q.     And I'll narrow it down a little bit.

23     In the months of July or August, 2018, the e-mail

24     is dated July 12th, who do you believe you would

25     have spoken with about this e-mail at that time?
```

```
 1                    - RAMI KRANZ -

 2         A.     I would have spoken to Keith at that

 3    time.  I don't recall the conversation, but I

 4    would have -- I would have spoken to him.

 5         Q.     Do you believe that you did have a

 6    conversation with Keith, whether or not you

 7    remember the details?

 8         A.     I believe that -- yes, reading this I

 9    believe that I would have contacted Keith.

10         Q.     For what purpose would you have

11    contacted him?

12         A.     To get a little more information and

13    even to clarify the information.

14         Q.     And as you sit here today to the best

15    of your memory, do you know any further

16    information or clarifications on the information?

17         A.     No, I don't remember even the

18    conversation that I had with him.  Again, it was a

19    while ago.

20         Q.     Further down in his

21    e-mail -- withdrawn.

22                Going up to the bottom of Page 1, the

23    e-mail from you September 13, 2018, 2:16 p.m., to

24    Keith Costello and a number of cc's.  Could I ask

25    you to read the text of your e-mail.
```

```
 1                    - RAMI KRANZ -

 2        A.     Yes, it says "Hi, Keith:  FYI since

 3   your last e-mail, I've been recommending stores

 4   concentrate on cleaning and to leave the pest

 5   control vendors to do their job."

 6        Q.     What is your last e-mail that you

 7   referred to in that sentence?

 8        A.     "Since your last e-mail" seems to

 9   detail Keith's e-mail that we just went through.

10        Q.     So the date on Keith's e-mail?

11        A.     The 12th.

12        Q.     July 12th, 2018?

13        A.     Yes.  Yup.

14        Q.     Was there any reason in particular

15   that you sent this e-mail on September 13th, 2018?

16        A.     Not that I can remember, but I'm sure

17   something that happened that I felt necessary to

18   reach out to Keith.

19        Q.     When you wrote that since his last

20   e-mail you've been recommending stores concentrate

21   on cleaning leaving the pest control vendors to do

22   their job, is that something that you began

23   recommending subsequent to his last e-mail?

24        A.     No, that was something that I was

25   concentrating on.  That was something that I was
```

```
 1                   - RAMI KRANZ -

 2       emphasizing with all the operation leadership

 3       saying follow the Starbucks protocol of we're in

 4       charge of the cleanliness and the food safety of

 5       the store.  The pest vendor is in charge of

 6       controlling the pests and applying the pesticides.

 7            Q.    Is that the same message you had been

 8       communicating since 2016?

 9            A.    That is correct.

10            Q.    Do you know whether anyone, other

11       than you, on the leadership team had any

12       communication with Keith Costello about the

13       substance of his e-mail?

14            A.    I honestly couldn't tell you.  I do

15       not have any information about anyone else

16       reaching out to him.

17            Q.    Who is Joseph DeMetro?

18            A.    Off the top of my head, I don't

19       recall Joseph De Metro so I'm not a hundred

20       percent sure.

21            Q.    Did you ever complain about the AVP

22       or any of its personnel to anyone?

23            A.    No, I didn't.  I had a good

24       relationship with Jill.

25            Q.    And I know she can't talk on the
```

```
 1                  - RAMI KRANZ -

 2        A.     Yes.

 3               MR. MOY:  I'm, sorry, Ari, I just

 4        wanted to note on the record Exhibit 53

 5        contains underlining that I believe counsel

 6        might added.

 7               MR. GRAFF:  I'll note that.

 8               MR. MOY:  Okay.

 9        Q.     Mr. Kranz, you'll note that on Page

10   52 because there's a lot of legal verbiage in

11   there, I've placed red highlighting under a couple

12   of sentences just for the purposes of being able

13   to refer you to the section I have in mind to ask

14   you about.  The other red underlining that appears

15   in this document is, likewise, placed by me to

16   facilitate the communication.

17               Do you see in the second underlined

18   bit on Page 3 it says "Defendant will produce Rami

19   Kranz, Manager Quality Assurance, to testify

20   generally as to Defendant's awareness, or lack

21   thereof of, of the use of pesticides including

22   DDVP or Hot Shots based on his communications with

23   representatives of AVP at Defendant's Manhattan

24   locations, as well as the initiatives and actions

25   undertaken to remediate the same."
```

```
 1                    - RAMI KRANZ -

 2               Mr. Kranz, is it your understanding

 3      that you've been designated by the defendant to

 4      testify about that subject?

 5          A.    Yes.

 6          Q.    Did you do any preparation work in

 7      particular to obtain more information about this

 8      specific subject?

 9               MR. MOY:  Objection.

10          A.    No, I didn't.

11          Q.    The line here refers to your

12      "communications with representatives of AVP"?

13          A.    Uh-huh.

14          Q.    We touched on Jill Shwiner and Paul

15      D'Auria.  Have you had any communications with

16      anyone else at AVP, as far as you know?

17          A.    Not that I know of.  Jill was my main

18      contact at AVP.

19          Q.    And the sentence where it ends it

20      says, "as well as the initiatives and actions

21      undertaken to remediate the same."  What

22      initiatives were undertaken to remediate the use

23      of DDVP or Hot Shots in Starbucks stores?

24          A.    So my initiatives and actions

25      undertaken -- because I can discuss what I did, I
```

                        - RAMI KRANZ -

1

2       can't discuss what the operations team did; but I

3       brought it to the operations team's attention via

4       e-mails and in-person meetings at the New York

5       Metro leadership team meetings.  I made them aware

6       via the huddles that I joined and mentioned in the

7       huddles, and then had the regional director or the

8       leader of that team reiterate the message and to

9       make -- to emphasize that message; and I also

10      added it to our shift supervisor workshop so that

11      we could get a broader range and get it, you know,

12      to more people as well and more partners within

13      the New York Metro area.

14          Q.    When it refers here to the actions

15      undertaken to remediate DDVP or Hot Shot use in

16      Starbucks stores, is that any different than the

17      initiatives that you were just describing?

18          A.    No, it's one and the same.

19          Q.    You have no information about what

20      operations did with the information that you

21      provided to them, beyond hearing it from you?

22          A.    I only have knowledge of what

23      operations did when I observed it during the

24      huddles and when I observed it in the field.

25      Outside of that I have no -- you know, I had no

```
 1                  - RAMI KRANZ -

 2      visibility to what they were doing.

 3                  But I can tell you that my

 4      observations during the huddles, during the

 5      meetings at the leadership team, everyone took it

 6      very seriously and, you know, everyone was

 7      following up on it.

 8          Q.     Do you know if anybody was ever

 9      punished or disciplined in the context of their

10      employment at Starbucks in connection with the

11      misuse of Hot Shots?

12          A.     Again, my role and responsibility

13      doesn't include, you know, any like knowledge of

14      punishments.  So that's all part of operation,

15      that's part of the partner resource's manager, so

16      I'm not privy to that.

17          Q.     Okay.  So in terms of this subject,

18      what you know and are able to testify about is

19      what you experienced firsthand and know from your

20      direct involvement; is that fair to say?

21          A.     That is correct.

22                  MR. MOY:  Objection.

23          Q.     And you don't know about things that

24      you were not directly personally involved with if

25      they were done by operations based on your advice,
```

```
 1                    - RAMI KRANZ -

 2      correct?

 3          A.     Correct.

 4          Q.     Let's scroll down, please, to Page 5.

 5      I'm sorry, I'll -- actually, yeah, Page 5.  I have

 6      underlined there a sentence that's "Subject 5 as

 7      Requested by Plaintiffs," it reads "Any and all

 8      complaints, reports, and/or allegations raised to

 9      any managerial employees of Defendant by anyone

10      (other than Plaintiffs) concerning the use of DDVP

11      in Defendant Manhattan area stores at any time

12      from 2015 to the present."

13                 And, Mr. Kranz, if you could go down

14      to that next page, I underlined a sentence of the

15      response that states "Defendant is not aware of

16      any individuals, other than Plaintiffs Paul

17      D'Auria and Jill Shwiner, who mention the use of

18      the DDVP in Defendant's Manhattan locations and

19      will produce Rami Kranz, Manager Quality

20      Assurance, to testify generally as to the lack of

21      complaints regarding the use of pesticides,

22      including DDVP, at Defendant's Manhattan

23      locations."

24                 Mr. Kranz, is it your understanding

25      before the start of this deposition that defendant
```

```
 1                   - RAMI KRANZ -

 2     designated you to testify on that subject?

 3          A.     Yes.

 4          Q.     What, if anything, did you do to

 5     prepare to testify on this specific subject?

 6          A.     I didn't have to prepare.  I lived

 7     it, so I -- I've been here through the whole

 8     period from 2013 till present.  If there were any

 9     complaints or any other complaints, I would have

10     known about it.

11          Q.     Is it your testimony that you were

12     never informed of any complaints, other than

13     through Paul D'Auria and Jill Shwiner?

14          A.     Complaints about what?

15          Q.     DDVP in Defendant's Manhattan stores.

16          A.     As far as I recollect, I didn't

17     receive any other complaints except from AVP, Paul

18     and Jill.

19          Q.     Do you have any information about

20     whether there may have been other people who

21     received complaints that weren't addressed to you

22     directly?

23          A.     Could you be more specific about

24     other people, please.

25          Q.     I understand that the only people who
```

```
 1                  - RAMI KRANZ -

 2    complained to you directly are Paul D'Auria and

 3    Jill Shwiner.  Do you have any information at all

 4    about whether anyone else complained to someone

 5    other than you?

 6         A.    So just to be -- just to be specific,

 7    Paul never complained to me.  Paul complained to

 8    Jill who relayed that to me.  I do know that Jill

 9    also sent an e-mail to Keith -- not Keith, sorry.

10    Stephen.  Stephen was there at the time, Stephen

11    Gallant.

12         Q.    Did anybody in the leadership team or

13    management ever inform you that they had received

14    a complaint from anyone concerning Hot Shots in

15    Starbucks stores?

16         A.    I don't remember them mentioning a

17    complaint.

18         Q.    Did you ask any people whether they

19    had received complaints of that nature, in

20    preparation for this deposition?

21         A.    No, I have not.

22         Q.    Did you ever ask other members of the

23    leadership team directly if anybody ever

24    complained to them about Hot Shots or DDVP in

25    Starbucks stores?
```

```
 1                   - RAMI KRANZ -

 2         A.      During the leadership meetings I

 3   didn't specifically ask them if anyone had

 4   complained, but during our discussions it would

 5   have come up; but it never did come up.

 6         Q.      And you have no written notes or

 7   documentation or records reflecting the dates or

 8   particulars of those weekly meetings; is that

 9   correct?

10         A.      That's correct.

11         Q.      Was there another person who would

12   regularly take notes at those meetings, that

13   you're aware of?

14         A.      No, there was not.

15         Q.      Were the meetings recorded by audio

16   and/or video?

17         A.      No, they were not.

18         Q.      Were they transcribed?

19         A.      No, they were not.

20         Q.      Do you know whether a district

21   manager named Tim Hutchinson ever received any

22   complaint from employees about the use of Hot

23   Shots or DDVP in stores?

24         A.       I -- to the best of my recollection,

25   I do not recall if he received any complaints.
```

```
 1                       - RAMI KRANZ -

 2           Q.     Do you know whether a district

 3     manager named Les Fable ever received any

 4     complaints from anyone concerning Hot Shots or

 5     DDVP used in stores?

 6           A.     Again to the best of my recollection,

 7     I can't recall if they did or didn't.  I don't

 8     remember if they did.

 9           Q.     One more name.  Tina McDonald, is

10     that a person you're familiar with at Starbucks?

11           A.     Tina McDonald, I believe she's the

12     PRM.

13           Q.     Do you have any information as to

14     whether Tina McDonald ever received a complaint

15     from anyone concerning Hot Shots or DDVP use in

16     Starbucks stores?

17           A.     No.  I know for sure that I don't

18     know of any complaints that she's received.  She's

19     not mentioned it to me, that I -- I can recollect.

20                   MR. GRAFF:  I apologize for

21             successive breaks.  Off the record.

22                   (Whereupon, a brief discussion was

23             held off record.)

24           Q.     Mr. Kranz, during any of the breaks

25     we've taken in the course of your testimony today,
```

```
 1                  - RAMI KRANZ -

 2     have you communicated with anyone other than

 3     counsel?

 4          A.     I've communicated with my kids and

 5     I've made one phone call, yes.

 6          Q.     Have you made any communications with

 7     anyone, other than what you've already told us

 8     about?

 9          A.     No, I haven't.

10          Q.     Have you read anything during any of

11     the breaks?

12          A.     No, I haven't.

13          Q.     During the break, I posted a document

14     that I've labeled as Kranz 9.  It is a copy of the

15     appendix filed by plaintiffs.  It's in a format of

16     two pages of the appendix printed on each

17     horizontal page of the document.  Will you let me

18     know when you have it open.

19          A.     I have it open.

20          Q.     Can you --

21               MR. MOY:  Can you republish that

22          again, Ari, because I don't think I got it in

23          my Chat.

24               (Whereupon, Kranz Exhibit 9 was

25          marked at this time.)
```

```
 1                    - RAMI KRANZ -

 2          Q.     Mr. Kranz, if I could ask you to go

 3     page by page, image by image, and starting at the

 4     first page and let me know if you recognize or

 5     have any information about what you see on the

 6     page.  I'll note that on the right half of the

 7     first page, I think we talked about this before.

 8          A.     Right.  So I don't -- I don't like

 9     remember the one, the first photo on the first

10     page.

11               I'll go to the second page.  So the

12     second page, second photo, it doesn't jog my

13     memory; but what it does jog is one of the

14     documents that you showed Jill mentioned a hot

15     Shot in a fly light, so I'm wondering if this is

16     what she was referring to.

17          Q.     It may well have been, but please

18     continue -- continue to review it.

19          A.     So the other photo, the first photo

20     on the second page, I don't remember.

21          Q.     In that photo, do you recognize the

22     yellow block as the insides of what's in a Hot

23     Shot package?

24               MR. MOY:  Objection.

25          A.     It certainly looks like it.  I
```

```
 1                    - RAMI KRANZ -

 2     mean, -- it could be a sponge, but it's -- we

 3     don't use that kind of sponge in Starbucks.

 4          Q.    Okay?

 5          A.    We use a blue one.  So it does look

 6     like it.

 7                Okay, so I'm on the third page.  Now,

 8     the first photo my question is -- I don't recall

 9     it, but my question:  Is that where they found it

10     or is that where they put it out to take a photo?

11          Q.    To my understanding -- and I'm not

12     able to testify, but I can represent that the best

13     of my understanding is these were photographed

14     exactly as found.

15          A.    Okay.  Then I don't remember the

16     other one, the second photo on the third page.

17     The fourth -- I don't remember the fourth page,

18     either one of those photos.  The fifth page, I

19     also don't remember or it doesn't -- I don't

20     recognize it.

21          Q.    On the fifth page, if I could pause

22     you just for minute, the photograph on the

23     right-hand side, do you recognize that Hot Shot

24     device?

25          A.    Yes, it definitely looks like a Hot
```

```
 1                   - RAMI KRANZ -

 2      Shot.

 3           Q.    Based on your familiarity with Hot

 4      Shots, is this device empty or not empty?

 5               MR. MOY:  Objection.

 6           A.    From the photo that I'm seeing right

 7      now, I'd say this device does not look empty; but,

 8      I mean, I'm not a hundred percent sure, but it

 9      does not look it.

10           Q.    Thank you.

11               If you could please continue on to

12      the next page reviewing and let me know if you

13      recognize or think you have any information about

14      any of the pictures as you go through.

15           A.    No, I don't remember Page 6.  Page

16      7 -- no, I don't remember -- I don't recognize

17      Page 7's photos.  Now one question too:  On Page 7

18      and Page 8 it says "Penn Station," which store was

19      it in Penn Station, because there's two?  There's

20      Penn 1 and Penn 2.

21           Q.    I'm not sure of the information

22      beyond what you see in the document, but I

23      appreciate your pointing out that there's a

24      distinction.

25           A.    Page 8 again, also I don't
```