# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

RAFAEL FOX, PAUL D'AURIA, and JILL SHWINER,

                                    Plaintiffs,

vs.

STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY,

                                    Defendant.

Case No.: 19-CV-4650 (AJN)(SN)

**PLAINTIFFS' RULE 56.1(b) COUNTERSTATEMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE**

Pursuant to Rule 56.1(b), Plaintiffs Rafael Fox ("Mr. Fox"), Paul D'Auria ("Mr. D'Auria") and Jill Shwiner ("Ms. Shwiner") (collectively, "Plaintiffs"), respectfully submit the following counterstatement of material facts in dispute,[1] which demonstrate that there are genuine issues of material facts to be tried:

---

[1]     All statements of fact not controverted herein are "admitted" solely for purposes of this Rule 56.1 Counter-Statement in opposition to Defendant's motion for summary judgment.

The materials cited herein by Plaintiffs are annexed to the March 1, 2021 Declaration of Ariel Y. Graff, Esq., submitted herewith in opposition to Defendant's summary judgment motion. "Fox Dep." refers to the transcript of the deposition of Rafael Fox taken on August 12, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 2. "D'Auria Dep." refers to the transcript of the deposition of Paul D'Auria taken on September 9, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 3. "Shwiner Dep." refers to the transcript of the deposition of Plaintiff Jill Shwiner taken on September 11, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 4 "Kranz Dep." refers to the transcript of the deposition of Rami Kranz, taken on September 15, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 5. "Costello Dep." refers to the transcript of the deposition of Keith Costello, taken on August 19, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 6. "Ruffin Dep." refers to the transcript of the deposition of Carla Ruffin taken on August 21, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 7. "Kelly Dep." refers to the transcript of the deposition of Rachel Kelly, taken on September 2, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 8. "Hutchinson Dep." refers to the deposition of Tim Hutchinson, taken on September 1, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 9. "Fable Dep." refers to the deposition of Leslie Fable, taken on September 29, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 10. "McDonald Dep." refers to the deposition of Tina McDonald, taken on August 27, 2020, the relevant portions of which are cited herein by Plaintiffs and annexed to the Graff Decl. as Ex. 11.

1.      Starbucks is an American chain of coffeehouses, with over 240 locations in New York, New York. Kelly Dec ¶ 2.

**RESPONSE TO PARAGRAPH 1**

   Admit.

2.      Starbucks District and store managers are in the field on a regular basis and regularly interact with customer-facing Starbucks' personnel. District managers are in the stores on a daily or weekly basis, and have the opportunity to coach other Starbucks employees with respect to everyday issues. Kelly Dec ¶ 3.

**RESPONSE TO PARAGRAPH 2**

   Admit.

3.      Starbucks Regional Managers supervise district managers and are responsible for fiscal performance of the stores in their region as well as ensuring Starbucks' policies and procedures are adhered to. Kelly Dec. ¶ 4; Ruffin Dep. 30:5-30:8.

**RESPONSE TO PARAGRAPH 3**

   Admit.

4.      Each Starbucks store has a store manager, and most also have an assistant store manager, who are responsible for adhering to Starbucks' policies and procedures and for supervising baristas. Kelly Dec. ¶ 5.

**RESPONSE TO PARAGRAPH 4**

   Admit.

5.      In early 2001, Starbucks hired Fox as a barista. Fox Dep. 98:24-100:6-8.

**RESPONSE TO PARAGRAPH 5**

   Admit.

6.     Between 2002 and 2007, Starbucks promoted Fox to various positions, *i.e.*, Shift Supervisor around 2002, Assistant Manager around 2006, and Manager around 2007. Fox Dep. 100:22-102:18.

**RESPONSE TO PARAGRAPH 6**

Admit.

7.     Eventually, Fox was assigned to be the store manager of the Starbucks located at 405 Broadway, New York, New York ("Broadway and Canal") where he worked from 2009 until his transfer in October 2017 to the Starbucks located at 180 West Broadway, New York, New York ("West Broadway and Leonard") where Fox worked as the store manager until his termination in February 2018. Fox Dep. 102:24-104:15; Ex. 25 to Fox Dep. (annexed to Weber Dec. as Ex. B).

**RESPONSE TO PARAGRAPH 7**

Admit.

8.     Spectrum Brands Holdings, a consumer products company, manufactures and distributes a product called a No-Pest Strip2 (hereinafter referred to as a "hot shot", "pest strip", "no pest strip" and any variation thereof). https://www.hotshot.com/products/general-insect-control/no-pest-strip.aspx.

**RESPONSE TO PARAGRAPH 8**

Admit.

9.     D'Auria and Shwiner were employees of AVP Termite & Pest Control of New York, Inc. ("AVP"), a vendor that Starbucks hired to provide pest control services to certain of its Manhattan stores during the relevant period. Complaint ¶¶ 19-30; Kranz Dec. ¶ 2.

**RESPONSE TO PARAGRAPH 9**

Admit.

10.      D'Auria was "a licensed, certified Pest Control Technician" and was primarily responsible for servicing . . . more than 100 different Starbucks locations in Manhattan" and responding "to particular stores in the event of any emergent pest control challenges." Complaint ¶¶ 16, 23-24; D'Auria Dep. 23:10.

**RESPONSE TO PARAGRAPH 10**

Admit.

11.      Shwiner was AVP's Director of Operations, and was charged in part with "provid[ing] periodic training to Starbucks management personnel in Manhattan regarding Integrated Pest Management best practices" and "accompan[ying] District Managers on walk-throughs of many Starbucks stores in Manhattan, during which she would identify maintenance and other deficiencies and recommend appropriate corrective action." Complaint ¶¶ 28-30; Shwiner Dep. 23:23, 24:1-24:7.

**RESPONSE TO PARAGRAPH 11**

Admit.

12.      Shwiner occasionally met with AVP customers to perform on-site inspections throughout the five boroughs. Shwiner Dep. 31:22-32:4.

**RESPONSE TO PARAGRAPH 12**

Admit.

13.      In 2012, AVP submitted a proposal to Starbucks for its pest control services. Kranz Dec. ¶ 3, Ex. 1 (the "2012 Proposal"). This proposal says, in part, "AVP will perform regularly scheduled pest elimination to each store as is designated for pest control service . . . ." *Id.*

**RESPONSE TO PARAGRAPH 13**

Admit.

14.     Starbucks retains pest control specialists to service Starbucks stores. Costello Dep. 60:19-25; 65:16-20. Starbucks accepted AVP's 2012 Proposal and retained AVP as a pest control specialist to service Starbucks stores. Kranz Dep. 72:3-6.

**RESPONSE TO PARAGRAPH 14**

Admit.

15.     According to AVP, Shwiner's job responsibilities included "monitor[ing] and ensur[ing] NYS and NYC regulatory compliance and [that] safety standards/procedures are met or exceeded," and responding to AVP customer concerns and troubleshooting any customer issues. See a copy of AVP's subpoena response attached to the Weber Dec. as Ex. G.

**RESPONSE TO PARAGRAPH 15**

Admit that these were among Ms. Shwiner's job responsibilities as further described in the cited exhibit.

16.     AVP's technicians are professionally licensed pest control technicians who specialize in pest-related issues. Costello Dep. 60:19-25; 65:16-20; Kranz Dep. 72:3-6.

**RESPONSE TO PARAGRAPH 16**

Admit.

17.     According to AVP, D'Auria's job responsibilities included "documenting and identifying, document and communicate [sic] pest activity, repairs required to control or prohibit pest activity, identify[ing], document[ing] and communicat[ing] conditions conducive to pest activity and/or a condition creating a potential NYC DOH violation", to develop strategies to solve and present pest problems, practice[ing] and implement[ing] proper pest management

strategies and provid[ing] documentation of illegal pesticide use for Starbucks. Weber Dec. Ex. G.

**RESPONSE TO PARAGRAPH 17**

Admit that these were among Mr. D'Auria's job responsibilities as further described in the cited exhibit.

18.    The scope of the work that D'Auria and Shwiner performed for Starbucks included inspecting Starbucks locations, solving pest control issues at Starbucks locations, addressing and alerting management to any problems that existed, as well as correcting these problems, all to ensure that the Starbucks locations AVP serviced were free of pests. D'Auria Dep. 31:20-22; Shwiner Dep. 91:6-12, 91:21-24; Kranz Dec. ¶ 5, Ex. 1.

**RESPONSE TO PARAGRAPH 18**

Admit.

19.    Correcting unsafe pesticide use, which includes removing any unapproved pest strips found and replacing them with approved pest control devices, was part of D'Auria and Shwiner's responsibilities as AVP employees because AVP was being paid by Starbucks to address these issues. Costello Dep. 60:19-25; 65:16-20; Kranz Dep. 72:3-6.

**RESPONSE TO PARAGRAPH 19**

Disputed. This statement is unsupported by the cited testimony, which makes no reference to AVP's responsibility to remove prohibited pesticides from stores. Instead, Costello testified that he instructed *Starbucks' employees* to dispose of prohibited "Hot Shots" pest strips found in stores. Costello Dep. 59:13-19; 61:3-19; 63:14-16 ("My job as a facilities manager was that if I found them to remove them and then advise."). Similarly, Kranz merely acknowledges in the cited testimony that he was aware that AVP was contracted to provide pest control services at

Starbucks stores. Kranz Dep. 72:3-6. However, Kranz testified that *Starbucks employees* were instructed on numerous occasions that if they found pest strips in any Starbucks location, it was *their* job to dispose of them. Kranz Dep. 84:9-13; *see also*, *infra*, ¶ 51 (same). Moreover, it was *not* AVP's responsibility to remove prohibited pest strips from stores, as was explained to Starbucks. D'Auria Dep. 66:17-67:3. Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51.

20.     On August 10, 2016, Shwiner e-mailed Margaret Kis, Starbucks Manager of Facilities Services, copying D'Auria, and reported that she "added on our workorders that the 'removal of equipment will result in additional charges,' to help deter the stores. Same with those no Pest strips, bug bombs, or bug spray." Kranz Dec. ¶ 6, Ex. 2.

**RESPONSE TO PARAGRAPH 20**

Admit for purposes of this motion that the quoted language appears in the cited email, but dispute any inference that its subject was the removal of prohibited pesticides. Instead, as the email chain makes clear, Ms. Shwiner was referring to charges for the unauthorized removal by Starbucks' personnel of permissible pest control devices that AVP placed in stores. *Id.*

21.     To confirm that AVP technicians were removing any unapproved pest strips found, on September 29, 2017, Margaret Kis wrote to Shwiner, "IF PAUL (referring to D'Auria) FINDS THEM, (referring to pest strips), TOSS THEM OUT", to which Shwiner replied, "he has been". Kranz Dec. ¶ 7, Ex. 3.

**RESPONSE TO PARAGRAPH 21**

Dispute that the cited email references the disposal of pest strips by D'Auria. Shwiner Dep. Tr. 123:2-18; D'Auria Dep. 66:17-67:3. It was *not* AVP's responsibility to remove

prohibited pest strips from stores, as was explained to Starbucks. D'Auria Dep. 66:17-67:3. Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51.

22.    It was not Starbucks' role to instruct AVP's technicians or management about best pest control practices, possible hazards, or risk mitigation of the application of pesticides. Costello Dep. 60:19-25; 65:16-20, Kranz Dep. 72:3-6.

**RESPONSE TO PARAGRAPH 22**

Admit.

23.    Ecolab, a different pest control service provider, was retained by Starbucks to service its Manhattan Starbucks locations. Kranz Dec. ¶ 8.

**RESPONSE TO PARAGRAPH 23**

Admit, but irrelevant to a determination of this motion.

24.    During the time that Ecolab worked for Starbucks, Ecolab located and removed pest strips as part of its assignment with Starbucks. Kranz Dec. ¶ 9, Ex. 4; Costello Dep. 135:6-11.

**RESPONSE TO PARAGRAPH 24**

Disputed, but also irrelevant to a determination of this motion. The cited email refers to the removal of non-pesticide containing "snap traps" rather than toxic Hot Shot no pest strips. *Id.*

25.    Starbucks' Food Safety Manual, which is distributed to all store employees, prohibits all Starbucks partners from using any pesticides, and requires that any pesticides or insecticides be applied only by Starbucks' expert pest control vendors. Kranz Dep. 63:3-7, 63:13, 67:23-25, 83:19-21, 113:20-21; Kranz Dec. ¶ 10, Ex. 5.

**RESPONSE TO PARAGRAPH 25**

Admit that this was the policy as stated in Starbucks' Food Safety Manual, but dispute that it was enforced in practice. Although Starbucks' managers consistently deployed Hot Shots and other prohibited pesticides in Starbucks stores in Manhattan, Starbucks never conducted an investigation to identify the culpable managers; never imposed discipline on any employee in connection with violations of this policy; and never logged or kept track of the locations, dates or other particulars concerning the discovery of pesticides in Starbucks stores. Kranz Dep. 109:16-111:11, 179:18-180:4, 111:12-25, 119:25-120:7, 158:10-19, 214:9-215:5, 215:19-216:8; Kelly Dep. 83:22-84:3, 219:15-21, 105:15-106:12; Graff Decl. Ex. 52. Starbucks district managers also authorized the use of Company funds for the purchase of such purportedly prohibited pesticides for use in Starbucks stores in Manhattan. Kelly 101:18-25, 105:15-106:12; Graff Decl. Exs. 15, 16, 17, 18, 19, 20.

26.    Starbucks C.A.F.E. Practices Verifier and Inspector Operations Manual, a publicly available document, forbids Starbucks vendors and suppliers from using any pesticides prohibited by the World Health Organization Type 1A or 1B lists, including DDVP. Complaint ¶ 44 and n. 4; Kranz Dec. ¶ 11, Ex. 11.

**RESPONSE TO PARAGRAPH 26**

Admit.

27.    From 2016 through September 2018, the Starbucks Quality Assurance team regularly performed walk-throughs of the Starbucks stores located in Manhattan with the assigned District Managers. Kranz Dec. ¶ 12.

**RESPONSE TO PARAGRAPH 27**

Admit.

28.     During the Starbucks Quality Assurance team's store walk-throughs, the team looks for the potential use of unauthorized chemicals in the stores. Kranz Dep. 99:11-18.

**RESPONSE TO PARAGRAPH 28**

Admit.

29.     Starbucks management repeatedly and officially disclaimed the use of No-Pest Strips and warned its store managers not to use them, and also prohibited its vendors from using the underlying pesticide ingredient, DDVP. Kranz Dep. 91:17-92:14, 106:11-18, 119:11-19, 142:11-13, 144:7-12, 145:4-7, 215:19-216:13; Kranz Dec. ¶ 13(a-d), Exs. 7, 8, 9, 10.

**RESPONSE TO PARAGRAPH 29**

Admit that Starbucks formally "disclaimed" the use of No-Pest Strips and other prohibited pesticides, but Dispute that Starbucks enforced its asserted policy in practice. Although Starbucks managers consistently deployed Hot Shots and other prohibited pesticides in Starbucks stores in Manhattan, Starbucks never conducted an investigation to identify the culpable managers; never imposed discipline on any employee in connection with violations of this policy; and never logged or kept track of the locations, dates or other particulars concerning the discovery of pesticides in Starbucks stores. Kranz Dep. 109:16-111:11, 179:18-180:4, 111:12-25, 119:25-120:7, 158:10-19, 214:9-215:5, 215:19-216:8; Kelly Dep. 83:22-84:3, 219:15-21, 105:15-106:12; Graff Decl. Ex. 52. Starbucks district managers also authorize the use of Company funds for the purchase of such purportedly prohibited pesticides for use in Starbucks stores in Manhattan. Kelly 101:18-25, 105:15-106:12; Graff Decl. Exs. 15, 16, 17, 18, 19, 20.

30.     When Starbucks discovered that its pest control vendor, Ecolab, which was assigned to service various Starbucks locations throughout Manhattan, had placed pest strips in some stores, Starbucks fired Ecolab. Costello Dep. 136:5-20; Kranz Dec. ¶ 14.

**RESPONSE TO PARAGRAPH 30**

Undisputed, but irrelevant to a determination of Starbucks' motion.

31.     To the extent that any pest strips appeared in stores in violation of Starbucks instructions and policies, Starbucks management relied on AVP and its technicians to fix this issue because they were specifically retained to advise Starbucks about pest management practices. Complaint ¶¶ 28, 29.

**RESPONSE TO PARAGRAPH 31**

Disputed. This allegation is unsupported by the cited paragraphs of the Complaint, which state that Ms. Shwiner provided training and recommended appropriate corrective action for identified maintenance or other integrated pest management deficiencies. *Id.* The Complaint in no way suggests that it was AVP's job to "fix issues" concerning Starbucks' placement of ostensibly prohibited pesticides in its stores in contravention of AVP's repeated warnings and instructions. *Id.* Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51.

32.     Rami Kranz, Regional Retail Quality Assurance Manager at Starbucks, learned that hot shots were found in various Manhattan locations from Jill Shwiner in 2016. Kranz Dep. 94:11-20; 152:12-17.

**RESPONSE TO PARAGRAPH 32**

Admit.

33.     The Starbucks Quality Assurance team regularly checked for unauthorized chemicals in their store visits. Kranz Dep. 99:11-18.

**RESPONSE TO PARAGRAPH 33**

Admit.

34.     Upon learning that hot shots were present in certain Manhattan locations, Starbucks took aggressive action to attempt to remove all existing pest strips, and ensure new ones would not be purchased or used in the future. Kranz Dec. ¶ 15. This action includes the following examples.

**RESPONSE TO PARAGRAPH 34**

Disputed. Apart from recirculating reminders of Starbucks' formal policy against the use of pest strips and other prohibited pesticides by its store manages, Starbucks never conducted an investigation to identify the culpable managers; never imposed discipline on any employee in connection with the deployment of purportedly prohibited pesticides; and never logged or kept track of the locations, dates or other particulars concerning the discovery of pesticides in Starbucks stores. Kranz Dep. 109:16-111:11, 179:18-180:4, 111:12-25, 119:25-120:7, 158:10-19, 214:9-215:5, 215:19-216:8; Kelly Dep. 83:22-84:3, 219:15-21, 105:15-106:12; Graff Decl. Ex. 52. Starbucks district managers also authorize the use of Company funds for the purchase of such purportedly prohibited pesticides for use in Starbucks stores in Manhattan. Kelly 101:18-25, 105:15-106:12; Graff Decl. Exs. 15, 16, 17, 18, 19, 20.

35.     All store employees, including district and store managers, attended numerous presentations about the importance of following the Food Safety Manual when addressing pest control issues, and were briefed about the discovery of hot shots/pest strips in Manhattan stores. Specifically, they were warned that Starbucks employees are prohibited from purchasing or using pest strips/hot shots in Starbucks stores, and that if any employee discovers a hot shot/pest strip, they should immediately throw out the device. Kranz Dep. 84:9-13, 215:24-216:13.

**RESPONSE TO PARAGRAPH 35**

Undisputed, but incomplete. These repetitive email reminders comprised the totality of Starbucks' "initiatives and actions undertaken to remediate" its managers' recurrent misuse of hazardous pesticides in Starbucks stores. Kranz Dep. 214:9-215:5, 215:19-216:8

36. On July 27, 2015, in response to an e-mail from D'Auria that he found pest strips in a Starbucks store, Margaret Kis e-mailed D'Auria and Shwiner and said, "in the future, when you see them [referring to pest strips] or anything that shouldn't be there, throw them away". Kranz Dec. ¶ 15(a), Ex. 11.

**RESPONSE TO PARAGRAPH 36**

Admit that this request was made, but dispute any inference that it was AVP's responsibility to remove prohibited pest strips from stores, as was explained to Ms. Kis. D'Auria Dep. 66:17-67:3. It was *not* AVP's responsibility to remove prohibited pest strips from stores, as was explained to Starbucks. D'Auria Dep. 66:17-67:3. Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51.

37. On August 10, 2016, Shwiner e-mailed Margaret Kis, copying D'Auria, and reported that she added to the work orders that the removal of equipment will result in additional charges, which also applies to the removal of no pest strips, bug bombs, or bug spray. Kranz Dec. ¶ 15(b), Ex. 12.

**RESPONSE TO PARAGRAPH 37**

Admit for purposes of this motion, but dispute any inference that the cited language was in reference to the removal of prohibited pesticides. Instead, as the email chain makes clear, Ms. Shwiner was referring to charges for the unauthorized removal by Starbucks' personnel of permissible pest control devices that AVP placed in stores. *Id.*

38.     On August 10, 2016, Margaret Kis forwarded an e-mail from Shwiner warning of the misuse of pest strips to the Starbucks facilities team, and copied Shwiner on that correspondence. Shwiner acknowledged this communication and forwarded the same message to D'Auria. Kranz Dec. ¶ 15(c), Ex. 13.

**<u>RESPONSE TO PARAGRAPH 38</u>**

Admit.

39.     On August 10, 2016, Margaret Kis reminded two facilities service managers responsible for Manhattan Starbucks locations that store employees are not to use pest strips. Kranz Dec. ¶ 15(d), Ex. 14.

**<u>RESPONSE TO PARAGRAPH 39</u>**

Admit.

40.     On July 5, 2017, the Starbucks facilities team e-mailed the New York regional and district managers to remind them that if "No Pest Strips" are found in stores they must be removed immediately. This e-mail was then forwarded to store managers. Kranz Dec. ¶ 15(e), Ex. 15.

**<u>RESPONSE TO PARAGRAPH 40</u>**

Admit.

41.     On July 5, 2017, Neal Opalka, facilities services manager for Starbucks, confirmed with Shwiner that the district managers had been reminded to remove any pest strips found in Starbucks stores. Kranz Dec. ¶ 15(f), Ex. 16.

**<u>RESPONSE TO PARAGRAPH 41</u>**

Admit.

42.     On September 29, 2017, Rami Kranz e-mailed the regional directors responsible for the Manhattan region, reminding that pest strips should not be used in stores and should be removed if located. Mr. Kranz' e-mail included a picture of a pest strip. Kranz Dec. ¶ 15(g), Ex. 17. This message was forwarded to other Starbucks personnel. See *id.*

**RESPONSE TO PARAGRAPH 42**

Admit.

43.     On September 29, 2017, Margaret Kis wrote to Jill Shwiner, "IF PAUL FINDS THEM, TOSS THEM OUT," to which Shwiner replies, "he has been". Kranz Dec. ¶ 15(h), Ex. 18.

**RESPONSE TO PARAGRAPH 43**

Dispute that the cited email references the disposal of pest strips by D'Auria. Shwiner Dep. Tr. 123:2-18; D'Auria Dep. 66:17-67:3. It was *not* AVP's responsibility to remove prohibited pest strips from stores, as was explained to Starbucks. D'Auria Dep. 66:17-67:3. Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51.

44.     On October 16, 2017, Rami Kranz e-mailed the New York regional and district managers and reminded them that hot shots are never to be used and should be removed if found. Kranz Dec. ¶ 15(i), Ex. 19. This e-mail was forwarded to other Starbucks managers. Kranz Dec. ¶ 15(i), Ex. 20.

**RESPONSE TO PARAGRAPH 44**

Admit.

45.     On October 16, 2017, Rami Kranz informed Shwiner that he had e-mailed a warning to the Manhattan stores not to use pest strips and to remove any they find. He also told

Shwiner that he included this warning in a leadership presentation to Starbucks New York regional directors the week prior. Mr. Kranz also informed Shwiner that he planned to remind his team of this in future meetings. Kranz Dec. ¶ 15(j), Ex. 21.

**RESPONSE TO PARAGRAPH 45**

Admit.

46.     On January 17, 2018, Kimberly Healy, Facilities Services Manager at Starbucks, forwarded a message to certain Manhattan Starbucks stores reminding them that hot shots are never to be used. This message was forwarded to other Starbucks personnel. Kranz Dec. ¶ 15(k), Ex. 22.

**RESPONSE TO PARAGRAPH 46**

Admit.

47.     On January 23, 2018, Ron Shuler, Starbucks regional director of NY Metro, confirmed with Rami Kranz that they were aware of hot shot sightings, and that the issue was being addressed. Kranz Dec. ¶ 15(l), Ex. 23.

**RESPONSE TO PARAGRAPH 47**

Admit.

48.     On March 12, 2018, Ron Shuler forwarded a message to Starbucks' store and district managers reminding them that hot shots are not to be used in Starbucks stores and should be removed when found. Kranz Dec. ¶ 15(m), Ex. 24.

**RESPONSE TO PARAGRAPH 48**

Admit.

49.     On April 13, 2018, Rami Kranz confirmed that he would remind the leadership team that hot shots had been found and that they were not to be used by Starbucks personnel. Kranz Dec. ¶ 15(n), Ex. 25.

**RESPONSE TO PARAGRAPH 49**

Admit.

50.     Starbucks employees were reminded in numerous other e-mails and weekly meetings of Starbucks' policy regarding pest strips/hot shots. Kranz Dep. 88:21-24, 89:2-90:2, 90:7-13, 90:18-91:2, 91:14-16, 91:20-92:2, 92:8-92:14, 95:3-7, 101:20-102:19, 102:23-103:7, 103:18-104:2, 106:3-4, 106:11-18, 110:4-7, 110:21-111:4, 111:8-11, 119:7-10, 119:14-24, 141:6-11, 141:15-22, 142:11-13, 142:16-17, 144:2-6, 145:4-7, 145:21-25, 149:25, 215:24-216:13, 217:3-7; Kranz Dec. ¶ 16, Exs. 9, 10, 16, 19, 22, 23, 24, 25, 26. These reminders included the instruction that staff were not to purchase pest strips as this product was prohibited by Starbucks' policies. Kranz Dep. 84:9-13, 176:21-177:4, 89:21-90:2, 90:7-13, 91:20-92:2, 102:6-19, 102:23-103:7, 119:7-10, 119:14-24, 142:11-13, 142:16-17, 145:21-25, 149:10-12, 215:24-216:13, 217:3-7; Kranz Dec. ¶ 16, Exs. 8, 9, 10, 13, 15, 16, 19, 21, 24, 25, 26.

**RESPONSE TO PARAGRAPH 50**

Admit.

51.     Starbucks employees were instructed on numerous occasions that if they found pest strips in any Starbucks location, they were to dispose of them. Kranz Dep. 84:9-13; Kranz Dec. ¶ 17, Exs. 13, 15, 16, 17, 25, 26.

**RESPONSE TO PARAGRAPH 51**

Admit.

52.     The communications Starbucks sent to its staff reminding of the company's prohibition of the use of pest strips were forwarded to Shwiner and D'Auria. See, e.g., Kranz Dec. ¶ 18, Exs. 13, 15.

**RESPONSE TO PARAGRAPH 52**

Admit.

53.     After D'Auria and Shwiner notified Starbucks of their discovery of pest strips, Starbucks relayed their messages to its personnel. Compl. ¶¶ 53-55; Kranz Dec. ¶ 19, Ex. 13.

**RESPONSE TO PARAGRAPH 53**

Admit.

54.     Starbucks transferred Fox to the West Broadway and Leonard location as the replacement for the prior store manager whom Starbucks terminated for time manipulation, which had resulted in underpayment of wages to store employees (also called "partners"). Fable Dep. 63:15-18; Ruffin Dep. 120:7-16, 121:2-8; Hutchinson Dep. 58:24-59:20; Kelly Dep. 59:9-20.

**RESPONSE TO PARAGRAPH 54**

Admit.

55.     Leslie Fable, Starbucks District Manager, had discovered and investigated the prior store manager's illicit time manipulation. Fable Dep. 37:6 – 41:15.

**RESPONSE TO PARAGRAPH 55**

Disputed. Fable investigated only the most recent illicit timeclock manipulation by the prior store manager. To his knowledge, Starbucks never conducted a more comprehensive review of the timeclock records, nor did anyone interview any employees who may have been adversely impacted. Fable never determined the dollar amount of wages that were improperly

withheld from the impacted employees, and did not know if *any* had received backpay as a result of the timeclock manipulation. Fable Dep. 59:14-62:5. In fact, more than thirty employees who were deprived of earned wages due to the prior manager's timeclock manipulation never received backpay to correct the underpayments.

56.     Leslie Fable, Rachel Kelly (Partner Resources Director for the NY Metro region at the time), and Regional Director Carla Ruffin were involved in the decision to terminate the prior store manager at West Broadway and Leonard. Fable Dep. 50:7-23; Ruffin Dep. 229:14-17; Kelly Dec. ¶ 1.

## RESPONSE TO PARAGRAPH 56

Admit, but further state that none of these individuals provided backpay to correct the underpayments caused by the prior store manager's timeclock manipulation. Fox Dep. 267:18-268:6; Graff Decl. Ex. 26; Fable Dep. 59:14-62:5 (no knowledge of backpay being issued), Fable Dep. 93:11-92:94 (did not direct Fox to input backpay); Hutchinson Dep. 58:4-60:2; Hutchinson Dep. 68:6-9 (directing Fox not to input backpay to impacted employees); Kelly Dep. 61:10-24 (asserting that District Managers Fable and Hutchinson communicated to her that Mr. Fox was responsible for inputting backpay); Ruffin 208:15-209:17.

57.     At the time of Fox's transfer to the West Broadway and Leonard location, Leslie Fable served as the District Manager for both the Broadway and Canal and West Broadway and Leonard locations. Fable Dep. 63:15-65:6.

## RESPONSE TO PARAGRAPH 57

Admit.

58. Leslie Fable proposed Fox's transfer to Mr. Fable's supervisor, Regional Director Carla Ruffin, who ultimately made the decision to transfer Fox to West Broadway and Leonard. Fable Dep. 66:2-67:10, 68:10-22.

**RESPONSE TO PARAGRAPH 58**

Admit.

59. Mr. Fable proposed Fox's transfer to the West Broadway and Leonard location because Fox had worked at the location for a long time and Mr. Fable felt that Fox's performance was "middle of the pack" and that he was very comfortable in his store and needed a change of venue. Fable Dep. 66:21-67:24.

**RESPONSE TO PARAGRAPH 59**

Disputed. Fox was told that he was selected for transfer to the West Broadway and Leonard location because "the partners there had been through a lot, that the store was not where it needs to be, and that [he] would be perfect for the role." Fox. Dep. 103:15-22. Less than one-month after his transfer, Fable wrote to Mr. Fox stating, in part, "*it's even more clear to me why you ar[e] the right guy for the job. Thank you again, and I will truly miss[] your leadership!*" Graff Decl. Ex. 26.

60. Carla Ruffin decided to transfer Fox to West Broadway and Leonard because she believed that Fox's performance at the Canal location was "stagnant" and that a transfer to a different location might revitalize his leadership capabilities and focus his attention to detail. Ruffin Dep. 107:24-111:13.

**RESPONSE TO PARAGRAPH 60**

Disputed. Starbucks produced no documentation reflecting such performance stagnation, and inexplicably "lost" all of Mr. Fox's performance reviews subsequent to 2014. Fox Dep.

132:7-133:6. Moreover, Mr. Fox continued to receive awards and acknowledgments for his outstanding performance in the years leading up to his transfer – including, among others, his selection as 2016 "Manager of the Quarter" for his Region, which was comprised of more than 80 stores. Fox Dep. 131:24-132:6; 152:13-20. Mr. Fox also achieved the highest scores in his District on audits conducted by an outside Quality Assurance auditor for the period from late 2016 through October 2017. Fable Dep. 82:3-83:9. There is also no evidence that Mr. Fox ever received any form of disciplinary or "corrective" action during the approximately 16 years of his employment with Starbucks prior to his termination.

61.     Ms. Ruffin believed Fox was not sufficiently detailed in either ensuring that policies and procedures at the Broadway and Canal store were meeting standards or that store employees were educated on and implementing the latest processes and standards. Ruffin Dep. 107:24-111:13.

**RESPONSE TO PARAGRAPH 61**

Disputed. The quoted testimony references Ruffin's general "impression" of Mr. Fox's performance, without reference to specific conduct or documented deficiencies. Starbucks also produced no documentation reflecting such performance gaps, and inexplicably "lost" all of Mr. Fox's performance reviews subsequent to 2014. Fox Dep. 132:7-133:6. Moreover, Mr. Fox continued to receive awards and acknowledgments for his outstanding performance in the years leading up to his transfer – including, among others, his selection as 2016 "Manager of the Quarter" for his Region, which was comprised of more than 80 stores. Fox Dep. 131:24-132:6; 152:13-20. The District Manager from whom Ruffin vaguely (mis-)remembered having heard concerns about Mr. Fox's performance some months or years prior was, in fact, the same individual who advocated for Mr. Fox's recognition as "Manager of the Quarter" at or around

that time. Fox Dep. 152:13-20. Mr. Fox also achieved the highest scores in his District on audits conducted by an outside Quality Assurance auditor for the period from late 2016 through October 2017. Fable Dep. 82:3-83:9

62.     Starbucks subsequently transferred Mr. Fable to Brooklyn, which he considered a favorable assignment. Fable Dep. 75:7-76:7.

**RESPONSE TO PARAGRAPH 62**

Admit.

63.     Starbucks transferred Timothy Hutchison, who was District Manager of the SoHo district, to replace Mr. Fable as the District Manager of the Tribeca district around late November/early December 2017. Hutchinson Dep. 37:21 – 38:10, 41:4-9; Fable Dep. 77:17-23.

**RESPONSE TO PARAGRAPH 63**

Admit.

64.     Mr. Hutchinson reported to Regional Director Carla Ruffin until her retirement. Hutchinson Dep. 38:25-39:23.

**RESPONSE TO PARAGRAPH 64**

Admit.

65.     After Fox transferred to the West Broadway and Leonard store, he believed he had found additional instances of underpayment of wages to employees working there under the prior store manager and reported this information first to Mr. Fable and then to Mr. Hutchinson sometime around November 2017. Hutchinson Dep. 64:8-68:23; Fox Dep. 260:22-265:12, 265:25 – 273:6.

**RESPONSE TO PARAGRAPH 65**

Admit that Mr. Fox "believed" that he had found instances of underpayment of wages to employees who had worked at least one shift at the West Broadway and Leonard store during the tenure of the prior store manager who was terminated for time clock manipulation. But further state that Mr. Fox's belief was well grounded in fact, inasmuch as only *one* employee was issued backpay at Mr. Fox's initiative, and none of the other employees who had been deprived of wages as a result of that manipulation ever received corrective backpay. Fox Dep. 267:18-268:6; Graff Decl. Ex. 26; Fable Dep. 59:14-62:5 (no knowledge of backpay being issued), Fable Dep. 93:11-92:94 (did not direct Fox to input backpay); Hutchinson Dep. 58:4-60:2; Hutchinson Dep. 68:6-9 (directing Fox not to input backpay to impacted employees); Kelly Dep. 61:10-24 (asserting that District Managers Fable and Hutchinson communicated to her that Mr. Fox was responsible for inputting backpay).

66. Fox did not share his concerns with anybody besides Mr. Fable, Mr. Hutchinson, and one person for whom Fox independently effectuated retroactive payments to remedy suspected underpayment by the terminated store manager. Fox Dep. 275:4-14, 292:25-293:14.

**RESPONSE TO PARAGRAPH 66**

Admit.

67. As Fox's then-current District Manager, Mr. Hutchinson performed an investigation of the information Fox presented him and, in doing so, concluded that the information did not show additional underpayment of wages had occurred. Hutchinson Dep. 68:3-69:25.

**RESPONSE TO PARAGRAPH 67**

Disputed. Hutchinson did not forward Fox's findings to the Starbucks Fraud Team that is tasked to conduct such an investigation (Fable Dep. 41:4-10; 41:16-42:6). Instead, he reviewed a

resource manual and spoke with a single District Manager – whose name he cannot recall; whom he "didn't seek out for the purpose"; and with whom he did not share the five-page spreadsheet that Mr. Fox had compiled to document the identified underpayments, nor did he otherwise follow up or direct anyone else to follow up on Mr. Fox's findings. Hutchinson Dep 68:24-69:21; Fox Dep. 264:4-5.

68.    In response to the New York City Fair Workweek legislation that came into effect on or about November 24, 2017, Starbucks created the position of Senior Compliance Specialist to support the implementation and execution of the law. Kelly Dep. 39:12-41:5; McDonald Dep. 112:7-20, 126:21-127:5; Fox Dep. 165:3-166:24.

**RESPONSE TO PARAGRAPH 68**

Admit.

69.    The Senior Compliance Specialist reported to the Director of Partner Resources of the New York Metro region, Rachel Kelly. Kelly Dep. 36:8-12.

**RESPONSE TO PARAGRAPH 69**

Admit.

70.    Tina McDonald was hired as the first Senior Compliance Specialist for the New York Metro region and served in the position from about November 2017 to November 2018. McDonald Dep. 109:22-110:5, 113:6-25.

**RESPONSE TO PARAGRAPH 70**

Admit.

71.    In her role as Senior Compliance Specialist, Ms. McDonald was responsible for supporting and monitoring compliance with Fair Workweek legislation specifically, not overall corporate compliance. McDonald Dep. 114:8-115:4, 116:6-12; Kelly Dep. 112:11-114:13.

**RESPONSE TO PARAGRAPH 71**

Disputed. Regardless of her primary focus, Starbucks' Human Resources Managers are *required* to directly escalate complaints relating to safety concerns, Kelly Dep. 57:16-58:4.

72.     To that end, Ms. McDonald, among other things, provided training and coaching and conducted audits during store visits to assess compliance with Fair Workweek requirements. Kelly Dep. 119:15-126:11, 130:15-132:16.

**RESPONSE TO PARAGRAPH 72**

Admit.

73.     On or about January 10, 2018, Fox received a complaint from the New York City Department Consumer Affairs ("DCA") alleging violations of the Fair Workweek legislation at the West Broadway and Leonard store ("Fox's store"). Fox Dep. 187:19-188:16, 350:5-25; Kelly Dep. 136:15-23; McDonald Dep. 188:7-19; Kelly Dec. ¶ 6, Ex. 1.

**RESPONSE TO PARAGRAPH 73**

Admit.

74.     A Starbucks employee working at Fox's store filed the complaint with the DCA alleging, among other things, an improper reduction in hours, missing work schedules, and schedules posted without adequate notice. Fox Dep. 283:2-284:25, 350:5-25; McDonald Dep. 175:14-176:9; Hutchinson Dep. 108:2-17.

**RESPONSE TO PARAGRAPH 74**

Undisputed for purposes of this motion that the employee made those allegations.

75.     On or about January 10, 2018, Ms. Ruffin visited Fox's store as part of her touring of all stores in Mr. Hutchinson's district. Ruffin Dep. 91:11-20, 92:3-93:7.

**RESPONSE TO PARAGRAPH 75**

Disputed. This meeting did not occur on the stated date, but rather one month prior, on December 7, 2017. Graff Decl. Ex. 36. Ruffin, herself, could not identify the month or year of the alleged visit, nor did she document it in any way. Ruffin Dep. 91: 24-25, 219:25-220:4.

76.     At Fox's store, Ms. Ruffin reviewed the store's daily records book and the schedule change log. Store employees are supposed to sign and date schedule changes in the log to confirm their consent, but Ms. Ruffin noticed that that all of the handwriting on the schedule change log appeared the same. Fox informed Ms. Ruffin that the handwriting on the log was his, which concerned Ms. Ruffin because it might indicate that employees were not being correctly paid. Ruffin Dep. 91:11-20, 92:3-93:7, 95:2-96:24.

**RESPONSE TO PARAGRAPH 76**

Disputed. This meeting did not occur on the stated date, but rather one month prior, on December 7, 2017. Graff Decl. Ex. 36. Ruffin, herself, could not identify the month or year of the alleged visit, nor did she document it in any way. Ruffin Dep. 91: 24-25, 219:25-220:4. The handwriting in the log was *not* exclusively Mr. Fox's, nor did he tell Ruffin that it was. Graff Decl. Ex. 36.. Instead, he explained to Ms. Ruffin that he was following Starbucks formal written procedures, which provided, in part: "If you have incomplete information or are not sure of information, contact the partner before processing payroll, record the information as accurately as possible and have the partner initial and confirm at the next possible time." *Id.*; Graff Decl. Ex. 44.

77.     During Ms. Ruffin's visit, Fox also informed Ms. Ruffin that he received a notice from the DCA. Ruffin Dep. 93:8-24.

**RESPONSE TO PARAGRAPH 77**

Disputed. Ruffin did not visit Mr. Fox's store on that date. Graff Decl. Ex. 36. Instead, Mr. Fox contacted his then-District Manager Tim Hutchinson to notify him that he had received a complaint through the DCA. Graff Decl. Ex. 45.

78. Ms. Ruffin was concerned that the DCA notice potentially involved an employee complaint arising out of edits to the schedule change log being made without the employee's signature and approval. Ruffin Dep. 93:8-24.

**RESPONSE TO PARAGRAPH 78**

Disputed. There was no basis for Ruffin to arrive at that concern because Mr. Fox had satisfactorily explained to her – when she inquired of him during an amicable store visit one month prior — that he was complying with policy and following Starbucks formal written procedures, which provided, in part: "If you have incomplete information or are not sure of information, contact the partner before processing payroll, record the information as accurately as possible and have the partner initial and confirm at the next possible time." *Id.*; Graff Decl. Ex. 36. Moreover, Ruffin did not issue any corrective action or otherwise memorialize that she had any concern with Mr. Fox's scheduling logs in connection with her visit the prior. Ruffin Dep. 91:11-20, 92:3-93:7, 95:2-96:24.

79. Based on Ms. Ruffin's visit, Ms. Ruffin was concerned with Fox's compliance with the Company's standards, policies, and procedures, as well as Fox's ability to do the job. Ruffin Dep. 106:10-21.

**RESPONSE TO PARAGRAPH 79**

Disputed. There was no basis for Ruffin to arrive at that concern because Mr. Fox had satisfactorily explained to her – when she inquired of him during an amicable store visit one month prior — that he was complying with policy and following Starbucks formal written

procedures, which provided, in part: "If you have incomplete information or are not sure of information, contact the partner before processing payroll, record the information as accurately as possible and have the partner initial and confirm at the next possible time." *Id.*; Graff Decl. Ex. 36. Moreover, Ruffin did not issue any corrective action or otherwise memorialize that she had any concern with Mr. Fox's scheduling logs in connection with her visit the prior month. Ruffin Dep. 91:11-20, 92:3-93:7, 95:2-96:24.

80. Given Ms. Ruffin's concern that employees at Fox's store might not have been fully paid in accordance with the requirements of the Fair Workweek Law, Ms. Ruffin believed that Ms. McDonald needed to do a more thorough review concerning compliance with Fair Workweek requirements at Fox's store. Ruffin Dep. 96:15-97:7, 107:6-11.

## RESPONSE TO PARAGRAPH 80

Disputed. Mr. Fox self-reported the DCA complaint to Hutchinson, who in turn contacted McDonald directly for further guidance. Graff Decl. Ex 45.

81. Ms. Ruffin instructed Mr. Hutchinson to inform Ms. McDonald of the notice Fox received from the DCA. Ruffin Dep. 93:14-19.

## RESPONSE TO PARAGRAPH 81

Disputed. Mr. Fox self-reported the DCA complaint to Hutchinson, who in turn contacted McDonald directly for further guidance. Graff Decl. Ex 45.

82. Fox sent a copy of the DCA complaint to Mr. Hutchinson who, in turn, forwarded the complaint to Ms. McDonald and Partner Resources Manager Bradley Jennison. Fox Dep. 187:19-188:16, 188:17-190:12; Kelly Dec. ¶ 7, Exs. 2, 3.

## RESPONSE TO PARAGRAPH 82

Admit.

83.     Upon learning that a complaint was filed with the DCA concerning violations of Fair Workweek requirements at Fox's store, on or about January 10, 2018, Ms. Kelly directed Ms. McDonald and Mr. Jennison to visit Fox's store to assess compliance with Fair Workweek standards. Kelly Dep. 137:4-17, 140:6-21, 167:13-168:13; *see also* Fox Dep. 188:24-190:12; Ruffin Dep. 191:9-192:25.

**RESPONSE TO PARAGRAPH 83**

Admit.

84.     The DCA complaint against Fox's store prompted Ms. McDonald's audit of Fox's store. McDonald Dep. 174:11-175:7, 181:12-182:10, 192:7-19, 236:5-9; *see also* Fox Dep. 192:8-18.

**RESPONSE TO PARAGRAPH 84**

Admit.

85.     The DCA complaint filed against Fox's store was the first DCA complaint Starbucks received alleging violations of Fair Workweek legislation. McDonald Dep. 179:22-25.

**RESPONSE TO PARAGRAPH 85**

Admit.

86.     In addition to Fox's store, Ms. Ruffin directed Ms. McDonald to audit other stores to assess compliance in Mr. Hutchinson's district. Ruffin Dep. 203:15-204:9; McDonald Dep. 207:10-22, 222:4-8; Hutchinson Dep. 108:18-110:14; Kelly Dep. 157:8-16, 158:7-16.

**RESPONSE TO PARAGRAPH 86**

Admit.

87.     Ms. McDonald visited Fox's store two to three times to investigate the DCA complaint. McDonald Dep. 175:8-13, 217:11-218:6, 246:13-254:15; Kelly Dec. ¶ 8, Ex. 4; Hutchinson Dep. 111:11-15.

**RESPONSE TO PARAGRAPH 87**

Admit.

88.     Ms. McDonald first visited Fox's store to assess compliance with Fair Workweek standards on or about January 11, 2018. Kelly Dep. 140:6-21; McDonald Dep. 175:8-25, 185:10-187:16, 192:7-193:11.

**RESPONSE TO PARAGRAPH 88**

Admit.

89.     During the first visit to Fox's store, Ms. McDonald determined that Fox's practices at the store were not compliant with Fair Workweek legislation in several respects. Among other things, Ms. McDonald concluded that Fox was not posting work schedules with adequate notice and that he was filling out the schedule change log rather than employees doing so themselves. McDonald Dep. 187:17-190:10, 193:24-195:8, 274:7-275:8; Fox Dep. 193:9-194:23; Kelly Dep. 141:15-143:19.

**RESPONSE TO PARAGRAPH 89**

Undisputed for purposes of this motion, but incomplete and potentially misleading. *None* of the Store Managers in New York City were in full compliance with the newly enacted Fair Workweek Legislation. McDonald Dep. 215: 10-12. Based on his training at Starbucks, Mr. Fox misunderstood an aspect of the new scheduling posting requirement. Fox Dep. 203:2-206:20. Ruffin did not issue Mr. Fox any disciplinary notice in connection with this misunderstanding, Ruffin Dep. 219:25-220:4, and McDonald wrote to Mr. Fox that "no action is required of you at

this time" in connection with the matters that she discussed with him during her visits to his store. Graff Decl. Ex. 35.

90. During the first visit to Fox's store, for the first and only time, Fox told Ms. McDonald about the alleged use of hot shots at another Starbucks store. McDonald Dep. 271:2-16; Complaint ¶ 65. Ms. McDonald, who did not have any responsibility for this issue, directed Fox to raise the issue with his District Manager, Mr. Hutchinson, but Fox did not do so. Fox Dep. 341:19-342:3; McDonald Dep. 157:6-158:12, 271:2-273:13.

**RESPONSE TO PARAGRAPH 90**

Disputed. Mr. Fox reported to McDonald that Hot Shots were being misused in stores, including potentially by other managers. Fox Dep. 339:24-340:1. Starbucks store managers (such as Mr. Fox) have the option to escalate health and safety concerns directly to partner resources, Fable Dep. 35:24-36-9, and Mr. Fox had previously complained to his District Manager (to no avail), Fox Dep. 58:11-59:14; 226:18-228:16. Moreover, Human Resources Managers like McDonald are *required* to directly escalate complaints relating to safety concerns, Kelly Dep. 57:16-58:4.

91. At some point during her investigation of Fox's store, Ms. McDonald also instructed Fox to make payments to a partner. McDonald Dep. 189:12-191:7.

**RESPONSE TO PARAGRAPH 91**

Disputed. Fox sought to make such payments, but McDonald instructed him that he should take no action. Fox Dep. 199:11-14, 208:18-25; McDonald Dep. 243:21-25. Prior to the DCA complaint, Mr. Fox contacted McDonald on multiple occasions to inquire as to application of the new regulations to particular employee-circumstances, and he made payments to all

partners when McDonald directed him to do so in response to his inquiries. *See* Graff Decl. Ex. 43, Ex. 45, 46.

92.     Ms. McDonald visited Fox's store a second time, a week or two after the initial January 11, 2018 visit. McDonald Dep. 195:11-19.

## RESPONSE TO PARAGRAPH 92

Admit for purposes of this motion.

93.     Ms. McDonald, among other things, gathered documents, including schedules and schedule change logs, to assess compliance. McDonald Dep. 202:2-25; Fox Dep. 206:25-209:12.

## RESPONSE TO PARAGRAPH 93

Admit for purposes of this motion.

94.     After the second visit, Ms. McDonald determined that even after Fox was instructed to make payments to partners, Fox did not do so. Ms. McDonald believed that Fox's failure to make the payments was intentional because he disagreed with the payments. Ms. McDonald also concluded that predictability pay was owed to partners due to late schedule postings, as well as schedule changes where partners experienced loss of hours or worked additional hours but were not compensated properly. Additionally, Ms. McDonald also learned that Fox was not responding to other Starbucks employees working outside his store who had expressed interest in available shift postings at his store, a requirement of the Fair Workweek Law. McDonald Dep. 190:11-191:7, 192:3-6, 196:8-199:24, 200:6-201:5; *see also* Kelly Dep. 143:20-146:17, 151:8-11, 154:7-156:19.

## RESPONSE TO PARAGRAPH 94

Disputed. Fox sought to make such payments, but McDonald instructed him that he should take no action. Fox Dep. 199:11-14, 208:18-25; McDonald Dep. 243:21-25. Prior to the

DCA complaint, Mr. Fox contacted McDonald on multiple occasions to inquire as to application of the new regulations to particular employee-circumstances, and he made payments to all partners when McDonald directed him to do so in response to his inquiries. *See* Graff Decl. Ex. 43, Ex. 46, 47. Also dispute that Mr. Fox was not responding to other "Starbucks employees working outside his store who had expressed interest in available shift postings at his store." Rather, Mr. Fox received permission from Human Resources manager Brad Jennison to hire an outside employee for the shift at issue. Graff Decl. Ex 36. Mr. Fox had not received any internal transfer requests prior to Jennison's grant of permission to hire an outside employee. *Id.*

95. Based on the compliance issues identified during Ms. McDonald's audit of Fox's store, Starbucks owed partners pay for Fox's non-compliance with Fair Workweek legislation. Kelly Dep. 161:25-162:21; Fox Dep. 351:24-352:13; *see also* Weber Ex. L. The payments totaled several thousand dollars. McDonald Dep. 206:5-22.

**RESPONSE TO PARAGRAPH 95**

Disputed. Ms. McDonald did not interview the allegedly impacted employees in Mr. Fox's store as part of her audit. When a DCA investigator later conducted such interviews, the employees' answers were generally supportive of Mr. Fox's compliance with the Fair Workweek legislation. Graff Decl. Ex. 47. Moreover, Starbucks rebuffed the DCA investigator's request to interview Mr. Fox directly and did not provide the investigator with Mr. Fox's contact information. Graff Decl. Ex. 49. Starbucks' counsel also informed the DCA Investigator that Mr. Fox had been terminated primarily for "integrity issues" rather than for non-compliance with the Fair Workweek Legislation. *Id.* at RF158

96. After Ms. McDonald completed her investigation, a meeting attended in part by Ms. McDonald, Partner Resources Manager Bradley Jennison, Ms. Kelly, and Ms. Ruffin was

held to discuss Ms. McDonald's investigation of Fox's store. Kelly Dep. 170:3-171:9; McDonald Dep. 218:9-24, 219:18-220:19.

**RESPONSE TO PARAGRAPH 96**

Admit for purposes of this motion that such a meeting occurred.

97.    Although no store in Mr. Hutchinson's district performed perfectly with respect to Fair Workweek compliance during Ms. McDonald's audit, the violations at Fox's store were far more pervasive and severe than the other stores. McDonald Dep. 233:18-235:6, 235:7-23; Kelly Dep. 174:24-175:19; Hutchinson Dep. 111:21-112:9.

**RESPONSE TO PARAGRAPH 97**

Disputed. Similar violations were identified in at least three other stores that McDonald and Jennison audited as comparators to Mr. Fox's store. Graff Decl. Ex. 50. The alleged violations in Mr. Fox's store were also not the primary reason for Starbucks decision to terminate his employment. Graff Decl. Ex. 49 at RF158.

98.    Ms. Ruffin made the decision to terminate Fox. Ruffin Dep. 205:15-206:10; Kelly Dep. 171:22-24.

**RESPONSE TO PARAGRAPH 98**

Undisputed for purposes of this motion that Ruffin made the decision in consultation with McDonald and others. *See supra*

99.    Ms. Ruffin decided to terminate Fox for several reasons. Ruffin Dep. 191:9-194:25; 197:18-200:24; Kelly Dep. 172:2-174:23; McDonald Dep. 203:25-205:16. These included the following:

**RESPONSE TO PARAGRAPH 99**

Disputed. Robin Ruderman, Starbucks' Counsel, who participated in the meeting at which it was decided to terminate Mr. Fox's employment (Kelly Dep. 171:5-11), informed the DCA investigator that Fox was fired primarily *not* as a result of Fair Workweek violations or the DCA investigation, but rather on the basis of "overall work performance, ethics, and integrity'" and "more integrity issues than FWL procedures is what led to his termination" Graff Decl. Ex. 49 at RF158.

100.    Fox failed to post schedules on time, so Starbucks owed partners predictability pay that Fox had not paid or caused to be paid. Ruffin Dep. 191:9-194:25, 197:18-200:24; Kelly Dep. 172:2-174:23; McDonald Dep. 203:25-205:16.

**RESPONSE TO PARAGRAPH 100**

Undisputed, but incomplete and potentially misleading. All three stores in Fox's district, audited on the same day, were also found by McDonald to have not posted multiple schedules on time that caused partners not to be paid: Mr. Fox's location (Store 15751) was determined to have posted four schedules with less than 14 days' notice; Store 14841 was likewise determined to have posted four schedules with less than 14 days' notice; Store 778 was determined to have posted three such late schedules, and Store 7466 appeared to have generally posted all schedules on fewer than seven days' notice. Graff Decl. Ex. 50. Starbucks owed predictability pay to the employees at each of these locations. Kelly Dep. 163:24-164:5.

101.    Moreover, Fox completed schedule change logs for other partners when the partners themselves were supposed to sign off to consent for the schedule change. Ruffin Dep. 191:9-194:25, 197:18-200:24; Kelly Dep. 172:2-174:23; McDonald Dep. 203:25-205:16.

**RESPONSE TO PARAGRAPH 101**

Disputed. Ruffin also could not identify the month or year of the alleged visit, nor did she document it in any way. Ruffin Dep. 91:11-20, 92:3-93:7, 95:2-96:24. In fact, the visit was amicable and occurred on or around December 7, 2017. Graff Decl. Ex. 36. The handwriting in the log was *not* exclusively Mr. Fox's, nor did he tell Ruffin that it was. *Id.* Instead, he explained to Ms. Ruffin that he was following Starbucks formal written procedures, which provided, in part: "If you have incomplete information or are not sure of information, contact the partner before processing payroll, record the information as accurately as possible and have the partner initial and confirm at the next possible time." *Id.*; Graff Decl. Ex. 44.

102.    Fox also hired externally even though there were current Starbucks employees who had expressed interest in the available shifts. Ruffin Dep. 191:9-194:25, 197:18-200:24; Kelly Dep. 172:2-174:23; McDonald Dep. 203:25-205:16.

**RESPONSE TO PARAGRAPH 102**

Disputed. Mr. Fox received permission from Human Resources manager Brad Jennison to hire an outside employee for the shift at issue. Graff Decl. Ex. 36. Mr. Fox had not received any internal transfer requests prior to Jennison's grant of permission to hire an outside employee. *Id.*

103.    Fox was also terminated due to integrity and trust issues. Ms. Ruffin learned that, according to Ms. McDonald, Fox had not paid partners predictability pay even though Ms. McDonald had instructed him to do so. Ruffin Dep. 191:9-194:25, 197:18-200:24; Kelly Dep. 172:2-174:23, 175:20-177:9; McDonald Dep. 203:25-205:16, 248:24-249:18.

**RESPONSE TO PARAGRAPH 103**

Disputed. Fox sought to issue corrective predictability pay in connection with specific incidents that McDonald identified to him during her audit, but McDonald instructed him that he

should take no action. Fox Dep. 199:11-14, 208:18-25; McDonald Dep. 243:21-25. Prior to the DCA complaint, Mr. Fox contacted McDonald on multiple occasions to inquire as to application of the new regulations to specific employee-circumstances, and he made payments to all partners when McDonald directed him to do so in response to his inquiries. *See* Graff Decl. Ex. 43, Ex. 46, 47. Also dispute that Mr. Fox was not responding to other "Starbucks employees working outside his store who had expressed interest in available shift postings at his store." Rather, Mr. Fox received permission from Human Resources manager Brad Jennison to hire an outside employee for the shift at issue. Graff Decl. Ex 36. Mr. Fox had not received any internal transfer requests prior to Jennison's grant of permission to hire an outside employee. *Id.*

104.     Additionally, Ms. Ruffin believed that Fox was not transparent because he did not disclose that he had posted schedules late when she had visited the store. Ruffin Dep. 191:9-194:25, 197:18-200:24; Kelly Dep. 172:2-174:23, 175:20-177:9; McDonald Dep. 203:25-205:16, 249:10-15.

**RESPONSE TO PARAGRAPH 104**

Disputed. Based on his training at Starbucks, Mr. Fox misunderstood an aspect of the new scheduling posting requirement. Fox Dep. 203:2-206:20. It would have thus been impossible for Mr. Fox attempt to conceal or be "not transparent" about an issue that he believed was being handled properly. Ruffin did not issue Mr. Fox any disciplinary notice in connection with this misunderstanding, Ruffin Dep. 219:25-220:4, and McDonald wrote to Mr. Fox that "no action is required of you at this time" in connection with the matters that she later discussed with him during her visits to his store. Graff Decl. Ex. 35.

105.     In sum, Ms. Ruffin did not trust Fox to correct his conduct and perform the duties of a store manager in compliance with Fair Workweek law and Company standards. Ms. Ruffin

believed that Fox lacked urgency and attention to detail in ensuring that partners at his stores were being paid for the time they worked and predictability pay they were owed. Ruffin Dep. 222:5-223:13, 223:22-224:21; Kelly Dep. 174:3-175:19.

**RESPONSE TO PARAGRAPH 105**

Disputed. Robin Ruderman, Starbucks Council, who participated in the meeting during which it was decided to terminate Mr. Fox's employment (Kelly Dep. 171:5-11), informed the DCA investigator that Fox was fired primarily "due to his 'overall work performance, ethics, and integrity'" and "more integrity issues than FWL procedures is what led to his termination" Graff Decl. Ex. 49 at RF158; *see also*, *supra*, Responses to Paragraphs 101-104.

106. Fox's employment was terminated on February 8, 2018. Kelly Dep. 169:17-20; Ex. 25 Notice of Separation, dated Feb. 8, 2018, annexed to Fox Dep.

**RESPONSE TO PARAGRAPH 106**

Undisputed for purposes of this motion.

107. At the time of Fox's termination, no other Starbucks store manager was under investigation by the New York City DCA. Kelly Dep. 215:4-9.

**RESPONSE TO PARAGRAPH 107**

Undisputed, but irrelevant to a determination of Defendant's motion. The fact of the DCA investigation was not Starbuck's asserted reason for terminating Mr. Fox's employment. Instead, Robin Ruderman, Starbucks Council, who participated in the meeting during which it was decided to terminate Mr. Fox's employment (Kelly Dep. 171:5-11), informed the DCA investigator that Fox was fired primarily "due to his 'overall work performance, ethics, and integrity'" and "more integrity issues than FWL procedures is what led to his termination**"** Graff Decl. Ex. 49 at RF158.

108.    At the time of Fox's termination, Ms. Kelly was not aware that Fox had raised concerns related to health and safety or the alleged use of hot shots. Kelly Dep. 58:11-15, 177:10-20, 204:19-206:23.

**RESPONSE TO PARAGRAPH 108**

Disputed. Kelly testified that Human Resources Managers are *required* to directly escalate complaints relating to safety concerns, Kelly Dep. 57:16-58:4, and it is undisputed Mr. Fox complained to McDonald (Kelly's direct report) about the health and safety danger that the misuse of hotshots in Starbucks stores posed to employees and customers. Fox Dep. 339:24-340:1. Kelly and McDonald also participated with Ruffin in the meeting during which it was decided to terminate Mr. Fox's employment.  Kelly Dep. 171:5-11.

109.    At the time of Fox's termination, Ms. Kelly also was not aware that Fox had raised concerns about suspected unpaid wages. Kelly Dep. 58:16-23, 177:21-178:2, 201:11-19, 208:12-211:16, 213:13-18, 214:22-215:2.

**RESPONSE TO PARAGRAPH 109**

Undisputed for purposes of this motion.

110.    Ms. Ruffin was not aware of Fox's statements to Mr. Hutchinson concerning alleged underpayment of wages. Ruffin Dep. 90:24-91:10.

**RESPONSE TO PARAGRAPH 110**

Disputed. Hutchinson told Fox he would inform Ruffin of the underpayment of wages that Fox reported to him. Fox Dep. 272:25-273:6. It is also Starbucks policy and Ruffin's expectation that a District Manager would inform the Regional Director of any wage underpayments in her stores. Ruffin Dep. 125:15-24.

111.    Ms. Ruffin also was not aware of Fox's statements to Ms. McDonald concerning the alleged use of hot shots at a Starbucks store. Ruffin Dep. 191:2-8.

## RESPONSE TO PARAGRAPH 111

Disputed. Kelly testified that Human Resources Managers are *required* to directly escalate complaints relating to safety concerns, Kelly Dep. 57:16-58:4, and it is undisputed Mr. Fox complained to McDonald (Kelly's direct report) about the health and safety danger that the misuse of hotshots in Starbucks stores posed to employees and customers. Fox Dep. 339:24-340:1. Kelly and McDonald also participated with Ruffin in the meeting during which it was decided to terminate Mr. Fox's employment. Kelly Dep. 171:5-11.

112.    Ms. McDonald did not communicate to anyone that Fox had raised an issue about the use of hot shots at a Starbucks location. McDonald Dep. 156:2-157:17, 272:24-273:13.

## RESPONSE TO PARAGRAPH 112

Disputed. Kelly testified that Human Resources Managers are *required* to directly escalate complaints relating to safety concerns, Kelly Dep. 57:16-58:4, and it is undisputed Mr. Fox complained to McDonald (Kelly's direct report) about the health and safety danger that the misuse of hotshots in Starbucks stores posed to employees and customers. Fox Dep. 339:24-340:1. Kelly and McDonald also participated with Ruffin in the meeting during which it was decided to terminate Mr. Fox's employment. Kelly Dep. 171:5-11.

113.    Ms. McDonald was not aware at the time of her investigation or Fox's termination that Fox had raised the issue of suspected underpayment of wages to Starbucks employees. McDonald Dep. 273:14-274:6.

## RESPONSE TO PARAGRAPH 113

Undisputed for purposes of this motion.

114.    Ms. McDonald did not make the decision and she was not involved in the decision to terminate Fox. McDonald Dep. 225:18-226:3.

**RESPONSE TO PARAGRAPH 114**

Disputed. Kelly and McDonald also participated with Ruffin in the meeting during which it was decided to terminate Mr. Fox's employment.  Kelly Dep. 171:5-11.

115.    Similarly, Mr. Hutchinson did not inform Ms. Ruffin of Fox's statements to him concerning alleged underpayment of wages because Mr. Hutchinson did not believe the information presented by Fox showed any underpayment of wages actually occurred. Hutchinson Dep. 69:5-69:17, 69:22-25, 106:12-107:3, 135:13-20; Ruffin Dep. 90:24-91:10.

**RESPONSE TO PARAGRAPH 115**

Disputed. Hutchinson told Fox he would be informing Ruffin of the underpayment of wages. Fox Dep. 272:25-273:6

116.    Mr. Hutchinson did not make the decision and he was not involved in the decision to terminate Fox. Hutchinson Dep. 112:25-113:20; Kelly Dep. 181:4-7.

**RESPONSE TO PARAGRAPH 116**

Undisputed for purposes of this motion.

117.    Mr. Hutchinson was instructed to deliver the Notice of Separation to Fox. Hutchinson Dep. 112:25-113:20; 115:4-116:7.

**RESPONSE TO PARAGRAPH 117**

Admit.

118.    Several weeks later, on or about March 1, 2018, Starbucks terminated another store manager for violations of Fair Workweek legislation. Kelly Dep. 185:6-10.

**RESPONSE TO PARAGRAPH 118**

Disputed. Kelly also testified that she did *not* know if there were other factors that contributed to the decision to terminate that manager's employment, nor could she identify any particulars concerning that alleged termination. Kelly Dep. 184:14-185:10.

119.    In the first year following enactment of the Fair Workweek legislation, Starbucks disciplined other managers and terminated eight other store managers in connection with violations of Fair Workweek legislations. Kelly Dep. 183:11-18; McDonald Dep. 226:20-230:14, 241:15-21.

**RESPONSE TO PARAGRAPH 119**

Undisputed for purposes of this motion, but incomplete and potentially misleading. The cited testimony is vague as to the reasons for the termination of other managers during the course of the full year following enactment of the Fair Workweek legislation. Moreover, none of the other three managers who were audited contemporaneously with Mr. Fox and were found to have similar violations were terminated. *Id.*; Kelly 163:24-164:5; Graff Decl. Ex. 50.

120.    D'Auria has not suffered any physical injury, and is only seeing to recover damages for emotional distress. D'Auria Dep. 197:13-24.

**RESPONSE TO PARAGRAPH 120**

Admit that Mr. D'Auria seeks to recover damages for emotional distress and not physical injury in this action, but dispute that the cited testimony supports the assertion that D'Auria did not suffer any physical injury.

121.    D'Auria has seen pest strips in other buildings in Manhattan besides Starbucks; for example, he once saw a pest strip in a pizza place while he was eating there. D'Auria Dep. 206:10-19.

**RESPONSE TO PARAGRAPH 121**

Undisputed, but incomplete and potentially misleading. On the referenced occasion, Mr. D'Auria photographed the pest strip and reported it to the Department of Health. D'Auria Dep. 206:15-25.

122.    D'Auria has seen pest strips (from another brand) in locations of another AVP client, Le Pain Quotidien. D'Auria Dep. 64:21-24, 65:10-18.

**RESPONSE TO PARAGRAPH 122**

Undisputed, but incomplete and potentially misleading. On the referenced occasion, Mr. D'Auria reported the misuse of pest-strips to management. D'Auria Dep. 65:19-24.

123.    D'Auria was concerned about pesticide exposure as a general matter, both for his own health and for the health of others. D'Auria Dep. 197:17 – 198:6.

**RESPONSE TO PARAGRAPH 123**

Admit.

124.    D'Auria did not see any doctors, including psychologists, psychiatrists or any other mental healthcare professional because of his alleged exposure to DDVP. D'Auria Dep. 198:7-21.

**RESPONSE TO PARAGRAPH 124**

Undisputed, but irrelevant to a determination of Defendant's motion.

125.    D'Auria did not see a mental health professional to assist him with the anxiety he claims to have suffered after seeing pest strips in Starbucks locations. D'Auria Dep. 198:15-18.

**RESPONSE TO PARAGRAPH 125**

Undisputed, but irrelevant to a determination of Defendant's motion.

126.    D'Auria has never filed a workers compensation claim with his employer, AVP. Shwiner Dep. 82:6.

**RESPONSE TO PARAGRAPH 126**

Undisputed, but irrelevant to a determination of Defendant's motion.

127.    Shwiner has not suffered any physical injury, and is only seeing to recover for emotional distress. Shwiner Dep. 156:19-23.

**RESPONSE TO PARAGRAPH 127**

Admit that Ms. Shwiner seeks to recover damages for emotional distress and not physical injury in this action, but dispute that the cited testimony supports the assertion that D'Auria did not suffer any physical injury

128.    Shwiner's "sightings" of hot shots in Starbucks locations from 2013 onwards were in part in photographs taken by her technicians, and in part from when she visited the locations in person. Shwiner Dep. 61:4-62:6.

**RESPONSE TO PARAGRAPH 128**

Admit.

129.    Shwiner testified that she recalls seeing, although not all personally, pest strips/hot shots in Starbucks from 2012 onwards. Shwiner Dep. 60:11-15, 61:12.

**RESPONSE TO PARAGRAPH 129**

Admit.

130.    Shwiner alleges her hot shot sightings caused her to feel anxious. Shwiner Dep. 156:19-157:3.

**RESPONSE TO PARAGRAPH 130**

Undisputed, but incomplete. Ms. Shwiner described additional heart and stress-related symptoms in her testimony. Shwiner Dep. 150:16-151:17.

131.     Shwiner has seen pest strips in locations of other AVP clients; for example, she saw at least one in Le Pain Quotidien in Manhattan in 2011. Shwiner Dep. 60:2-15.

## RESPONSE TO PARAGRAPH 131

Undisputed, but irrelevant to a determination of Defendant's motion.

132.     Shwiner also saw pest strips in various Macy's locations (also a client of AVP) in Manhattan in 2015 and 2016. Shwiner Dep. 67:7-16.

## RESPONSE TO PARAGRAPH 132

Undisputed, but irrelevant to a determination of Defendant's motion.

133.     Shwiner has suffered from anxiety and ADD/ADHD since 2013 and saw a psychiatrist to treat these conditions in 2013. Shwiner Dep. 148:15-21.

## RESPONSE TO PARAGRAPH 133

Dispute that this purported material fact has any bearing on Defendant's motion, and object to Defendant's gratuitous interjection of Ms. Shwiner's personal health information into the public record.

134.     Shwiner's awareness of the alleged toxicity of pest strips was based solely on the label found on pest strips, and that her only knowledge of the risks of exposure to pest strips were based on her reading of the label. Shwiner Dep. 99:10-11, 100:2-4.

## RESPONSE TO PARAGRAPH 134

Disputed. The cited testimony does not support the characterization that this was the "sole" or "only" basis for Ms. Shwiner's knowledge.

135.     Shwiner did not see a doctor in 2016, 2017, 2018, or 2019 for anxiety. Shwiner Dep. 158:4-13.

## RESPONSE TO PARAGRAPH 135

Disputed. Ms. Shwiner did not see a mental health professional for these symptoms, but she addressed them with her cardiologist and other physicians. Shwiner Dep. 151:7-17.

136.    Shwiner did not see a mental health professional to assist her with the anxiety she claims to have suffered after seeing pest strips in Starbucks locations. Shwiner Dep. 158.

## RESPONSE TO PARAGRAPH 136

Undisputed, but irrelevant to a determination of Defendant's motion.

137.    Shwiner has never filed a workers compensation claim with her employer, AVP. Shwiner Dep. 82:7-9.

## RESPONSE TO PARAGRAPH 137

Undisputed, but irrelevant to a determination of Defendant's motion.


## ADDITIONAL MATERIAL FACTS IN DISPUTE

In addition to the material disputed facts enumerated and controverted above, additional material facts as to which there exists a genuine issue to be tried include:

138.    Mr. Fox served with distinction as a Starbucks employee and Store Manager at multiple locations in Manhattan for sixteen years — until Starbucks abruptly terminated his employment in February 2018, as further set forth below.

139.    For example, while serving as Manager of the Starbucks located at 405 Broadway in Manhattan in 2016, Mr. Fox was recognized as "Manager of the Quarter" for his Region (Carla Ruffin's region), which was comprised of more than 80 stores. Fox Dep. 131:24-132:6; 152:13-20.

140. Mr. Fox also achieved the highest scores in his District on audits conducted by an independent Quality Assurance auditor for the period from late 2016 through October 2017. Fable Dep. 82:3-83:9.

141. There is no evidence that Mr. Fox ever received any form of disciplinary or "corrective" action during the approximately 16 years of his employment with Starbucks prior to his terminations.

142. On October 10, 2017, Mr. Fox was re-assigned to become Store Manager of the Starbucks location at 180 West Broadway, where he replaced a Store Manager who had been fired the day before for depriving employees under his supervision of earned wages through illicit timeclock manipulation. Fable Dep. 63:15-18; Ruffin Dep. 120:7-16, 121:2-8; Hutchinson Dep. 58:24-59:20; Kelly Dep. 59:9-20

143. Fox was told that he was selected for transfer to the West Broadway and Leonard location because "the partners there had been through a lot, that the store was not where it needs to be, and that [he] would be perfect for the role." Fox. Dep. 103:15-22. Less than one-month after his transfer, Fable wrote to Mr. Fox stating, in part, "*it's even more clear to me why you ar[e] the right guy for the job. Thank you again, and I will truly miss[] your leadership!*" Graff Decl. Ex. 26.

144. During the first weeks following his October 2017 re-assignment to serve as Store Manager at the Starbucks located at 180 West Broadway — and in a reflection of the diligence that was a hallmark of his sixteen years of service — Mr. Fox sought to learn more about the schedules and attendance records of the employees who were newly under his management at the West Broadway location. He did so by conducting an independent audit of the Global Labor System (GLS) time keeping records for his new store. Fox Dep. 261:3-263:18.

145. Mr. Fox almost immediately discovered that several employees had performed hours of work without pay in the weeks prior to his assignment to that location. Fox Dep. 261:3-263:18.

146. Mr. Fox approached one such employee to ask if he had been aware that he was working hours without being paid. Mr. Fox was dismayed when the employee responded that he had been afraid that the prior manager would fire him if he had challenged the apparent non-payment of portions of his wages. Fox Dep. 270:17-24. He assured the employee that he had nothing to fear and, with the employee standing beside him, Mr. Fox entered retroactive pay into the system to account for the hours of work for which the employee had never been paid. Fox Dep. 262:22-25.

147. During a meeting with his District Manager Les Fable, Mr. Fox informed him of the issues he had discovered concerning the non-payment of wages for hours worked by at least ten employees. Fox Dep. 267:11-17. Mr. Fox's District Manager encouraged Mr. Fox to continue his investigation, which resulted in his identification of at least thirty-one employees who had been deprived of wages at his store due to prior timeclock manipulation. Fox Dep. 267:11-268:6

148. Mr. Fox gathered additional information, and, on November 3, 2017, he sent an email to his District Manager with the subject line "*Time clock manipulation at West Broadway and Leonard*." Graff Decl. Ex. 6. Mr. Fox's email included images of manipulated timecards, and an explanation of the mechanics of the scheme to deprive employees of their earned wages. *Id.*

149. The District Manager responded by email, thanking Mr. Fox for the information, and commending him that "*it's even more clear to me now that you are the right guy for this job*." Graff Decl. Ex 6.

150.     Encouraged by the positive feedback, and eager to do what he could to attempt to ensure that every employee working at his new location had been paid for all hours of work at that location, Mr. Fox undertook a more systematic audit of the GLS records. Mr. Fox reviewed timecard and pay records for every employee who worked at that location for any length of time over the course of the prior three years. After reviewing these records for a limited sample of only approximately 130 such current and former Starbucks employees, Mr. Fox identified at least 29 who had worked hours on the clock during the preceding three-year period without being paid. Those employees were spread across the West Broadway location, as well as eight other stores in the area. Fox Dep. 277:13-280:9.

151.     When Mr. Fox presented this information to Tim Hutchinson, the newly appointed District Manager for his district, however, Hutchinson prohibited Mr. Fox from inputting retro pay for any of the 29 employees pending further instructions from his Regional Director. Hutchinson Dep. 58:4-60:2, 68:6-9.

152.     Starbucks never issued corrective backpay to the employees who had been deprived of wages by the manager who preceded Mr. Fox at that location and had been terminated specifically because of his illicit time clock manipulation that deprived employees of earned wages.  Graff Decl. Ex. 12, ¶ 6.

**Starbucks' Pervasive Misuse of Hot Shot Brand "No-Pest" DDVP Strips Despite the Resulting Health Hazard to Employees and Customers**

153.     Spectrum Brands Holdings ("Spectrum") produces a line of powerful insecticide units encased in small, perforated plastic boxes and marketed as "Hot Shot No-Pest 2" strips (hereinafter referred to as a "hot shot", "pest strip", "no pest strip" and any variation thereof). https://www.hotshot.com/products/general-insect-control/no-pest-strip.aspx; Graff Decl. Ex. 21, at 4-6.

154. As described on its retail labeling:

> Hot Shot No-Pest Strip utilizes controlled release technology to slowly diffuse a deep-penetrating vapor in enclosed spaces for up to 4 months. The clean, odorless vapor is evenly distributed throughout the enclosed treatment area, killing visible and hidden insects on contact and preventing new insect infestations while you're away.

*Id.*

155. In particular, each No-Pest Strip diffuses a continuous "deep penetrating vapor" emanating from a 65-gram strip of a toxin called Dichlorvos (2,2-dichlorovinyl dimethyl phosphate or "DDVP"), which kills insects within an approximately 1,200 cubic foot radius for four months. *Id.*

156. Significantly, however, DDVP is hazardous to humans, and the No-Pest Strip labeling is clear that the strips must ***not*** be used in occupied areas or in the vicinity of food or food preparation areas. *Id.*

157. Among other warnings, the Hot Shot No-Pest Strip labeling provides as follows:

- **"[I]t is a violation of Federal law to use this product in a manner inconsistent with its labeling"**

- **"Do not use in the food/feed areas or food/feed processing or food/feed manufacturing or food/feed establishments"**

- **"FOR USE IN UNOCCUPIED AREAS"**

*Id.*

158. The warnings also specifically state:

- **"Do not use in kitchens, restaurants or areas where food is prepared or served. Do not use in homes except for garages, attics, crawl spaces, and sheds occupied by people for less than 4 hours per day."**

*Id.*

159.    The  Center for Disease Control ("CDC") and the National Institute for

Occupational Safety and Health ("NIOSH") jointly maintain a website, which warns consumers

that the known health hazards of DDVP also include, *inter alia*:[2]

- **"Pupillary constriction, muscle cramp, excessive salivation. Sweating. Nausea. Dizziness. Labored breathing. Convulsions. Unconsciousness"**

- Upon skin contact **"MAY BE ABSORBED! Redness. Pain."**

- **"STRICT HYGIENE! AVOID EXPOSURE OF (PREGNANT) WOMEN! AVOID EXPOSURE OF ADOLESCENTS AND CHILDREN!**

- **"IN ALL CASES CONSULT A DOCTOR!"**

- **"The effects may be delayed. Medical observation is indicated."**

160.    Lest there be any doubt about the potential seriousness and genuine risk that

accompanies exposure to DDVP, one such warning states that even short-term exposure,

> **"may cause effects on the central nervous system. Cholinesterase inhibitor. Exposure above the OEL (Occupational Exposure Limit) may result in death."**

*Id.* (emphasis added).

161.    Starbucks has also, itself, explicitly acknowledged that DDVP is classified as

"Highly Hazardous" by the World Health Organization, and Starbucks purports to have a "Zero

Tolerance" policy to prevent the misuse of DDVP by its vendors and ingredient suppliers so as

"to ensure that Starbucks sources sustainably grown and processed coffee."[3]

162.    While serving as the professional pest management control technician assigned to

Starbucks Stores in Manhattan, New York — Mr. D'Auria discovered that Starbucks

---

[2]      https://www.atsdr.cdc.gov/ToxProfiles/tp88-c1-b.pdf (last visited May 20, 2019); *see also* http://pmep.cce.cornell.edu/profiles/extoxnet/carbaryl-dicrotophos/dichlorvos-ext.html

[3]      *See C.A.F.E. Practices Verifier and Inspector Operations Manual v5.3*, Starbucks Coffee Company, Oct. 2017, at 68.

management personnel routinely placed numerous sets of DDVP No-Pest Strips within most of the more than 100 stores that he serviced from at least early in 2015 through June 2018, and in multiple locations in each such store. D'Auria Dep. 46:12-48:22.

163.    Mr. D'Auria photographed many of the No-Pest Strips that he discovered for purposes of documenting and reporting the dangerous misuse of this product which posed an obvious threat to his health and safety (as he worked in close and unsafe proximity to these DDVP strips). *See generally* Photographic Appendix to Plaintiffs' Complaint.

164.    One of AVP's many warnings to Starbucks District Managers was sent by email on July 5, 2017. District Management thereafter forwarded AVP's email to Mr. Fox and other Manhattan area managers on July 5, 2017, with the forwarding subject line "No-Pest Strips." Graff Decl. Ex. 21.

165.    The email included a link to a news article headlined "CDC WARNING ON MISUSE OF PEST STRIPS,"[4] which describes the extreme hazard of using DDVP in the vicinity of humans. Graff Decl. Ex. 21 Among other things, the article emphasized that:

> "**[M]isuse can result in ending up on your back twitching like a dying roach**."

*Id.* (emphasis added).

166.    It also attached a copy of the packaging label that warned of these dangers. Graff Decl. Ex. 21.

167.    Use of Hot Shots and similar products in violation of their package labeling is not only dangerous, but also unlawful. Kranz Dep. 84:17-85:3.

168.    Additional written warnings were delivered to Starbucks Regional and/or District Managers, *inter alia*, on or around: September 11, 2017, Graff Decl. Ex, 22;[5] September 26,

---

[4]      https://www.wired.com/2014/01/cdc-warning-misuse-pest-strips/

2017, Graff Decl. Ex. 28;[6] October 15, 2017 Graff Decl. Ex. 38;[7] October 17, 2017, Graff Decl. Ex. 27;[8] and April 18, 2018, Graff Decl. Ex. 38.[9]

169.     During this period — in the course of overseeing the closure of a Starbucks located at 471 Broadway — Mr. Fox, himself, discovered several Hot Shot-brand Dichlorvos strips that had been hidden throughout the store. Fox Dep. 226:22-227:14.

170.     Mr. Fox immediately reported this finding to his then-District Manager, who responded by assuring Mr. Fox that she would purportedly investigate to confirm that the strips had not been placed in recent years. Fox Dep. 227:23-228-16.

171.     In January 2018 — approximately three months after being re-assigned to serve as Store Manager of the Starbucks located at 180 West Broadway — Mr. Fox saw a former co-worker of his who continued to work at Mr. Fox's prior Starbucks location at 405 Broadway. The co-worker informed Mr. Fox that his successor as Store Manager at that location had placed No-Pest Strips throughout the store — including near and within the pastry display, emitting toxic poisons into baked goods. Fox Dep. 301:4-303:16.

---

[5]     Referencing, among other things: "the improper use of this product and the liability that it creates" as a result of the hazard to employees and others subject to exposure in Starbucks stores.

[6]     Emphasizing, among other things, that additional Hot Shot Dichlorvos strips were discovered on consecutive days in multiple stores and urging Starbucks's Regional Quality Assurance Manager to reiterate to store managers that "these are illegal to use let alone toxic."

[7]     Warning of the ongoing presence of hazardous Dichlorvos strips hidden, by way of example, "in a flylight" and "under counter cabinets."

[8]     Stating, in part: "This is a serious hazard for those touching it and as well as those in the area. The use of these strips has increased. This is [a] serious environmental issue. Dichlorvos is an organophospate which affects the cholinesterase levels in the brain and it interferes with proper working of the nervous system in insects as well as humans."

[9]     Urgently warning of hazardous pesticides "literally dripping down off ceiling and onto the uncovered bar/equipment below."

172.    Fearful of the known hazard to which Starbucks employees and patrons were being unwittingly exposed, Mr. Fox reported this information to Starbucks Human Resource Compliance Specialist Tina McDonald. Fox Dep. 339:24-340:15.

173.    Although No-Pest Strips were by far the most prevalent of the hazardous pesticides that Mr. D'Auria discovered while servicing Starbucks locations in Manhattan, he occasionally discovered a variety of other toxic pesticides hazardously hidden about his scheduled work locations:

174.    By way of example only, on the night of September 14, 2016, upon entering a Starbucks location on West 23rd Street in lower Manhattan, Mr. D'Auria was unexpectedly engulfed by toxic pesticides spewing forth from two "bug bombs" that store personnel had placed in the front of the store lobby — without any warning or notice to Mr. D'Auria — only moments before he arrived to perform scheduled work at that location. Graff Decl. Ex. 41; *see also* Graff Decl. Ex. 28 ("Yesterday tech [D'Auria] was working under counter and turned his head and he was inches from a strip. This is same tech who 2 weeks ago walked into a store that had just set off bombs. *He is extremely upset*.").

175.    By way of further example only, on September 11, 2017, Mr. D'Auria was similarly shocked to be confronted by three "Hot Shot" brand pesticide fogger bombs actively spraying toxic insecticide into his face upon entering the Starbucks located at the intersection of 36th Street and 6th Avenue in Manhattan. Graff Decl. Ex. 22, at 2.

176.    By way of further example only, on the night of April 18, 2018 — while performing scheduled services at the Starbucks located at the intersection of Broadway and 60th Street in Manhattan — Mr. D'Auria was shocked and alarmed upon feeling an unknown liquid dripping down on him from the ceiling above the bar area of the store. Graff Decl. Ex. 38.

177.    Upon further inspection, Mr. D'Auria discovered that Starbucks personnel had placed a dangerous quantity of toxic "D Force" brand insecticide — which is not designed for use in occupied areas or in the vicinity of food or food preparation areas — that was streaming from the ceiling down into the bar area of the store and onto his skin and the exposed food preparation areas of the store. Graff Decl. Ex. 38.

178.    As a lymphoma survivor, Mr. D'Auria suffered from ever-escalating fear, stress and anxiety as a result of being repeatedly and involuntarily exposed to toxic, carcinogenic pesticides that Starbucks management hid about his scheduled work locations without notice or warning. D'Auria Dep. 9:2-4.

179.    Mr. D'Auria also sought out the counsel of Dr. Matt Frye, an entomologist who runs an integrated pest management program at Cornell University, to discuss his concerns about the dangerous misuse of pesticides by Starbucks' store personnel and how he could best respond to protect himself. D'Auria Dep. 51:2-25. Dr. Frye assured Mr. D'Auria that his health and safety concerns were well-founded, and that Starbucks' behavior was shocking. D'Auria Dep. 93:4-6,

180.    It was *not* AVP's responsibility to remove prohibited pest strips from stores. D'Auria Dep. 66:17-67:3. Such duties are likewise absent from the AVP's scope of work agreement with Starbucks, as well as the job descriptions for Mr. D'Auria and Ms. Shwiner. Graff Decl. Ex. 23, Ex. 51

181.    Although Starbucks' managers consistently deployed Hot Shots and other prohibited pesticides in Starbucks stores in Manhattan, Starbucks never undertook any investigation to identify the culpable managers; never imposed discipline on any employee in connection with violations of this policy; and never logged or kept track of the locations, dates or

other particulars concerning the discovery of pesticides in Starbucks stores. Kranz Dep. 109:16-111:11, 179:18-180:4, 111:12-25, 119:25-120:7, 158:10-19, 214:9-215:5, 215:19-216:8; Kelly Dep. 83:22-84:3, 219:15-21, 105:15-106:12; Graff Decl. Ex. 52.

182.    Starbucks' district managers also continued to authorize the use of Company funds for the purchase of such prohibited pesticides for use in Starbucks stores in Manhattan even *after* the commencement of this litigation. Kelly 101:18-25, 105:15-106:12; Graff Decl. Exs. 15, 16, 17, 18, 19, 20.

183.    In response to the filing of this lawsuit, a spokesperson for Starbucks falsely stated to the press, in part, as follows:

> To reiterate the on-background information, products used in our stores must meet high safety standards in order to comply with our company guidelines. Upon hearing reports that employees had used a product that violated company guidelines, Starbucks immediately instructed local leadership to remove these products. We can confirm that these products have been removed.
>
> Additionally, I can confirm that we consulted with experts who concluded that based on how the strips were used in stores, employees and customers were not exposed to health risks. Please feel free to use that information, attributable to a Starbucks spokesperson, in any article/segment you end up writing.

Graff Decl. Ex. 13.

184.    In particular, Starbucks has *never* undertaken any investigation that would enable it to "confirm that these products have been removed." Kranz Dep. 109:16-111:11, 179:18-180:4, 111:12-25, 119:25-120:7, 158:10-19, 214:9-215:5, 215:19-216:8; Kelly Dep. 83:22-84:3, 219:15-21, 105:15-106:12; Graff Decl. Ex. 52.

185.    To the contrary, Starbucks' district managers continued to authorize the use of Company funds for the purchase of such prohibited pesticides for use in Starbucks stores in

Manhattan even *after* the commencement of this litigation. Kelly 101:18-25, 105:15-106:12; Graff Decl. Exs. 15, 16, 17, 18, 19, 20.

186.    Moreover, Starbucks' claim to have consulted with experts in connection with its public assurance that "based on how the strips were used in stores, employees and customers were not exposed to health risks" was simply false. Graff Decl. Ex. 14. Starbucks did not consult with any experts in connection with formulating or releasing its false public statement. *Id.*

187.    Starbucks was also aware at that time that its managers were purchasing Hot Shots and other prohibited pesticides for self-deployment in stores, and recognized that this practice was dangerous and could potentially expose the company to liability for secretly poisoning its customers and employees. *See* Graff Decl. Ex. 25 ["[W]e do have times when stores will take matters of pest control into their own hands (hot shots in particular)…. If he did in fact report us to the NYS DEC…there could be an investigation"]; Graff Decl. Ex. 30 ("Partners have been abusing hot shots in stores, using up to ten hot shots on top of the menu board counters."); Graff Decl. Ex. 29 (store with nine hot shot devices piled on top of store cabinets in behind bar); Graff Decl. Ex. 39 (hotshots placed in store pastry case).

188.    Rather than taking action to reign in these dangerous and unlawful practices, Starbucks senior management personnel openly urged one another to "at the very least let's make sure we conceal" prohibited pesticides that they used in Starbucks stores. Graff Decl. Ex. 25.

189.    Like Mr. D'Auria, Ms. Shwiner was also dangerously exposed to hazardous pesticides while working in Starbucks stores. Graff Decl. Ex. 38 ("I myself came across 2 in the past 2 nights while inspecting under counter cabinets and we[re] inches from my face.").

190.    Ms. Shwiner was regularly confronted with exposure in close confines to such hazardous pesticides when working in Starbucks stores. Shwiner Dep. 64:12-65:5.

191.    Ms. Shwiner suffered significant fear and anxiety due to her repeated involuntary and unexpected exposures to unlawfully misused toxic pesticides, for which she sought treatment with a cardiologist to help cope. Shwiner Dep. 150:18-151:17.

Dated: New York, New York
       March 1, 2021                              Respectfully submitted,

                                                 FILOSA GRAFF LLP

                                                 By: _____
                                                        Ariel Y. Graff
                                                        Gregory N. Filosa

                                                 111 John Street, Suite 2510
                                                 New York, NY 10038
                                                 Tel: (212) 203-3473
                                                 agraff@filosagraff.com
                                                 gfilosa@filosagraff.com

                                                 *ATTORNEYS FOR PLAINTIFFS*