UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/13/21
```

| | |
|---|---|
| Rafael Fox, et al., | |
| Plaintiffs, | 19-CV-4650 (AJN) |
| —v— | |
| Starbucks Corporation, | OPINION |
| Defendant. | & ORDER |

ALISON J. NATHAN, District Judge:

Plaintiffs Rafael Fox, Paul D'Auria, and Jill Shwiner filed this action against Defendant Starbucks Corporation on May 21, 2019. Fox claims that his former employer, Starbucks, unlawfully retaliated against him for reporting the use of a dangerous pesticide in Starbucks's Manhattan stores and the underpayment of Starbucks workers. D'Auria and Shwiner, who were pest control contractors for Starbucks, bring a claim for negligent infliction of emotional distress resulting from Starbucks's use of a dangerous pesticide in their stores. Starbucks on January 14, 2021, filed a motion for summary judgment in its favor on all four claims. For the reasons given below, the Court GRANTS Starbucks's motion.

## I.    Background

### A. Factual Background

The following facts are drawn from the parties' statements and counter-statements made pursuant to Local Civil Rule 56.1.[1]

---

[1] Fox in his Rule 56.1 Statement at times responds "Admit" to a statement of fact and other times "Undisputed for purposes of this motion." *See, e.g.*, Pls. 56.1 ¶¶ 116–17. The Court deems these responses to have an identical meaning.

Rafael Fox was hired by Starbucks as a barista in 2001.  Pls. 56.1 ¶ 5, Dkt. No. 106. Between 2002 and 2007, Fox was promoted several times, ultimately becoming a Manager in 2007.  *Id.* ¶ 6.  In 2009, Fox was assigned to be the store manager of the Starbucks store at Broadway and Canal.  *Id.* ¶ 7.  Starbucks transferred Fox from that location to the West Broadway and Leonard location in October 2017.  *Id.*  Fox worked at that location until he was terminated in February 2018.  *Id.*

Peter D'Auria and Jill Shwiner both worked at AVP Termite & Pest Control of New York, Inc.  *Id.* ¶ 9.  D'Auria was "a licensed, certified Pest Control Technician," meaning that he responded "to particular stores in the event of any emergent pest control challenges."  *Id.* ¶ 10. He was tasked with, among other duties, "[m]aintaining knowledge and implementation of applicable laws, rules, and regulations governing pesticide application in (including documenting illegal pesticide use)."  Weber Decl., Ex. G at 2, Dkt. No. 99; Pls. 56.1 ¶ 17.  Shwiner was AVP's Direction of Operations, in which role she provided "periodic training to Starbucks management personnel in Manhattan," walked through stores with Starbucks District Managers, and "perform[ed] on-site inspections."  Pls. 56.1 ¶¶ 11–12. Shwiner was also responsible for "responding to AVP customer concerns and troubleshooting any customer issue."  *Id.* ¶ 15.

Starbucks hired AVP to provide pest control services to some of its Manhattan stores pursuant to a proposal prepared by AVP in 2012.  *Id.* ¶¶ 9, 13–14.  According to the proposal, AVP would "perform regularly scheduled pest elimination to each store as is designated for pest control service for Starbucks Coffee Co."  Graff Decl., Ex. 23 at 2, Dkt. No. 105.  AVP provided these services through the time period at issue in this case.  Pls. 56.1 ¶¶ 9, 14.  D'Auria and Shwiner both worked with Starbucks in their roles at AVP.  *Id.* ¶¶ 9–11, 18.

Plaintiffs are connected in the Complaint by Starbucks's use of a pesticide product called the No-Pest Strip2, alternatively referred to by the parties as a "hot shot," "pest strip," or "no pest strip." *Id.* ¶ 8. It is undisputed that pest strips can be dangerous to humans. For example, the product's label states, "Do not use in . . . food/feed establishments," and "FOR USE IN UNOCCUPIED AREAS." *Id.* ¶ 157. The label further states, "Do not use in kitchens, restaurants or areas where food is prepared or served. Do not use in homes except for garages, attics, crawl spaces, and sheds occupied by people for less than 4 hours per day." *Id.* ¶ 158. Additionally, both the Centers for Disease Control and the National Institute for Occupational Safety and Health warn consumers about the dangers of exposure to Dichlorvos (or "DDVP"), the active pesticide in pest strips. *Id.* ¶¶ 159–60.

It is undisputed that these pest strips were present in some Starbucks stores in Manhattan throughout the time period at issue. *Id.* ¶¶ 30–32. D'Auria and Shwiner discovered the pest strips at Starbucks stores and sent repeated messages to Starbucks management that they should not be used. *Id.* ¶¶ 53, 128–30.

Both Starbucks's Food Safety Manual and its Inspector Operations Manual forbid the use of pesticides by Starbucks staff, including DDVP. *Id.* ¶¶ 25–26. Starbucks management also "repeatedly and officially disclaimed" the use of pest strips and other pesticides in its stores. *Id.* ¶ 29. For example, both Margaret Kis, Starbucks Manager of Facilities Services, and Rami Kranz, the Regional Retail Qualify Assurance Manager, told managers in a series of emails from 2015 to 2018, often at the urging of Shwiner or D'Auria, not to use pest strips in their stores and to remove any that they found. *Id.* ¶¶ 29, 35–37, 39–40, 41–42, 44, 50–53; *e.g.*, Kranz Decl., Exs. 7–10, Dkt. No. 98. These official policies and repeated warnings notwithstanding, pest strips were deployed in Starbucks stores.

3

Fox was transferred to the West Broadway and Leonard store to replace the prior store manager. *Id.* ¶ 54. Starbucks had terminated that prior store manager after District Manager Leslie Fable discovered that he had manipulated employees' time records, which resulted in underpayment of wages. *Id.* ¶¶ 54–55.[2] Fable recommended Fox's transfer to the store, which was ordered by Regional Director Carla Ruffin, who was Fable's supervisor. *Id.* ¶¶ 58–59. The parties dispute precisely why Fox was chosen for this transfer. According to Starbucks, Fox was chosen because his performance at the prior location had grown "stagnant," and Starbucks hoped that a transfer would "revitalize his leadership capabilities." *Id.* ¶ 60. Ruffin stated, for example, that Fox's prior store had not been meeting Starbucks's standards. *Id.* ¶ 61. According to Fox, he was transferred because the employees at the new location had "been through a lot" and Fox "would be perfect for the role." *Id.* ¶ 59. He notes, in support, that he was chosen in 2016 as "Manager of the Quarter" for his Region, and that he once received "the highest scores in his District" from Quality Assurance. *Id.* ¶ 60. Regardless of the reason, Fable, who discovered the misconduct, was then transferred to Brooklyn, which he considered a "favorable assignment," and Timothy Hutchinson became the new District Manager supervising Fox. *Id.* ¶¶ 62–63. Like Fable, Hutchinson reported to Ruffin, the Regional Director. *Id.* ¶ 64.

After transferring to the West Broadway and Leonard store in October 2017, Fox concluded that the prior store manager had committed additional misconduct that he believed Starbucks management did not know. *Id.* ¶ 65. Specifically, Fox determined that only one employee had received back pay for the time manipulation when in fact other employees at the store were owed back pay. *Id.* ¶¶ 56, 65. Fox first reported this additional misconduct to Fable

---

[2] Fox disputes the extent of Fable's subsequent investigation and the extent to which Starbucks remedied the underpayment, but does not dispute that Fable initially discovered the misconduct that resulted in the prior manager's termination. Pls. 56.1 ¶¶ 55–56.

on November 3, 2017, and then to Hutchinson sometime later that month.  *Id.*  ¶¶ 65–66; Graff

Decl., Ex. 26.  Hutchinson investigated Fox's report and concluded that additional back pay was

not justified.  Pls. 56.1 ¶ 67.  Fox disputes whether Hutchinson's investigation was sufficiently

thorough to uncover any wrongdoing.  *Id.*

In November 2017, New York City's Fair Workweek legislation went into effect.  *Id.*

¶ 68.  In response, Starbucks created the Senior Compliance Specialist role, which was filled by

Tina McDonald.  *Id.* ¶¶ 68–70.  McDonald monitored Starbucks's Fair Workweek compliance

by providing training and auditing stores.  *Id.* ¶ 71–72.  She reported to Rachel Kelly, the

Director of Partner Resources in New York City.  *Id.* ¶ 69.  The Fair Workweek requirements are

overseen and enforced by the New York City Department of Consumer Affairs ("DCA").

On January 10, 2018, Fox received a complaint from the DCA alleging a Fair Workweek

violation in his store.  *Id.* ¶ 73.  The complaint, filed by one of Fox's employees, alleged that

hours were improperly reduced, that work schedules were missing, and that schedules were not

posted with adequate notice.  *Id.* ¶ 74.  Fox sent a copy of the DCA complaint to Hutchinson,

who, in turn, forwarded the complaint to McDonald and Partner Resources Manager Bradley

Jennison.  *Id.* ¶ 82.[3]  Kelly directed McDonald and Jennison to visit Fox's store to assess Fox's

Fair Workweek compliance.  *Id.* ¶ 83–84.  McDonald visited Fox's store at least twice to

investigate the DCA complaint.  *Id.* ¶ 87.  At the first visit on January 11, 2018, McDonald

concluded that Fox had not complied with the Fair Workweek law because he had not posted

work schedules with adequate noticed and he, not an employee, had filled out the schedule

---

[3] The parties dispute whether Fox self-reported the DCA complaint to Hutchinson or whether it
was sent to Hutchinson only after Ruffin visited Fox's store on January 10, 2018, and told Fox to
share the complaint.  Pls. 56.1 ¶¶ 75–81.  According to Fox, Ruffin did not visit Fox's store after
the DCA complaint was received.  *Id.* ¶¶ 75–76.

change log. *Id.* ¶¶ 88–89.  During this first visit, Fox told McDonald that pest strips were being used at other store locations.  *Id.* ¶¶ 90.  McDonald told Fox to speak to his District Manager, Hutchinson, about this report, which Fox did not do.  *Id.*[4]

McDonald visited Fox's store a second time a week or two later.  *Id.* ¶ 92.  At that visit, McDonald concluded that employees were owed predictability pay for late schedule postings. *Id.* ¶¶ 93–94.  The parties dispute whether McDonald also found that Fox had disregarded requests for shifts from Starbucks employees at other stores in violation of the Fair Workweek law.  *Id.* ¶ 94.[5]  Starbucks concluded that it owed employees at Fox's store several thousand dollars in wages arising from Fox's noncompliance with the Fair Workweek law.  *Id.* ¶ 95.  Fox contests the accuracy and thoroughness of McDonald's investigation that led to this conclusion. *Id.*

After McDonald completed her investigation, McDonald, Jennison, Kelly, and Ruffin attended a meeting to discuss McDonald's findings.  *Id.* ¶ 96.  McDonald stated at this meeting that while other stores in Fox's district were out of compliance with the Fair Workweek law, the violations at Fox's store were the most pervasive and severe of the four stores discussed.  *Id.* ¶ 97.  Ruffin then made the decision to terminate Fox.  *Id.* ¶ 98.  At that time, he was the only

---

[4] Fox additionally alleges that Fable had been informed of the use of pest strips in another store when Fox and Fable helped to clean up a store that had closed in October 2018.  Pls. 56.1 ¶ 90; Graff Decl., Ex. 2 at 59.

[5] The parties also disagree about whether McDonald gave Fox any instructions after her first visit.  According to Starbucks, McDonald "[a]t some point during the investigation" instructed Fox to make payments to an employee.  *Id.* ¶ 91.  According to Fox, McDonald did not give such an instruction and instead, in a text message dated January 12, 2021, told Fox that "[n]o action is required of you at this time."  *Id.* ¶¶ 91–92; Graff Decl., Ex. 11 at 243; Graff Decl., Ex. 2 at 199.[5] The Court concludes, based on the portions of McDonald's deposition to which Starbucks's cites, that the record is at least ambiguous as to whether McDonald ordered Fox to pay any employees after she completed her first visit.  Weber Decl., Ex. K at 190–94.

Starbucks store manager under investigation by the DCA.  *Id.* ¶ 107.  Hutchinson delivered

Fox's Notice of Separation and Fox was terminated on February 8, 2018.  *Id.* ¶ 106, 117.  In the

first year of the Fair Workweek law, a total of nine Starbucks store managers, including Fox,

were terminated, at least in part, for Fair Workweek violations.  *Id.* ¶¶ 118–19.

### B.  Procedural History

On May 21, 2019, Fox, D'Auria, and Shwiner filed this action against Starbucks

Corporation.  Complaint, Dkt. No. 1.  The Complaint lists four partially overlapping causes of

action.  All three Plaintiffs claimed negligent infliction of emotional distress for being exposed to

pest strips in Starbucks stores, which, they allege, "caused [them] to suffer physical harm as well

as extreme personal and emotional hardship."  Complaint at 22–24.  Fox also raised three

unlawful retaliation claims: retaliation for his report of pest strips in Starbucks stores, under New

York Labor Law § 215, and retaliation for his report of unpaid wages, under New York Labor

Law § 215 and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).  Complaint at 24–27.

On July 12, 2019, Starbucks filed a motion to dismiss all three Plaintiffs' negligent

infliction of emotional distress claims.  Dkt. No. 14.  The Court on March 2, 2020, granted that

motion as to Fox but denied it as to D'Auria and Shwiner, maintaining their claims.  *Fox v.

Starbucks Corp.*, No. 19-CV-4650 (AJN), 2020 WL 1033059, at *2–3 (S.D.N.Y. Mar. 2, 2020).

After the parties completed discovery, Starbucks on January 14, 2021, moved for

summary judgment in its favor on all Plaintiffs' claims.  Dkt. No. 95.  The motion is fully

briefed.  Starbucks Br., Dkt. No. 100; Fox Br., Dkt. No. 104; Reply Br., Dkt. No. 110.

### II.    Legal Standard

Summary judgment may not be granted unless all of the submissions taken together

"show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[I]n making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In seeking summary judgment, the initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Where the non-moving party would bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant "demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting *Celotex*, 477 U.S. at 323). The non-moving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are

not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

Additionally, the Court need consider "only admissible evidence," as determined under the

typical "principles governing admissibility of evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66

(2d Cir. 1997).

### III.   Analysis

### A. Retaliation for reporting wage violations

Fox first contends that he was terminated in retaliation for reporting misconduct

committed by the prior store manager at the West Broadway and Leonard location. Complaint at

25–27. He alleges that his termination therefore violated both the Federal Labor Standards Act,

29 U.S.C. § 215(a)(3), and New York Labor Law, N.Y. Lab. Law § 215(1)(a).

### 1.   Applicable Law

Both federal and New York law prohibit termination of an employee in retaliation for the

employee's participation in a protected activity. 29 U.S.C. § 215(a)(3); N.Y. Lab. Law

§ 215(1)(a). Fox's retaliation claim is "subject to the three-step burden-shifting framework

established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Mullins v. City of

New York*, 626 F.3d 47, 53 (2d Cir. 2010). "For present purposes, the elements of FLSA and

NYLL retaliation claims overlap in all material respects." *Cortese v. Skanska Koch, Inc.*, No.

19-CV-11189 (JSR), 2021 WL 2472242, at *10 (S.D.N.Y. June 17, 2021); *see also Jones v.

Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 27 (E.D.N.Y. 2020).

"[A] plaintiff alleging retaliation under FLSA must first establish a prima facie case of

retaliation by showing (1) participation in protected activity known to the defendant . . . ; (2) an

employment action disadvantaging the plaintiff; and (3) a causal connection between the

protected activity and the adverse employment action." *Mullins*, 626 F.3d at 53. Once the

plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a

'legitimate, non-discriminatory reason for the employment action.'" *Id.* (quoting *Weinstock v.*

*Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). "If the defendant meets this burden, the

plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-

discriminatory reasons proffered by the defendant were false, and that more likely than not

discrimination was the real reason for the employment action.'" *Id.* at 53–54 (quoting *Weinstock*,

224 F.3d at 42).

### 2.  The Protected-Activity and Adverse-Action Elements

Starbucks does not meaningfully dispute that Fox has established several elements of this

retaliation claim.  First, Fox reported to Fable and Hutchinson in November 2017 that he

believed the prior store manager had underpaid Starbucks employees beyond what Starbucks had

previously discovered.  Pls. 56.1 ¶¶ 65–66.  Such an internal complaint about violations of

employees' rights is a protected activity under both federal and New York law.  *See Lopez v.*

*Advantage Plumbing & Mech. Corp.*, No. 15-CV-4507 (AJN), 2016 WL 1268274, at *2

(S.D.N.Y. Mar. 31, 2016).  Further, knowledge of that protected activity is established because,

"for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her

protected activity to establish the knowledge prong of the prima facie case."  *Kwan v. Andalex*

*Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d

111, 116 (2d Cir. 2000)); *see also Armstrong v. Metro. Transp. Auth.*, No. 07 CIV. 3561 DAB,

2014 WL 4276336, at *20 (S.D.N.Y. Aug. 28, 2014) ("Courts have found general corporate

knowledge to arise when a supervisor, corporate officer, or employee whose job is to investigate

and resolve discrimination complaints becomes aware of the protected activity.").  Second, Fox's

employment was terminated, which is an adverse employment action. *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019)

Starbucks attacks two elements of Fox's claim. First, it argues that Fox cannot demonstrate a causal connection between his statements to Hutchinson and Ruffin's decision to terminate Fox. Second, Starbucks argues that even if Fox can make out a prima facie case, it had a legitimate reason for terminating Fox that Fox cannot show to be pretext. The Court concludes that Fox has failed to demonstrate a genuine dispute of material fact as to the causal-connection element and therefore does not evaluate Starbucks's proffered justification.

### 3. The Causal-Connection Element

A plaintiff "cannot rely on general corporate knowledge alone to satisfy the third 'causal connection' prong" of his retaliation claim. *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015) (citing *Kwan*, 737 F.3d at 844 n.4 (stating that a plaintiff "cannot satisfy the causation prong through mere corporate knowledge"). Rather, a plaintiff generally must show that the particular decision maker who took adverse action against the plaintiff had knowledge of the plaintiff's protected activity. *See EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013) ("[T]he lack of evidence indicating knowledge of particular individual agents can doom a plaintiff's ability to show . . . causation[.]"); *Parsons v. JPMorgan Chase Bank, N.A.*, No. 16CV0408NGGJO, 2018 WL 4861379, at *15 (E.D.N.Y. Sept. 30, 2018) (finding that it "alone is fatal to Plaintiff's retaliation claim" that the decision maker "who made the ultimate decision" was "unaware" of Plaintiff's activity); *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11 CIV. 8934 AJN, 2014 WL 896744, at *11–12 (S.D.N.Y. Mar. 3, 2014) (noting "that such lack of knowledge by decision-makers undercuts a claim of a causal connection" (citing *Gordon*, 232 F.3d at 117); *Papelino v. Albany Coll. of Pharmacy of*

*Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("First, there is no indication that Rice even knew about the right-to-sue letter when she proposed transferring respondent.").

Here, Fox reported wage underpayments to Hutchinson.  Pls. 56.1 ¶ 65.  But it is undisputed that Hutchinson "was not involved in the decision to terminate Fox." *Id.* ¶ 116. Rather, the parties agree that Ruffin made the decision to terminate Fox. *Id.* ¶ 98.  And she did so after attending a meeting that Hutchinson did not attend.  *Id.* ¶ 96.  Further, Ruffin stated she was unaware of Fox's report to Hutchinson, *id.* ¶ 110 (citing Weber Decl., Ex. A at 90–91), and Hutchinson stated that he did not inform Ruffin because he concluded there was no misconduct to report, *id.* ¶ 67 (citing Weber Decl., Ex. I at 68–69).  The Court therefore concludes that there is no direct evidence that Ruffin, the decision maker in question, had knowledge of Fox's protected activity as necessary to establish the causation element.

Yet even when a plaintiff lacks direct evidence of decision-maker knowledge, the plaintiff may nevertheless rely on indirect evidence of causation.  *Gordon*, 232 F.3d at 117.  For example, a plaintiff may show that "the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity *acts pursuant to encouragement by a superior* (who has knowledge) to disfavor the plaintiff."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010)).  Or causation may be inferred in part "by showing that the protected activity was closely followed in time by the adverse action."  *Mullins*, 626 F.3d at 53 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

Fox raises three pieces of indirect evidence that, he says, support an inference of causation despite the absence of direct evidence that Ruffin knew about his report.  First, Fox

argues that Ruffin's knowledge of his report is a disputed fact because Hutchinson told Fox that he would inform Ruffin of the underpayments, Pls. 56.1 ¶ 110 (citing Graff Decl., Ex. 2 at 272–73 ("he also said he would bring it to the attention of Carla [Ruffin]")),[6] and because Ruffin stated that she would expect a District Manager like Hutchinson to report to her any such underpayments of which he became aware, *id.* (citing Graff Decl., Ex. 7 at 125). But these statements, taken as true, do not create a genuine dispute of fact. Rather, the statements are consistent: Hutchinson told Fox that he would inform Ruffin of Fox's report but Hutchinson, after investigating the matter, did not. That explanation is also consistent with Ruffin's expectation that a District Manager "would report to [her] if they became aware of time clock manipulation at one of the stores." Graff Decl., Ex. 7 at 125. Hutchinson concluded that he was not aware of any such time manipulation because he decided, rightly or wrongly, that Fox's report lacked merit.

Other evidence identified by Fox further demonstrates there is no genuine dispute as to Hutchinson's actions. Fox emphasizes, for example, that Hutchinson "did not forward Fox's findings to the Starbucks Fraud Team that is tasked to conduct such an investigation" and that he instead only reviewed the matter himself and "spoke with a single District Manager" whose name he cannot recall. Pls. 56.1 ¶ 67. Further, Fox stated that Hutchinson responded to his report with "skepticism." Graff Decl., Ex. 2 at 272. These undisputed facts bolster the only available conclusion that Hutchinson did not believe Fox's report and so did not relay it to Ruffin.

---

[6] Starbucks argues that Fox's statement of what Hutchinson said to him is hearsay, Def. Reply 56.1 ¶ 110, but the Court finds it is not, *see* Fed. R. Evid. 801.

13

Second, Fox points to the "close temporal proximity between [his] investigation and complaints of unpaid wages" in November 2017 "and his termination" on February 8, 2018, a gap of approximately three months.  Fox Br. 10–11.  Temporal proximity can support an inference of causation, but proximity "alone is insufficient to defeat summary judgment."  *Kwan*, 737 F.3d at 847.  Moreover, when "a plaintiff relies exclusively on timing to [establish] causation, the temporal proximity . . . must be 'very close.'"  *Ehrbar*, 131 F. Supp. 3d at 34 (ultimately quoting *Clark Cnty.*, 532 U.S. at 273).  There is no "bright line" that determines this inquiry, but courts in the Second Circuit have, on occasion, held that a gap of up to five months is still enough to "support a causal connection."  *Id.* (ultimately citing *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001)).  But the Supreme Court has suggested that a passage of three or more months is generally too long to infer causality.  *See Clark Cnty.*, 532 U.S. at 273–74.  And district courts in the Second Circuit have more "consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."  *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007); *see also Wojcik v. Brandiss*, 973 F. Supp. 2d 195, 215 (E.D.N.Y. 2013) ("Claims of retaliation are, however, routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation.").

The Court concludes that Fox's report to Hutchinson and Ruffin's decision to terminate Fox's employment three months later are insufficiently proximate in time to support an inference of a causal nexus between the two events.  That is especially so when Fox relies on temporal proximity in the absence of any evidence that Ruffin was otherwise informed of what Hutchinson was told.  *See Smith v. City of New York*, 385 F. Supp. 3d 323, 346 (S.D.N.Y. 2019)

14

(holding that a plaintiff did not show causation, despite closer temporal proximity, when decision makers did not know about the plaintiff's complaint).

Third, Fox argues that causation may be inferred because Starbucks's justifications for terminating Fox are variously "false," "inconsistent," and "implausible." Fox Br. 8–10. But these arguments go to whether Starbucks's proffered justification for terminating Fox was legitimate or mere pretext. Starbucks does not carry the burden of justifying Fox's termination until Fox first makes out a prima facie case of retaliation, which under both federal and New York law means that he must demonstrate a causal "nexus" between his report and his termination. *Higueros v. N.Y. State Cath. Health Plan, Inc.*, 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007). Because Fox has failed to establish a genuine dispute of material fact as to a prima facie case, the burden does not shift to Starbucks to justify its decision.

On Fox's first retaliation claim under both the FLSA and New York Labor Law premised on his report of unpaid wages, the Court concludes that Starbucks is entitled to summary judgment because Starbucks has demonstrated there is no genuine dispute of material fact as to the causal-connection element of a retaliation claim.

### B. Retaliation for reporting pest strips

Fox's second retaliation claim is premised on his report to McDonald that some Starbucks stores were using pest strips, which Fox believed to be a danger to employees' and customers' health. Complaint at 24–25. He invokes only New York Labor Law for this claim, but the same legal principles govern this claim as for his above unpaid-wages retaliation claim.

### 1. The Protected-Activity and Adverse-Action Elements

The Court first concludes that there is adequate record evidence to demonstrate the first two elements of a prima facie retaliation claim. An internal report is a protected activity under

New York Labor Law so long as it raises a "colorable violation" of the state statute.  *Cortese*, 2021 WL 2472242, at *10 (quoting *Castagna v. Luceno*, No. 09-CV-9332 CS, 2011 WL 1584593, at *12 (S.D.N.Y. Apr. 26, 2011)).  The reporting employee "need not state his complaints with lawyerly precision" or cite a specific statutory provision that he reasonably believes to have been violated.  *Id.*; N.Y. Lab. Law § 215(1)(a) ("An employee complaint or other communication need not make explicit reference to any section or provision of this chapter to trigger the protections of this section.").

Fox contends that his report of pest-strip usage to McDonald on January 11, 2018, was a protected activity under New York Labor Law because it raises a colorable violation of N.Y. Labor Law § 200.  Fox Br. 12–13.  Under that provision, employers must "provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places."  N.Y. Lab. Law § 200(1); *see also Jock v. Fien*, 605 N.E.2d 365 (N.Y. 1992) (stating that § 200 "codifies the common-law duty of an owner or employer to provide employees with a safe place to work").  Starbucks responds that Fox's report did not raise a colorable violation of § 200 because there is no evidence that the pest strips are "illegal" or were placed in violation of New York Labor Law.  Starbucks Br. 12.  It further argues that McDonald did not understand Fox to be making a complaint but only to be asking a question.  *Id.*

Viewing the evidence in the light most favorable to Fox, the Court concludes that Fox's report of the pest strips was a protected activity.  *See Rodriguez*, 72 F.3d at 1061.  According to Fox, he told McDonald about the risks of pest strips, as listed in the "warnings" on the product's labels, including to the "children" that visit Starbucks stores.  Graff Decl., Ex. 2 at 340. McDonald's subjective impression of Fox's report is not an undisputed fact and a jury could conclude that McDonald "could reasonably have understood" that Fox was complaining about a

violation of New York Labor Law. *Rojas*, 660 F.3d at 108; *see also* Graff Decl., Ex. 2 at 339–40.

Fox has demonstrated that Starbucks had knowledge of Fox's protected activity because, like with Fox's other retaliation claim, corporate knowledge may be imputed. *See Kwan*, 737 F.3d at 844.

Last, the adverse action identified in this retaliation claim is the same as for Fox's prior claim: his employment was terminated. *See Davis-Garett*, 921 F.3d at 43.

### 2.  The Causal-Connection Element

Starbucks argues that Ruffin, as with Fox's unpaid-wages report, did not have knowledge of Fox's pest-strip report to McDonald. Starbucks Br. 13. Specifically, Ruffin stated that she was not aware of the report. Pls. 56.1 ¶ 111. And McDonald stated that she did not transmit the report to anyone else. *Id.* ¶ 112. Similarly, Kelly, who was also at the meeting with Ruffin in McDonald, stated that she was not aware of Fox's pest-strip report. *Id.* ¶ 108. Therefore, the Court again concludes that there is no direct evidence that Ruffin, who decided to terminate Fox, was aware of Fox's protected activity as required to demonstrate the causal-connection element under New York Labor Law. *See EEOC*, 967 F. Supp. 2d at 859.

Yet Fox may again attempt to demonstrate causality with indirect evidence. *See Gordon*, 232 F.3d at 117. Unlike his unpaid-wages claim, the Court concludes that there is adequate indirect evidence to create a genuine dispute of material fact as to causality. First, Fox's report and his termination were much closer in time than for his first retaliation claim—just 28 days between January 11 and February 8, 2018. Pls. 56.1 ¶¶ 90, 106. The events are sufficiently proximate as to support an inference of causality. *See Kwan*, 737 F.3d at 845 (stating that the "three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a

prima facie showing of causation indirectly through temporal proximity"); *cf. Schmidt-Sarosi v. Offs. for Fertility & Reprod. Med., P.C.*, 195 A.D.3d 479 (N.Y. App. Div. 2021) ("The complaint states a cause of action under Labor Law § 215 by alleging that plaintiff was terminated four weeks after complaining of unlawful deductions from her wages.").

Second, there is additional "circumstantial evidence" that could permit a jury to infer causation.  Most notable is that McDonald was present at the meeting, at the conclusion of which Ruffin decided to terminate Fox.  Pls. 56.1 ¶¶ 96, 98.  That fact distinguishes Fox's pest-usage report from his unpaid-wage report because Hutchinson indisputably did not attend the meeting. Starbucks responds that there is no evidence that McDonald was present during the portion of the meeting at which this decision was made, Def. Reply 56.1 ¶ 98, but the Court at summary judgment must draw all inferences in favor of Fox.  And even if McDonald had left prior to the formal decision-making process, a reasonable jury could still infer that McDonald disclosed Fox's pest-strip report to Ruffin earlier in the meeting.  Additionally, Ruffin consulted with Kelly on her decision to terminate Fox, and Kelly was McDonald's supervisor, which permits a jury to reasonably infer that McDonald relayed Fox's report to Kelly.  *Id.*; Pls. 56.1 ¶ 108.

The Court therefore concludes that, unlike Fox's unpaid-wage retaliation claim, there is adequate indirect evidence that Ruffin was aware of Fox's pest-strip retaliation claim to create a genuine dispute of fact as to causality for a jury to resolve.  McDonald's and Ruffin's denials amount to a credibility determination for the jury.  *See Rodriguez*, 72 F.3d at 1061 ("On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.").

### 3.  Starbucks's Reason for Fox's Termination

Because Fox has demonstrated a prima facie case of retaliation, the Court next considers whether there is a genuine dispute of material fact as to Starbucks's legitimate justification for Fox's termination and whether that justification is a mere pretext for unlawful retaliation. *See Mullins*, 626 F.3d at 53–54.

Starbucks's stated justifications—Fox's Fair Workweek noncompliance and Starbucks management's lack of trust in his ability to comply—is a legitimate and non-retaliatory justification sufficient for Starbucks to carry its burden. It is undisputed that Fox failed to post schedules on time, in violation of the Fair Workweek law, causing Starbucks to owe employees additional wages. Pls. 56.1 ¶ 100. And at the time of his termination, he was the only Starbucks store manager under investigation by the DCA. *Id.* ¶ 107.

Starbucks identifies additional violations cited by McDonald and Ruffin that justified Ruffin's decision. *Id.* ¶¶ 99–105. First, Ruffin stated that she saw Fox, rather than an employee, had completed schedule change logs, in violation of the Fair Workweek law. *Id.* ¶ 101. Second, McDonald concluded that Fox had hired externally rather than giving priority to Starbucks employees that wanted the shifts. *Id.* ¶ 102. And third, Ruffin was told by McDonald that Fox had not complied with an instruction to pay an employee at his store. *Id.* ¶ 103; Weber Decl., Ex. A at 193, Ex. K at 249.

The Court concludes, however, that there are genuine disputes about these three additional justifications. First, Fox stated in a sworn affidavit that Ruffin visited his store only on December 7, 2017, before he received the DCA complaint, and that Ruffin did not visit his store at a later date, when Starbucks contends she discovered the schedule-change violation. Graff Decl., Ex. 36 at 2. Notably, Ruffin could not recall the date of her visit. Weber Decl., Ex. A at 91–93. Nevertheless, Ruffin did provide this as a justification, relayed to her by McDonald,

for her decision.  *Id.* at 192–93. Second, Fox contends that he had permission to hire externally and denies that he disregarded shift requests from Starbucks employees.  Graff Decl., Ex. 36 at 2. The Court's review of Starbucks's record citations found only scattered evidence of this justification.  *See* Weber Decl., Ex. K at 190–200, 203–05, Ex. A at 190–200; Ex. J at 173–74. Third, there is significant ambiguity as to when and how McDonald instructed Fox to make a curative payment to an employee. *E.g.*, Weber Decl., Ex. K at 189–93.

Ultimately, however, Starbucks has proffered a legitimate, non-retaliatory justification adequate to shift the burden to Fox to demonstrate that the justification is pretext.  *See Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 245 (S.D.N.Y. 2013).

### 4. Fox's Showing of Pretext

In showing pretext, the plaintiff is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the "motivating" factors' for the decision."  *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 118 (S.D.N.Y. 2020) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).  Yet identifying "factual disputes [about the employer's justification] alone would not necessarily be sufficient to survive summary judgment."  *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008). Rather, a plaintiff may demonstrate that legitimate reasons are pretextual "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Kwan*, 737 F.3d at 846.

Fox primarily identifies three such inconsistencies or inaccuracies that, he argues, demonstrate Starbucks's justification for his termination is pretext for retaliation.  First, Fox emphasizes statements by Robyn Ruderman, Starbucks's counsel present at the February 2018 meeting, who spoke to DCA on behalf of Starbucks on February 28 and March 9, 2018.  Fox Br. 9; Pls. 56.1 ¶ 99; Graff Decl., Ex. 49 at RF157–58.  According to DCA's notes of those conversations, Ruderman told DCA that Fox was terminated for "overall work performance, ethics[,] and integrity"; "[m]ore [for] integrity issues than [Fair Workweek] procedures."  Graff Decl., Ex. 49 at RF157–58.  The notes further state that Starbucks concluded that predictability pay was owed and that Starbucks would pay it.  *Id.* at RF158.[7]

Yet "in order to infer pretext for a retaliatory motive from multiple justifications, a defendant's nonretaliatory justifications must be not merely different, *but inconsistent with one another.*"  *Richardson v. Bronx Lebanon Hosp.*, No. 11 CIV. 9095 KPF, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014) (emphasis added).  Ruderman's statements do not contradict Starbucks's stated justifications.  Ruffin stated that the combination of reported Fair Workweek violations led her to the conclusion that Fox was not being "transparen[t]" with his supervisors, which "indicated an integrity issue."  Weber Decl., Ex. A at 197–200; Pls. 56.1 ¶ 103. Ruderman's statement that Fox was terminated more because of such integrity concerns than for the violations themselves is thus wholly consistent with Ruffin's stated justification.  *See Richardson*, 2014 WL 4386731, at *18 ("The reasons put forward by Defendant are properly understood as multiple facets of a consistent rationale, rather than conflicting or contradictory accounts.").  It is therefore inadequate to raise a genuine dispute as to pretext.

---

[7] The Court notes, but does not decide, whether the DCA's notes of this conversation would be admissible.  *See* Fed. R. Evid. 801, 901; Reply Br. 4–5.

Second, Fox argues that some of Ruffin's justifications for terminating Fox were simply wrong. Fox Br. 9–10. In particular, he contends that he was not ordered by McDonald to issue curative payments to an employee, Pls. 56.1 ¶ 94, and that Ruffin herself did not identify errors in Fox's schedule-change logs as she later stated she did, *id.* ¶¶ 76–79. Fox further argues that Starbucks's justification is "implausible" because Fox had been "agitating for months to remedy the wage theft" he reported in November 2017 and because Starbucks, in Fox's estimation, did not remedy all unpaid wages but only terminated the prior store manager. Fox Br. 9–10; Pls. 56.1 ¶¶ 56, 65.

The Court assumes, as it must at summary judgment, that a reasonable jury could find Fox's factual disputes meritorious such that Ruffin's decision to terminate Fox was based in part on incorrect factual conclusions. Yet "[i]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012) (collecting cases); *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006); *see also, e.g.*, *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421 (2d Cir. 2021); *Goonewardena v. N.Y. State Workers' Comp. Bd.*, 788 F. App'x 779, 782 (2d Cir. 2019) ("[H]is employer's view of his performance, and not the accuracy of that view, is the proper focus of the pretext [inquiry.]"). Fox's disputes show that some, but not all, of Ruffin's beliefs about Fox's performance were factually incorrect. But Ruffin relied upon McDonald's reports of Fair Workweek violations, which Ruffin was permitted to do. *See Jacobs v. New York City Dep't of Educ.*, 768 F. App'x 86, 88 (2d Cir. 2019) (finding the contention that a report "is factually

incorrect . . . unavailing").  Similarly insufficient are Fox's suggestions that the investigations of his Fair Workweek violations were not thorough.  *See Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010) ("Even if the investigation was flawed . . . a faulty investigation is not in and of itself evidence of pretext.").

Fox also takes issue with the fact that Ruffin's decision was based on her "subjective perception" that Fox was not trustworthy or transparent.  Fox Br. 2.  Yet, inevitably "there is a subjective element to auditing" managers and "there is nothing to suggest that because there is this subjective element," Starbucks's "dissatisfaction with plaintiff's work was pretextual." *Robinson*, 892 F. Supp. 2d at 430.

Third, Fox argues that Starbucks's "outright deception" regarding the use of pest strips in its stores supports an inference of pretext and that its justification for terminating Fox for being "untrustworthy" is "inherent[ly]" implausible, raising a question of fact for the jury.  Fox Br. 14. Fox notes, for example, that Starbucks managers continued to purchase pest strips despite repeated emails from their supervisors not to do so, and that Starbucks has not fully investigated the use of pest strips or terminated managers that used them.  Pls. 56.1 ¶¶ 181–87.  These actions, Fox contends, contradict Starbucks's position that it "took aggressive action to attempt to remove all existing pest strips, and ensure new ones would not be purchased." *Id.* ¶ 34.

But Fox's factual contentions, again accepted as true, demonstrate that Starbucks's public statements condemning pest strips, and its internal emails instructing managers against their use, were inconsistent with its actual conduct that condoned their usage.  That hypocrisy regarding pest strips, however, simply does not create an inconsistent justification for Fox's termination.

Ultimately, it is undisputed that Fox violated the Fair Workweek law.  Pls. 56.1 ¶¶ 94–95, 100.  To be sure, several other Starbucks stores were found to be noncompliant.  *Id.* ¶ 100. But

the undisputed record demonstrates that McDonald and Ruffin concluded that the severity of

violations at Fox's store, and his lack of transparency to his supervisors, distinguished him from

other store managers who were audited during the same period. *Id.* ¶ 97.  More importantly, Fox

was the first store manager to be the subject of a DCA investigation and he was the only such

store manager under investigation at the time of his termination. *Id.* ¶¶ 85–86, 107, 119.  And

while Fox was the first store manager to be terminated for a Fair Workweek violation, he was not

the last: eight more followed that same year. *Id.* ¶ 119.  Even allowing all available inferences in

Fox's favor, these undisputed facts together, in the absence of a showing of pretext, entitle

Starbucks to summary judgment because it had a legitimate, non-retaliatory justification for

terminating Fox.

### C.  Negligent Infliction of Emotional Distress

Plaintiffs D'Auria and Shwiner claim negligent infliction of emotional distress caused by

Starbucks's use of pest strips in Starbucks stores that they serviced as employees of AVP.

Complaint at 22–24.  They report feeling fear, stress, and anxiety from repeated exposures to the

pest strips at Starbucks stores.  Pls. 56.1 ¶¶ 178, 191.  They each seek to recover damages for

emotional harms suffered. *Id.* ¶¶ 120, 127.

"A party can recover for emotional injury resulting from a breach of a duty of care under

New York law even if no physical injury occurs." *Sesto v. Slaine*, 171 F. Supp. 3d 194, 203–04

(S.D.N.Y. 2016) (citing *Taggart v. Costabile*, 14 N.Y.S.3d 388, 398 (N.Y. App. Div. 2015)).

But "the mental injury must be a direct, rather than a consequential, result of the breach, and the

claim must possess some guarantee of genuineness." *Id.* (quoting *Taggart*, 14 N.Y.S.3d at 398).

"The 'guarantee of genuineness' element can be satisfied either by showing a particular kind of

negligence recognized by the courts (e.g., mishandling of a corpse; transmitting false information

24

that a loved one has died), or by showing that a breach of duty owed to the injured party endangered that party's physical safety or caused them to fear for their physical safety." *Id.*

Starbucks attacks three elements of Plaintiffs' negligence claim.  First, Starbucks argues that it did not owe D'Auria and Shwiner a special duty.  Second, it argues that D'Auria and Shwiner's emotional distress lacks a guarantee of genuineness.  And third, Starbucks argues that its conduct would have satisfied any applicable duty of care.

The Court concludes that Starbucks did not owe a duty to D'Auria and Shwiner and that they have not demonstrated the necessary guarantee of genuineness, but it declines to decide whether Starbucks's conduct would have satisfied any duty of care owed.

### 1.  Starbucks's Duty to D'Auria and Shwiner

The duty required to state a negligent infliction of emotional distress claim "must be specific to the plaintiff" and is "far more specific than the more generalized duty to avoid negligently injuring another." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 285 (N.D.N.Y. 2018) (quoting *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 272 (N.D.N.Y. 2008), and *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005)).

Under New York law, a contractor "cannot recover for injuries received while doing an act to eliminate the cause of the injury." *Kowalsky v. Conreco Co.*, 190 N.E. 206, 207 (N.Y. 1934); *Hansen v. Trs. of the Methodist Episcopal Church of Glen Cove*, 858 N.Y.S.2d 303, 304 (N.Y. App. Div. 2008); *Bedneau v. N.Y. Hosp. Med. Ctr. of Queens*, 841 N.Y.S.2d 689, 690 (N.Y. App. Div. 2007).  This rule has several aspects to it:  An employer "need not guard against hazards inherent in the worker's work, hazards caused by the condition the worker is engaged to repair, or hazards which are readily observed by someone of the worker's age, intelligence, and experience." *Rojas v. 1000 42nd St., LLC*, 72 N.Y.S.3d 568, 569 (N.Y. App. Div. 2018).  A

contrary rule would, for example, "lead inexorably to the absurd conclusion that defendants'
duty was to hire a cleaning service to clean the premises for the cleaning service" that might
suffer an injury. *Imtanios v. Sachs*, 843 N.Y.S.2d 569, 572 (N.Y. App. Div. 2007).

Starbucks argues that it did not owe a duty to D'Auria and Shwiner because "removing
any pest strips found and replacing them with appropriate pest control device(s) was part of
D'Auria and Shwiner's job." Starbucks Br. 16. It further contends that the pesticide hazards that
D'Auria and Shwiner "were exposed to were part and parcel of their jobs as pest control
experts," *id.* at 18, and that "inherent in the work of pest control technicians hired to eradicate
pest-related issues is the risk that they may come into contact with pesticides or pest control
devices," *id.* at 19.

Plaintiffs contend that D'Auria and Shwiner were not hired to remove the pest strips and
that Starbucks's misuse of the pest strips was not an "inherent" condition of their pest control
work. Fox Br. 16–17. Summary judgment must be denied, they argue, because there is a
genuine dispute over the scope of D'Auria and Shwiner's work for Starbucks.

The parties agree that the "scope of the work that D'Auria and Shwiner performed for
Starbucks included inspecting Starbucks locations, solving pest control issues at Starbucks
locations, addressing and alerting management to any problems that existed, as well as correcting
these problems, all to ensure that the Starbucks locations AVP serviced were free of pests." Pls.
56.1 ¶ 18. The Court further concludes that there is no genuine dispute that the scope of D'Auria
and Shwiner's work included (1) the identification and occasional removal of pest strips, and (2)
an inherent risk during their work of exposure to DDVP from the pest strips. Starbucks has
proffered several pieces of evidence that put these facts beyond dispute. First, in an email sent
August 10, 2016, Shwiner stated to Kis, Starbucks Manager of Facilities Services, and copied

D'Auria, that Shwiner had "added on [AVP's] workorders that the 'removal of equipment will result in additional charges,' to help deter the stores.  Same with those no Pest strips, bug bombs or bug spray."  Kranz Decl., Ex. 2 at 1; Pls. 56.1 ¶ 20.  Plaintiffs argue that this email refers only to approved mouse traps, which Starbucks employees had been removing.  Pls. 56.1 ¶ 20.  That reading of the email exchange, however, completely disregards the last sentence, which expressly refers to the removal of "no Pest strips."  *Id.*

Second, in a September 29, 2017 email to Shwiner with the subject line "Hot Shots–Pest strips," Kis wrote "IF PAUL [D'AURIA] FINDS THEM, TOSS THEM OUT."  Kranz Decl., Ex. 3; Pls. 56.1 ¶ 21.  Attached to that email was a photo of one such pest strip.  Kranz Decl., Ex. 3.  Shwiner responded, "He has been," to which Kis replied, "Ok good."  *Id.*  Plaintiffs "[d]ispute that the cited email references the disposal of pest strips by D'Auria," but provide no other plausible interpretation of the email even after the completion of discovery.  Pls. 56.1 ¶ 21.  And Plaintiffs' vague suggestion that this email refers to some unrelated subject is belied by other emails that similarly request that D'Auria dispose of pest strips.  *E.g.*, Kranz Decl., Ex. 11 ("In future, when you see them or anything that shouldn't be there, throw them away," in response to Shwiner stating that "15 pest strips" had been found).

Third, AVP's employees were aware of pest-strip usage at Starbucks because Shwiner and D'Auria were asked to report unauthorized pesticides in Starbucks stores, including pest strips.  *E.g.*, Kis Reply Decl., Ex. 1, Dkt. No. 114 ("Jill [Shwiner] Please formulate a list of all stores that have pest strips found," to which Shwiner responded, "Ok").  Shwiner affirmed in her deposition that "it generally was AVP's practice to have the techs advise [her] of any pest strips that they found at the locations."  Graff Decl., Ex. 4 at 92.

27

And fourth, it is undisputed that D'Auria and Shwiner both encountered pest strips at other AVP clients, including Le Pain Quotidien and Macy's.  Pls. 56.1 ¶¶ 122, 131–32.  This supports a conclusion that the pest strips were a "hazard inherent in the duty" of Plaintiffs' work. *Wagner v. Wody*, 951 N.Y.S.2d 59, 60 (N.Y. App. Div. 2012).

Fox's contention that removal of pest strips was outside the scope of D'Auria and Shwiner's work rests on three pieces of evidence.  Pls. 56.1 ¶ 19, 21, 180.  First, they point to AVP's 2012 work proposal defining the program that AVP performs for Starbucks, which does not list the duty to remove pest strips or other unauthorized pesticides.  Graff Decl., Ex. 23.  Yet the proposal expressly states that it is "not limited to the following" tasks listed.  *Id.*  And one task that the proposal does list is to "address any conditions or reports as made by Starbucks staff," which could very well include responding to Starbucks's instructions to remove pest strips.  *Id.*  The Court finds this work proposal does not contravene the above evidence of D'Auria and Shwiner's work duties.

Second, Plaintiffs cite their job descriptions as produced by AVP.  Graff Decl., Ex. 51.  Neither description lists the removal of pest strips or other unauthorized pesticides.  But both descriptions are written in open-ended terms, using phrases like, "Responding to AVP customer concerns, questions and/or troubleshooting," "Practice and implement proper IPM (Integrated pest management) strategies," and "Monitor and ensuring NYS and NYC regulatory compliance and safety standards/procedures are met or exceeded."  *Id.*  The Court again finds that these job descriptions do not create a dispute as to D'Auria and Shwiner's work for Starbucks.

Last, Plaintiffs identify a portion of D'Auria's deposition in which he was asked whether Starbucks managers ever "advise[d] [him] to remove these pest strips?"  Graff Decl., Ex. 3 at 66.  D'Auria responded that they did "[o]n one occasion" but that "Shwiner informed them that we

wouldn't take responsibility to remove those because they . . . had to be disposed of a certain way." *Id.* "So," he continued, "we told Starbucks we were not going to touch those devices." *Id.* at 66–67; *see also id.* at 67 ("We were told to remove them, but we refused to remove them for liability reasons."). D'Auria explained further that this request was "sent to [Shwiner]" and that she "forwarded [the email] to [D'Auria]." *Id.* at 67. Though more supportive of Plaintiffs' position than the prior two pieces of evidence, D'Auria's statement that he was asked on one occasion to remove pest strips and refused to "take responsibility to remove" them ultimately does not contradict that on multiple other occasions Shwiner agreed that she and D'Auria would identify and remove pest strips as they were found.

The Court therefore determines that no reasonable jury could conclude, based on all evidence and construing it in the light most favorable to Plaintiffs, that Plaintiffs never agreed to remove pest strips as part of their work for Starbucks. Rather, remedying the hazard posed by the pest strips was part of what they were hired to do. *See Kowalsky*, 190 N.E. at 207.

Yet even if there were a dispute as to whether D'Auria and Shwiner were tasked by Starbucks to remove pest strips, the Court would still find, for the reasons above, that proximity to pest strips was an inherent and foreseeable hazard of D'Auria and Shwiner's work for Starbucks, which is an independent basis for finding that Starbucks did not owe a duty to guard Plaintiffs from the pest strips' danger. *See Steiner v. Benroal Realty Assocs., L.P.*, 736 N.Y.S.2d 702, 703 (N.Y. App. Div. 2002) ("When a worker confronts the ordinary and obvious hazards of his or her employment, and has the time and other resources (e.g., a co-worker) to proceed safely, a defendant may not be held responsible if the worker performs the job so incautiously as to be injured.").

### 2. Guarantees of Genuineness

The Court also concludes that D'Auria and Shwiner's claim lacks a guarantee of genuineness required by New York law.  "To maintain a cause of action for emotional distress caused by exposure to a toxic substance, a plaintiff must establish 'both that he or she was in fact exposed to a disease-causing agent and that there is a "rational basis" for his or her fear of contracting a disease.'"  *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 528 F. Supp. 2d 303, 311 (S.D.N.Y. 2007) (quoting *DiStefano v. Nabisco, Inc.*, 767 N.Y.S.2d 891, 891 (N.Y. App. Div. 2003)).  A rational basis is defined as "the clinically-demonstrable presence of a toxin in the plaintiff['s] body, or some other indication of a toxin-induced disease."  *Id.* (quoting *DiStefano*, 767 N.Y.S.2d at 891); *see also Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 281 (S.D.N.Y. 2008) ("The case law has narrowly defined 'rational basis' in this context to mean the demonstrable presence of the toxin in the plaintiff's body or a physical manifestation of the contamination."); *Abusio v. Consol. Edison Co. of N.Y.*, 656 N.Y.S.2d 371, 372 (N.Y. App. Div. 1997).

Here, D'Auria and Shwiner have not presented any evidence either that a toxin from the pest strips, such as DDVP, is in either of their bodies, or that they have otherwise suffered symptoms of a toxin-induced disease.  That undisputed fact alone is sufficient to grant Starbucks summary judgment on Plaintiffs' emotional-distress claim.  *See Kamdem-Ouaffo v. Pepsico, Inc.*, 21 N.Y.S.3d 150 (N.Y. App. Div. 2015) (granting defendant summary judgment because "plaintiff's deposition testimony . . . conceded that he had not been diagnosed with or treated for any effects of formaldehyde exposure"); *Prato v. Vigliotta*, 677 N.Y.S.2d 386, 388 (N.Y. App. Div. 1998) (granting defendant summary judgment because "although the respondents presented sufficient evidence to establish exposure to petroleum, they failed to present any clinical evidence of some physical manifestation of petroleum contamination").

Plaintiffs do not acknowledge this extensive body of case law.  They insist that D'Auria and Shwiner's fear of pest strips is "genuine," but proffer no record evidence necessary to satisfy the requirements of New York law.  Fox Br. 20.  The Court therefore concludes that there is no genuine dispute of material fact as to Plaintiffs' showing of a "rational basis" for their emotional distress.

Because the Court concludes for two independent reasons that Starbucks is entitled to summary judgment on Plaintiffs' negligent infliction of emotional distress claim, it does not decide Starbucks's additional argument that it satisfied the applicable duty of care owed to Plaintiffs.

IV.     Conclusion

For the reasons above, the Court GRANTS Starbucks's motion for summary judgment. This resolves docket number 95.  The Clerk of Court is respectfully directed to enter judgment and close the case.


SO ORDERED.

Dated: September 13, 2021
       New York, New York

_____
       ALISON J. NATHAN
     United States District Judge

31